IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

| | |
|---|---|
| REDSTONE LOGICS LLC,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>NVIDIA CORPORATION,<br><br>　　　　　Defendant. | CASE NO. 7:25-CV-00184 [ADA]<br><br>**JURY TRIAL DEMANDED** |

**DEFENDANT NVIDIA CORPORATION'S
OPENING CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................................... 1
II. BACKGROUND ............................................................................................................. 2
III. LEVEL OF ORDINARY SKILL IN THE ART ............................................................ 4
IV. AGREED UPON TERMS .............................................................................................. 4
V. DISPUTED TERMS ....................................................................................................... 5
    A.    "the first clock signal is independent from the second clock signal" ................. 5
        1.    The "independent" limitation's plain and ordinary meaning requires clock signals that depend from different reference oscillator clocks ......................................................................................... 5
        2.    Extrinsic evidence also supports NVIDIA's proposed construction .... 10
    B.    "located in a common region that is substantially central to the first set of processor cores and the second set of processor cores" .................................... 10
VI. CONCLUSION .............................................................................................................. 14

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
   713 F.3d 1090 (Fed. Cir. 2013)..........................................................................................9

*Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*,
   222 F.3d 951 (Fed. Cir. 2000)..............................................................................................9

*Interval Licensing LLC v. AOL, Inc.*,
   766 F.3d 1364 (Fed. Cir. 2014)....................................................................................11, 12

*KLA-Tencor Corp. v. Xitronix Corp.*,
   No. A-08-CA-723, 2011 WL 318123 (W.D. Tex. Jan. 31, 2011) .......................................11

*Medrad, Inc. v. MRI Devices Corp.*,
   401 F.3d 1313 (Fed. Cir. 2005)............................................................................................5

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014)............................................................................................................11

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005).......................................................................................5, 10

*Saffran v. Johnson & Johnson*,
   712 F.3d 549 (Fed. Cir. 2013)..............................................................................................9

I.      INTRODUCTION

The Court should adopt NVIDIA's proposals for the parties' two current claim construction disputes.  First, asserted independent claims 1 and 21 of US Patent No. 8,549,339 (the "'339 patent") require "independent" first and second clock signals.  The parties disagree whether that limitation in view of the intrinsic evidence means first and second signals are provided by different reference oscillators.  But that is exactly how a POSITA would understand the plain and ordinary meaning of the limitation when read in view of the specification and prosecution history.  The prosecution history is particularly telling.  Before the Patent Office, the applicant confronted two prior art references—Jacobowitz and Kim—that each had multiple clock signals produced by a single reference oscillator.  In response to the examiner's rejections based on that art, the applicant added the "independent" clock signals limitation to the claims.  The applicant distinguished each of Jacobowitz and Kim as failing to disclose the "independent" clock signals limitation ***because they have a single reference oscillator***.  In addition to establishing plain and ordinary meaning to a POSITA, applicant's clear statements also disclaimed all single reference oscillator implementations.  The scope of the "independent" clock signals limitation should be construed accordingly.  NVIDIA's proposed construction faithfully reflects the intrinsic record.

Second, claim 14 includes two phrases that a skilled person is unable to parse to reveal reasonably certain claim scope: "substantially central" and "common region."  The vague claim language raises serious questions about the boundaries of each phrase.  The specification and prosecution history do nothing to mitigate those concerns.  As a result, the phrases are indefinite, and claim 14 is invalid.  Indeed, both this Court and Magistrate Judge Gilliland have found claim 14 indefinite on three prior occasions in other cases.  The outcome here should be the same.

## II.     BACKGROUND

The '339 patent describes a multi-core processor with (i) a first set of processor cores that receives a first power supply and first clock signal and (ii) a second set of cores that receives a second power supply and second clock signal. Baxter Decl.[1] Ex. 1 ('399 patent), Abstract, 1:61-2:40. That purportedly differs from prior art multi-core processors where each core "generally shares the same supply voltage and clock signal." *Id.* at 1:7-14. The patent's approach to clock signals is illustrated below in annotated Figure 3, which includes three separate clock signals, "clock signal 1" (green), "clock signal 2" (red), and "clock signal 3" (blue) that provide separate inputs to "respective phase lock loops (PLLs)" 1, 2, and 3. *Id.* at 4:1-17, Fig. 3. Clock signals 1, 2, and 3 separately drive cores 152, 154, and 156, respectively. *Id.* Consistent with Figure 3, both asserted independent claims (1 and 21) of the '339 patent recite "a first phase lock loop (PLL) having a first clock signal as input" and "a second PLL having a second clock signal as input" wherein "the first clock signal is independent from the second clock signal."



---

[1] All references to "Baxter Decl." are to the Declaration of Elizabeth J. Baxter in support of this Brief.

In another litigation where Redstone asserts the '339 patent against Qualcomm, the Court construed the "independent" clock signals limitation to have "its plain-and-ordinary meaning, wherein the plain and ordinary meaning does not require that the first and second clock signals depend from different oscillator clocks." *Redstone Logics LLC v. Qualcomm Inc.*, No. 7:24-cv-231-ADA, Dkt. 43 at 19 (W.D. Tex. Oct. 15, 2025); *see also Redstone Logics LLC v. NXP Semiconductors N.V.*, No. 7:24-cv-28-DC-DTG, Dkt. 50 at 2 (W.D. Tex. Feb. 21, 2025).

The '339 patent also describes a "power control block" that provides supply voltage to processor cores and a "clock control block" that provides clock signals to the cores. Baxter Decl. Ex. 1, 2:27-31. Annotated Figure 1 below shows "power control block 108" and "clock control block 110" (yellow) "arranged at two different sides of the multi-core processor." *Id.* at 2:31-34. The patent mentions that the power and control blocks "may be arranged in a common area near the center of the multi-core processor" but provides no additional explanation. *Id.* at 2:34-40. Nor is there any figure to illustrate that potential implementation. Claim 14, which depends from claim 1, recites "one or more control blocks located in a common region that is substantially central to the first set of processor cores and the second set of processor cores."



In the *Qualcomm* case, the Court concluded that claim 14 is indefinite because a POSITA "would not understand with reasonable certainty the scope of 'substantially central.'" *Qualcomm*, Dkt. 43 at 33. Magistrate Judge Gilliland reached the same conclusion in two other cases when addressing the same issue. *NXP*, Dkt. 50 at 3; *Redstone Logics LLC v. MediaTek, Inc.*, No. 7:24-cv-29-DC-DTG, Dkt. 40 at 3 (W.D. Tex. Feb. 21, 2025).

### III.   LEVEL OF ORDINARY SKILL IN THE ART

A person of ordinary skill in the art ("POSITA") at the time of the alleged invention would have had at least a bachelor's degree in electrical engineering, computer engineering, computer science, or a similar field, as well as at least two years of academic or industry experience designing or analyzing electronic circuits, semiconductors, processors, or power management, and related firmware and software, or the equivalent. A POSITA with a higher level of education may have fewer years of academic or industry experience, or vice versa. Declaration of Dr. Massoud Pedram in Support of Defendant NVIDIA Corporation's Opening Claim Construction Brief ("Pedram Decl.") ¶ 25.

### IV.   AGREED UPON TERMS

The parties have agreed on the following construction.

| Claim(s) | Term | Agreed Construction |
|---|---|---|
| 1, 21 | "a [first/second] set of processor cores" | "a [first/second] group of two or more processor cores" |

V.  **DISPUTED TERMS**

    A.  **"the first clock signal is independent from the second clock signal"**

| Claim(s) | Redstone's Proposal | NVIDIA's Proposal |
|---|---|---|
| 1, 21 | Plain and ordinary meaning | "the first and second clock signals depend from different reference oscillator clocks" |

For this limitation, the intrinsic record shows that "independent" clock signals must originate from different reference oscillator clocks. NVIDIA's proposed construction tracks a POSITA's understanding of the plain and ordinary meaning of the limitation based on the intrinsic evidence. In particular, the applicant's statements to overcome prior art during prosecution support NVIDIA's position. Those statements clearly disclaimed any broader interpretation of the claim limitation. For these reasons, NVIDIA's proposed construction is correct and should be adopted.

    1.  **The "independent" limitation's plain and ordinary meaning requires clock signals that depend from different reference oscillator clocks**

Claim terms "are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (citation omitted). Determining that meaning requires examining the context provided by the "written description and the prosecution history." *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) (citation omitted).

Here, the intrinsic record supports NVIDIA's proposed construction for the "independent" clock signals limitation. The patent describes that a set of cores "may be associated with an . . . *independent clock domain* defined by a clock signal."[2] Baxter Decl. Ex. 1, at 2:26-31. Annotated

---

[2] All emphases added unless otherwise noted.

Figure 3 below illustrates the point with three separate clock signals (1, 2, 3) provided to three separate PLLs (1, 2, 3) that send output clock signals to three separate cores (152, 154, 156).  *Id.* at 4:4-10.  These teachings are consistent with having multiple reference oscillators (the circuits that originate clock signals) that provide the separate clock signals to the separate PLLs.  Pedram Decl. ¶¶ 28, 40.



The prosecution history confirms that the claimed "independent" clock signals require different reference oscillators.  The examiner originally rejected the application claims that later issued as independent claims 1 and 21 based on Jacobowitz (U.S. Pat. Pub. No. 2009/0106576).  Baxter Decl. Ex. 2 ('339 patent file history), at 71-73.  Jacobowitz discloses a multi-core processor that "distribute[s] the [single] system reference oscillator clock frequency ($v_R$) [orange] to each local oscillator 108 [also orange]," as shown in annotated Figure 6 from Jacobowitz below.  Baxter Decl. Ex. 3 (Jacobowitz) ¶ 38.



FIG. 6

During prosecution, the applicant explicitly distinguished the claimed "independent clock signals" from Jacobowitz's single reference oscillator. In an examiner interview, the applicant said that in Figure 3 of the '339 patent, "clock signals 1 through 3 were different/***independent*** clock signals input to the PLLs while Jacobowitz disclosed using a ***single reference clock***." Baxter Decl. Ex. 2, at 95. It follows from this statement that ***multiple*** "different reference oscillator clocks" are required to generate the claimed "independent" clock signals, as proposed in NVIDIA's construction. The examiner agreed with the applicant's assertion but determined that the as-filed claims were broad enough to encompass Jacobowitz's single reference oscillator approach. *Id.* Two days later, the applicant amended the claims to add that "the first clock signal is independent from the second clock signal." *Id.* at 83, 86-87. The applicant then argued that Jacobowitz did not teach the claimed "independent" clock signals. *Id.* at 90.

The applicant's statement to the examiner makes clear that different reference oscillators are required to generate "independent" clock signals. Thus, contrary to the analysis in *Qualcomm*, Dkt. 43 at 19, the applicant distinguished Jacobowitz for having a single reference oscillator.

Indeed, the applicant amended the claim to avoid Jacobowitz's single reference oscillator design by injecting the "independent" clock signals limitations.

The applicant's admissions about the scope of the "independent" clock signals limitation did not end there. The applicant was also forced to grappled with the examiner's rejections based on Kim (U.S. Pat. Pub. No. 2009/0138737). Baxter Decl. Ex. 2, at 73-76. Kim describes a single reference oscillator that provides a signal that is divided and distributed to multiple PLLs. Baxter Decl. Ex. 4 (Kim) ¶ 25. As shown below in annotated Figure 2 from Kim, clock source 270 (orange) sends a signal to main PLL 260 (also orange), which divides that signal and provides inputs (orange arrows) to each of PLL1 through PLL4. *Id*. The applicant argued that Kim "fails to disclose or teach . . . a first clock signal is independent from the second clock signal" because "*[i]nstead*, *Kim* discloses . . . a **single clock source** (i.e., 170 in FIG. 1 or 270 in FIG. 2)." Baxter Decl. Ex. 2, at 90-91. The applicant's use of the word "instead" establishes that clock signals that originate from a single reference oscillator are outside the scope of the limitation. If a "single clock source" cannot provide "independent" clock signals, the only reasonable conclusion is that "different reference oscillator clocks" are required, as proposed in NVIDIA's construction.



FIG. 2

The intrinsic evidence establishes that "independent" clock signals require multiple reference oscillators. A POSITA reading the specification and prosecution history would understand this claim term requires that the first and second clock signals depend from different reference oscillator sources, as reflected in NVIDIA's proposed construction. Pedram Decl. ¶¶ 40-51.

In addition, the circumstances here meet the standard for prosecution-based disclaimer. The applicant's statements during prosecution of the '339 patent clearly surrendered claim scope. The statements are not ambiguous to a POSITA. Pedram Decl. ¶¶ 41-43, 46-50. "[W]hen the patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent," that disavowal limits the meaning of the claim term. *See Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013). Redstone is bound by the applicant's disavowal. *See, e.g.*, *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 956-57 (Fed. Cir. 2000) (finding disavowal based on inventor's statements during prosecution even though the patent had been assigned to another entity).

In the *Qualcomm* case, the Court concluded there was no disclaimer relating to the applicant's statements about Kim. NVIDIA respectfully disagrees. The Court noted that Kim allegedly fails to disclose providing first and second clocks signals to separate sets of cores. *Qualcomm*, Dkt. 43 at 15-17. But while the applicant argued that Kim fails to disclose the claimed first and second signals, it separately distinguished Kim as lacking "independent" clock signals. "[A]n applicant's argument that a prior art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well." *See Saffran v. Johnson & Johnson*, 712 F.3d 549, 559 (Fed. Cir. 2013) (citation omitted). Here, the applicant explained in no uncertain terms that "[i]nstead" of "independent"

clock signals, Kim discloses a multicore processor "having a single clock source." Baxter Decl. Ex. 2, at 90. The Court suggested that the applicant may have understood Kim to disclose a single clock signal and, for that reason, lacked "independent" clock signals. *Qualcomm*, Dkt. 43 at 17-19. But the applicant expressly provided Kim's "single source clock" as the only reason why the reference's clock signals are not independent and therefore do not read on the claims as amended. The Court also states that the applicant did not distinguish Jacobowitz for having a single clock source, which indicates there was no disclaimer. *Qualcomm*, Dkt. 43 at 19. As described above, however, the applicant distinguished Jacobowitz's single clock source from the claimed "independent" clock signals.

### 2. Extrinsic evidence also supports NVIDIA's proposed construction

Extrinsic evidence is helpful to determining "what a person of ordinary skill in the art would understand claim terms to mean." *Phillips*, 415 F.3d at 1317-19. Here, dictionary definitions support that a POSITA would have understood "independent" clock signals as separate and not depending from the same source. Baxter Decl. Ex. 5 (The Oxford English Dictionary) (defining "independent" as "[n]ot depending upon another for its value"); *id*. Ex. 6 (New Oxford American Dictionary) ("independent" means "separate"). NVIDIA's proposed construction is consistent with these definitions.

### B. "located in a common region that is substantially central to the first set of processor cores and the second set of processor cores"

| Claim(s) | Redstone's Proposal | NVIDIA's Proposal |
|---|---|---|
| 14 | Plain and ordinary meaning | Indefinite |

The dispute for this term is straightforward. NVIDIA contends that the limitation is indefinite and therefore invalid, as this Court has held before. Redstone disagrees. NVIDIA's

argument centers on two phrases from the limitation: "substantially central" and "common region." For both, the '339 patent does not provide a POSITA with reasonable certainty about claim scope. *Nautilus*, *Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014) (claim is indefinite when it "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention"). That renders claim 14 indefinite.

Turning first to "substantially central," that phrase is a subjective term of degree. Such terms are often indefinite because they lack objective boundaries. *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) ("[A] term of degree fails to provide sufficient notice of its scope if it depends 'on the unpredictable vagaries of any one person's opinion.'" (citation omitted)). So it is here. The claim language, specification, and file history fail to provide an objective standard for the scope of "substantially central." *KLA-Tencor Corp. v. Xitronix Corp.*, No. A-08-CA-723, 2011 WL 318123, at *3 (W.D. Tex. Jan. 31, 2011) ("[W]hen there is no objective standard by which to determine the scope of the word of degree, the word of degree renders the claims indefinite."); Pedram Decl. ¶¶ 63-65, 68.

To begin with, the claim language is rife with ambiguity. The claims do not require any specific arrangement for the processor cores, making it difficult for a POSITA to evaluate whether the claimed "common region" that includes "control blocks" is "substantially central" to those sets of cores. *Qualcomm*, Dkt. 43 at 32; Pedram Decl. ¶ 63. And regardless of the cores' location, it is unclear what it means for the "common region" to be "substantially central" to the cores. *Qualcomm*, Dkt. 43 at 33; Pedram Decl. ¶¶ 63-68. The figures below provide examples of physical layouts for a "common region" with "control blocks" and "sets of processor cores." Both figures illustrate the ambiguity in the phrase "substantially central." In the top example, the common region of control blocks is located in the center of the figure among four core sets positioned in

the corners. Does this configuration satisfy the claim limitation? If so, how far from the center of the figure (right or left, up or down) can the common region be shifted and still qualify as "substantially central?" The bottom example includes a common region of control blocks located below two core sets in the upper corners of the figure. This potential configuration raises even more questions. Is the common region of control blocks shown in the figure "substantially central" to the core sets? Or does the common region need to be situated in between the two sets of cores to be "substantially central?" The claim language leaves these questions unanswered. Pedram Decl. ¶¶ 63, 66-67.



For its part, the specification provides no guidance. *See Interval Licensing*, 766 F.3d at 1371 ("Where, as here, we are faced with a 'purely subjective' claim phrase, we must look to the

written description for guidance." (citation omitted)); Pedram Decl. ¶¶ 63-65, 68. As the Court has recognized, the specification never mentions the words "central" and "substantially central." *Qualcomm*, Dkt. 43 at 32. And while the term "substantially" appears twice in the specification, neither instance relates to the physical relationship between the "common region" and sets of processor cores. *See* Baxter Decl. Ex. 1, at 4:24-27 ("For ease of description, the transition processing routine 400 is described in terms of a set of processor cores and interface blocks substantially similar to those described previously with respect to FIG. 3."); *id.* at 6:56-57 ("the use of substantially any plural and/or singular terms herein"). The specification also mentions that the control blocks "may be arranged in a common area located near the center of the multi-core processor," *id.* at 2:37-40, but "near the center" is just as vague as "substantially central." *Qualcomm*, Dkt. 43 at 33. A POSITA is left to wonder what it means to be "near the center." Pedram Decl. ¶ 65. Furthermore, the passage in the specification is irrelevant because it refers to positioning the "common region" relative to the "multi-core processor," not the different sets of cores. The prosecution history is silent on these issues. Based on the intrinsic evidence, a POSITA would not understand the scope of "substantially central" with reasonable certainty. Pedram Decl. ¶¶ 62, 68.

The phrase "common region" is likewise indefinite. As a threshold matter, it is unclear whether the "common region" includes just the "control blocks" or extends to the sets of processor cores. Pedram Decl. ¶¶ 56-59. In the *Qualcomm* case, the Court accepted the premise that the "common region" includes the sets of cores, citing the specification. *Qualcomm*, Dkt. 43 at 32 (citing Baxter Decl. Ex. 1, at 2:20-23). But the claim language is vague. It refers to core sets and control blocks without clearly delineating which of those are part of the claimed "common region." The specification deepens the ambiguity. Although the portion of the specification cited by the

Court states that a "multi-core processor may be divided into regions," Baxter Decl. 1 Ex. 1, at 2:20-23, another sentence in the same paragraph notes that "the power control block 108 and the clock control block 110 may be arranged in a common area" with no mention of cores, *id.* at 2:37-40.

The limitation raises other issues. Does a "common region" require intermingling the structures for the control blocks (and possibly the core sets) in the same space? Or does it suffice if separate structures are located near one another? If nearness is sufficient, how close together must the structures be to be considered within a "common region?" The specification and prosecution history are no help. The '339 patent never uses the phrase "common region." The specification describes one embodiment with two control blocks "arranged in a common area." *See* Baxter Decl. Ex. 1, at 2:37-40. But "common area" is merely another way to say "common region," which raises the same issues described above. Under the circumstances, a POSITA would not know the scope of the claimed "common region" with reasonable certainty. Pedram Decl. ¶¶ 60, 68. That provides a second reason why claim 14 is indefinite.

## VI. CONCLUSION

NVIDIA respectfully requests that the Court adopt its proposed construction for the "independent" limitation and find claim 14 indefinite.

Dated: October 27, 2025

Respectfully submitted,

/s/ *Tyler R. Bowen*
Chad S. Campbell, Bar No. 012080
Tyler R. Bowen, Bar No. 025376
Jaymin Patel, Bar No. 037693*
Elizabeth J. Baxter, Bar No. 037969*
**PERKINS COIE LLP**
2525 E. Camelback Road, Suite 500
Phoenix, Arizona 85016-4227
Tel.: 602-351-8000

Fax: 602-648-7000
CSCampbell@perkinscoie.com
TBowen@perkinscoie.com
JPatel@perkinscoie.com
EBaxter@perkinscoie.com

Philip A. Morin, Bar No. 256864*
**PERKINS COIE LLP**
11452 El Camino Real, Suite 300
San Diego, California 92130-2080
Tel.: 858-720-5700
Fax: 858-720-5799
PMorin@perkinscoie.com

Shaun W. Hassett, SBN 24074372
Michael E. Jones, SBN 10929400
**POTTER MINTON, P.C.**
102 North College, Suite 900
Tyler, Texas 75702
Tel.: 903-525-2272
Fax: 903-531-3972
ShaunHassett@potterminton.com
MikeJones@potternminton.com

*Attorneys for Defendant NVIDIA Corporation*

*Admitted *Pro Hac Vice*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been filed on October 27, 2025 and made available to all counsel of record via the Court's CM/ECF system.

*/s/ Indy LaFever*
Indy LaFever
