**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION**

| | |
|---|---|
| REDSTONE LOGICS LLC, | CASE NO. 7:25-CV-00184 [ADA] |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| NVIDIA CORPORATION, | |
| Defendant. | |

**DECLARATION OF ELIZABETH J. BAXTER IN SUPPORT OF
DEFENDANT NVIDIA CORPORATION'S OPENING CLAIM
CONSTRUCTION BRIEF**

I, Elizabeth J. Baxter, declare as follows:

1.    I am admitted pro hac vice to practice in the Western District of Texas and am an attorney at the law firm of Perkins Coie, LLP, counsel of record for NVIDIA Corporation ("NVIDIA") in the above-captioned action.  I submit this declaration in support of NVIDIA's Opening Claim Construction Brief in the above-captioned matter.

2.    Attached hereto as **Exhibit 1** is a true and correct copy of U.S. Patent No. 8,549,339.

3.    Attached hereto as **Exhibit 2** is a true and correct copy of the prosecution file history for U.S. Patent No. 8,549,339.

4.    Attached hereto as **Exhibit 3** is a true and correct copy of U.S. Patent Pub. No. 2009/0106576 ("Jacobowitz").

5.    Attached hereto as **Exhibit 4** is a true and correct copy of U.S. Patent Pub. No. 2009/0138737 ("Kim").

6.    Attached hereto as **Exhibit 5** is a true and correct copy of a highlighted excerpt from *The Oxford English Dictionary*, (2nd ed.) (copyright 1989, Oxford Univ. Press).

7.    Attached hereto as **Exhibit 6** is a true and correct copy of a highlighted excerpt from *New Oxford American Dictionary*, (3d ed.) (copyright 2010, Oxford Univ. Press).

8.    Attached hereto as **Exhibit 7** is a true and correct copy of the public application note AND8248/D titled "System Clock Generators: A Comparison of a PLL Synthesizer vs. a Crystal Oscillator Clock" by Casey Stys and Paul Shockman ("Stys").

9.    Attached hereto as **Exhibit 8** is a true and correct copy of U.S. Patent No. 7,538,625 ("Cesky").

I declare under penalty of perjury under the laws of the United States that to the best of my knowledge and recollection the foregoing is true and correct.

**EXECUTED** this 27th day of October, 2025, in Phoenix, Arizona.


_____

Elizabeth J. Baxter

# Exhibit 1

US008549339B2

(12) **United States Patent**
Wolfe et al.

(10) Patent No.: **US 8,549,339 B2**
(45) Date of Patent: **Oct. 1, 2013**

(54) **PROCESSOR CORE COMMUNICATION IN MULTI-CORE PROCESSOR**

(75) Inventors: **Andrew Wolfe**, Los Gatos, CA (US); **Marc Elliot Levitt**, San Jose, CA (US)

(73) Assignee: **Empire Technology Development LLC**, Wilmington, DE (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 524 days.

(21) Appl. No.: **12/713,220**

(22) Filed: **Feb. 26, 2010**

(65) **Prior Publication Data**

US 2011/0213991 A1    Sep. 1, 2011

(51) **Int. Cl.**
*G06F 1/08* (2006.01)
*G06F 1/32* (2006.01)

(52) **U.S. Cl.**
USPC .......................... **713/322**; 713/320; 713/501

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,711,447 | B1 | 3/2004 | Saeed |
| 7,219,245 | B1 | 5/2007 | Raghuvanshi |
| 7,248,838 | B2 * | 7/2007 | Goodnow et al. ............... 455/70 |
| 7,263,457 | B2 | 8/2007 | White et al. |
| 7,735,037 | B2 | 6/2010 | Tell |
| 7,853,808 | B2 | 12/2010 | Kim et al. |
| 8,225,315 | B1 * | 7/2012 | Cheng et al. ...................... 718/1 |
| 2009/0106576 | A1 * | 4/2009 | Jacobowitz et al. ......... 713/501 |
| 2009/0138737 | A1 * | 5/2009 | Kim et al. ..................... 713/322 |
| 2010/0162018 | A1 * | 6/2010 | Subramanian et al. ....... 713/322 |
| 2010/0188115 | A1 * | 7/2010 | von Kaenel ..................... 326/16 |

OTHER PUBLICATIONS

Notification of Transmittal of the International Search Report and the Written Opinion of the International Searching Authority, May 17, 2011.

Joonho Kong et al "Low-Cost Application-Aware DVFS for Multi-Core Architecture", Third 2008 International Conference on Convergence and Hybrid Information Technology, IEEE Computer Society, 2008, pp. 106-111.
Reinaldo Bergamaschi et al., "Exploring Power Management in Multi-Core Systems", IEEE, 2008, pp. 708-713 (Downloaded on Jul. 13, 2009 from IEEE Xplore).
Wayne H. Cheng et al "Dynamic Voltage and Frequency Scaling Circuits with Two Supply Voltages", IEEE, 2008, pp. 1236-1239 (Downloaded on Jul. 14, 2009 from IEEE Xplore).
Wonyoung Kim et al "System Level Analysis of Fast, Per-Core DVFS using On-Chip Switching Regulators", High Performance Computer Architecture, IEEE 14th International Symposium, Feb. 16-20, 2008, pp. 123-134.
Howlett-Packard Corporation et al., "Advanced Configuration and Power Interface Specification", Oct. 10, 2006, pp. 1-631 (represented by 4 different files), Revision 3.0b.
Micah Schmidt, "Nehalem: Xeon Gets Core i7 Upgrade", 2CPU.com, Mar 29, 2009 <http://www.2cpu.com/review.php?id=117>.
"Third-Generation AMD Opteron Processor Key Architectural Features", Waybackmachine, Oct. 20, 2007 <http://www.amd.com/us-en/Processors/ProductInformation/0,,30_118_8796_15224,00.html>.

* cited by examiner

*Primary Examiner* — Dennis M Butler
(74) *Attorney, Agent, or Firm* — Ren-Sheng International

(57) **ABSTRACT**

Embodiments of the disclosure generally set forth techniques for handling communication between processor cores. Some example multi-core processors include a first set of processor cores in a first region of the multi-core processor configured to dynamically receive a first supply voltage and a first clock signal, a second set of processor cores in a second region of the multi-core processor configured to dynamically receive a second supply voltage and a second clock signal, and an interface block coupled to the first set of processor cores and the second set of processor cores, wherein the interface block is configured to facilitate communications between the first set of processor cores and the second set of processor cores.

**23 Claims, 5 Drawing Sheets**





**FIG. 1**



**FIG. 2**



**FIG. 3**



400



402 — Receive Clock Frequency Change Request

404 — Idle Communication between Stripes

406 — Examine PLL Blocks of Requesting Stripe and Adjacent Stripes

YES

408 — Does Each of PLL Blocks Acquire a Lock?    NO

YES

410 — Determine Whether to Resume Communication between Stripes

**FIG. 4**

500 A computer program product

502 at least one of

one or more instructions for receiving a request of changing the
clock frequency;

one or more instructions for issuing a command to idle
communication with the first region;

one or more instructions for examining whether a first phase lock
loop operation associated with the first region has acquired a first
lock signal in response to the request; and/or

one or more instructions for examining whether a second phase lock
loop operation associated with a second region of processor cores
in the multi-core processor has acquired a second lock signal in
response to the request, wherein the second region is adjacent to
the first region

504 a signal bearing
medium

506 a communication
medium

508 a computer readable
medium

510 a recordable
medium

**FIG. 5**

US 8,549,339 B2

**1**

# PROCESSOR CORE COMMUNICATION IN MULTI-CORE PROCESSOR

## BACKGROUND OF THE DISCLOSURE

A multi-core processor includes two or more independent processor cores arranged in an array. Each processor core in a conventional multi-core processor generally shares the same supply voltage and clock signal to simplify the interfaces between the processor cores. For power consumption management, dynamic supply voltage and clock speed control may be utilized, so that a multi-core processor may operate at high power and high clock frequency when needed and at low power when the computing requirements are reduced.

## BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing and other features of the present disclosure will become more fully apparent from the following description and appended claims, taken in conjunction with the accompanying drawings. These drawings depict only several embodiments in accordance with the disclosure and are, therefore, not to be considered limiting of its scope. The disclosure will be described with additional specificity and detail through use of the accompanying drawings.

FIG. **1** illustrates an example configuration of a multi-core processor;

FIG. **2** is a block diagram illustrating an example set of processor cores with example interface blocks having level shifters;

FIG. **3** is another block diagram illustrating an example set of processor cores with example interface blocks having synchronizers;

FIG. **4** is a flow chart illustrating an example transition processing routine for managing a clock frequency change; and

FIG. **5** is a block diagram illustrating an example computer program product for handling processor core communication in a multi-core processor; all arranged in accordance with at least some embodiments of the present disclosure.

## DETAILED DESCRIPTION

In the following detailed description, reference is made to the accompanying drawings, which form a part hereof. In the drawings, similar symbols typically identify similar components, unless context dictates otherwise. The illustrative embodiments described in the detailed description, drawings, and claims are not meant to be limiting. Other embodiments may be utilized, and other changes may be made, without departing from the spirit or scope of the subject matter presented here. It will be readily understood that the aspects of the present disclosure, as generally described herein, and illustrated in the Figures, can be arranged, substituted, combined, and designed in a wide variety of different configurations, all of which are explicitly contemplated and make part of this disclosure.

This disclosure is drawn, inter alia, to devices, methods, systems, and computer programs related to power management for a multi-core processor.

A multi-core processor may include multiple processor cores arranged in an array. A power profile associated with an individual processor core may be controlled through signals that may be received from control blocks that are located in the periphery of the multi-core processor. The power profile may include, without limitation, one or more power-supply voltages of the core processor, clock rates of the core processor, clock multipliers of the core processor, power throttling of the core processor, and/or sleep state cycles of the core processor.

FIG. **1** illustrates an example configuration of a multi-core processor **100** that is arranged in accordance with at least some embodiments of the present disclosure. The multi-core processor **100** may include multiple processor cores **102** arranged in rows and columns in a 2-dimensional array in an integrated circuit. A processor core may be coupled with adjacent processor cores through an interface circuit **120**. In some implementations, the processor cores **102** may be horizontally coupled to one another, vertically coupled to one another, and/or diagonally coupled to one another by the interface circuit **120**. In some example implementations, the processor core **102** located on one edge of the multi-core processor **100** may also be coupled to the processor core **102** on the opposite edge with a wrap-around connection **122**, which may be employed to ensure a continuous connection among the processor cores in the same row and/or column.

The multi-core processor **100** may be further divided into regions. In some implementations, the regions of multi-core processor **100** may correspond to rows of the two-dimensional array, and the regions may or may not be overlapping. Each row of processors may also be referred to as a "stripe." For example, the multi-core processor **100** may be divided into stripes **112**, **114**, **116**, and **118**. Each stripe may be associated with an independent power profile. For example, the stripe **112** may be powered by a supply voltage received from a power control block **108** and/or may be associated with an independent clock domain defined by a clock signal received from a clock control block **110**. In some implementations, the power control block **108** and the clock control block **110** may be arranged at two different sides of the multi-core processor **100** as shown in FIG. **1**. In some other implementations, the power control block **108** and the clock control block **110** may be arranged at the same side of the multi-core processor **100**. In yet some other implementations, the power control block **108** and the clock control block **110** may be arranged in a common area located near the center of the multi-core processor **100**.

The power profile associated with a stripe may be determined based on the computational requirements of the tasks assigned to the processor cores in the stripe. In some implementations, sensors placed at the input of each processor core may be configured to measure the supply voltage and the local temperature for the processor core. The measured supply voltage and local temperature may be maintained in the power control block **108**. One or more performance counters associated with each processor core may also provide feedback to the power control block **108**. Based on the measured operational information (e.g., supply voltage and local temperature) and the performance data, the power control block **108** may then be configured to select a supply voltage for each strip. For example, the tasks with the highest computational requirements may be scheduled into the topmost stripe, such as the stripe **112**. The stripe **112** may be configured to operate at a high supply voltage. The tasks with lesser computational requirements may be scheduled into the stripe **114** and so forth. The stripes **114**, **116**, and **118** thus may be configured to operate lower supply voltages.

In some implementations, supply voltages to the stripes may be selected such that the selected supply voltages for adjacent stripes may differ by a limited amount. This limited amount may be based on a relationship between the output voltage level associated with one stripe and the input voltage level associated with an adjacent stripe. For example, suppose the stripe with the higher supply voltage (e.g., the stripe **112**)

**3**

may be associated with an output voltage level (e.g., $V_o$). $V_o$ needs to fall reliably within an acceptable input voltage level range (e.g., $V_{i+}$ to $V_{i-}$) for an adjacent stripe (e.g., the stripe **114**). In other words, the power control block **108** may be configured to select the supply voltages to the stripe **112** and the stripe **114**, so that the aforementioned relationship between $V_o$ and range $V_{i+}$ to $V_{i-}$ may be maintained.

To maintain the limited differential relationship discussed above, adjusting the supply voltage to one stripe may involve adjusting the supply voltages to the other stripes. To illustrate, suppose the power control block **108** may adjust the supply voltage to the stripe **112**. To maintain the limited differential relationship, the power control block **108** may adjust the supply voltages to the stripes **118**, **116**, and **114** before adjusting the supply voltage to the stripe **112**.

Although dynamically adjusting the power profile for a stripe in response to changes in computational requirements may reduce power consumption for a multi-core processor, such adjustments may take some period of time to stabilize. To further illustrate the interfaces that facilitate communication between two processor cores in the multi-core processor **100**, a subset **150** of processor cores **152**, **154**, and **156** of FIG. **1** may be selected. The processor core **152** belongs to the stripe **112**; the processor core **154** belongs to the stripe **114**; and the processor core **156** belongs to the stripe **116**.

FIG. **2** is a block diagram illustrating an example subset **150** of processor cores with example interface blocks having level shifters, arranged in accordance with at least some embodiments of the present disclosure. The processor core **152** may be powered by a supply voltage **1** and coupled to an interface block **200** having a level shifter **202**; the processor core **154** may be powered by a supply voltage **2** and coupled to the same interface block **200**; and the processor core **156** may be powered by a supply voltage **3** and coupled to an interface block **204** having a level shifter **206**. In some implementations, the inputs of the level shifter **202** may be the supply voltage **1** and the supply voltage **2**, and the inputs of the level shifter **206** may be the supply voltage **2** and the supply voltage **3**. The supply voltage **1**, the supply voltage **2**, and the supply voltage **3** may come from a power control block, such as the power control block **108** of FIG. **1**.

When the processor core **152** of the stripe **112** sends a signal to the processor core **154** of the stripe **114**, in some implementations, the output voltage of the level shifter **202** may be tied to the supply voltage **2**, and the input voltage of the level shifter **202** may be tied to the supply voltage **1**. The level shifters are arranged to translate the signal levels such that each of the processor cores operates correctly (e.g., the processor cores properly interpret the voltages as valid logic levels even though processor cores are powered by different supply voltages). Here, the level shifter **202** may be adapted to translate first logic levels associated with the stripe **112** to second logic levels associated with the stripe **114**, and the level shifter **202** may be referenced to the supply voltage **2**. On the other hand, when the processor core **154** of the stripe **114** sends a signal to the processor core **152** of the stripe **112**, the output voltage of the level shifter **202** may be tied to the supply voltage **1**, and the input voltage of the level shifter **202** may be tied to the supply voltage **2**. In other words, the level shifter **202** may be adapted to translate second logic levels associated with the stripe **114** to first logic levels associated with stripe **112**, and the level shifter **202** may be referenced to the supply voltage **1**. The relationships among the supply voltage **1**, supply voltage **2**, and the level shifter **202** described above similarly apply to the relationships among the supply voltage **2**, supply voltage **3**, and the level shifter **206**.

**4**

FIG. **3** is another block diagram illustrating an example subset **150** of processor cores with example interface blocks having synchronizers, arranged in accordance with at least some embodiments of the present disclosure. The processor core **152** may be driven by a clock signal **1** and coupled to an interface block **300** having a synchronizer **302**; the processor core **154** may be driven by a clock signal **2** and coupled to the same interface block **300**; and the processor core **156** may be driven by a clock signal **3** and coupled to an interface block **304** having a synchronizer **306**. In some implementations, the clock signal **1**, the clock signal **2**, the clock signal **3**, and the respective phase lock loops (PLLs) may be a part of a clock control block, such as the clock control block **110**. The processing results of the PLL blocks may be fed back to a transition processing routine **308**. Commands generated by the transition processing routine **308** may also be sent to the synchronizer **302** and/or the synchronizer **306**.

As discussed above, when the power profile for a stripe changes, such as a change in clock frequency, the clock signal for the stripe may become unstable. To handle such a situation, FIG. **4** is a flow chart illustrating an example transition processing routine **400** for managing a clock frequency change, arranged in accordance with at least some embodiments of the present disclosure. For ease of description, the transition processing routine **400** is described in terms of a set of processor cores and interface blocks substantially similar to those described previously with respect to FIG. **3**. The transition processing routine **400** may include one or more functions, operations, or actions as depicted by operations **402**, **404**, **406**, **408**, and/or **410**. In some implementations, the various features of the illustrated operations for the transition processing routine **400** may be combined into fewer operations, divided into additional operations, or eliminated based on the desired result.

Processing for the transition processing routine **400** may begin at operation **402**, "receive clock frequency change request." Operation **402** may be followed by operation **404**, "idle communication between stripes." Operation **404** may be followed by operation **406**, "examine PLL blocks of requesting stripe and adjacent stripe(s)." Operation **406** may be followed by operation **408**, "does each of PLL blocks acquire a lock?" Operation **408** may be followed by either operation **406** when the decision logic tested at block **408** fails to be satisfied (NO), or operation **410**, "determine whether to resume communication between stripes", when the decision logic tested at block **408** is satisfied (YES). Processing for the routine may terminate after block **410**.

For illustration, suppose the processor core **154** of the stripe **114** in FIG. **3** is asked to change its clock frequency based on the tasks that are being assigned to the stripe **114** for processing. After having received the request in operation **402**, the transition processing routine **400** may issue commands to the synchronizer **302** and the synchronizer **306** in operation **404** to idle the communications between the processor core **154** and the processor core **152** and between the processor core **154** and the processor core **156**. Following operation **404**, the outputs of the PLL blocks for the stripes that are adjacent to the stripe **114** may be examined in operation **406**. Depending on whether the PLL blocks have acquired locks as determined in operation **408**, the transition processing routine **400** may decide in operation **410** whether the transition sequence has occurred properly and the communication between the stripes may resume.

In some implementations, after each of the PLL block **1**, PLL block **2**, and PLL block **3** is determined to have acquired a lock of its respective clock signal in operation **408**, a stable clock signal may be sent to the processor core **154** and also the

US 8,549,339 B2

**5**

synchronizer **302** and the synchronizer **306**. Then, the synchronizer **302** may be configured to synchronize the clock signal **1** and the clock signal **2** for the communication between the processor core **152** and the processor core **154**. Similarly, the synchronizer **306** may be configured to synchronize the clock signal **2** and the clock signal **3** for the communication between the processor core **154** and the processor core **156**.

FIG. **5** is a block diagram illustrating a computer program product **500** for handling processor core communication in a multi-core processor in accordance with at least some embodiments of the present disclosure. Computer program product **500** may include one or more sets of executable instructions **502** for executing the transition processing routine described above and illustrated in FIG. **4**. Computer program product **500** may be transmitted in a signal bearing medium **504** or another similar communication medium **506**. Computer program product **500** may also be recorded in a computer readable medium **508** or another similar recordable medium **510**.

There is little distinction left between hardware and software implementations of aspects of systems; the use of hardware or software is generally (but not always, in that in certain contexts the choice between hardware and software can become significant) a design choice representing cost vs. efficiency tradeoffs. There are various vehicles by which processes and/or systems and/or other technologies described herein can be effected (e.g., hardware, software, and/or firmware), and that the preferred vehicle will vary with the context in which the processes and/or systems and/or other technologies are deployed. For example, if an implementer determines that speed and accuracy are paramount, the implementer may opt for a mainly hardware and/or firmware vehicle; if flexibility is paramount, the implementer may opt for a mainly software implementation; or, yet again alternatively, the implementer may opt for some combination of hardware, software, and/or firmware.

The foregoing detailed description has set forth various embodiments of the devices and/or processes via the use of block diagrams, flowcharts, and/or examples. Insofar as such block diagrams, flowcharts, and/or examples contain one or more functions and/or operations, it will be understood by those within the art that each function and/or operation within such block diagrams, flowcharts, or examples can be implemented, individually and/or collectively, by a wide range of hardware, software, firmware, or virtually any combination thereof. In one embodiment, several portions of the subject matter described herein may be implemented via Application Specific Integrated Circuits (ASICs), Field Programmable Gate Arrays (FPGAs), digital signal processors (DSPs), or other integrated formats. However, those skilled in the art will recognize that some aspects of the embodiments disclosed herein, in whole or in part, can be equivalently implemented in integrated circuits, as one or more computer programs running on one or more computers (e.g., as one or more programs running on one or more computer systems), as one or more programs running on one or more processors (e.g., as one or more programs running on one or more microprocessors), as firmware, or as virtually any combination thereof, and that designing the circuitry and/or writing the code for the software and/or firmware would be well within the skill of one of skill in the art in light of this disclosure. In addition, those skilled in the art will appreciate that the mechanisms of the subject matter described herein are capable of being distributed as a program product in a variety of forms, and that an illustrative embodiment of the subject matter described herein applies regardless of the particular type of signal bearing medium used to actually carry out the distribution. Examples of a signal bearing medium include, but are not limited to, the following: a recordable type medium such as a floppy disk, a hard disk drive, a Compact Disc (CD), a Digital Video Disk (DVD), a digital tape, a computer memory, etc.; and a transmission type medium such as a digital and/or an analog communication medium (e.g., a fiber optic cable, a waveguide, a wired communications link and/or channel, a wireless communication link and/or channel, etc.).

**6**

Those skilled in the art will recognize that it is common within the art to describe devices and/or processes in the fashion set forth herein, and thereafter use engineering practices to integrate such described devices and/or processes into data processing systems. That is, at least a portion of the devices and/or processes described herein can be integrated into a data processing system via a reasonable amount of experimentation. Those having skill in the art will recognize that a typical data processing system generally includes one or more of a system unit housing, a video display device, a memory such as volatile and non-volatile memory, processors such as microprocessors and digital signal processors, computational entities such as operating systems, drivers, graphical user interfaces, and applications programs, one or more interaction devices, such as a touch pad or screen, and/or control systems including feedback loops and control motors (e.g., feedback for sensing position and/or velocity; control motors for moving and/or adjusting components and/or quantities). A typical data processing system may be implemented utilizing any suitable commercially available components, such as those typically found in data computing/communication and/or network computing/communication systems.

The herein described subject matter sometimes illustrates different components contained within, or connected with, different other components. It is to be understood that such depicted architectures are merely exemplary, and that in fact many other architectures can be implemented which achieve the same functionality. In a conceptual sense, any arrangement of components to achieve the same functionality is effectively "associated" such that the desired functionality is achieved. Hence, any two components herein combined to achieve a particular functionality can be seen as "associated with" each other such that the desired functionality is achieved, irrespective of architectures or intermedial components. Likewise, any two components so associated can also be viewed as being "operably connected", or "operably coupled", to each other to achieve the desired functionality, and any two components capable of being so associated can also be viewed as being "operably couplable", to each other to achieve the desired functionality. Specific examples of operably couplable include but are not limited to physically mateable and/or physically interacting components and/or wirelessly interactable and/or wirelessly interacting components and/or logically interacting and/or logically interactable components.

With respect to the use of substantially any plural and/or singular terms herein, those having skill in the art can translate from the plural to the singular and/or from the singular to the plural as is appropriate to the context and/or application. The various singular/plural permutations may be expressly set forth herein for sake of clarity.

It will be understood by those within the art that, in general, terms used herein, and especially in the appended claims (e.g., bodies of the appended claims) are generally intended as "open" terms (e.g., the term "including" should be interpreted as "including but not limited to," the term "having" should be interpreted as "having at least," the term "includes"

US 8,549,339 B2

7

should be interpreted as "includes but is not limited to," etc.). It will be further understood by those within the art that if a specific number of an introduced claim recitation is intended, such an intent will be explicitly recited in the claim, and in the absence of such recitation no such intent is present. For example, as an aid to understanding, the following appended claims may contain usage of the introductory phrases "at least one" and "one or more" to introduce claim recitations. However, the use of such phrases should not be construed to imply that the introduction of a claim recitation by the indefinite articles "a" or "an" limits any particular claim containing such introduced claim recitation to inventions containing only one such recitation, even when the same claim includes the introductory phrases "one or more" or "at least one" and indefinite articles such as "a" or "an" (e.g., "a" and/or "an" should typically be interpreted to mean "at least one" or "one or more"); the same holds true for the use of definite articles used to introduce claim recitations. In addition, even if a specific number of an introduced claim recitation is explicitly recited, those skilled in the art will recognize that such recitation should typically be interpreted to mean at least the recited number (e.g., the bare recitation of "two recitations," without other modifiers, typically means at least two recitations, or two or more recitations). Furthermore, in those instances where a convention analogous to "at least one of A, B, and C, etc." is used, in general such a construction is intended in the sense one having skill in the art would understand the convention (e.g., "a system having at least one of A, B, and C" would include but not be limited to systems that have A alone, B alone, C alone, A and B together, A and C together, B and C together, and/or A, B, and C together, etc.). In those instances where a convention analogous to "at least one of A, B, or C, etc." is used, in general such a construction is intended in the sense one having skill in the art would understand the convention (e.g., "a system having at least one of A, B, or C" would include but not be limited to systems that have A alone, B alone, C alone, A and B together, A and C together, B and C together, and/or A, B, and C together, etc.). It will be further understood by those within the art that virtually any disjunctive word and/or phrase presenting two or more alternative terms, whether in the description, claims, or drawings, should be understood to contemplate the possibilities of including one of the terms, either of the terms, or both terms. For example, the phrase "A or B" will be understood to include the possibilities of "A" or "B" or "A and B."

While various aspects and embodiments have been disclosed herein, other aspects and embodiments will be apparent to those skilled in the art. The various aspects and embodiments disclosed herein are for purposes of illustration and are not intended to be limiting, with the true scope and spirit being indicated by the following claims.

We claim:

1. A multi-core processor, comprising:
a first set of processor cores of the multi-core processor, wherein each processor core from the first set of processor cores is configured to dynamically receive a first supply voltage and a first output clock signal of a first phase lock loop (PLL) having a first clock signal as input;
a second set of processor cores of the multi-core processor, wherein each processor core from the second set of processor cores is configured to dynamically receive a second supply voltage and a second output clock signal of a second PLL having a second clock signal as input, wherein the first supply voltage is independent from the second supply voltage, and the first clock signal is independent from the second clock signal; and

8

an interface block coupled to the first set of processor cores and also coupled to the second set of processor cores, wherein the interface block is configured to facilitate communication between the first set of processor cores and the second set of processor cores.

2. The multi-core processor of claim 1, wherein the interface block further comprises a first level shifter that is referenced to the second supply voltage and adapted to translate first logic levels associated with the first set of processor cores to second logic levels associated with the second set of processor cores for a first signal traveling from the first set of processor cores to the second set of processor cores.

3. The multi-core processor of claim 1, wherein the interface block further comprises a second level shifter that is referenced to the first supply voltage and adapted to translate second logic levels associated with the second set of processor cores to first logic levels associated with the first set of processor cores for a second signal traveling from the second set of processor cores to the first set of processor cores.

4. The multi-core processor of claim 1, wherein the interface block further comprises a synchronizer configured to synchronize the first clock signal and the second clock signal for communication between one or more processor cores of the first set of processor cores and one or more processor cores of the second set of processor cores.

5. The multi-core processor of claim 1, wherein the first set of processor cores and the second set of processor cores are configured to receive one or more control signals from one or more control blocks located in a periphery of the multi-core processor.

6. The multi-core processor of claim 5, wherein the first set of processor cores is adjacent to the second set of processor cores, and the one or more control blocks are configured to select the first supply voltage and the second supply voltage to maintain a differential relationship between the first supply voltage and the second supply voltage.

7. The multi-core processor of claim 6, wherein the differential relationship is based on having an output voltage level associated with the first set of processor cores to be within an acceptable input voltage level associated with the second set of processor cores.

8. The multi-core processor of claim 1, wherein the first set of processor cores are located in a first region of the multi-core processor, and the second set of processor cores are located in a second region of the multi-core processor.

9. The multi-core processor of claim 8, wherein the first region and the second region are overlapping regions of the multi-core processor.

10. The multi-core processor of claim 8, wherein the first region and the second region are non-overlapping regions of the multi-core processor.

11. The multi-core processor of claim 8, wherein the first region corresponds to a first row of the multi-core processor, and wherein the second region corresponds to a second row of the multi-core processor.

12. The multi-core processor of claim 1, wherein the interface block is configured to idle communications between the first set of processor cores and the second set of processor cores when one or more of the first output clock signal and/or the second output clock signal is determined to have changed.

13. The multi-core processor of claim 12, wherein the interface block is configured to resume communication between the first set of processor cores and the second set of processor cores after one or more of the first output clock signal and/or the second output clock signal is determined to have stabilized.

US 8,549,339 B2

9

**14**. The multi-core processor of claim **1**, wherein the first set of processor cores and the second set of processor cores are configured to receive one or more control signals from one or more control blocks located in a common region that is substantially central to the first set of processor cores and the second set of processor cores.

**15**. A method for managing communications in a multi-core processor that includes a plurality of processor cores having a first set of processor cores and a second set of processor cores, the method comprising:

idling communications between the first set of processor cores and the second set of processor cores in response to a clock frequency change request for the first set of processor cores; and

resuming communications between the first set of processor cores and the second set of processor cores after having determined that a first phase lock loop operation associated with a first clock signal for the first set of processor cores has acquired a first lock signal and a second phase lock loop operation associated with a second clock signal for the second set of processor cores has also acquired a second lock signal, wherein the first clock signal is independent from the second clock signal.

**16**. The method of claim **15**, wherein resuming communications further comprises having determined that a third phase lock loop operation associated with a third set of processor cores in the multi-core processor has acquired a third lock signal, wherein the third set of processor cores is adjacent to the first set of processor cores.

**17**. The method of claim **16**, wherein the second set of processor cores is adjacent to the first set of processor cores.

**18**. A non-transitory computer-readable medium containing a sequence of instructions to manage communications in a multi-core processor that includes a plurality of processor cores having a first set of processor cores and a second set of processor cores, which when executed by a computing device, causes the computing device to:

issue a first command to idle communications between the first set of processor cores and the second set of processor cores in response to a clock frequency change request for the first set of processor cores;

issue a second command to resume communications between the first set of processor cores and the second set of processor cores after having determined that a first phase lock loop operation associated with a first clock signal for the first set of processor cores has acquired a first lock signal and a second phase lock loop operation associated with a second clock signal for the second set

10

of processor cores has also acquired a second lock signal, wherein the first clock signal is independent from the second clock signal.

**19**. The non-transitory computer-readable medium of claim **18**, further including a sequence of instructions, which when executed by the computing device, causes the computing device to determine whether a third phase lock loop operation associated with a third set of processor cores in the multi-core processor has acquired a third lock signal before issuing the second command, wherein the third set of processor cores is adjacent to the first set of processor cores.

**20**. The non-transitory computer-readable medium of claim **19**, wherein the second set of processor cores is adjacent to the first set of processor cores.

**21**. A multi-core processor, comprising:

a first set of processor cores of the multi-core processor, wherein each processor core from the first set of processor cores is configured to dynamically receive a first supply voltage from a power control block and a first output clock signal from a first phase lock loop (PLL) having a first clock signal as input in a clock control block;

a second set of processor cores of the multi-core processor, wherein each processor core from the second set of processor cores is configured to dynamically receive a second supply voltage from the power control block and a second output clock signal from a second PLL having a second clock signal as input in the clock control block, wherein the first supply voltage is independent from the second supply voltage, and the first clock signal is independent from the second clock signal; and

an interface block coupled to the first set of processor cores and also coupled to the second set of processor cores, wherein the interface block is configured to facilitate communication between the first set of processor cores and the second set of processor cores.

**22**. The multi-core processor of claim **21**, wherein the interface block is configured to idle communications between the first set of processor cores and the second set of processor cores when one or more of the first output clock signal and/or the second output clock signal is determined to have changed.

**23**. The multi-core processor of claim **22**, wherein the interface block is configured to resume communication between the first set of processor cores and the second set of processor cores after one or more of the first output clock signal and/or the second output clock signal is determined to have stabilized.

\*     \*     \*     \*     \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 8,549,339 B2                                  Page 1 of 1
APPLICATION NO.  : 12/713220
DATED                  : October 1, 2013
INVENTOR(S)        : Wolfe et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page

In Item (56), under "OTHER PUBLICATIONS", in Column 2, Line 1, delete "al" and insert -- al., --, therefor.

In Item (56), under "OTHER PUBLICATIONS", in Column 2, Line 8, delete "al" and insert -- al., --, therefor.

In Item (56), under "OTHER PUBLICATIONS", in Column 2, Line 11, delete "al" and insert -- al., --, therefor.

In Item (56), under "OTHER PUBLICATIONS", in Column 2, Line 15, delete "Howlett-Packard" and insert -- Hewlett-Packard --, therefor.

In the Specifications

In Column 5, Line 61, delete "and or" and insert -- and/or --, therefor.

In the Claims

In Column 9, Line 7, in Claim 15, delete "for managing" and insert -- to manage --, therefor.

Signed and Sealed this
Sixth Day of May, 2014

Michelle K. Lee

Michelle K. Lee
*Deputy Director of the United States Patent and Trademark Office*

Exhibit 2

Attorney Docket No. 121-0019-US-REG

## United States Patent Application
### POWER OF ATTORNEY

I, the undersigned, as an authorized representative for EMPIRE TECHNOLOGY DEVELOPMENT LLC, of 2711 Centerville Road, Suite 400, Wilmington, New Castle County, Delaware 19808, U.S.A., hereby revoke all previous powers of attorney in the following application:

| U.S. APPLICATION NUMBER | DATE OF FILING (day, month, year) | FIRST NAMED INVENTOR | TITLE |
|---|---|---|---|
| | | Andrew Wolfe | PROCESSOR CORE COMMUNICATION IN MULTI-CORE PROCESSOR |

I hereby appoint the Practitioner *Ren-Sheng International IP Management Ltd., 17F-1, No. 151, Sec. 4, XinYi Road, Taipei, Taiwan* (s) associated with the following Customer Number as attorney(s) or agent(s) to prosecute the application identified above, and to transact all business in the United States Patent and Trademark Office connected therewith:

> **83,446**
> **U.S. PATENT & TRADEMARK OFFICE**
> **CUSTOMER NUMBER**

Please direct all correspondence for the above-identified application to the address associated with the above-identified customer number.

For: _____ EMPIRE TECHNOLOGY DEVELOPMENT LLC _____

By: _____ ERIC BELL _____        Title: AUTHORIZED PERSON

Signature: _____        Date: 2/22/10

Page 1 of 1

PTO/SB/14 (07-07)
Approved for use through 08/30/2010. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 121-0019-US-REG |
|---|---|---|
| | Application Number | |

| Title of Invention | PROCESSOR CORE COMMUNICATION IN MULTI-CORE PROCESSOR |
|---|---|

The application data sheet is part of the provisional or nonprovisional application for which it is being submitted. The following form contains the bibliographic data arranged in a format specified by the United States Patent and Trademark Office as outlined in 37 CFR 1.76.
This document may be completed electronically and submitted to the Office in electronic format using the Electronic Filing System (EFS) or the document may be printed and included in a paper filed application.

# Secrecy Order 37 CFR 5.2

☐ Portions or all of the application associated with this Application Data Sheet may fall under a Secrecy Order pursuant to 37 CFR 5.2 (Paper filers only. Applications that fall under Secrecy Order may not be filed electronically.)

# Applicant Information:

**Applicant 1** [Remove]

**Applicant Authority** ⦿ Inventor   ◯ Legal Representative under 35 U.S.C. 117   ◯ Party of Interest under 35 U.S.C. 118

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Andrew | | WOLFE | |

**Residence Information (Select One)** ⦿ US Residency   ◯ Non US Residency   ◯ Active US Military Service

| City | Los Gatos | State/Province | CA | Country of Residence i | US |
|---|---|---|---|---|---|

| Citizenship under 37 CFR 1.41(b) i | US |
|---|---|

**Mailing Address of Applicant:**

| Address 1 | 108 Leewood Ct. |
|---|---|
| Address 2 | |

| City | Los Gatos | State/Province | CA |
|---|---|---|---|

| Postal Code | 95032 | Country i | US |
|---|---|---|---|

**Applicant 2** [Remove]

**Applicant Authority** ⦿ Inventor   ◯ Legal Representative under 35 U.S.C. 117   ◯ Party of Interest under 35 U.S.C. 118

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Marc | Elliot | LEVITT | |

**Residence Information (Select One)** ⦿ US Residency   ◯ Non US Residency   ◯ Active US Military Service

| City | San Jose | State/Province | CA | Country of Residence i | US |
|---|---|---|---|---|---|

| Citizenship under 37 CFR 1.41(b) i | US |
|---|---|

**Mailing Address of Applicant:**

| Address 1 | 5615 Brookhurst Ct. |
|---|---|
| Address 2 | |

| City | San Jose | State/Province | CA |
|---|---|---|---|

| Postal Code | 95129 | Country i | US |
|---|---|---|---|

All Inventors Must Be Listed - Additional Inventor Information blocks may be generated within this form by selecting the **Add** button.   [Add]

# Correspondence Information:

Enter either Customer Number or complete the Correspondence Information section below.
For further information see 37 CFR 1.33(a).

PTO/SB/14 (07-07)
Approved for use through 08/30/2010. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 121-0019-US-REG |
|---|---|---|
| | Application Number | |

| Title of Invention | PROCESSOR CORE COMMUNICATION IN MULTI-CORE PROCESSOR |
|---|---|

☐ **An Address is being provided for the correspondence Information of this application.**

| Customer Number | 83446 |
|---|---|
| Email Address | gsu@suipconsulting.com    [Add Email] [Remove Email] |

## Application Information:

| Title of the Invention | PROCESSOR CORE COMMUNICATION IN MULTI-CORE PROCESSOR | |
|---|---|---|
| Attorney Docket Number | 121-0019-US-REG | **Small Entity Status Claimed** ☐ |
| Application Type | Nonprovisional | |
| Subject Matter | Utility | |
| Suggested Class (if any) | | Sub Class (if any) |
| Suggested Technology Center (if any) | | |
| Total Number of Drawing Sheets (if any) | 5 | **Suggested Figure for Publication (if any)** 2 |

## Publication Information:

☐ Request Early Publication (Fee required at time of Request 37 CFR 1.219)

☐ **Request Not to Publish.** I hereby request that the attached application not be published under 35 U.S.C. 122(b) and certify that the invention disclosed in the attached application **has not and will not** be the subject of an application filed in another country, or under a multilateral international agreement, that requires publication at eighteen months after filing.

## Representative Information:

Representative information should be provided for all practitioners having a power of attorney in the application. Providing this information in the Application Data Sheet does not constitute a power of attorney in the application (see 37 CFR 1.32). Enter either Customer Number or complete the Representative Name section below. If both sections are completed the Customer Number will be used for the Representative Information during processing.

| Please Select One: | ⦿ Customer Number | ◯ US Patent Practitioner | ◯ Limited Recognition (37 CFR 11.9) |
|---|---|---|---|
| Customer Number | 83446 | | |

## Domestic Benefit/National Stage Information:

This section allows for the applicant to either claim benefit under 35 U.S.C. 119(e), 120, 121, or 365(c) or indicate National Stage entry from a PCT application. Providing this information in the application data sheet constitutes the specific reference required by 35 U.S.C. 119(e) or 120, and 37 CFR 1.78(a)(2) or CFR 1.78(a)(4), and need not otherwise be made part of the specification.

| Prior Application Status | | [Remove] |
|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing Date (YYYY-MM-DD) |

Additional Domestic Benefit/National Stage Data may be generated within this form by selecting the **Add** button.    [Add]

PTO/SB/14 (07-07)
Approved for use through 06/30/2010.  OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 121-0019-US-REG |
|---|---|---|
| | Application Number | |

| Title of Invention | PROCESSOR CORE COMMUNICATION IN MULTI-CORE PROCESSOR |
|---|---|

## Foreign Priority Information:

This section allows for the applicant to claim benefit of foreign priority and to identify any prior foreign application for which priority is not claimed. Providing this information in the application data sheet constitutes the claim for priority as required by 35 U.S.C. 119(b) and 37 CFR 1.55(a).

| | | | Remove |
|---|---|---|---|
| Application Number | Country $^i$ | Parent Filing Date (YYYY-MM-DD) | Priority Claimed |
| | | | ◯ Yes  ⦿ No |

Additional Foreign Priority Data may be generated within this form by selecting the **Add** button. | Add

## Assignee Information:

Providing this information in the application data sheet does not substitute for compliance with any requirement of part 3 of Title 37 of the CFR to have an assignment recorded in the Office.

| **Assignee** $^1$ | | Remove |
|---|---|---|

| If the Assignee is an Organization check here. | ☒ |
|---|---|

| Organization Name | Empire Technology Development LLC |
|---|---|

**Mailing Address Information:**

| **Address 1** | 2711 Centerville Road, Suite 400 | | |
|---|---|---|---|
| Address 2 | | | |
| **City** | Wilmington | **State/Province** | DE |
| **Country** $^i$  US | | Postal Code | 19808 |
| Phone Number | | Fax Number | |
| Email Address | | | |

Additional Assignee Data may be generated within this form by selecting the **Add** button. | Add

## Signature:

A signature of the applicant or representative is required in accordance with 37 CFR 1.33 and 10.18. Please see 37 CFR 1.4(d) for the form of the signature.

| **Signature** | /Gene Su/ | | | Date  (YYYY-MM-DD) | 2010-02-25 |
|---|---|---|---|---|---|
| First Name | Gene | Last Name | Su | Registration Number | 45140 |

This collection of information is required by 37 CFR 1.76.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14.  This collection is estimated to take 23 minutes to complete, including gathering, preparing, and submitting the completed application data sheet form to the USPTO.  Time will vary depending upon the individual case.  Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.      The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.

2.      A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.      A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.      A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.      A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.      A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.      A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.      A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.      A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

**005**

Attorney Docket No. 121-0019-US-REG

## United States Patent Application
### DECLARATION UNDER 37 C.F.R. § 1.63

As a below named inventor, I hereby declare that:

My residence, mailing address, and citizenship are as stated below next to my name.

I believe I am the original, first and sole inventor (if only one name is listed below) or an original, first and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled:

### *PROCESSOR CORE COMMUNICATION IN MULTI-CORE PROCESSOR*

The specification of which:

☒ is attached hereto
☒ was filed on _____ as United States Patent Application Serial No. or PCT
International Application No. _____ and was amended on _____ *(if applicable).*

I hereby state that I have reviewed and understand the contents of the above-identified specification, including the claim(s), as amended by any amendment specifically referred to above.

I acknowledge the duty to disclose all information which is material to patentability as defined in 37 C.F.R. § 1.56, including for continuation-in-part applications, material information which became available between the filing date of the prior application and the national or PCT international filing date of the continuation-in-part application.

### PRIORITY CLAIMS

I hereby claim foreign priority benefits under Title 35 U.S.C. § 119(a)-(d) or (f) or § 365(b) of any foreign application(s) for patent or inventor's certificate, or § 365(a) of any PCT international application(s) which designated at least one country other than the United States of America listed below and have also identified, by checking the box, any foreign application(s) for patent or inventor's certificate or any PCT international application(s) having a filing date before that of the application(s) on which priority is claimed.

☒ no such applications have been filed.
☒ such applications have been filed as follows:

| COUNTRY | APPLICATION NUMBER | DATE OF FILING (day, month, year) | PRIORITY CLAIMED UNDER § 119 or § 365 | |
|---------|--------------------|-----------------------------------|---------------------------------------|---|
| | | | ☒YES | NO ☒ |
| | | | ☒YES | NO ☒ |
| | | | ☒YES | NO ☒ |
| | | | ☒YES | NO ☒ |

Attorney Docket No. 121-0019-US-REG

I hereby claim the benefit under Title 35, United States Code, § 120/365 of any United States and PCT international application(s) listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States application in the manner provided by the first paragraph of Title 35, United States Code, § 112, I acknowledge the duty to disclose material information as defined in Title 37, Code of Federal Regulations, § 1.56(a) which occurred between the filing date of the prior application and the national or PCT international filing date of this application.

▨ no such applications have been filed.
   such applications have been filed as follows:

| U.S. APPLICATION NUMBER | DATE OF FILING (day, month, year) | STATUS (patented, pending, abandoned) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

I hereby claim the benefit under Title 35, United States Code § 119(e) of any United States provisional application(s) listed below:

▨ no such applications have been filed.
▨ such applications have been filed as follows:

| U.S. PROVISIONAL APPLICATION NUMBER | DATE OF FILING (day, month, year) |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

Page 2 of 4

Attorney Docket No. 121-0019-US-REG

## DECLARATION

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001 and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

| | |
|---|---|
| Given Name: | Andrew Wolfe |
| Inventor's Signature: | _____ Date 2/10/10 |
| Residence: | Los Gatos, CA, USA     Citizenship:    USA |
| Mailing Address: | 108 Leewood Ct. |
| | Los Gatos, CA 95032, US |

| | |
|---|---|
| Given Name: | Marc Elliot Levitt |
| Inventor's Signature: | _____ Date 2-11-10 |
| Residence: | San Jose, CA, USA     Citizenship:    USA |
| Mailing Address: | 5616 Brookhurst Ct., |
| | San Jose, CA 95129, USA |

Page 3 of 4

Attorney Docket No. 121-0019-US-REG

### 37 C.F.R. § 1.56 Duty to disclose information material to patentability.

(a)      A patent by its very nature is affected with a public interest. The public interest is best served, and the most effective patent examination occurs when, at the time an application is being examined, the Office is aware of and evaluates the teachings of all information material to patentability. Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section. The duty to disclose information exists with respect to each pending claim until the claim is cancelled or withdrawn from consideration, or the application becomes abandoned. Information material to the patentability of a claim that is cancelled or withdrawn from consideration need not be submitted if the information is not material to the patentability of any claim remaining under consideration in the application. There is no duty to submit information which is not material to the patentability of any existing claim. The duty to disclose all information known to be material to patentability is deemed to be satisfied if all information known to be material to patentability of any claim issued in a patent was cited by the Office or submitted to the Office in the manner prescribed by §§ 1.97(b)-(d) and 1.98. However, no patent will be granted on an application in connection with which fraud on the Office was practiced or attempted or the duty of disclosure was violated through bad faith or intentional misconduct. The Office encourages applicants to carefully examine:

(1)      Prior art cited in search reports of a foreign patent office in a counterpart application, and

(2)      The closest information over which individuals associated with the filing or prosecution of a patent application believe any pending claim patentably defines, to make sure that any material information contained therein is disclosed to the Office.

(b)      Under this section, information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and

(1)      It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or

(2)      It refutes, or is inconsistent with, a position the applicant takes in:

(i)      Opposing an argument of unpatentability relied on by the Office, or

(ii)      Asserting an argument of patentability.

A prima facie case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability.

(c)      Individuals associated with the filing or prosecution of a patent application within the meaning of this section are:

(1)      Each inventor named in the application;

(2)      Each attorney or agent who prepares or prosecutes the application; and

(3)      Every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application.

(d)      Individuals other than the attorney, agent or inventor may comply with this section by disclosing information to the attorney, agent, or inventor.

(e)      In any continuation-in-part application, the duty under this section includes the duty to disclose to the Office all information known to the person to be material to patentability, as defined in paragraph (b) of this section, which became available between the filing date of the prior application and the national or PCT international filing date of the continuation-in-part application.

Sheet 1 of 5
PROCESSOR CORE COMMUNICATION IN MULTI-CORE PROCESSOR
Wolfe et al.
121-0019-US-REG

100



**FIG. 1**



**FIG. 2**

Sheet 3 of 5
PROCESSOR CORE COMMUNICATION IN MULTI-CORE PROCESSOR
Wolfe et al.
121-0019-US-REG



**FIG. 3**

012

Sheet 4 of 5
PROCESSOR CORE COMMUNICATION IN MULTI-CORE PROCESSOR
Wolfe et al.
121-0019-US-REG

<u>400</u>



402    Receive Clock Frequency Change Request

404    Idle Communication between Stripes

406    Examine PLL Blocks of Requesting Stripe and Adjacent Stripes

YES

408    Does Each of PLL Blocks Acquire a Lock?    NO

YES

410    Determine Whether to Resume Communication between Stripes

**<u>FIG. 4</u>**

500 A computer program product

502 at least one of

one or more instructions for receiving a request of changing the clock frequency;

one or more instructions for issuing a command to idle communication with the first region;

one or more instructions for examining whether a first phase lock loop operation associated with the first region has acquired a first lock signal in response to the request; and/or

one or more instructions for examining whether a second phase lock loop operation associated with a second region of processor cores in the multi-core processor has acquired a second lock signal in response to the request, wherein the second region is adjacent to the first region

504 a signal bearing medium

506 a communication medium

508 a computer readable medium

510 a recordable medium

**FIG. 5**

PATENT APPLICATION FOR:


PROCESSOR CORE COMMUNICATION IN MULTI-CORE PROCESSOR


INVENTORS:


ANDREW WOLFE

MARC ELLIOT LEVITT


ATTORNEY DOCKET NUMBER: 121-0019-US-REG

015

PATENT
Attorney Docket No.: 121-0019-US-REG

# PROCESSOR CORE COMMUNICATION IN MULTI-CORE PROCESSOR

## BACKGROUND OF THE DISCLOSURE

[0001]  A multi-core processor includes two or more independent processor cores arranged in an array.  Each processor core in a conventional multi-core processor generally shares the same supply voltage and clock signal to simplify the interfaces between the processor cores.  For power consumption management, dynamic supply voltage and clock speed control may be utilized, so that a multi-core processor may operate at high power and high clock frequency when needed and at low power when the computing requirements are reduced.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0002]  The foregoing and other features of the present disclosure will become more fully apparent from the following description and appended claims, taken in conjunction with the accompanying drawings.  These drawings depict only several embodiments in accordance with the disclosure and are, therefore, not to be considered limiting of its scope.  The disclosure will be described with additional specificity and detail through use of the accompanying drawings.

[0003]  FIG. 1 illustrates an example configuration of a multi-core processor;

FIG. 2 is a block diagram illustrating an example set of processor cores with example interface blocks having level shifters;

FIG. 3 is another block diagram illustrating an example set of processor cores with example interface blocks having synchronizers;

FIG. 4 is a flow chart illustrating an example transition processing routine for managing a clock frequency change; and

FIG. 5 is a block diagram illustrating an example computer program product for handling processor core communication in a multi-core processor; all arranged in accordance with at least some embodiments of the present disclosure.

2

**016**

PATENT
Attorney Docket No.: 121-0019-US-REG

## DETAILED DESCRIPTION

**[0004]**  In the following detailed description, reference is made to the accompanying drawings, which form a part hereof.  In the drawings, similar symbols typically identify similar components, unless context dictates otherwise.  The illustrative embodiments described in the detailed description, drawings, and claims are not meant to be limiting.  Other embodiments may be utilized, and other changes may be made, without departing from the spirit or scope of the subject matter presented here.  It will be readily understood that the aspects of the present disclosure, as generally described herein, and illustrated in the Figures, can be arranged, substituted, combined, and designed in a wide variety of different configurations, all of which are explicitly contemplated and make part of this disclosure.

**[0005]**  This disclosure is drawn, *inter alia*, to devices, methods, systems, and computer programs related to power management for a multi-core processor.

**[0006]**  A multi-core processor may include multiple processor cores arranged in an array.  A power profile associated with an individual processor core may be controlled through signals that may be received from control blocks that are located in the periphery of the multi-core processor.  The power profile may include, without limitation, one or more power-supply voltages of the core processor, clock rates of the core processor, clock multipliers of the core processor, power throttling of the core processor, and/or sleep state cycles of the core processor.

**[0007]**  FIG. 1 illustrates an example configuration of a multi-core processor 100 that is arranged in accordance with at least some embodiments of the present disclosure.  The multi-core processor 100 may include multiple processor cores 102 arranged in rows and columns in a 2-dimensional array in an integrated circuit.  A processor core may be coupled with adjacent processor cores through an interface circuit 120.  In some implementations, the processor cores 102 may be horizontally coupled to one another, vertically coupled to one another, and/or diagonally coupled to one another by the interface circuit 120.  In some example implementations, the processor core 102 located on one edge of the multi-core processor 100 may also be coupled to the processor core 102 on the opposite edge with a wrap-around

3

PATENT
Attorney Docket No.: 121-0019-US-REG

connection 122, which may be employed to ensure a continuous connection among the processor cores in the same row and/or column.

[0008]  The multi-core processor 100 may be further divided into regions.  In some implementations, the regions of multi-core processor 100 may correspond to rows of the two-dimensional array, and the regions may or may not be overlapping.  Each row of processors may also be referred to as a "stripe."  For example, the multi-core processor 100 may be divided into stripes 112, 114, 116, and 118.  Each stripe may be associated with an independent power profile.  For example, the stripe 112 may be powered by a supply voltage received from a power control block 108 and/or may be associated with an independent clock domain defined by a clock signal received from a clock control block 110.  In some implementations, the power control block 108 and the clock control block 110 may be arranged at two different sides of the multi-core processor 100 as shown in FIG. 1.  In some other implementations, the power control block 108 and the clock control block 110 may be arranged at the same side of the multi-core processor 100.  In yet some other implementations, the power control block 108 and the clock control block 110 may be arranged in a common area located near the center of the multi-core processor 100.

[0009]  The power profile associated with a stripe may be determined based on the computational requirements of the tasks assigned to the processor cores in the stripe.  In some implementations, sensors placed at the input of each processor core may be configured to measure the supply voltage and the local temperature for the processor core.  The measured supply voltage and local temperature may be maintained in the power control block 108.  One or more performance counters associated with each processor core may also provide feedback to the power control block 108.  Based on the measured operational information (e.g., supply voltage and local temperature) and the performance data, the power control block 108 may then be configured to select a supply voltage for each strip.  For example, the tasks with the highest computational requirements may be scheduled into the topmost stripe, such as the stripe 112.  The stripe 112 may be configured to operate at a high supply voltage.  The tasks with lesser computational requirements may be

4

PATENT
Attorney Docket No.: 121-0019-US-REG

scheduled into the stripe 114 and so forth.  The stripes 114, 116, and 118 thus may be configured to operate lower supply voltages.

[0010]  In some implementations, supply voltages to the stripes may be selected such that the selected supply voltages for adjacent stripes may differ by a limited amount.  This limited amount may be based on a relationship between the output voltage level associated with one stripe and the input voltage level associated with an adjacent stripe.  For example, suppose the stripe with the higher supply voltage (e.g., the stripe 112) may be associated with an output voltage level (e.g., $V_o$).  $V_o$ needs to fall reliably within an acceptable input voltage level range (e.g., $V_{i+}$ to $V_{i-}$) for an adjacent stripe (e.g., the stripe 114).  In other words, the power control block 108 may be configured to select the supply voltages to the stripe 112 and the stripe 114, so that the aforementioned relationship between $V_o$ and range $V_{i+}$ to $V_{i-}$ may be maintained.

[0011]  To maintain the limited differential relationship discussed above, adjusting the supply voltage to one stripe may involve adjusting the supply voltages to the other stripes.  To illustrate, suppose the power control block 108 may adjust the supply voltage to the stripe 112.  To maintain the limited differential relationship, the power control block 108 may adjust the supply voltages to the stripes 118, 116, and 114 before adjusting the supply voltage to the stripe 112.

[0012]  Although dynamically adjusting the power profile for a stripe in response to changes in computational requirements may reduce power consumption for a multi-core processor, such adjustments may take some period of time to stabilize.  To further illustrate the interfaces that facilitate communication between two processor cores in the multi-core processor 100, a subset 150 of processor cores 152, 154, and 156 of FIG. 1 may be selected.  The processor core 152 belongs to the stripe 112; the processor core 154 belongs to the stripe 114; and the processor core 156 belongs to the stripe 116.

[0013]  FIG. 2 is a block diagram illustrating an example subset 150 of processor cores with example interface blocks having level shifters, arranged in accordance

5

PATENT
Attorney Docket No.: 121-0019-US-REG

with at least some embodiments of the present disclosure. The processor core 152 may be powered by a supply voltage 1 and coupled to an interface block 200 having a level shifter 202; the processor core 154 may be powered by a supply voltage 2 and coupled to the same interface block 200; and the processor core 156 may be powered by a supply voltage 3 and coupled to an interface block 204 having a level shifter 206. In some implementations, the inputs of the level shifter 202 may be the supply voltage 1 and the supply voltage 2, and the inputs of the level shifter 206 may be the supply voltage 2 and the supply voltage 3. The supply voltage 1, the supply voltage 2, and the supply voltage 3 may come from a power control block, such as the power control block 108 of FIG 1.

[0014] When the processor core 152 of the stripe 112 sends a signal to the processor core 154 of the stripe 114, in some implementations, the output voltage of the level shifter 202 may be tied to the supply voltage 2, and the input voltage of the level shifter 202 may be tied to the supply voltage 1. The level shifters are arranged to translate the signal levels such that each of the processor cores operates correctly (e.g., the processor cores properly interpret the voltages as valid logic levels even though processor cores are powered by different supply voltages). Here, the level shifter 202 may be adapted to translate first logic levels associated with the stripe 112 to second logic levels associated with the stripe 114, and the level shifter 202 may be referenced to the supply voltage 2. On the other hand, when the processor core 154 of the stripe 114 sends a signal to the processor core 152 of the stripe 112, the output voltage of the level shifter 202 may be tied to the supply voltage 1, and the input voltage of the level shifter 202 may be tied to the supply voltage 2. In other words, the level shifter 202 may be adapted to translate second logic levels associated with the stripe 114 to first logic levels associated with stripe 112, and the level shifter 202 may be referenced to the supply voltage 1. The relationships among the supply voltage 1, supply voltage 2, and the level shifter 202 described above similarly apply to the relationships among the supply voltage 2, supply voltage 3, and the level shifter 206.

[0015] FIG. 3 is another block diagram illustrating an example subset 150 of processor cores with example interface blocks having synchronizers, arranged in

6

PATENT
Attorney Docket No.: 121-0019-US-REG

accordance with at least some embodiments of the present disclosure. The processor core 152 may be driven by a clock signal 1 and coupled to an interface block 300 having a synchronizer 302; the processor core 154 may be driven by a clock signal 2 and coupled to the same interface block 300; and the processor core 156 may be driven by a clock signal 3 and coupled to an interface block 304 having a synchronizer 306. In some implementations, the clock signal 1, the clock signal 2, the clock signal 3, and the respective phase lock loops (PLLs) may be a part of a clock control block, such as the clock control block 110. The processing results of the PLL blocks may be fed back to a transition processing routine 308. Commands generated by the transition processing routine 308 may also be sent to the synchronizer 302 and/or the synchronizer 306.

[0016]  As discussed above, when the power profile for a stripe changes, such as a change in clock frequency, the clock signal for the stripe may become unstable. To handle such a situation, FIG. 4 is a flow chart illustrating an example transition processing routine 400 for managing a clock frequency change, arranged in accordance with at least some embodiments of the present disclosure. For ease of description, the transition processing routine 400 is described in terms of a set of processor cores and interface blocks substantially similar to those described previously with respect to FIG. 3. The transition processing routine 400 may include one or more functions, operations, or actions as depicted by operations 402, 404, 406, 408, and/or 410. In some implementations, the various features of the illustrated operations for the transition processing routine 400 may be combined into fewer operations, divided into additional operations, or eliminated based on the desired result.

[0017]  Processing for the transition processing routine 300 may begin at operation 302, "receive clock frequency change request." Operation 302 may be followed by operation 304, "idle communication between stripes." Operation 304 may be followed by operation 306, "examine PLL blocks of requesting stripe and adjacent stripe(s)." Operation 306 may be followed by operation 308, "does each of PLL blocks acquire a lock?" Operation 308 may be followed by either operation 306 when the decision logic tested at block 308 fails to be satisfied (NO), or operation

7

PATENT
Attorney Docket No.: 121-0019-US-REG

310, "determine whether to resume communication between stripes", when the decision logic tested at block 308 is satisfied (YES). Processing for the routine may terminate after block 310.

[0018]  For illustration, suppose the processor core 154 of the stripe 114 in FIG. 3 is asked to change its clock frequency based on the tasks that are being assigned to the stripe 114 for processing. After having received the request in operation 402, the transition processing routine 400 may issue commands to the synchronizer 302 and the synchronizer 306 in operation 404 to idle the communications between the processor core 154 and the processor core 152 and between the processor core 154 and the processor core 156. Following operation 404, the outputs of the PLL blocks for the stripes that are adjacent to the stripe 114 may be examined in operation 406.  Depending on whether the PLL blocks have acquired locks as determined in operation 408, the transition processing routine 400 may decide in operation 410 whether the transition sequence has occurred properly and the communication between the stripes may resume.

[0019]  In some implementations, after each of the PLL block 1, PLL block 2, and PLL block 3 is determined to have acquired a lock of its respective clock signal in operation 408, a stable clock signal may be sent to the processor core 154 and also the synchronizer 302 and the synchronizer 306. Then, the synchronizer 302 may be configured to synchronize the clock signal 1 and the clock signal 2 for the communication between the processor core 152 and the processor core 154. Similarly, the synchronizer 306 may be configured to synchronize the clock signal 2 and the clock signal 3 for the communication between the processor core 154 and the processor core 156.

[0020]  FIG. 5 is a block diagram illustrating a computer program product 500 for handling processor core communication in a multi-core processor in accordance with at least some embodiments of the present disclosure. Computer program product 500 may include one or more sets of executable instructions 502 for executing the transition processing routine described above and illustrated in FIG. 4. Computer program product 500 may be transmitted in a signal bearing medium 504

8

PATENT
Attorney Docket No.: 121-0019-US-REG

or another similar communication medium 506. Computer program product 500 may also be recorded in a computer readable medium 508 or another similar recordable medium 510.

[0021]  There is little distinction left between hardware and software implementations of aspects of systems; the use of hardware or software is generally (but not always, in that in certain contexts the choice between hardware and software can become significant) a design choice representing cost vs. efficiency tradeoffs.  There are various vehicles by which processes and/or systems and/or other technologies described herein can be effected (e.g., hardware, software, and/or firmware), and that the preferred vehicle will vary with the context in which the processes and/or systems and/or other technologies are deployed.  For example, if an implementer determines that speed and accuracy are paramount, the implementer may opt for a mainly hardware and/or firmware vehicle; if flexibility is paramount, the implementer may opt for a mainly software implementation; or, yet again alternatively, the implementer may opt for some combination of hardware, software, and/or firmware.

[0022]  The foregoing detailed description has set forth various embodiments of the devices and/or processes via the use of block diagrams, flowcharts, and/or examples.  Insofar as such block diagrams, flowcharts, and/or examples contain one or more functions and/or operations, it will be understood by those within the art that each function and/or operation within such block diagrams, flowcharts, or examples can be implemented, individually and/or collectively, by a wide range of hardware, software, firmware, or virtually any combination thereof.  In one embodiment, several portions of the subject matter described herein may be implemented via Application Specific Integrated Circuits (ASICs), Field Programmable Gate Arrays (FPGAs), digital signal processors (DSPs), or other integrated formats.  However, those skilled in the art will recognize that some aspects of the embodiments disclosed herein, in whole or in part, can be equivalently implemented in  integrated circuits, as one or more computer programs running on one or more computers (e.g., as one or more programs running on one or more computer systems), as one or more programs running on one or more processors (e.g., as one or more programs running on one or more microprocessors), as firmware, or as virtually any combination thereof, and

9

PATENT
Attorney Docket No.: 121-0019-US-REG

that designing the circuitry and/or writing the code for the software and or firmware would be well within the skill of one of skill in the art in light of this disclosure. In addition, those skilled in the art will appreciate that the mechanisms of the subject matter described herein are capable of being distributed as a program product in a variety of forms, and that an illustrative embodiment of the subject matter described herein applies regardless of the particular type of signal bearing medium used to actually carry out the distribution. Examples of a signal bearing medium include, but are not limited to, the following: a recordable type medium such as a floppy disk, a hard disk drive, a Compact Disc (CD), a Digital Video Disk (DVD), a digital tape, a computer memory, etc.; and a transmission type medium such as a digital and/or an analog communication medium (e.g., a fiber optic cable, a waveguide, a wired communications link and/or channel, a wireless communication link and/or channel, etc.).

[0023] Those skilled in the art will recognize that it is common within the art to describe devices and/or processes in the fashion set forth herein, and thereafter use engineering practices to integrate such described devices and/or processes into data processing systems. That is, at least a portion of the devices and/or processes described herein can be integrated into a data processing system via a reasonable amount of experimentation. Those having skill in the art will recognize that a typical data processing system generally includes one or more of a system unit housing, a video display device, a memory such as volatile and non-volatile memory, processors such as microprocessors and digital signal processors, computational entities such as operating systems, drivers, graphical user interfaces, and applications programs, one or more interaction devices, such as a touch pad or screen, and/or control systems including feedback loops and control motors (e.g., feedback for sensing position and/or velocity; control motors for moving and/or adjusting components and/or quantities). A typical data processing system may be implemented utilizing any suitable commercially available components, such as those typically found in data computing/communication and/or network computing/communication systems.

10

024

PATENT
Attorney Docket No.: 121-0019-US-REG

[0024]  The herein described subject matter sometimes illustrates different components contained within, or connected with, different other components.  It is to be understood that such depicted architectures are merely exemplary, and that in fact many other architectures can be implemented which achieve the same functionality.  In a conceptual sense, any arrangement of components to achieve the same functionality is effectively "associated" such that the desired functionality is achieved.  Hence, any two components herein combined to achieve a particular functionality can be seen as "associated with" each other such that the desired functionality is achieved, irrespective of architectures or intermedial components.  Likewise, any two components so associated can also be viewed as being "operably connected", or "operably coupled", to each other to achieve the desired functionality, and any two components capable of being so associated can also be viewed as being "operably couplable", to each other to achieve the desired functionality.  Specific examples of operably couplable include but are not limited to physically mateable and/or physically interacting components and/or wirelessly interactable and/or wirelessly interacting components and/or logically interacting and/or logically interactable components.

[0025]  With respect to the use of substantially any plural and/or singular terms herein, those having skill in the art can translate from the plural to the singular and/or from the singular to the plural as is appropriate to the context and/or application.  The various singular/plural permutations may be expressly set forth herein for sake of clarity.

[0026]  It will be understood by those within the art that, in general, terms used herein, and especially in the appended claims (e.g., bodies of the appended claims) are generally intended as "open" terms (e.g., the term "including" should be interpreted as "including but not limited to," the term "having" should be interpreted as "having at least," the term "includes" should be interpreted as "includes but is not limited to," etc.).  It will be further understood by those within the art that if a specific number of an introduced claim recitation is intended, such an intent will be explicitly recited in the claim, and in the absence of such recitation no such intent is present.  For example, as an aid to understanding, the following appended claims may contain

11

PATENT
Attorney Docket No.: 121-0019-US-REG

usage of the introductory phrases "at least one" and "one or more" to introduce claim recitations. However, the use of such phrases should not be construed to imply that the introduction of a claim recitation by the indefinite articles "a" or "an" limits any particular claim containing such introduced claim recitation to inventions containing only one such recitation, even when the same claim includes the introductory phrases "one or more" or "at least one" and indefinite articles such as "a" or "an" (e.g., "a" and/or "an" should typically be interpreted to mean "at least one" or "one or more"); the same holds true for the use of definite articles used to introduce claim recitations. In addition, even if a specific number of an introduced claim recitation *is* explicitly recited, those skilled in the art will recognize that such recitation should typically be interpreted to mean *at least* the recited number (e.g., the bare recitation of "two recitations," without other modifiers, typically means *at least* two recitations, or *two or more* recitations). Furthermore, in those instances where a convention analogous to "at least one of A, B, and C, etc." is used, in general such a construction is intended in the sense one having skill in the art would understand the convention (e.g., "a system having at least one of A, B, and C" would include but not be limited to systems that have A alone, B alone, C alone, A and B together, A and C together, B and C together, and/or A, B, and C together, etc.). In those instances where a convention analogous to "at least one of A, B, or C, etc." is used, in general such a construction is intended in the sense one having skill in the art would understand the convention (e.g., "a system having at least one of A, B, or C" would include but not be limited to systems that have A alone, B alone, C alone, A and B together, A and C together, B and C together, and/or A, B, and C together, etc.). It will be further understood by those within the art that virtually any disjunctive word and/or phrase presenting two or more alternative terms, whether in the description, claims, or drawings, should be understood to contemplate the possibilities of including one of the terms, either of the terms, or both terms. For example, the phrase "A or B" will be understood to include the possibilities of "A" or "B" or "A and B."

[0027] While various aspects and embodiments have been disclosed herein, other aspects and embodiments will be apparent to those skilled in the art. The various

PATENT
Attorney Docket No.: 121-0019-US-REG

aspects and embodiments disclosed herein are for purposes of illustration and are not intended to be limiting, with the true scope and spirit being indicated by the following claims.

PATENT
Attorney Docket No.: 121-0019-US-REG

We Claim:

1.    A multi-core processor, comprising:
a first set of processor cores of the multi-core processor, wherein each
processor core from the first set of processor cores is configured to
dynamically receive a first supply voltage and a first clock signal;
a second set of processor cores of the multi-core processor, wherein each
processor core from the second set of processor cores is configured to
dynamically receive a second supply voltage and a second clock signal;
and
an interface block coupled to the first set of processor cores and also coupled
to the second set of processor cores, wherein the interface block is
configured to facilitate communication between the first set of
processor cores and the second set of processor cores.

2.    The multi-core processor of claim 1, the interface block further comprising a
first level shifter that is referenced to the second supply voltage and adapted to
translate first logic levels associated with the first set of processor cores to second
logic levels associated with the second set of processor cores for a first signal
traveling from the first set of processor cores to the second set of processor cores.

3.    The multi-core processor of claim 1, the interface block further comprising a
second level shifter that is referenced to the first supply voltage and adapted to
translate second logic levels associated with the second set of processor cores to
first logic levels associated with the first set of processor cores for a second signal
traveling from the second set of processor cores to the first set of processor cores.

4.    The multi-core processor of claim 1, wherein the interface block further
comprises a synchronizer configured to synchronize the first clock signal and the
second clock signal for communication between one or more processor cores of the
first set of processor cores and one or more processor cores of the second set of
processor cores.

14

PATENT
Attorney Docket No.: 121-0019-US-REG

5.      The multi-core processor of claim 1, wherein the first set of processor cores and the second set of processor cores are configured to receive one or more control signals from one or more control blocks located in a periphery of the multi-core processor.

6.      The multi-core processor of claim 1, wherein the first set of processor cores are located in a first region of the multi-core processor, and the second set of processor cores are located in a second region of the multi-core processor.

7.      The multi-core processor of claim 6, wherein the first region and the second region are overlapping regions of the multi-core processor.

8.      The multi-core processor of claim 6, wherein the first region and the second region are non-overlapping regions of the multi-core processor.

9.      The multi-core processor of claim 6, wherein the first region corresponds to a first row of the multi-core processor, and wherein the second region corresponds to a second row of the multi-core processor.

10.     The multi-core processor of claim 1, wherein the interface block is configured to idle communications between the first set of processor cores and the second set of processor cores when one or more of the first clock signal and/or the second clock signal is determined to have changed.

11.     The multi-core processor of claim 10, wherein the interface block is configured to resume communication between the first set of processor cores and the second set of processor cores after one or more of the first clock signal and/or the second clock signal is determined to have stabilized.

12.     The multi-core processor of claim 5, wherein the first set of processor cores is adjacent to the second set of processor cores, and the one or more control blocks

15

PATENT
Attorney Docket No.: 121-0019-US-REG

are configured to select the first supply voltage and the second supply voltage to maintain a differential relationship between the first supply voltage and the second supply voltage.

13.    The multi-core processor of claim 12, wherein the differential relationship is based on having an output voltage level associated with the first set of processor cores to be within an acceptable input voltage level associated with the second set of processor cores.

14.    The multi-core processor of claim 1, wherein the first set of processor cores and the second set of processor cores are configured to receive one or more control signals from one or more control blocks located in a common region that is substantially central to the first set of processor cores and the second set of processor cores.

15.    A method for managing communications in a multi-core processor that includes a plurality of processor cores having a first set of processor cores and a second set of processor cores, the method comprising:

idling communications with one or more of the plurality of processor cores in response to a clock frequency change request for the first set of processor cores; and

resuming communications with one or more of the plurality of processor cores after having determined that a first phase lock loop operation associated with the first set of processor cores has acquired a first lock signal and a second phase lock loop operation associated with the second set of processor cores has also acquired a second lock signal.

16.    The method of claim 15, wherein resuming communications further comprising having determined that a third phase lock loop operation associated with a third set of processor cores in the multi-core processor has acquired a third lock signal, wherein the third set of processor cores is adjacent to the first set of processor cores.

16

PATENT
Attorney Docket No.: 121-0019-US-REG

17.    The method of claim 16, wherein the second set of processor cores is adjacent to the first set of processor cores.

18.    A computer-readable medium containing a sequence of instructions for managing communications in a multi-core processor that includes a plurality of processor cores having a first set of processor cores and a second set of processor cores, which when executed by a computing device, causes the computing device to:

      issue a first command to idle communications with one or more of the plurality of processor cores in response to a clock frequency change request for the first set of processor cores;

      issue a second command to resume communications with one or more of the plurality of processor cores after having determined that a first phase lock loop operation associated with the first set of processor cores has acquired a first lock signal and a second phase lock loop operation associated with the second set of processor cores has also acquired a second lock signal.

19.    The computer-readable medium of claim 18, further including a sequence of instructions, which when executed by the computing device, causes the computing device to determine whether a third phase lock loop operation associated with a third set of processor cores in the multi-core processor has acquired a third lock signal before issuing the second command, wherein the third set of processor cores is adjacent to the first set of processor cores.

20.    The computer-readable medium of claim 19, wherein the second set of processor cores is adjacent to the first set of processor cores.

17

031

PATENT
Attorney Docket No.: 121-0019-US-REG

## ABSTRACT OF THE DISCLOSURE

Embodiments of the disclosure generally set forth techniques for handling communication between processor cores.   Some example multi-core processors include a first set of processor cores in a first region of the multi-core processor configured to dynamically receive a first supply voltage and a first clock signal, a second set of processor cores in a second region of the multi-core processor configured to dynamically receive a second supply voltage and a second clock signal, and an interface block coupled to the first set of processor cores and the second set of processor cores, wherein the interface block is configured to facilitate communications between the first set of processor cores and the second set of processor cores.

18

Attorney Docket No. 121-0019-US-REG

## United States Patent Application

## STATEMENT UNDER 37 CFR § 3.73(b)

I, the undersigned, as an authorized representative for EMPIRE TECHNOLOGY DEVELOPMENT LLC, of 2711 Centerville Road, Suite 400, Wilmington, New Castle County, Delaware 19808, U.S.A., state that EMPIRE TECHNOLOGY DEVELOPMENT LLC is the assignee of the entire right, title, and interest in the following application:

| U.S. APPLICATION NUMBER | DATE OF FILING (day, month, year) | FIRST NAMED INVENTOR | TITLE |
|---|---|---|---|
| | | Andrew Wolfe | PROCESSOR CORE COMMUNICATION IN MULTI-CORE PROCESSOR |

Copies of the assignment agreement(s) establishing the chain of title is/are:

☒ attached hereto.

☒ recorded in the United States Patent and Trademark Office as shown below:

From: _____
To:   _____
Reel: _____    Frame: _____

From: _____
To:   _____
Reel: _____    Frame: _____

From: _____
To:   _____
Reel: _____    Frame: _____

From: _____
To:   _____
Reel: _____    Frame: _____

For: ____ EMPIRE TECHNOLOGY DEVELOPMENT LLC _____

By: _____ ERIC BELL _____        Title: AUTHORIZED PERSON _____

Signature: _____        Date: 2/22/10

Page 1 of 1

**033**

Attorney Docket. No.
121-0019-US-REG

## ASSIGNMENT OF PATENT RIGHTS

For valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Andrew Wolfe of 108 Leewood Ct., Los Gatos, CA 95032, US, and Marc Elliot Levitt of 5615 Brookhurst Ct., San Jose, CA 95129, US, **"Assignors"** effective as of December 10, 2009, hereby sells, assigns, transfers, and conveys unto

(A)     Empire Technology Development LLC, a Delaware limited liability company,  with an address at 2711 Centerville Road, Suite 400, Wilmington, DE  19808 ("U.S. Assignee"), all rights, title, and interests that exist today and may exist in the future in and to any and all of the following items (1) through (8) below:

1.      the inventions disclosed in the solution report/invention disclosure titled **"Controlled voltage gradients in an asynchronous processor array"** and all inventions claimed and/or described in the Application (collectively, the **"Invention"**);

2.      the patent applications listed in the table below (the **"Application"**);

| Patent Application No. | Country | Filing Date | Title |
|---|---|---|---|
| | US | | PROCESSOR CORE COMMUNICATION IN MULTI-CORE PROCESSOR |
| | | | |
| | | | |
| | | | |

3.      all rights with respect to the Invention, including all United States patents or other governmental grants or issuances that may be granted with respect to the Invention or from any direct or indirect divisionals, continuations, continuations-in-part, or other patent applications claiming priority rights from the Application (**"Potential Patents"**);

4.      all reissues, reexaminations, extensions, or registrations of the Potential Patents;

5.      all non-United States patents, patent applications, and counterparts relating to any or all of the Invention, the Application, and the Potential Patents, including, without limitation, certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances (**"Foreign Rights"**), and including the right to file foreign applications directly in the name of Assignee, its successors and assigns;

6.      all rights to claim priority rights deriving from the Application;

034

7.      all causes of action and remedies related to any or all of the Application, the Invention, the Potential Patents, and the Foreign Rights (including, without limitation, the right to sue for past, present, or future infringement, misappropriation or violation of rights related to any of the foregoing and the right to collect royalties and other payments under or on account of any of the foregoing); and

8.      any and all other rights and interests arising out of, in connection with, or in relation to the Application, the Invention, Potential Patents, and the Foreign Rights.

As used in this Assignment, "Assignee" means, collectively, the U.S. Assignee and the Non-U.S. Assignee.  Assignor will not sign any document or do any act conflicting with this Assignment, and, without further compensation, will sign all documents and do such additional acts as Assignee, its successors, legal representatives, and assigns deem necessary or desirable to perfect enjoyment of the Rights, conduct proceedings regarding the Rights (including any litigation or interference proceedings), or perfect or defend title to the Rights.  Assignor requests the respective patent office or governmental agency in each jurisdiction to issue any and all patents, certificates of invention, utility models, or other governmental grants or issuances that may be granted upon any of the Rights in the name of the Assignee, as the assignee to the entire interest therein.

Assignor hereby authorizes and requests legal representative *Ren-Sheng International IP Management Ltd., 17F-1, No. 151, Sec. 4, XinYi Road, Taipe, Taiwan,* to insert on this Assignment the filing date and Patent Application Numbers in the table above when known.

The terms and conditions of this Assignment will inure to the benefit of Assignee, its successors, legal representatives, and assigns and will be binding upon Assignor, their successors, legal representatives and assigns.

[Signature Page(s) to Follow]

Attorney Docket. No.
121-0019-US-REG

By: _____

Andrew Wolfe
108 Leewood Ct.,
Los Gatos, CA 95032 U.S.

## NOTARIZATION

STATE OF <u>CALIFORNIA</u>         )
                                   ) ss.
COUNTY OF <u>SANTA</u>             )
<u>CLARA</u>

On <u>FEB. 11</u>, 20<u>10</u>, before me, <u>JOANNE VENEGAS</u>, Notary Public, personally appeared Andrew Wolfe, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of <u>CALIFORNIA</u> that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____



JOANNE VENEGAS
Commission # 1789670
Notary Public - California
Santa Clara County
My Comm. Expires Feb 21, 2012

Page 3 / 4

036

Attorney Docket. No.
121-0019-US-REG

By: _____

Marc Elliot Levitt
5615 Brookhurst Ct.,
San Jose, CA 95129 U.S.

## NOTARIZATION

STATE OF _____ )
                                                    ) ss.
COUNTY OF _____ )

*See attached.*

On _____, 20___, before me, _____, Notary Public,
personally appeared Marc Elliot Levitt, who proved to me on the basis of satisfactory evidence
to be the person whose name is subscribed to the within instrument and acknowledged to me
that he executed the same in his authorized capacity, and that by his signature(s) on the
instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the
instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _____ that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

037

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of *Santa Clara*

On *February 11, 2010* before me, *Mary Ann Walthers, Notary Public*
　　　　Date　　　　　　　　　　　　Here Insert Name and Title of the Officer

personally appeared *Marc Elliott Levitt*
　　　　　　　　　　　　Name(s) of Signer(s)

MARY ANN WALTHERS
Commission # 1773587
Notary Public - California
Santa Clara County
My Comm. Expires Oct 16, 2011

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature *Mary A. Walthers*
　　　　　　　Signature of Notary Public

Place Notary Seal Above

## OPTIONAL

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: *Assignment of Patent Rights*

Document Date: *December 10, 2009*　　　Number of Pages: *4*

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
- ☐ Individual
- ☐ Corporate Officer — Title(s): _____
- ☐ Partner — ☐ Limited ☐ General
- ☐ Attorney in Fact
- ☐ Trustee
- ☐ Guardian or Conservator
- ☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

Signer's Name: _____
- ☐ Individual
- ☐ Corporate Officer — Title(s): _____
- ☐ Partner — ☐ Limited ☐ General
- ☐ Attorney in Fact
- ☐ Trustee
- ☐ Guardian or Conservator
- ☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5907   Reorder: Call Toll-Free 1-800-876-6827

038



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 12/713,220 | 02/26/2010 | 2189 | 1090 | 121-0019-US-REG | 20 | 3 |

**CONFIRMATION NO. 4243**

83446
GENE I. SU
17F-1, NO. 151, SEC. 4, XINYI ROAD
TAIPEI,
TAIWAN

**FILING RECEIPT**

*OC000000040441055*

Date Mailed: 03/09/2010

Receipt is acknowledged of this non-provisional patent application. The application will be taken up for examination in due course. Applicant will be notified as to the results of the examination. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. **If an error is noted on this Filing Receipt, please submit a written request for a Filing Receipt Correction. Please provide a copy of this Filing Receipt with the changes noted thereon. If you received a "Notice to File Missing Parts" for this application, please submit any corrections to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections**

**Applicant(s)**
          Andrew WOLFE, Los Gatos, CA;
          Marc Elliot LEVITT, San Jose, CA;
**Assignment For Published Patent Application**
          EMPIRE TECHNOLOGY DEVELOPMENT LLC, Wilmington, DE
**Power of Attorney:** The patent practitioners associated with Customer Number 83446

**Domestic Priority data as claimed by applicant**

**Foreign Applications**


**If Required, Foreign Filing License Granted:** 03/04/2010

The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US 12/713,220**

**Projected Publication Date:** 09/01/2011

**Non-Publication Request:** No

**Early Publication Request:** No

**Title**

PROCESSOR CORE COMMUNICATION IN MULTI-CORE PROCESSOR

**Preliminary Class**

711

# PROTECTING YOUR INVENTION OUTSIDE THE UNITED STATES

Since the rights granted by a U.S. patent extend only throughout the territory of the United States and have no effect in a foreign country, an inventor who wishes patent protection in another country must apply for a patent in a specific country or in regional patent offices. Applicants may wish to consider the filing of an international application under the Patent Cooperation Treaty (PCT). An international (PCT) application generally has the same effect as a regular national patent application in each PCT-member country. The PCT process **simplifies** the filing of patent applications on the same invention in member countries, but **does not result** in a grant of "an international patent" and does not eliminate the need of applicants to file additional documents and fees in countries where patent protection is desired.

Almost every country has its own patent law, and a person desiring a patent in a particular country must make an application for patent in that country in accordance with its particular laws. Since the laws of many countries differ in various respects from the patent law of the United States, applicants are advised to seek guidance from specific foreign countries to ensure that patent rights are not lost prematurely.

Applicants also are advised that in the case of inventions made in the United States, the Director of the USPTO must issue a license before applicants can apply for a patent in a foreign country. The filing of a U.S. patent application serves as a request for a foreign filing license. The application's filing receipt contains further information and guidance as to the status of applicant's license for foreign filing.

Applicants may wish to consult the USPTO booklet, "General Information Concerning Patents" (specifically, the section entitled "Treaties and Foreign Patents") for more information on timeframes and deadlines for filing foreign patent applications. The guide is available either by contacting the USPTO Contact Center at 800-786-9199, or it can be viewed on the USPTO website at http://www.uspto.gov/web/offices/pac/doc/general/index.html.

For information on preventing theft of your intellectual property (patents, trademarks and copyrights), you may wish to consult the U.S. Government website, http://www.stopfakes.gov. Part of a Department of Commerce initiative, this website includes self-help "toolkits" giving innovators guidance on how to protect intellectual property in specific countries such as China, Korea and Mexico. For questions regarding patent enforcement issues, applicants may call the U.S. Government hotline at 1-866-999-HALT (1-866-999-4158).

# LICENSE FOR FOREIGN FILING UNDER

## Title 35, United States Code, Section 184

## Title 37, Code of Federal Regulations, 5.11 & 5.15

**<u>GRANTED</u>**

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as

set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Bureau of Industry and Security, Department of Commerce (15 CFR parts 730-774); the Office of Foreign AssetsControl, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

## NOT GRANTED

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 12/713,220 | 02/26/2010 | Andrew WOLFE | 121-0019-US-REG |

**CONFIRMATION NO. 4243**

83446
GENE I. SU
17F-1, NO. 151, SEC. 4, XINYI ROAD
TAIPEI,
TAIWAN

**POA ACCEPTANCE LETTER**


*OC000000040440964*

Date Mailed: 03/09/2010

## NOTICE OF ACCEPTANCE OF POWER OF ATTORNEY

This is in response to the Power of Attorney filed 02/26/2010.

The Power of Attorney in this application is accepted. Correspondence in this application will be mailed to the above address as provided by 37 CFR 1.33.

/sibrahim/

Office of Data Management, Application Assistance Unit (571) 272-4000, or (571) 272-4200, or 1-888-786-0101

page 1 of 1

042

PATENT
Atty. Dkt. No. 121-0019-US-REG

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of: WOLFE, et al.                          §          Group Art Unit: 2115
                                                            §
Serial No.:    12/713,220                                   §          Examiner: LEE, THOMAS C
                                                            §
                                                            §
Filed:         February 26, 2010                            §          Confirmation No.: 4243
                                                            §
For:  PROCESSOR CORE COMMUNICATION                          §
      IN MULTI-CORE PROCESSOR                               §
                                                            §

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

**PRELIMINARY AMENDMENT**

　　　Prior to examination, please amend the application as indicated on the following pages. Payment of US$324 pursuant to 37 CFR §1.16 for one newly added independent claim and two newly added dependent claims is also submitted with this Preliminary Amendment. **Amendments to the Claims** are reflected in the listing of claims which begins on page 2 of this paper. **Remarks** begin on page 6 of this paper.

Page 1 of 6

043

PATENT
Atty. Dkt. No. 121-0019-US-REG

**IN THE CLAIMS:**

The listing of claims will replace all prior versions, and listings, of claims in the application.

1.      (Original) A multi-core processor, comprising:

a first set of processor cores of the multi-core processor, wherein each processor core from the first set of processor cores is configured to dynamically receive a first supply voltage and a first clock signal;

a second set of processor cores of the multi-core processor, wherein each processor core from the second set of processor cores is configured to dynamically receive a second supply voltage and a second clock signal; and

an interface block coupled to the first set of processor cores and also coupled to the second set of processor cores, wherein the interface block is configured to facilitate communication between the first set of processor cores and the second set of processor cores.

2.      (Original) The multi-core processor of claim 1, the interface block further comprising a first level shifter that is referenced to the second supply voltage and adapted to translate first logic levels associated with the first set of processor cores to second logic levels associated with the second set of processor cores for a first signal traveling from the first set of processor cores to the second set of processor cores.

3.      (Original) The multi-core processor of claim 1, the interface block further comprising a second level shifter that is referenced to the first supply voltage and adapted to translate second logic levels associated with the second set of processor cores to first logic levels associated with the first set of processor cores for a second signal traveling from the second set of processor cores to the first set of processor cores.

4.      (Original) The multi-core processor of claim 1, wherein the interface block further comprises a synchronizer configured to synchronize the first clock signal and the second clock signal for communication between one or more processor cores of the first set of processor cores and one or more processor cores of the second set of processor cores.

5.      (Original) The multi-core processor of claim 1, wherein the first set of processor cores and the second set of processor cores are configured to receive one or more control signals from one or more control blocks located in a periphery of the multi-core processor.

PATENT
Atty. Dkt. No. 121-0019-US-REG

6.    (Original) The multi-core processor of claim 1, wherein the first set of processor cores are located in a first region of the multi-core processor, and the second set of processor cores are located in a second region of the multi-core processor.

7.    (Original) The multi-core processor of claim 6, wherein the first region and the second region are overlapping regions of the multi-core processor.

8.    (Original) The multi-core processor of claim 6, wherein the first region and the second region are non-overlapping regions of the multi-core processor.

9.    (Original) The multi-core processor of claim 6, wherein the first region corresponds to a first row of the multi-core processor, and wherein the second region corresponds to a second row of the multi-core processor.

10.    (Original) The multi-core processor of claim 1, wherein the interface block is configured to idle communications between the first set of processor cores and the second set of processor cores when one or more of the first clock signal and/or the second clock signal is determined to have changed.

11.    (Original) The multi-core processor of claim 10, wherein the interface block is configured to resume communication between the first set of processor cores and the second set of processor cores after one or more of the first clock signal and/or the second clock signal is determined to have stabilized.

12.    (Original) The multi-core processor of claim 5, wherein the first set of processor cores is adjacent to the second set of processor cores, and the one or more control blocks are configured to select the first supply voltage and the second supply voltage to maintain a differential relationship between the first supply voltage and the second supply voltage.

13.    (Original) The multi-core processor of claim 12, wherein the differential relationship is based on having an output voltage level associated with the first set of processor cores to be within an acceptable input voltage level associated with the second set of processor cores.

14.    (Original) The multi-core processor of claim 1, wherein the first set of processor cores

**PATENT**
Atty. Dkt. No. 121-0019-US-REG

and the second set of processor cores are configured to receive one or more control signals from one or more control blocks located in a common region that is substantially central to the first set of processor cores and the second set of processor cores.

15.    (Original) A method for managing communications in a multi-core processor that includes a plurality of processor cores having a first set of processor cores and a second set of processor cores, the method comprising:

      idling communications with one or more of the plurality of processor cores in response to a clock frequency change request for the first set of processor cores; and

      resuming communications with one or more of the plurality of processor cores after having determined that a first phase lock loop operation associated with the first set of processor cores has acquired a first lock signal and a second phase lock loop operation associated with the second set of processor cores has also acquired a second lock signal.

16.    (Original) The method of claim 15, wherein resuming communications further comprising having determined that a third phase lock loop operation associated with a third set of processor cores in the multi-core processor has acquired a third lock signal, wherein the third set of processor cores is adjacent to the first set of processor cores.

17.    (Original) The method of claim 16, wherein the second set of processor cores is adjacent to the first set of processor cores.

18.    (Original) A computer-readable medium containing a sequence of instructions for managing communications in a multi-core processor that includes a plurality of processor cores having a first set of processor cores and a second set of processor cores, which when executed by a computing device, causes the computing device to:

      issue a first command to idle communications with one or more of the plurality of processor cores in response to a clock frequency change request for the first set of processor cores;

      issue a second command to resume communications with one or more of the plurality of processor cores after having determined that a first phase lock loop operation associated with the first set of processor cores has acquired a first lock signal and a second phase lock loop operation associated with the second set of processor cores has also acquired a second lock signal.

PATENT
Atty. Dkt. No. 121-0019-US-REG

19.     (Original) The computer-readable medium of claim 18, further including a sequence of instructions, which when executed by the computing device, causes the computing device to determine whether a third phase lock loop operation associated with a third set of processor cores in the multi-core processor has acquired a third lock signal before issuing the second command, wherein the third set of processor cores is adjacent to the first set of processor cores.

20.     (Original) The computer-readable medium of claim 19, wherein the second set of processor cores is adjacent to the first set of processor cores.

21.     (New) A multi-core processor, comprising:

    a first set of processor cores of the multi-core processor, wherein each processor core from the first set of processor cores is configured to dynamically receive a first supply voltage from a power control block and a first clock signal from a clock control block;

    a second set of processor cores of the multi-core processor, wherein each processor core from the second set of processor cores is configured to dynamically receive a second supply voltage from the power control block and a second clock signal from the clock control block; and

    an interface block coupled to the first set of processor cores and also coupled to the second set of processor cores, wherein the interface block is configured to facilitate communication between the first set of processor cores and the second set of processor cores.

22.     (New) The multi-core processor of claim 1, wherein the interface block is configured to idle communications between the first set of processor cores and the second set of processor cores when one or more of the first clock signal and/or the second clock signal is determined to have changed.

23.     (New) The multi-core processor of claim 21, wherein the interface block is configured to resume communication between the first set of processor cores and the second set of processor cores after one or more of the first clock signal and/or the second clock signal is determined to have stabilized.

PATENT
Atty. Dkt. No. 121-0019-US-REG

## REMARKS

Claim 21 - 23 are being introduced.  Claims 1-23 are pending.  No new matter has been introduced.


If there are any questions, please contact the undersigned representative.


Respectfully submitted,


/Gene Su/
Gene I. Su
Attorney for Applicant(s)
Reg. No. 45,140
7F, No. 57, Sec. 2, DunHua S. Road
Taipei, Taiwan
Telephone: (886) 2.2700.7882
Facsimile:  (650) 644.3217
Email:       filing@suipconsulting.com

**PATENT**
Atty. Dkt. No. 121-0019-US-REG

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re Application of:  Andrew WOLFE | § | Group Art Unit:  2115 |
| | § | |
| Serial No.:  12/713,220 | § | Examiner:  LEE, THOMAS C |
| | § | |
| Filed:        February 26, 2010 | § | Confirmation No.:  4243 |
| | § | |
| For:  PROCESSOR CORE COMMUNICATION | § | |
|       IN MULTI-CORE PROCESSOR | § | |
| | § | |

MAIL STOP AMENDMENT
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

## INFORMATION DISCLOSURE STATEMENT

Please consider the U.S. patents and the International Search Report and the Written Opinion listed on the enclosed PTO/SB/08a form.  The cited non-patent literature document is enclosed.

This statement is being filed before the receipt of a first Office Action on the merits.  Although applicant believes that no fees are due in connection with this filing, the Commissioner is hereby authorized to apply any charges or credits to Deposit Account No. 50-4588 to make this filing timely and acceptable to the Office.

Respectfully submitted,

/Gene Su/
Gene I. Su
Attorney for Applicant(s)
Reg. No. 45,140
7F, No. 57, Sec. 2, Dun Hua S. Road
Taipei, Taiwan
Telephone: (886) 2.2700.7882
Facsimile:  (650) 644.3217

Page 1 of 1

049

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (01-10)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 12713220 |
| | Filing Date | 2010-02-26 |
| | First Named Inventor | Andrew WOLFE |
| | Art Unit | 2115 |
| | Examiner Name | LEE, THOMAS C |
| | Attorney Docket Number | 121-0019-US-REG |

### U.S.PATENTS                                                    Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 7735037 | | 2010-06-08 | TELL | entire document, especially Abstract; para [0030], [0035], [0054], [0058], [0127], [0163] |
| | 2 | 7853808 | | 2010-12-14 | KIM et al. | entire document, especially Abstract; Fig.2; para [0004], [0005], [0006], [0011], [0032], [0034], [0035], [0043], [0044], [0048], [0054] |
| | 3 | 7263457 | | 2007-08-28 | WHITE et al. | entire document, especially Abstract; para [0004], [0006], [0009], [0010], [0017], [0032], [0033], [0037] |

If you wish to add additional U.S. Patent citation information please click the Add button.    Add

### U.S.PATENT APPLICATION PUBLICATIONS                            Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button.    Add

### FOREIGN PATENT DOCUMENTS                                       Remove

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | ☐ |

EFS Web 2.1.17

050

| | |
|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99**) | Application Number | 12713220 |
| | Filing Date | 2010-02-26 |
| | First Named Inventor | Andrew WOLFE |
| | Art Unit | 2115 |
| | Examiner Name | LEE, THOMAS C |
| | Attorney Docket Number | 121-0019-US-REG |

| If you wish to add additional Foreign Patent Document citation information please click the Add button | **Add** |
|---|---|

**NON-PATENT LITERATURE DOCUMENTS**    Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T5 |
|---|---|---|---|
| | 1 | NOTIFICATION OF TRANSMITTAL OF THE INTERNATIONAL SEARCH REPORT AND THE WRITTEN OPINION OF THE INTERNATIONAL SEARCHING AUTHORITY, May 17, 2011 | ☐ |

| If you wish to add additional non-patent literature document citation information please click the Add button | **Add** |
|---|---|

**EXAMINER SIGNATURE**

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

# INFORMATION DISCLOSURE STATEMENT BY APPLICANT
( **Not for submission under 37 CFR 1.99)**

| | |
|---|---|
| Application Number | 12713220 |
| Filing Date | 2010-02-26 |
| First Named Inventor | Andrew WOLFE |
| Art Unit | 2115 |
| Examiner Name | LEE, THOMAS C |
| Attorney Docket  Number | 121-0019-US-REG |

---

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

☐ That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

☐ See attached certification statement.

☐ The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

## SIGNATURE
 A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Gene Su/ | Date (YYYY-MM-DD) | 2011-08-02 |
|---|---|---|---|
| Name/Print | Gene Su | Registration Number | 45140 |

This collection of information is required by 37 CFR 1.97 and 1.98.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14.  This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO.  Time will vary depending upon the individual case.  Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

## Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent.  Accordingly, pursuant to the requirements of the Act, please be advised that:  (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent.  If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.      The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a).  Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.      A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.      A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.      A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract.  Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.      A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.      A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.      A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906.  Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive.  Such disclosure shall not be used to make determinations about individuals.

8.      A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151.  Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.      A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

## PATENT COOPERATION TREATY

From the INTERNATIONAL SEARCHING AUTHORITY

| To: | **PCT** |
|-----|---------|
| **GENE SU**<br>**REN-SHENG INTERNATIONAL IP**<br>**MANAGEMENT LTD.**<br>**7F, NO. 57, SEC. 2, DUN HUA S. ROAD**<br>**106 TAIPEI**<br>**TAIWAN, PROVINCE OF CHINA** | NOTIFICATION OF TRANSMITTAL OF<br>THE INTERNATIONAL SEARCH REPORT AND<br>THE WRITTEN OPINION OF THE INTERNATIONAL<br>SEARCHING AUTHORITY, OR THE DECLARATION<br><br>(PCT Rule 44.1) |

| | Date of mailing (day/month/year) **17 MAY 2011** |
|---|---|

| Applicant's or agent's file reference<br>**121-0019-PCT** | **FOR FURTHER ACTION**    See paragraphs 1 and 4 below |
|---|---|
| International application No.<br>**PCT/US 11/24477** | International filing date (day/month/year)<br>**11 February 2011 (11.02.2011)** |

| Applicant  **EMPIRE TECHNOLOGY DEVELOPMENT LLC** |
|---|

---

1. ☒ The applicant is hereby notified that the international search report and the written opinion of the International Searching Authority have been established and are transmitted herewith.

   **Filing of amendments and statement under Article 19:**
   The applicant is entitled, if he so wishes, to amend the claims of the international application (see Rule 46):

   **When?**  The time limit for filing such amendments is normally two months from the date of transmittal of the international search report.

   **Where?**  Directly to the International Bureau of WIPO, 34 chemin des Colombettes
   1211 Geneva 20, Switzerland, Facsimile No.: +41 22 338 82 70

   **For more detailed instructions, see** *PCT Applicant's Guide*, International Phase, paragraphs 9.004 – 9.011.

2. ☐ The applicant is hereby notified that no international search report will be established and that the declaration under Article 17(2)(a) to that effect and the written opinion of the International Searching Authority are transmitted herewith.

3. ☐ **With regard to any protest against payment of (an) additional fee(s) under Rule 40.2, the applicant is notified that:**

   ☐ the protest together with the decision thereon has been transmitted to the International Bureau together with any request to forward the texts of both the protest and the decision thereon to the designated Offices.

   ☐ no decision has been made yet on the protest; the applicant will be notified as soon as a decision is made.

4. **Reminders**

   The applicant may submit comments on an informal basis on the written opinion of the International Searching Authority to the International Bureau. The International Bureau will send a copy of such comments to all designated Offices unless an international preliminary examination report has been or is to be established. Following the expiration of 30 months from the priority date, these comments will also be made available to the public.

   Shortly after the expiration of **18 months** from the priority date, the international application will be published by the International Bureau. If the applicant wishes to avoid or postpone publication, a notice of withdrawal of the international application, or of the priority claim, must reach the International Bureau before the completion of the technical preparations for international publication (Rules 90*bis*.1 and 90*bis*.3).

   Within **19 months** from the priority date, but only in respect of some designated Offices, a demand for international preliminary examination must be filed if the applicant wishes to postpone the entry into the national phase **until 30 months** from the priority date (in some Offices even later); otherwise, the applicant must, **within 20 months** from the priority date, perform the prescribed acts for entry into the national phase before those designated Offices.

   In respect of other designated Offices, the time limit of **30 months** (or later) will apply even if no demand is filed within 19 months.

   For details about the applicable time limits, Office by Office, see www.wipo.int/pct/en/texts/time_limits.html and the *PCT Applicant's Guide*, National Chapters.

| Name and mailing address of the ISA/<br>Mail Stop PCT, Attn: ISA/US<br>Commissioner for Patents<br>P.O. Box 1450, Alexandria, Virginia 22313-1450<br>Facsimile No. 571-273-3201 | Authorized officer<br><br>Lee W. Young<br>PCT Helpdesk: 571-272-4300<br>PCT OSP: 571-272-7774 |
|---|---|
| | Telephone No. |

Form PCT/ISA/220 (July 2010)

## PATENT COOPERATION TREATY

# PCT

### INTERNATIONAL SEARCH REPORT

(PCT Article 18 and Rules 43 and 44)

| Applicant's or agent's file reference<br>121-0019-PCT | **FOR FURTHER<br>ACTION** | see Form PCT/ISA/220<br>as well as, where applicable, item 5 below. |
|---|---|---|
| International application No.<br>PCT/US 11/24477 | International filing date *(day/month/year)*<br>11 February 2011 (11.02.2011) | (Earliest) Priority Date *(day/month/year)*<br>26 February 2010 (26.02.2010) |
| Applicant<br>EMPIRE TECHNOLOGY DEVELOPMENT LLC | | |

This international search report has been prepared by this International Searching Authority and is transmitted to the applicant according to Article 18. A copy is being transmitted to the International Bureau.

This international search report consists of a total of _____ 2 _____ sheets.

☐ It is also accompanied by a copy of each prior art document cited in this report.

1. **Basis of the report**

   a. With regard to the **language**, the international search was carried out on the basis of:

   ☒ the international application in the language in which it was filed.

   ☐ a translation of the international application into _____ which is the language of a translation furnished for the purposes of international search (Rules 12.3(a) and 23.1(b)).

   b. ☐ This international search report has been established taking into account the **rectification of an obvious mistake** authorized by or notified to this Authority under Rule 91 (Rule 43.6*bis*(a)).

   c. ☐ With regard to any **nucleotide and/or amino acid sequence** disclosed in the international application, see Box No. I.

2. ☐ Certain claims were found **unsearchable** (see Box No. II).

3. ☐ **Unity of invention** is lacking (see Box No. III).

4. With regard to the **title**,

   ☒ the text is approved as submitted by the applicant.

   ☐ the text has been established by this Authority to read as follows:

5. With regard to the **abstract**,

   ☒ the text is approved as submitted by the applicant.

   ☐ the text has been established, according to Rule 38.2, by this Authority as it appears in Box No. IV. The applicant may, within one month from the date of mailing of this international search report, submit comments to this Authority.

6. With regard to the **drawings**,

   a. the figure of the drawings to be published with the abstract is Figure No. 2

   ☒ as suggested by the applicant.

   ☐ as selected by this Authority, because the applicant failed to suggest a figure.

   ☐ as selected by this Authority, because this figure better characterizes the invention.

   b. ☐ none of the figures is to be published with the abstract.

Form PCT/ISA/210 (first sheet) (July 2009)

## INTERNATIONAL SEARCH REPORT

International application No.

PCT/US 11/24477

**A.    CLASSIFICATION OF SUBJECT MATTER**

IPC(8) - G06F 13/36 (2011.01)
USPC - 710/306

According to International Patent Classification (IPC) or to both national classification and IPC

**B.    FIELDS SEARCHED**

Minimum documentation searched (classification system followed by classification symbols)
USPC: 710/306

Documentation searched other than minimum documentation to the extent that such documents are included in the fields searched
USPC: 710/1, 33, 56, 315; 370/351, 389, 402; 702/127, 130, 132; 714/699, 746, 752, 755; 711/E12.023 (keyword limited - see search terms below)

Electronic data base consulted during the international search (name of data base and, where practicable, search terms used)
PubWEST (PGPB, USPT, USOC, EPAB, JPAB); GOOGLE; Google Scholar
Terms: processors, multi, core, chip, die, cache, interface, communication, voltage, clock, shift, power, supply, synchronize, timing, shifter, differential.

**C.    DOCUMENTS CONSIDERED TO BE RELEVANT**

| Category* | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| Y | US 2007/0174586 A1 (TELL) 26 July 2007 (26.07.2007) entire document, especially Abstract; para [0030], [0035], [0054], [0058], [0127], [0163] | 1-20 |
| Y | US 2008/0178023 A1 (KIM et al.) 24 July 2008 (24.07.2008) entire document, especially Abstract; Fig. 2; para [0004], [0005], [0006], [0011], [0032], [0034], [0035], [0043], [0044], [0048], [0054] | 1-20 |
| A | US 2007/0156370 A1 (WHITE et al.) 05 July 2007 (05.07.2007) entire document, especially Abstract; para [0004], [0006], [0009], [0010], [0017], [0032], [0033], [0037] | 1-20 |

☐  Further documents are listed in the continuation of Box C.    ☐

| | | |
|---|---|---|
| * | Special categories of cited documents: | "T" later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention |
| "A" | document defining the general state of the art which is not considered to be of particular relevance | |
| "E" | earlier application or patent but published on or after the international filing date | "X" document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone |
| "L" | document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified) | "Y" document of particular relevance; the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art |
| "O" | document referring to an oral disclosure, use, exhibition or other means | |
| "P" | document published prior to the international filing date but later than the priority date claimed | "&" document member of the same patent family |

| Date of the actual completion of the international search | Date of mailing of the international search report |
|---|---|
| 09 May 2011 (09.05.2011) | 1 7 MAY 2011 |

| Name and mailing address of the ISA/US | Authorized officer: |
|---|---|
| Mail Stop PCT, Attn: ISA/US, Commissioner for Patents P.O. Box 1450, Alexandria, Virginia 22313-1450 | Lee W. Young |
| Facsimile No.    571-273-3201 | PCT Helpdesk: 571-272-4300 PCT OSP: 571-272-7774 |

Form PCT/ISA/210 (second sheet) (July 2009)

## PATENT COOPERATION TREATY

From the
INTERNATIONAL SEARCHING AUTHORITY

To: GENE SU
REN-SHENG INTERNATIONAL IP
MANAGEMENT LTD.
7F, NO. 57, SEC. 2, DUN HUA S. ROAD
106 TAIPEI
TAIWAN, PROVINCE OF CHINA

# PCT

WRITTEN OPINION OF THE
INTERNATIONAL SEARCHING AUTHORITY

(PCT Rule 43*bis*.1)

| Date of mailing *(day/month/year)* | 1 7 MAY 2011 |
|---|---|

| Applicant's or agent's file reference | FOR FURTHER ACTION |
|---|---|
| 121-0019-PCT | See paragraph 2 below |

| International application No. | International filing date *(day/month/year)* | Priority date *(day/month/year)* |
|---|---|---|
| PCT/US 11/24477 | 11 February 2011 (11.02.2011) | 26 February 2010 (26.02.2010) |

International Patent Classification (IPC) or both national classification and IPC
IPC(8) - G06F 13/36 (2011.01)
USPC - 710/306

Applicant EMPIRE TECHNOLOGY DEVELOPMENT LLC

1. This opinion contains indications relating to the following items:

☒ Box No. I        Basis of the opinion

☐ Box No. II       Priority

☐ Box No. III      Non-establishment of opinion with regard to novelty, inventive step and industrial applicability

☐ Box No. IV       Lack of unity of invention

☒ Box No. V        Reasoned statement under Rule 43*bis*.1(a)(i) with regard to novelty, inventive step or industrial applicability;
citations and explanations supporting such statement

☐ Box No. VI       Certain documents cited

☐ Box No. VII      Certain defects in the international application

☐ Box No. VIII     Certain observations on the international application

2. **FURTHER ACTION**

If a demand for international preliminary examination is made, this opinion will be considered to be a written opinion of the
International Preliminary Examining Authority ("IPEA") except that this does not apply where the applicant chooses an Authority
other than this one to be the IPEA and the chosen IPEA has notified the International Bureau under Rule 66.1*bis*(b) that written
opinions of this International Searching Authority will not be so considered.

If this opinion is, as provided above, considered to be a written opinion of the IPEA, the applicant is invited to submit to the IPEA
a written reply together, where appropriate, with amendments, before the expiration of 3 months from the date of mailing of Form
PCT/ISA/220 or before the expiration of 22 months from the priority date, whichever expires later.

For further options, see Form PCT/ISA/220.

3. For further details, see notes to Form PCT/ISA/220.

| Name and mailing address of the ISA/US | Date of completion of this opinion | Authorized officer: |
|---|---|---|
| Mail Stop PCT, Attn: ISA/US Commissioner for Patents P.O. Box 1450, Alexandria, Virginia 22313-1450 Facsimile No. 571-273-3201 | 09 May 2011 (09.05.2011) | Lee W. Young PCT Helpdesk: 571-272-4300 PCT OSP: 571-272-7774 |

Form PCT/ISA/237 (cover sheet) (July 2009)

## WRITTEN OPINION OF THE
## INTERNATIONAL SEARCHING AUTHORITY

| International application No. |
| --- |
| PCT/US 11/24477 |

| Box No. I | Basis of this opinion |
| --- | --- |

1. With regard to the **language**, this opinion has been established on the basis of:

   [X] the international application in the language in which it was filed.

   [ ] a translation of the international application into _____ which is the language of a translation furnished for the purposes of international search (Rules 12.3(a) and 23.1(b)).

2. [ ] This opinion has been established taking into account the **rectification of an obvious mistake** authorized by or notified to this Authority under Rule 91 (Rule 43bis.1(a))

3. With regard to any **nucleotide and/or amino acid sequence** disclosed in the international application, this opinion has been established on the basis of a sequence listing filed or furnished:

   a. (means)

      [ ] on paper

      [ ] in electronic form

   b. (time)

      [ ] in the international application as filed

      [ ] together with the international application in electronic form

      [ ] subsequently to this Authority for the purposes of search

4. [ ] In addition, in the case that more than one version or copy of a sequence listing has been filed or furnished, the required statements that the information in the subsequent or additional copies is identical to that in the application as filed or does not go beyond the application as filed, as appropriate, were furnished.

5. Additional comments:

Form PCT/ISA/237 (Box No. I) (July 2009)

## WRITTEN OPINION OF THE
## INTERNATIONAL SEARCHING AUTHORITY

| | International application No. |
|---|---|
| | PCT/US 11/24477 |

| Box No. V | Reasoned statement under Rule 43*bis*.1(a)(i) with regard to novelty, inventive step or industrial applicability; citations and explanations supporting such statement |
|---|---|

**1. Statement**

| | | | | |
|---|---|---|---|---|
| Novelty (N) | Claims | 1-20 | | YES |
| | Claims | None | | NO |
| | | | | |
| Inventive step (IS) | Claims | None | | YES |
| | Claims | 1-20 | | NO |
| | | | | |
| Industrial applicability (IA) | Claims | 1-20 | | YES |
| | Claims | None | | NO |

**2. Citations and explanations:**

Claims 1-20 lack an inventive step under PCT Article 33(3) as being obvious over US 2007/0174586 A1 (Tell) in view of US 2008/0178023 A1 to Kim et al. (hereinafter, 'Kim').

Regarding claim 1, Tell teaches a multi-core processor (processor 54 may comprise any one of several alternative processing circuit cores capable of executing machine-readable instructions provided according to a programmable processing instruction set, para [0058]), comprising: a first set of processor cores of the multi-core processor, wherein each processor core from the first set of processor cores is configured to dynamically receive a first supply voltage and a first clock signal (processor 54 may at least in part control and/or adjust one or more timing characteristics and/or one or more voltage characteristics of signals 84 in multiple, independent closed feedback loops, para [0054]). Tell does not expressly teach a second set of processor cores of the multi-core processor, wherein each processor core from the second set of processor cores is configured to dynamically receive a second supply voltage and a second clock signal; and an interface block coupled to the first set of processor cores and also coupled to the second set of processor cores, wherein the interface block is configured to facilitate communication between the first set of processor cores and the second set of processor cores. However Kim, in an analogous art, teaches a second set of processor cores of the multi-core processor, wherein each processor core from the second set of processor cores is configured to dynamically receive a second supply voltage and a second clock signal (on a multi-core processor system chip by supplying a nominal power supply voltage to a first processing core and a second core power supply voltage to a second processing core, the second core power supply voltage greater or lower than the nominal power supply voltage, para [0006]); and an interface block coupled to the first set of processor cores and also coupled to the second set of processor cores, wherein the interface block is configured to facilitate communication between the first set of processor cores and the second set of processor cores (controlled by a controller 210. It is known that each of the individual processing cores 202, 204, 206, 208 may evidence divergent clock rates f.sub.CLK, k in response to similar operational inputs and operating environments. For example, in response to the same nominal power supply voltage V.sub.DDnom the first core 102 may exhibit an impermissibly slow clock rate relative to a minimum reference clock speed (f.sub.CLK, k,<f.sub.spec), the second core 104 may exhibit an impermissibly fast clock rate relative to a maximum clock speed, para [0032]; Fig.2). It would have been obvious to one skilled in the art to combine the teachings of Tell with those of Kim in order to more efficiently tailor individual operating environments in a multi core processor system (see Kim para [0004]-[0005]).

Regarding claim 2, Kim further teaches the interface block further comprising a first level shifter that is referenced to the second supply voltage and adapted to translate first logic levels associated with the first set of processor cores to second logic levels associated with the second set of processor cores for a first signal traveling from the first set of processor cores to the second set of processor cores (raise or lower each core supply voltage V.sub.DD, k as needed until each core meets specifications, thus enabling the MCP chip to pass both minimum and maximum core clock rate specifications in the present example, para [0043]).

Regarding claim 3, Kim further teaches the interface block further comprising a second level shifter that is referenced to the first supply voltage and adapted to translate second logic levels associated with the second set of processor cores to first logic levels associated with the first set of processor cores for a second signal traveling from the second set of processor cores to the first set of processor cores (repetitive lowering iterations in order to enable graduated and/or incremental voltage lowering of each supply voltage V.sub.DD, k (for example, at steps 310 and 312 above) by the controller, which may gradually lower a core supply voltage V.sub.DD, k for each core 202,204,206,208 to determine the lowest supply voltage at which each individual core will evidence a clock rate required by specifications, para [0044]).

Regarding claim 4, Kim further teaches wherein the interface block further comprises a synchronizer configured to synchronize the first clock signal and the second clock signal for communication between one or more processor cores of the first set of processor cores and one or more processor cores of the second set of processor cores (if individual cores are required to meet a maximum clock rate specification, then the present invention may provide a means for verifying that each core k meets said specifications. Thus, in one example illustrated in FIG. 6, subsequent to determining each core's adjusted power supply voltage V.sub.Min, k at 316 or 318 as described above, the core clock rate f.sub.CLK, k at V.sub.Min, k is compared to a specified maximum rate, para [0048]).

Regarding claim 5, Tell further teaches wherein the first set of processor cores and the second set of processor cores are configured to receive one or more control signals from one or more control blocks located in a periphery of the multi-core processor (Comparator 480 compares the incoming data signals from lines 330 with a reference voltage level, V.sub.ref, which is adjusted by threshold control circuitry 490. Threshold control circuitry 490 may respond to an adjustment signal from processor 54 stored in threshold control register, para [0127]).

---continued in supplemental box---

Form PCT/ISA/237 (Box No. V) (July 2009)

PCT/US2011/024477 17.05.2011

International application No.

PCT/US 11/24477

**Supplemental Box**

In case the space in any of the preceding boxes is not sufficient.
Continuation of:
Box No. V.2. Citations and explanations.

Regarding claim 6, Kim further teaches wherein the first set of processor cores are located in a first region of the multi-core processor, and the second set of processor cores are located in a second region of the multi-core processor (first and second individual processing cores formed on a unitary chip structure, each core connected to first and second adjustable power supplies, para [0011]).

Regarding claim 7, Kim further teaches wherein the first region and the second region are overlapping regions of the multi-core processor (first and second individual processing cores formed on a unitary chip structure, each core connected to first and second adjustable power supplies, para [0011]; the MCP 712 can read and/or write data to/from memory 732, storage system 716, and/or I/O interface, para [0054]).

Regarding claim 8, Kim further teaches wherein the first region and the second region are non-overlapping regions of the multi-core processor (first and second individual processing cores formed on a unitary chip structure, each core connected to first and second adjustable power supplies, para [0011]; the MCP 712 can read and/or write data to/from memory 732, storage system 716, and/or I/O interface, para [0054]).

Regarding claim 9, Kim further teaches wherein the first region corresponds to a first row of the multi-core processor, and wherein the second region corresponds to a second row of the multi-core processor (Fig. 2, communication block 220 may be located between the controller 210 and the cores 202,204,206,208, para [0035]).

Regarding claim 10, Kim further teaches wherein the interface block is configured to idle communications between the first set of processor cores and the second set of processor cores when one or more of the first clock signal and/or the second clock signal is determined to have changed (raise the clock rate of cores that do not meet a minimum reference clock speed, thereby enabling an otherwise failing MCP chip 200 to pass a minimum reference clock specification, para [0043]).

Regarding claim 11, Kim further teaches wherein the interface block is configured to resume communication between the first set of processor cores and the second set of processor cores after one or more of the first clock signal and/or the second clock signal is determined to have stabilized (raise the clock rate of cores that do not meet a minimum reference clock speed, thereby enabling an otherwise failing MCP chip 200 to pass a minimum reference clock specification, para [0043]).

Regarding claim 12, Tell further teaches wherein the first set of processor cores is adjacent to the second set of processor cores, and the one or more control blocks are configured to select the first supply voltage and the second supply voltage to maintain a differential relationship between the first supply voltage and the second supply voltage (the interconnection between circuit elements or circuit blocks may be shown or described as multi-conductor or single conductor signal lines. Each of the multi-conductor signal lines may alternatively be single-conductor signal lines, and each of the single-conductor signal lines may alternatively be multi-conductor signal lines. Signals and signaling paths shown or described as being single-ended may also be differential, para [0163]).

Regarding claim 13, Kim further teaches wherein the differential relationship is based on having an output voltage level associated with the first set of processor cores to be within an acceptable input voltage level associated with the second set of processor cores (controller 210 means is configured to individually select and adjust a supply voltage V.sub.DD, k supplied to each core 202,204,206,208 by its respective adjustable power supply, para [0034]).

Regarding claim 14, Kim further teaches wherein the first set of processor cores and the second set of processor cores are configured to receive one or more control signals from one or more control blocks located in a common region that is substantially central to the first set of processor cores and the second set of processor cores (Comparator 480 compares the incoming data signals from lines 330 with a reference voltage level, V.sub.ref, which is adjusted by threshold control circuitry 490. Threshold control circuitry 490 may respond to an adjustment signal from processor 54 stored in threshold control register, para [0127]).

Regarding claim 15, Tell teaches a method for managing communications (a link may carry or communicate information in the form of a signal from a transmitting device to a receiving device, para [0030]) in a multi-core processor that includes a plurality of processor cores having a first set of processor cores and a second set of processor cores (processor 54 may comprise any one of several alternative processing circuit cores capable of executing machine-readable instructions provided according to a programmable processing instruction set, para [0058]), the method comprising: resuming communications with one or more of the plurality of processor cores after having determined that a first phase lock loop operation associated with the first set of processor cores has acquired a first lock signal and a second phase lock loop operation associated with the second set of processor cores has also acquired a second lock signal (a timing comparison signal may indicate a difference between a phase of an input signal and a phase of a reference signal, para [0035]). Tell does not expressly teach idling communications with one or more of the plurality of processor cores in response to a clock frequency change request for the first set of processor cores. However Kim, in an analogous art, teaches idling communications with one or more of the plurality of processor cores in response to a clock frequency change request for the first set of processor cores (raise the clock rate of cores that do not meet a minimum reference clock speed, thereby enabling an otherwise failing MCP chip 200 to pass a minimum reference clock specification, para [0043]). It would have been obvious to one skilled in the art to combine the teachings of Tell with those of Kim in order to more efficiently tailor individual operating environments in a multi core processor system (see Kim para [0004]-[0005]).

Regarding claim 16, Tell further teaches wherein resuming communications further comprising having determined that a third phase lock loop operation associated with a third set of processor cores in the multi-core processor has acquired a third lock signal, wherein the third set of processor cores is adjacent to the first set of processor cores (a timing comparison signal may indicate a difference between a phase of an input signal and a phase of a reference signal, para [0035]).

---continued in supplemental box---

Form PCT/ISA/237 (Supplemental Box) (July 2009)

## WRITTEN OPINION OF THE
## INTERNATIONAL SEARCHING AUTHORITY

| International application No. |
| --- |
| PCT/US 11/24477 |

**Supplemental Box**

In case the space in any of the preceding boxes is not sufficient.
Continuation of:
Box No. V.2. Citations and explanations.

Regarding claim 17, Kim further teaches wherein the second set of processor cores is adjacent to the first set of processor cores (first and second individual processing cores formed on a unitary chip structure, each core connected to first and second adjustable power supplies, para [0011]; the MCP 712 can read and/or write data to/from memory 732, storage system 716, and/or I/O interface, para [0054]).

Regarding claim 18, Tell teaches a computer-readable medium containing a sequence of instructions for managing communications (a link may carry or communicate information in the form of a signal from a transmitting device to a receiving device, para [0030]) in a multi-core processor that includes a plurality of processor cores having a first set of processor cores and a second set of processor cores (processor 54 may comprise any one of several alternative processing circuit cores capable of executing machine-readable instructions provided according to a programmable processing instruction set, para [0058]), which when executed by a computing device, causes the computing device to: issue a second command to resume communications with one or more of the plurality of processor cores after having determined that a first phase lock loop operation associated with the first set of processor cores has acquired a first lock signal and a second phase lock loop operation associated with the second set of processor cores has also acquired a second lock signal (a timing comparison signal may indicate a difference between a phase of an input signal and a phase of a reference signal, para [0035]). Tell does not expressly teach issue a first command to idle communications with one or more of the plurality of processor cores in response to a clock frequency change request for the first set of processor cores. However Kim, in an analogous art, teaches issue a first command to idle communications with one or more of the plurality of processor cores in response to a clock frequency change request for the first set of processor cores (raise the clock rate of cores that do not meet a minimum reference clock speed, thereby enabling an otherwise failing MCP chip 200 to pass a minimum reference clock specification, para [0043]). It would have been obvious to one skilled in the art to combine the teachings of Tell with those of Kim in order to more efficiently tailor individual operating environments in a multi core processor system (see Kim para [0004]-[0005]).

Regarding claim 19, Tell further teaches a sequence of instructions, which when executed by the computing device, causes the computing device to determine whether a third phase lock loop operation associated with a third set of processor cores in the multi-core processor has acquired a third lock signal before issuing the second command, wherein the third set of processor cores is adjacent to the first set of processor cores (a timing comparison signal may indicate a difference between a phase of an input signal and a phase of a reference signal, para [0035]).

Regarding claim 20, Kim further teaches wherein the second set of processor cores is adjacent to the first set of processor cores (first and second individual processing cores formed on a unitary chip structure, each core connected to first and second adjustable power supplies, para [0011]; the MCP 712 can read and/or write data to/from memory 732, storage system 716, and/or I/O interface, para [0054]).

Claims 1-20 have industrial applicability as defined by PCT Article 33(4) because the subject matter can be made or used in industry.

Form PCT/ISA/237 (Supplemental Box) (July 2009)

# SEARCH HISTORY

| | |
|---|---|
| **Application Number** | PCT/US 11/24477 |
| **Search Conducted By** | BOK |
| **Search Approved By** | RC/RLP |

| | |
|---|---|
| **US/IPC Classifications Searched** | USPC: 710/306 |
| **Date Conducted** | 09 May 2011 (09.05.2011) |

| | |
|---|---|
| **Documentation Searched** | USPC: 710/1, 33, 56, 315; 370/351, 389, 402; 702/127, 130, 132; 714/699, 746, 752, 755; 711/E12.023 (keyword limited; terms below) |
| **Search Terms Used** | processors multi core chip die cache interface communication voltage clock shift power supply synchronize timing shifter differential |
| **Date Conducted** | 09 May 2011 (09.05.2011) |

| | |
|---|---|
| **Electronic Database Searched** | PubWEST |
| **Files Searched** | PGPB, USPT, EPAB, JPAB |
| **Date Conducted** | 09 May 2011 (09.05.2011) |
| **Search Logic:** | |

**DATE: Monday, May 09, 2011**     Purge Queries     Printable Copy     Create Case

| Set Name Side by Side | Query | Hit Count | Set Name Result Set | Set Name Grid |
|---|---|---|---|---|
| | DB=PGPB,USPT,USOC,EPAB,JPAB; PLUR=NO; OP=ADJ | | | |
| L15 | L12 and differential$1 | 1 | L15 | L15 |
| L14 | L12 and shifter$1 | 0 | L14 | L14 |

# SEARCH HISTORY

| | | | | |
|---|---|---|---|---|
| L13 | L12 and (synchroniz$3 near5 (clock$1 or tim$3)) | 2 | L13 | L13 |
| L12 | L8 and synchroniz$3 | 12 | L12 | L12 |
| L11 | L10 and (suppl$3 near5 volt$4) | 2 | L11 | L11 |
| L10 | L8 and (power near5 suppl$3) | 5 | L10 | L10 |
| L9 | L8 and (volt$4 near5 (shift$3 or adjust$3)) | 1 | L9 | L9 |
| L8 | L6 and clock$1 | 37 | L8 | L8 |
| L7 | L6 and voltage$1 | 9 | L7 | L7 |
| L6 | L5 and (communicat$4 or messag$3) | 71 | L6 | L6 |
| L5 | L4 and interfac$3 | 75 | L5 | L5 |
| L4 | L3 and (chip$1 or die$1) | 82 | L4 | L4 |
| L3 | L2 and (multi near4 (core$1 or processor$1)) | 119 | L3 | L3 |
| L2 | L1 and processors | 501 | L2 | L2 |
| L1 | 710/306[ccls] | 1168 | L1 | L1 |

END OF SEARCH HISTORY

**DATE: Monday, May 09, 2011**   Purge Queries    Printable Copy    Create Case

| Set Name Side by Side | Query | Hit Count | Set Name Result Set | Set Name Grid |
|---|---|---|---|---|
| | **DB=PGPB,USPT,USOC,EPAB,JPAB; PLUR=NO; OP=ADJ** | | | |
| L31 | L29 and differential$1 | 8 | L31 | L31 |
| L30 | L29 and shifter$1 | 1 | L30 | L30 |
| L29 | L24 and (synchroniz$3 near5 (clock$1 or tim$3)) | 13 | L29 | L29 |
| L28 | L27 and synchroniz$3 | 1 | L28 | L28 |
| L27 | L26 and (suppl$3 near5 volt$4) | 6 | L27 | L27 |
| L26 | L25 and (power near5 suppl$3) | 6 | L26 | L26 |
| L25 | L24 and (volt$4 near5 (shift$3 or adjust$3)) | 7 | L25 | L25 |
| L24 | L23 and clock$1 | 35 | L24 | L24 |
| L23 | L22 and voltage$1 | 48 | L23 | L23 |
| L22 | L21 and (communicat$4 or messag$3) | 267 | L22 | L22 |
| L21 | L20 and interfac$3 | 276 | L21 | L21 |
| L20 | L19 and cache$1 | 292 | L20 | L20 |
| L19 | L18 and (chip$1 or die$1) | 496 | L19 | L19 |
| L18 | L17 and (multi near4 (core$1 or processor$1)) | 787 | L18 | L18 |
| L17 | L16 and processors | 6144 | L17 | L17 |
| L16 | 710/1[ccls] or 710/33[ccls] or 710/56[ccls] or | 23991 | L16 | L16 |

# SEARCH HISTORY

710/315[ccls] or 370/351[ccls] or 370/389[ccls] or
370/402[ccls] or 702/127[ccls] or 702/130[ccls] or
702/132[ccls] or 714/699[ccls] or 714/746[ccls] or
714/752[ccls] or 714/755[ccls] or 711/E12.023[ccls]

END OF SEARCH HISTORY

**DATE: Monday, May 09, 2011**    Purge Queries      Printable Copy    Create
Case

| Set Name Side by Side | Query | Hit Count | Set Name Result Set | Set Name Grid |
|---|---|---|---|---|
| | *DB=PGPB,USPT,USOC,EPAB,JPAB; PLUR=NO; OP=ADJ* | | | |
| L46 | L45 and differential$1 | 0 | L46 | L46 |
| L45 | L44 and shifter$1 | 6 | L45 | L45 |
| L44 | L43 and (synchroniz$3 near5 (clock$1 or tim$3)) | 57 | L44 | L44 |
| L43 | L42 and synchroniz$3 | 95 | L43 | L43 |
| L42 | L41 and (suppl$3 near5 volt$4) | 161 | L42 | L42 |
| L41 | L40 and (power near5 suppl$3) | 180 | L41 | L41 |
| L40 | L39 and (volt$4 near5 (shift$3 or adjust$3)) | 229 | L40 | L40 |
| L39 | L38 and clock$1 | 1339 | L39 | L39 |
| L38 | L37 and voltage$1 | 1768 | L38 | L38 |
| L37 | L36 and (communicat$4 or messag$3) | 9409 | L37 | L37 |
| L36 | L35 and interfac$3 | 9934 | L36 | L36 |
| L35 | L34 and cache$1 | 11077 | L35 | L35 |
| L34 | L33 and (chip$1 or die$1) | 21552 | L34 | L34 |
| L33 | L32 and (multi near4 (core$1 or processor$1)) | 41711 | L33 | L33 |
| L32 | processors | 409083 | L32 | L32 |

END OF SEARCH HISTORY

| Electronic Database Searched | Google |
|---|---|
| Files Searched | Google |
| Date Conducted | 09 May 2011 (09.05.2011) |

# SEARCH HISTORY



| Search Logic: |
|---|
| Terms: processors multi core chip die cache interface communication voltage clock shift power supply synchronize timing shifter differential |
| About 5,110 results (0.36 seconds) |

| | |
|---|---|
| **Electronic Database Searched** | Google |
| **Files Searched** | Google Scholar |
| **Date Conducted** | 09 May 2011 (09.05.2011) |
| **Search Logic:** | |

Terms: processors multi core chip die cache interface communication voltage clock shift power supply synchronize timing shifter differential

Results 1 - 10 of about 75. (0.23 sec)



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 12/713,220 | 02/26/2010 | Andrew WOLFE | 121-0019-US-REG |

**CONFIRMATION NO. 4243**

83446
REN-SHENG INTERNATIONAL IP MANAGEMENT LTD.
GENE I. SU
7F, NO. 57, SEC. 2, DUN HUA S. ROAD
TAIPEI, 106
TAIWAN

**PUBLICATION NOTICE**

*OC000000049630276*

**Title:** PROCESSOR CORE COMMUNICATION IN MULTI-CORE PROCESSOR

**Publication No.** US-2011-0213991-A1
**Publication Date:** 09/01/2011

# NOTICE OF PUBLICATION OF APPLICATION

The above-identified application will be electronically published as a patent application publication pursuant to 37 CFR 1.211, et seq. The patent application publication number and publication date are set forth above.

The publication may be accessed through the USPTO's publically available Searchable Databases via the Internet at www.uspto.gov. The direct link to access the publication is currently http://www.uspto.gov/patft/.

The publication process established by the Office does not provide for mailing a copy of the publication to applicant. A copy of the publication may be obtained from the Office upon payment of the appropriate fee set forth in 37 CFR 1.19(a)(1). Orders for copies of patent application publications are handled by the USPTO's Office of Public Records. The Office of Public Records can be reached by telephone at (703) 308-9726 or (800) 972-6382, by facsimile at (703) 305-8759, by mail addressed to the United States Patent and Trademark Office, Office of Public Records, Alexandria, VA 22313-1450 or via the Internet.

In addition, information on the status of the application, including the mailing date of Office actions and the dates of receipt of correspondence filed in the Office, may also be accessed via the Internet through the Patent Electronic Business Center at www.uspto.gov using the public side of the Patent Application Information and Retrieval (PAIR) system. The direct link to access this status information is currently http://pair.uspto.gov/. Prior to publication, such status information is confidential and may only be obtained by applicant using the private side of PAIR.

Further assistance in electronically accessing the publication, or about PAIR, is available by calling the Patent Electronic Business Center at 1-866-217-9197.

Office of Data Managment, Application Assistance Unit (571) 272-4000, or (571) 272-4200, or 1-888-786-0101



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/713,220 | 02/26/2010 | Andrew WOLFE | 121-0019-US-REG | 4243 |

83446         7590         08/29/2012
REN-SHENG INTERNATIONAL IP MANAGEMENT LTD.
GENE I. SU
7F, NO. 57, SEC. 2, DUN HUA S. ROAD
TAIPEI, 106
TAIWAN

| EXAMINER |
|---|
| BUTLER, DENNIS |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2115 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 08/29/2012 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

gsu@suipconsulting.com
filing@suipconsulting.com
gene.i.su@gmail.com

PTOL-90A (Rev. 04/07)

| **Office Action Summary** | Application No.<br>12/713,220 | Applicant(s)<br>WOLFE ET AL. | |
|---|---|---|---|
| | Examiner<br>DENNIS M. BUTLER | Art Unit<br>2115 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1)☒ Responsive to communication(s) filed on <u>26 February 2010</u>.

2a)☐ This action is **FINAL**.    2b)☒ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____ ; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims

5)☒ Claim(s) <u>1-23</u> is/are pending in the application.

    5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6)☐ Claim(s) _____ is/are allowed.

7)☒ Claim(s) <u>1-23</u> is/are rejected.

8)☐ Claim(s) _____ is/are objected to.

9)☐ Claim(s) _____ are subject to restriction and/or election requirement.

## Application Papers

10)☐ The specification is objected to by the Examiner.

11)☒ The drawing(s) filed on <u>26 February 2010</u> is/are: a)☒ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

12)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

## Priority under 35 U.S.C. § 119

13)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All    b)☐ Some * c)☐ None of:

      1.☐ Certified copies of the priority documents have been received.

      2.☐ Certified copies of the priority documents have been received in Application No. _____ .

      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☒ Information Disclosure Statement(s) (PTO/SB/08)
Paper No(s)/Mail Date <u>8/2/2011</u>.

4)☐ Interview Summary (PTO-413)
Paper No(s)/Mail Date. _____ .

5)☐ Notice of Informal Patent Application

6)☐ Other: _____ .

Application/Control Number: 12/713,220                    Page 2
Art Unit: 2115

This action is in response to the application filed on February 26, 2010. Claims 1-
23 are pending.

### Claim Objections

Applicant is advised that should claims 10 and 11 be found allowable, claims 22
and 23 will be objected to under 37 CFR 1.75 as being a substantial duplicate thereof.
When two claims in an application are duplicates or else are so close in content that
they both cover the same thing, despite a slight difference in wording, it is proper after
allowing one claim to object to the other as being a substantial duplicate of the allowed
claim.  See MPEP § 706.03(k).

### Claim Rejections - 35 USC § 101

35 U.S.C. 101 reads as follows:

Whoever invents or discovers any new and useful process, machine, manufacture, or composition of
matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the
conditions and requirements of this title.

Claims 18-20 are rejected under 35 U.S.C. 101 because the claimed invention is
directed to non-statutory subject matter.

The claims are directed to a medium that has been defined in the
specification as a transmission type medium such as a wireless communication
channel or link (at paragraph 22) that is a signal. Signals are not statutory under
35 USC 101 because they do not fit any of the four statutory categories. The

claim language would be improved if applicant amended the claims to recite " a

non-transitory computer readable medium".


### Claim Rejections - 35 USC § 112

The following is a quotation of the second paragraph of 35 U.S.C. 112:

The specification shall conclude with one or more claims particularly pointing out and distinctly
claiming the subject matter which the applicant regards as his invention.

Claims 15-20 are rejected under 35 U.S.C. 112, second paragraph, as being

indefinite for failing to particularly point out and distinctly claim the subject matter which

applicant regards as the invention.

Regarding claims 15 and 18, the claims are vague and indefinite as to the

relationship between idling/resuming communications with one or more of the plurality

of processor cores and the first and second sets of processor cores. The claims are

unclear whether the communications are between one or more cores and some internal

or external component, between cores of the same set or between cores of different

sets.

Claims 16-17 and 19-20 are rejected because they incorporate the deficiencies

of claims 15 and 18 respectively.


### Claim Rejections - 35 USC § 102

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

Application/Control Number: 12/713,220                                      Page 4
Art Unit: 2115

A person shall be entitled to a patent unless –

(e) the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language.

.

Claims 1, 5-6, 8-9, 14 and 21 are rejected under 35 U.S.C. 102(e) as being anticipated by Jacobowitz et al., U.S. Patent Application Publication 2009/0106576.

Per claim 1:

A)      Jacobowitz et al teach the following claimed items:

1.       a first set of processor cores of the multi-core processor configured to dynamically receive a first supply voltage and a first clock signal with the V0 cores 102 (top set) of figure 6 and paragraphs 32, 34, 37-38 and 43;

2.       a second set of processor cores of the multi-core processor configured to dynamically receive a second supply voltage and a second clock signal with the V1 cores 102 (bottom set) of figure 6 and paragraphs 32, 34, 37-38 and 43;

3.       an interface block coupled to the first and second sets of cores and configured to facilitate communication between the first and second sets of cores with internal cluster fabric 206, MCM fabric controller 208 and fabric 210 of figure 2 and paragraph 28.

Per claims 5-6, 8-9 and 14:

Jacobowitz discloses that the first and second sets of cores are configured to receive control signals from one or more control blocks located in a periphery of

the multi-core processor with the 2ND level distribution function block and/or the local store vData and distribution block. Jacobowitz discloses locating the first set of cores in a first region/row and the second set of cores in a second region/row, the regions are non-overlapping with figure 6. Jacobowitz discloses that the first and second sets of cores are configured to receive control signals from one or more control blocks located in a common region of the multi-core processor with the 2ND level distribution function block 502.

Per claim 21:

A)      Jacobowitz et al teach the following claimed items:

1.       a first set of processor cores of the multi-core processor configured to dynamically receive a first supply voltage from a power control block (local power grid controller) and a first clock signal from a clock control block (local core clock controller) with the V0 cores 102 (top set) of figure 6 and paragraphs 32, 34, 37-38 and 43;

2.      a second set of processor cores of the multi-core processor configured to dynamically receive a second supply voltage from a power control block (local power grid controller) and a second clock signal from a clock control block (local core clock controller) with the V1 cores 102 (bottom set) of figure 6 and paragraphs 32, 34, 37-38 and 43;

3.      an interface block coupled to the first and second sets of cores and configured to facilitate communication between the first and second sets of cores

Application/Control Number: 12/713,220                                    Page 6
Art Unit: 2115

with internal cluster fabric 206, MCM fabric controller 208 and fabric 210 of figure

2 and paragraph 28.


### *Claim Rejections - 35 USC § 103*


The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

This application currently names joint inventors. In considering patentability of the

claims under 35 U.S.C. 103(a), the examiner presumes that the subject matter of the

various claims was commonly owned at the time any inventions covered therein were

made absent any evidence to the contrary. Applicant is advised of the obligation under

37 CFR 1.56 to point out the inventor and invention dates of each claim that was not

commonly owned at the time a later invention was made in order for the examiner to

consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g)

prior art under 35 U.S.C. 103(a).


Claims 2-4, 7, 12 and 13 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Jacobowitz et al., U.S. Patent Application Publication 2009/0106576

in view of Kim et al., U.S. Patent Application Publication 2009/0138737.

Per claims 2 and 3:

073

Application/Control Number: 12/713,220                                    Page 7
Art Unit: 2115

Jacobowitz discloses a multi-core processor including an interface block
configured to facilitate communication as described above in connection to the
rejection of claim 1. Jacobowitz does not disclose first and second level shifters
adapted to translate logic levels as claimed. Kim teaches that it is known to
include first and second level shifters adapted to translate logic levels in a multi-
core processor with voltage level translating communication transceiver 180 of
figure 1 and at paragraph 24. It would have been obvious to one having ordinary
skill in the art at the time the invention was made to include first and second level
shifters adapted to translate logic levels in a multi-core processor, as taught by
Kim, in order to enable communication between each of the cores that are
operating at different voltage levels.

Per claims 4, 7, 12 and 13:

It would have been obvious to one having ordinary skill in the art at the time the
invention was made to include a synchronizer in the multi-core processor of
Jacobowitz because Jacobowitz discloses providing dynamically programmable
local oscillators for each set of cores and synchronizing the core clock signals
would allow for synchronous communication of data between the cores.
Jacobowitz discloses placing sets of cores in non-overlapping regions of the
processor. However,  placing sets of cores in overlapping regions of the
processor is an obvious design choice and would have been obvious to one of
ordinary skill in the art in view of Jacobowitz's disclosure of including a plurality of
sets of cores in a multi-core processor. Kim discloses maintaining a differential

Application/Control Number: 12/713,220                                    Page 8
Art Unit: 2115

relationship between the first and second supply voltages with voltage level

translating communication transceiver 180 of figure 1 and at paragraph 24.


Claims 10-11,15-20 and 22-23 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Jacobowitz et al., U.S. Patent Application Publication 2009/0106576

in view of Kim et al., U.S. Patent Application Publication 2009/0138737 and further in

view of von Kaenel, U.S. Patent Application Publication 2010/0188115.

Per claims 10-11,15, 18 and 22-23:

Jacobowitz discloses a multi-core processor including first and second sets of

cores and an interface block configured to facilitate communication between

cores as described above in connection to the rejection of claim 1. Jacobowitz

does not disclose idling communications and resuming communications as

claimed. Kim discloses that it is known to use first and second PLLs for

managing communications in a multi-core processor with PLL1-4 of figure 2 and

paragraph 25. While Kim does not explicitly disclose idling communications in

response to a change in frequency request and resuming communications when

the PLLs have locked/stabilized the requested clock, von Kaenel discloses that it

is known to stop core activity when changing frequency and waiting until lock

before resuming activity with figure 9 and paragraphs 73-76. It would have been

obvious to one having ordinary skill in the art at the time the invention was made

to idle communications with one or more of the plurality of cores in response to a

clock frequency change request for the first set of cores and  resume

communications with one or more of the plurality of cores after having

determined that a first phase lock loop operation associated with the first set of

cores has acquired a first lock signal and a second phase lock loop operation

associated with the second set of cores has also acquired a second lock signal in

order to avoid the unpredictable effects of communicating while the PLL is being

programmed with the new frequency and has not locked on the new frequency.

Per claims 16-17 and 19-20:

It would have been obvious to one having ordinary skill in the art at the time the

invention was made to add a third PLL for a third set of processor cores in order

to gain the cumulative effect of increasing processing power and/or flexibility by

increasing the number of sets of processor cores. Jacobowitz discloses locating

sets of cores adjacent to each other with figures 2 and 6.


### *Conclusion*

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to DENNIS M. BUTLER whose telephone number is

(571)272-3663.  The examiner can normally be reached on M-F from 9:00 to 5:30.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Thomas Lee, can be reached on 571-272-3667.  The fax phone number for

the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

Application/Control Number: 12/713,220                                    Page 10
Art Unit: 2115

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://portal.uspto.gov/external/portal.

Should you have questions on access to the Private PAIR system, contact the

Electronic Business Center (EBC) at 866-217-9197 (toll-free).


/DENNIS M BUTLER/                          DENNIS M BUTLER
Primary Examiner, Art Unit 2115           Primary Examiner
                                          Art Unit 2115

| *Notice of References Cited* | Application/Control No. 12/713,220 | Applicant(s)/Patent Under Reexamination WOLFE ET AL. | |
|---|---|---|---|
| | Examiner DENNIS M. BUTLER | Art Unit 2115 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| * | A | US-2010/0188115 | 07-2010 | von Kaenel, Vincent R. | 326/16 |
| * | B | US-2010/0162018 | 06-2010 | SUBRAMANIAN et al. | 713/322 |
| * | C | US-2009/0106576 | 04-2009 | Jacobowitz et al. | 713/501 |
| * | D | US-2009/0138737 | 05-2009 | Kim et al. | 713/322 |
| * | E | US-7,248,838 | 07-2007 | Goodnow et al. | 455/70 |
| * | F | US-8,225,315 | 07-2012 | Cheng et al. | 718/1 |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                    **Notice of References Cited**                    Part of Paper No. 20120822

Receipt date: 08/02/2011                                                    12713220 - GAU: 2115

Doc code: IDS                                                              PTO/SB/08a (01-10)
Doc description: Information Disclosure Statement (IDS) Filed               Approved for use through 07/31/2012. OMB 0651-0031
                                                                          U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 12713220 |
| | Filing Date | 2010-02-26 |
| | First Named Inventor | Andrew WOLFE |
| | Art Unit | 2115 |
| | Examiner Name | LEE, THOMAS C |
| | Attorney Docket Number | 121-0019-US-REG |

| U.S.PATENTS | | | | | | Remove |
|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| /D.B./ | 1 | 7735037 | | 2010-06-08 | TELL | entire document, especially Abstract; para [0030], [0035], [0054], [0058], [0127], [0163] |
| /D.B./ | 2 | 7853808 | | 2010-12-14 | KIM et al. | entire document, especially Abstract; Fig.2; para [0004], [0005], [0006], [0011], [0032], [0034], [0035], [0043], [0044], [0048], [0054] |
| /D.B./ | 3 | 7263457 | | 2007-08-28 | WHITE et al. | entire document, especially Abstract; para [0004], [0006], [0009], [0010], [0017], [0032], [0033], [0037] |

If you wish to add additional U.S. Patent citation information please click the Add button.    Add

| U.S.PATENT APPLICATION PUBLICATIONS | | | | | | Remove |
|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button.    Add

| FOREIGN PATENT DOCUMENTS | | | | | | | Remove |
|---|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
| | 1 | | | | | | | ☐ |

079

Receipt date: 08/02/2011

| | |
|---|---|
| Application Number | 12713220 |
| Filing Date | 2010-02-26 |
| First Named Inventor | Andrew WOLFE |
| Art Unit | 2115 |
| Examiner Name | LEE, THOMAS C |
| Attorney Docket Number | 121-0019-US-REG |

12713220 - GAU: 2115

# INFORMATION DISCLOSURE STATEMENT BY APPLICANT
( Not for submission under 37 CFR 1.99)

If you wish to add additional Foreign Patent Document citation information please click the Add button    Add

## NON-PATENT LITERATURE DOCUMENTS    Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|
| /D.B./ | 1 | NOTIFICATION OF TRANSMITTAL OF THE INTERNATIONAL SEARCH REPORT AND THE WRITTEN OPINION OF THE INTERNATIONAL SEARCHING AUTHORITY, May 17, 2011 | ☐ |

If you wish to add additional non-patent literature document citation information please click the Add button    Add

## EXAMINER SIGNATURE

| Examiner Signature | /Dennis Butler/ | Date Considered | 08/22/2012 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

EFS Web 2.1.17

080

PATENT
Atty. Dkt. No. 121-0019-US-REG

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re Application of: | § | |
|       Andrew WOLFE | § | |
| | § | Group Art Unit: 2115 |
| Serial No.: 12/713,220 | § | |
| | § | |
| Confirmation No.: 4243 | § | |
| | § | Examiner: BUTLER, DENNIS |
| Filed: February 26, 2010 | § | |
| | § | |
| For:    PROCESSOR CORE | § | |
|         COMMUNICATION IN MULTI- | § | |
|         CORE PROCESSOR | § | |

**MAIL STOP AMENDMENT**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

### RESPONSE TO OFFICE ACTION DATED AUGUST 29, 2012

In response to the non-final Office Action dated August 29, 2012 having a shortened statutory period for response set to expire on November 29, 2012, please enter this response and reconsider the claims pending in the application for the reasons discussed below.  Although Applicant believes that no fees are due in connection with this response, the Commissioner is hereby authorized to charge Counsel's Deposit Account No. 50-4588/121-0019-US-REG for any fees, including extension of time fees or excess claims fees, required to make this response timely and acceptable to the Office.

      **Amendments to the Specification** are reflected on page 2 of this paper.

**Amendments to the Claims** are reflected in the listing of claims which begins on page 3 of this paper.  **Remarks** begin on page 8 of this paper.

PATENT
Atty. Dkt. No. 121-0019-US-REG

**IN THE SPECIFICATION:**

The following paragraph will replace paragraph [0017] in the as filed application:

**[0017]** Processing for the transition processing routine [[300]]400 may begin at operation [[302]]402, "receive clock frequency change request." Operation [[302]]402 may be followed by operation [[304]]404, "idle communication between stripes." Operation [[304]]404 may be followed by operation [[306]]406, "examine PLL blocks of requesting stripe and adjacent stripe(s)." Operation [[306]]406 may be followed by operation [[308]]408, "does each of PLL blocks acquire a lock?" Operation [[308]]408 may be followed by either operation [[306]]406 when the decision logic tested at block [[308]]408 fails to be satisfied (NO), or operation [[310]]410, "determine whether to resume communication between stripes", when the decision logic tested at block [[308]]408 is satisfied (YES). Processing for the routine may terminate after block [[310]]410.

PATENT
Atty. Dkt. No. 121-0019-US-REG

**IN THE CLAIMS:**

The listing of claims will replace all prior versions, and listings, of claims in the application.

1.      (Currently Amended) A multi-core processor, comprising:

a first set of processor cores of the multi-core processor, wherein each processor core from the first set of processor cores is configured to dynamically receive a first supply voltage and a first output clock signal of a first phase lock loop (PLL) having a first clock signal as input;

a second set of processor cores of the multi-core processor, wherein each processor core from the second set of processor cores is configured to dynamically receive a second supply voltage and a second output clock signal of a second PLL having a second clock signal as input, wherein the first supply voltage is independent from the second supply voltage, and the first clock signal is independent from the second clock signal; and

an interface block coupled to the first set of processor cores and also coupled to the second set of processor cores, wherein the interface block is configured to facilitate communication between the first set of processor cores and the second set of processor cores.

2.      (Original) The multi-core processor of claim 1, the interface block further comprising a first level shifter that is referenced to the second supply voltage and adapted to translate first logic levels associated with the first set of processor cores to second logic levels associated with the second set of processor cores for a first signal traveling from the first set of processor cores to the second set of processor cores.

3.      (Original) The multi-core processor of claim 1, the interface block further comprising a second level shifter that is referenced to the first supply voltage and adapted to translate second logic levels associated with the second set of processor cores to first logic levels associated with the first set of processor cores for a second signal traveling from the second set of processor cores to the first set of processor cores.

4.      (Original) The multi-core processor of claim 1, wherein the interface block further comprises a synchronizer configured to synchronize the first clock signal and the second clock

PATENT
Atty. Dkt. No. 121-0019-US-REG

signal for communication between one or more processor cores of the first set of processor cores and one or more processor cores of the second set of processor cores.

5.      (Original) The multi-core processor of claim 1, wherein the first set of processor cores and the second set of processor cores are configured to receive one or more control signals from one or more control blocks located in a periphery of the multi-core processor.

6.      (Original) The multi-core processor of claim 1, wherein the first set of processor cores are located in a first region of the multi-core processor, and the second set of processor cores are located in a second region of the multi-core processor.

7.      (Original) The multi-core processor of claim 6, wherein the first region and the second region are overlapping regions of the multi-core processor.

8.      (Original) The multi-core processor of claim 6, wherein the first region and the second region are non-overlapping regions of the multi-core processor.

9.      (Original) The multi-core processor of claim 6, wherein the first region corresponds to a first row of the multi-core processor, and wherein the second region corresponds to a second row of the multi-core processor.

10.     (Currently Amended) The multi-core processor of claim 1, wherein the interface block is configured to idle communications between the first set of processor cores and the second set of processor cores when one or more of the first output clock signal and/or the second output clock signal is determined to have changed.

11.     (Currently Amended) The multi-core processor of claim 10, wherein the interface block is configured to resume communication between the first set of processor cores and the second set of processor cores after one or more of the first output clock signal and/or the second output clock signal is determined to have stabilized.

12.     (Original) The multi-core processor of claim 5, wherein the first set of processor cores is adjacent to the second set of processor cores, and the one or more control blocks are

PATENT
Atty. Dkt. No. 121-0019-US-REG

configured to select the first supply voltage and the second supply voltage to maintain a differential relationship between the first supply voltage and the second supply voltage.

13.    (Original) The multi-core processor of claim 12, wherein the differential relationship is based on having an output voltage level associated with the first set of processor cores to be within an acceptable input voltage level associated with the second set of processor cores.

14.    (Original) The multi-core processor of claim 1, wherein the first set of processor cores and the second set of processor cores are configured to receive one or more control signals from one or more control blocks located in a common region that is substantially central to the first set of processor cores and the second set of processor cores.

15.    (Currently Amended) A method for managing communications in a multi-core processor that includes a plurality of processor cores having a first set of processor cores and a second set of processor cores, the method comprising:

> idling communications ~~with one or more of the plurality of processor cores~~<u>between the first set of processor cores and the second set of processor cores</u> in response to a clock frequency change request for the first set of processor cores; and
>
> resuming communications ~~with one or more of the plurality of processor cores~~<u>between the first set of processor cores and the second set of processor cores</u> after having determined that a first phase lock loop operation associated with <u>a first clock signal for</u> the first set of processor cores has acquired a first lock signal and a second phase lock loop operation associated with <u>a second clock signal for</u> the second set of processor cores has also acquired a second lock signal<u>, wherein the first clock signal is independent from the second clock signal</u>.

16.    (Original) The method of claim 15, wherein resuming communications further comprising having determined that a third phase lock loop operation associated with a third set of processor cores in the multi-core processor has acquired a third lock signal, wherein the third set of processor cores is adjacent to the first set of processor cores.

17.    (Original) The method of claim 16, wherein the second set of processor cores is adjacent to the first set of processor cores.

PATENT
Atty. Dkt. No. 121-0019-US-REG

18.    (Currently Amended) A non-transistory computer-readable medium containing a sequence of instructions for managing communications in a multi-core processor that includes a plurality of processor cores having a first set of processor cores and a second set of processor cores, which when executed by a computing device, causes the computing device to:

> issue a first command to idle communications ~~with one or more of the plurality of processor cores~~between the first set of processor cores and the second set of processor cores in response to a clock frequency change request for the first set of processor cores;

> issue a second command to resume communications ~~with one or more of the plurality of processor cores~~between the first set of processor cores and the second set of processor cores after having determined that a first phase lock loop operation associated with a first clock signal for the first set of processor cores has acquired a first lock signal and a second phase lock loop operation associated with a second clock signal for the second set of processor cores has also acquired a second lock signal, wherein the first clock signal is independent from the second clock signal.

19.    (Currently Amended) The non-transistory computer-readable medium of claim 18, further including a sequence of instructions, which when executed by the computing device, causes the computing device to determine whether a third phase lock loop operation associated with a third set of processor cores in the multi-core processor has acquired a third lock signal before issuing the second command, wherein the third set of processor cores is adjacent to the first set of processor cores.

20.    (Currently Amended) The non-transistory computer-readable medium of claim 19, wherein the second set of processor cores is adjacent to the first set of processor cores.

21.    (Currently Amended) A multi-core processor, comprising:

> a first set of processor cores of the multi-core processor, wherein each processor core from the first set of processor cores is configured to dynamically receive a first supply voltage from a power control block and a first output clock signal from a first phase lock loop (PLL) having a first clock signal as input in a clock control block;

> a second set of processor cores of the multi-core processor, wherein each processor core from the second set of processor cores is configured to dynamically receive

PATENT
Atty. Dkt. No. 121-0019-US-REG

a second supply voltage from the power control block and a second <u>output </u>clock signal from <u>a second PLL having a second clock signal as input in </u>the clock control block<u>, wherein the first supply voltage is independent from the second supply voltage, and the first clock signal is independent from the second clock signal</u>; and

an interface block coupled to the first set of processor cores and also coupled to the second set of processor cores, wherein the interface block is configured to facilitate communication between the first set of processor cores and the second set of processor cores.

22.    (Currently Amended) The multi-core processor of claim [[1]]<u>21</u>, wherein the interface block is configured to idle communications between the first set of processor cores and the second set of processor cores when one or more of the first <u>output </u>clock signal and/or the second <u>output </u>clock signal is determined to have changed.

23.    (Currently Amended) The multi-core processor of claim [[21]]<u>22</u>, wherein the interface block is configured to resume communication between the first set of processor cores and the second set of processor cores after one or more of the first <u>output </u>clock signal and/or the second <u>output </u>clock signal is determined to have stabilized.

**PATENT**
Atty. Dkt. No. 121-0019-US-REG

## REMARKS

This is intended as a full and complete response to the Office Action dated August 29, 2012, having a shortened statutory period for response set to expire on November 29, 2012. By way of this reply, Applicant is amending claims 1, 10-11, 15, and 18-23. Claims 1 – 23 are pending. Applicant is also amending paragraph [0017] in the as filed application, which describes FIG. 4, to correct typographical errors. No new matter has been added.

### Examiner Interview

Applicant thanks Examiner Butler for the November 27, 2012 telephone interview. The interview included discussions of the 35 U.S.C. § 101 rejections, 35 U.S.C. § 112 rejections, 35 U.S.C. § 102, and 35 U.S.C. § 103 rejections in view of the references cited in the Office Action. An agreement was reached regarding the 35 U.S.C. § 101 rejections and the 35 U.S.C. § 112 rejections. Pending the Examiner's further searches, the Examiner acknowledges that the architecture shown and described in the present disclosure differs from the currently cited references.

Applicant respectfully submits that the claims as presented in this response substantially reflect the discussions during the interview.

### Claim Objections

Claims 22 – 23 are objected to under 37 CFR 1.75 as allegedly being substantial duplicates of claims 10 and 11. Claims 22 – 23 have been amended to depend on claims 21 and 22, respectively. Claim 21 also recites different elements than claim 1 (e.g., a power control block and a clock control block). Applicant respectfully requests the withdrawal of the claim objections.

### 35 U.S.C. § 101 Rejection

Claims 18 – 20 are rejected under 35 U.S.C. §101, because the claimed invention is allegedly directed to non-statutory subject matter. The suggested "non-transitory" language has been added, and Applicant respectfully requests the withdrawal of the rejections under 35 U.S.C. §101.

### 35 U.S.C. § 112 Rejection

Claims 15 – 20 are rejected under 35 U.S.C. §112, second paragraph for being allegedly indefinite and failing to particularly point out and distinctly claim the subject matter which Applicant regards as the invention. As discussed during the interview, Applicant has amended

PATENT
Atty. Dkt. No. 121-0019-US-REG

independent claims 15 and 18 to clarify that the communication is "between the first set of processor cores and the second set of processor cores." The amendments are at least supported by paragraph [0018] and FIG. 1, FIG. 3, and FIG. 4 of the as filed application. Applicant respectfully requests the withdrawal of the rejections under 35 U.S.C. §112.

### 35 U.S.C. § 102 Rejections

Claims 1, 5 – 6, 8 – 9, 14 and 21 are rejected under 35 U.S.C. §102(e) as being allegedly anticipated by U.S. Patent Application Publication 2009/0106576 (hereinafter *Jacobowitz*).

Applicant does not concede that the above reference is prior art and reserves the right to challenge the reference at a later date. Further, Applicant respectfully submits that the rejections are overcome for at least the reasons stated below.

To anticipate a claim, the alleged reference must teach each and every element of the claim. Applicant respectfully submits that *Jacobowitz* does not teach or suggest one or more elements of the amended independent claims 1 and 21. Specifically, *Jacobowitz* does not teach or suggest at least the elements of "a first set of processor cores… configured to dynamically receive a first supply voltage and a first output clock signal of a first phase lock loop (LLP) having a first clock signal as input," "a second set of processor cores… configured to dynamically received a second supply voltage and a second output clock signal of a second PLL having a second clock signal as input, wherein the first supply voltage is independent from the second supply voltage, and the first clock signal is independent from the second clock signal." The claim amendments are at least supported by paragraph [0015] and FIG. 3 of the as filed application.

First, *Jacobowitz* fails to disclose or teach a first set of processor cores and second set of processor cores configured to dynamically receive a first supply voltage and a second supply voltage, respectively. In addition, the first supply voltage is <u>independent from</u> the second supply voltage, as required in the amended independent claims 1 and 21. Paragraph [0043] of *Jacobowitz* merely mentions that "[f]urther power management can be realized by controlling the power supply voltage (Vdd) to each core and/or chip." In other words, *Jacobowitz* is silent with respect to least the recited different <u>sets of processor cores</u> configured to receive <u>independent</u> supply voltages.

Second, FIG. 6 and all other figures of *Jacobowitz* clearly show that the microprocessor chip (e.g., 600) receives a system reference oscillator clock frequency ($v_R$) and distributes $v_R$ to local oscillators 108. <u>See</u> *Jacobowitz*, paragraphs [0037]-[0038] and FIG. 6. *Jacobowitz* fails to

PATENT
Atty. Dkt. No. 121-0019-US-REG

disclose or teach a first set of processor cores and second set of processor cores configured to dynamically receive <u>a first output clock signal of a first PLL having a first clock signal as input</u> and <u>a second output clock signal of a second PLL having a second clock signal as input</u>, respectively.  In addition, the first clock signal is independent from the second clock signal, as required in the amended independent claims 1 and 21.

For at least the reasons set forth above, the amended independent claims 1 and 21 and the related dependent claims 2 – 14 and 22 – 23 are patentable over *Jacobowitz*.  Applicant respectfully requests the withdrawal of the rejections under 35 U.S.C. §102.

## 35 U.S.C. § 103 Rejections

Claims 2 – 4, 7, 12 and 13 are rejected under 35 U.S.C. §103(a) as being allegedly unpatentable over *Jacobowitz* in view of U.S. Patent Application Publication 2009/0138737 (hereinafter *Kim*).

Claims 10 – 11, 15 – 20 and 22 – 23 rejected under 35 U.S.C. §103(a) as being allegedly unpatentable over *Jacobowitz* in view of Kim and further in view of U.S. Patent Application Publication 2010/0188115 (hereinafter *von Kaenel*).

Applicant does not concede that the aforementioned references are prior art and reserves the right to challenge these references at a later date.  Further Applicant respectfully submits that these rejections are overcome for at least the reasons stated below.

To establish a *prima facie* case of obviousness required for a §103(a) rejection, the references must teach or suggest all the claim elements.

<u>Claims 2 – 4, 7, 12 and 13</u>

As discussed during the interview, *Kim* discloses a different architecture than the one recited in the present disclosure.  Specifically, as shown in FIG. 1 and FIG. 2 of *Kim*, *Kim* fails to disclose or teach a first set of processor cores and second set of processor cores configured to dynamically receive a first supply voltage and a second supply voltage, which is independent from the first supply voltage, respectively.  Instead, *Kim* discloses having each core, <u>not</u> a set of processor cores, received a $V_{DD}$ (i.e., $V_{DD1}$, $V_{DD2}$, $V_{DD3}$, and $V_{DD4}$).

In addition, *Kim* also fails to disclose or teach a first set of processor cores and second set of processor cores configured to dynamically receive a first output clock signal of a first PLL having a first clock signal as input and a second output clock signal of a second PLL having a second clock signal, respectively.  In addition, the first clock signal is independent from the second clock signal.  Instead, *Kim* discloses the apparatus comprising a multi-core processor (i.e., 100 in FIG. 1 or 200 in FIG. 2) having a single clock source (i.e., 170 in FIG. 1 or 270 in

PATENT
Atty. Dkt. No. 121-0019-US-REG

FIG. 2). The clock signal from this single clock source is then processed (i.e., divided or multiplied) and provided to each of the cores. See Kim, paragraphs [0024]-[0025] and FIGs 1 – 2.

Moreover, the Examiner acknowledges that Jacobowitz does not disclose the recited first and second level shifters in claims 2 and 3. See Office Action, page 7. Kim merely discloses a voltage level-translating communication transceiver 180 that is "configured to enable communications between each of the plurality of cores 110, 120, 130, and 140." See Kim, paragraph [0024]. Kim is silent with respect to the recited "first level shifter that is referenced to the second supply voltage" (which is independent from the first supply voltage) and "adapted to translate… for a first signal traveling from the first set of processor cores to the second set of processor cores" in claim 2. Kim is also silent with respect to the recited "second level shifter that is referenced to the first supply voltage" and "adapted to translate… for a second signal traveling from the second set of processor cores to the first set of processor cores."

For at least the reasons set forth above, Kim fails to cure the deficiencies of Jacobowitz.

Claims 10 – 11, 15, 18 and 22 – 23

The Examiner acknowledges neither Jacobowitz nor Kim discloses the recited operations of idling communications and resuming communications. See Office Action, page 8. Applicant respectfully submits that none of Jacobowitz, Kim, and von Kaenel discloses or teaches at least "resuming communications… after having determined that a first phase lock loop operation associated with a first clock signal for the first set of processor cores has acquired a first lock signal and a second phase lock loop operation associated with a second clock signal for the second set of processor cores has also acquired a second lock signal, wherein the first clock signal is independent from the second clock signal," as required in the amended independent claims 15 and 18.

As discussed above, neither Jacobowitz nor Kim discloses having sets of processor cores configured to receive multiple and independent clock signals. In conjunction with its FIG. 9, von Kaenel merely describes "wait[ing] for the clock generation circuit to lock to the new frequency (block 148)" in paragraph [0074]. von Kaenel is silent with respect to at least the recited elements of "idling communication… in response to a clock frequency change request" and "resuming communication" after having determined the acquisition of PLL lock signals associated with multiple independent clock signals.

For at least the reasons set forth above, von Kaenel fails to cure the deficiencies of Jacobowitz and Kim.

PATENT
Atty. Dkt. No. 121-0019-US-REG

Thus, claims 2 – 4, 7, 10 – 13, 15 – 20, and 22 - 23 are patentable over *Jacobowitz*, *Kim*, and *von Kaenel*.  Applicant respectfully requests the withdrawal of the rejections under 35 U.S.C. §103.

**PATENT**
Atty. Dkt. No. 121-0019-US-REG

## CONCLUSION

Having addressed all issues set out in the office action, Applicant respectfully submits that the claims are in condition for allowance and respectfully requests that the claims be allowed.  If there are any questions about any of the foregoing, please contact Applicant's undersigned representative.

Respectfully submitted,

/Gene Su/
Gene Su
Attorney for Applicant(s)
Registration No. 45,140

Telephone:   (886) 2.2700.7882
Facsimile 1:  (886) 2.2700.7856
Facsimile 2:  (650) 644.3217
Email: filing@suipconsulting.com

Page 13

093



Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇs Pᴀᴛᴇɴᴛ ᴀɴᴅ Tʀᴀᴅᴇᴍᴀʀᴋ Oғғɪᴄᴇ

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/713,220 | 02/26/2010 | Andrew WOLFE | 121-0019-US-REG | 4243 |

83446        7590        12/03/2012
REN-SHENG  INTERNATIONAL IP MANAGEMENT LTD.
GENE I. SU
7F, NO. 57, SEC. 2, DUN HUA S. ROAD
TAIPEI, 106
TAIWAN

| EXAMINER |
|---|
| BUTLER, DENNIS |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2115 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 12/03/2012 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

gsu@suipconsulting.com
filing@suipconsulting.com
gene.i.su@gmail.com

PTOL-90A (Rev. 04/07)

| ***Applicant-Initiated Interview Summary*** | Application No. | Applicant(s) |
| | 12/713,220 | WOLFE ET AL. |
| | Examiner | Art Unit |
| | DENNIS M. BUTLER | 2115 |

All participants (applicant, applicant's representative, PTO personnel):

(1) *Dennis Butler (examiner 2115)*.          (3) _____.

(2) *Gene Su (applicant's representative)*.    (4) _____.

Date of Interview: *27 November 2012*.

Type:    ☒ Telephonic    ☐ Video Conference
         ☐ Personal [copy given to: ☐ applicant    ☐ applicant's representative]

Exhibit shown or demonstration conducted:    ☐ Yes    ☒ No.
    If Yes, brief description: _____.

Issues Discussed    ☐101 ☒112 ☒102 ☒103 ☐Others
(For each of the checked box(es) above, please describe below the issue and detailed description of the discussion)

Claim(s) discussed: *1,10-13,15 and 18*.

Identification of prior art discussed: *Jacobowitz (2009/0106576), Kim (2009/0138737) and von Kaenel (2010/0188115)*.

Substance of Interview
(For each issue discussed, provide a detailed description and indicate if agreement was reached. Some topics may include: identification or clarification of a reference or a portion thereof, claim interpretation, proposed amendments, arguments of any applied references etc...)

*Claims 15 and 18 were discussed regarding the 112, second paragraph rejection. Applicant's representative agreed to amend the claims to clarify that communication is between the first and second sets of processor cores. Claims 1, 10-13, 15 and 18 were discussed regarding the art rejections under 35 USC 102 and 103. Applicant's representative referred to figure 3 of the specification and stated that clock signals 1 through 3 were different/independent clock signals input to the PLLs while Jacobowitz disclosed using a single reference clock. The examiner agreed that Jacobowitz discloses using a single reference clock and that clock signals 1 through 3 of figure 3 are different than disclosed by Jacobowitz. However, the broadest reasonable interprtation of the recited claim language (i.e.,claim 1: first set of processor cores configured to dynamically receive a first clock signal) reads on the clock output of the local oscillators of Jacobowitz and also reads on the output of the PLLs shown in applicant's figure 3. Applicant's representative stated that he would discuss amends to the claims with applicant regarding clock signals 1 through 3 of figure 3.*

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04. If a reply to the last Office action has already been filed, applicant is given a non-extendable period of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

☐ Attachment

| /DENNIS M BUTLER/ | |
| Primary Examiner, Art Unit 2115 | |

# Summary of Record of Interview Requirements

**Manual of Patent Examining Procedure (MPEP), Section 713.04, Substance of Interview Must be Made of Record**
A complete written statement as to the substance of any face-to-face, video conference, or telephone interview with regard to an application must be made of record in the application whether or not an agreement with the examiner was reached at the interview.

### Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews
Paragraph (b)

In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant. An interview does not remove the necessity for reply to Office action as specified in §§ 1.111, 1.135. (35 U.S.C. 132)

### 37 CFR §1.2 Business to be transacted in writing.
All business with the Patent or Trademark Office should be transacted in writing. The personal attendance of applicants or their attorneys or agents at the Patent and Trademark Office is unnecessary. The action of the Patent and Trademark Office will be based exclusively on the written record in the Office. No attention will be paid to any alleged oral promise, stipulation, or understanding in relation to which there is disagreement or doubt.

_____

The action of the Patent and Trademark Office cannot be based exclusively on the written record in the Office if that record is itself incomplete through the failure to record the substance of interviews.

It is the responsibility of the applicant or the attorney or agent to make the substance of an interview of record in the application file, unless the examiner indicates he or she will do so. It is the examiner's responsibility to see that such a record is made and to correct material inaccuracies which bear directly on the question of patentability.

Examiners must complete an Interview Summary Form for each interview held where a matter of substance has been discussed during the interview by checking the appropriate boxes and filling in the blanks. Discussions regarding only procedural matters, directed solely to restriction requirements for which interview recordation is otherwise provided for in Section 812.01 of the Manual of Patent Examining Procedure, or pointing out typographical errors or unreadable script in Office actions or the like, are excluded from the interview recordation procedures below. Where the substance of an interview is completely recorded in an Examiners Amendment, no separate Interview Summary Record is required.

The Interview Summary Form shall be given an appropriate Paper No., placed in the right hand portion of the file, and listed on the "Contents" section of the file wrapper. In a personal interview, a duplicate of the Form is given to the applicant (or attorney or agent) at the conclusion of the interview. In the case of a telephone or video-conference interview, the copy is mailed to the applicant's correspondence address either with or prior to the next official communication. If additional correspondence from the examiner is not likely before an allowance or if other circumstances dictate, the Form should be mailed promptly after the interview rather than with the next official communication.

The Form provides for recordation of the following information:
– Application Number (Series Code and Serial Number)
– Name of applicant
– Name of examiner
– Date of interview
– Type of interview (telephonic, video-conference, or personal)
– Name of participant(s) (applicant, attorney or agent, examiner, other PTO personnel, etc.)
– An indication whether or not an exhibit was shown or a demonstration conducted
– An identification of the specific prior art discussed
– An indication whether an agreement was reached and if so, a description of the general nature of the agreement (may be by attachment of a copy of amendments or claims agreed as being allowable). Note: Agreement as to allowability is tentative and does not restrict further action by the examiner to the contrary.
– The signature of the examiner who conducted the interview (if Form is not an attachment to a signed Office action)

It is desirable that the examiner orally remind the applicant of his or her obligation to record the substance of the interview of each case. It should be noted, however, that the Interview Summary Form will not normally be considered a complete and proper recordation of the interview unless it includes, or is supplemented by the applicant or the examiner to include, all of the applicable items required below concerning the substance of the interview.

A complete and proper recordation of the substance of any interview should include at least the following applicable items:
1) A brief description of the nature of any exhibit shown or any demonstration conducted,
2) an identification of the claims discussed,
3) an identification of the specific prior art discussed,
4) an identification of the principal proposed amendments of a substantive nature discussed, unless these are already described on the Interview Summary Form completed by the Examiner,
5) a brief identification of the general thrust of the principal arguments presented to the examiner,
(The identification of arguments need not be lengthy or elaborate. A verbatim or highly detailed description of the arguments is not required. The identification of the arguments is sufficient if the general nature or thrust of the principal arguments made to the examiner can be understood in the context of the application file. Of course, the applicant may desire to emphasize and fully describe those arguments which he or she feels were or might be persuasive to the examiner.)
6) a general indication of any other pertinent matters discussed, and
7) if appropriate, the general results or outcome of the interview unless already described in the Interview Summary Form completed by the examiner.
Examiners are expected to carefully review the applicant's record of the substance of an interview. If the record is not complete and accurate, the examiner will give the applicant an extendable one month time period to correct the record.

### Examiner to Check for Accuracy

If the claims are allowable for other reasons of record, the examiner should send a letter setting forth the examiner's version of the statement attributed to him or her. If the record is complete and accurate, the examiner should place the indication, "Interview Record OK" on the paper recording the substance of the interview along with the date and the examiner's initials.



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| | | |
|---|---|---|
| 83446 | 7590 | 02/14/2013 |

REN-SHENG INTERNATIONAL IP MANAGEMENT LTD.
GENE I. SU
7F, NO. 57, SEC. 2, DUN HUA S. ROAD
TAIPEI, 106
TAIWAN

| EXAMINER |
|---|
| BUTLER, DENNIS |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2115 | |

DATE MAILED: 02/14/2013

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/713,220 | 02/26/2010 | Andrew WOLFE | 121-0019-US-REG | 4243 |

TITLE OF INVENTION: PROCESSOR CORE COMMUNICATION IN MULTI-CORE PROCESSOR

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | NO | $1770 | $300 | $0 | $2070 | 05/14/2013 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.** THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED.** SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.

**HOW TO REPLY TO THIS NOTICE:**

I. Review the SMALL ENTITY status shown above.

If the SMALL ENTITY is shown as YES, verify your current SMALL ENTITY status:

A. If the status is the same, pay the TOTAL FEE(S) DUE shown above.

B. If the status above is to be removed, check box 5b on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and twice the amount of the ISSUE FEE shown above, or

If the SMALL ENTITY is shown as NO:

A. Pay TOTAL FEE(S) DUE shown above, or

B. If applicant claimed SMALL ENTITY status before, or is now claiming SMALL ENTITY status, check box 5a on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and 1/2 the ISSUE FEE shown above.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

PTOL-85 (Rev. 02/11)

097

## PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to:** <u>Mail</u>

Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

or <u>Fax</u>   (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

83446        7590        02/14/2013

REN-SHENG INTERNATIONAL IP MANAGEMENT LTD.
GENE I. SU
7F, NO. 57, SEC. 2, DUN HUA S. ROAD
TAIPEI, 106
TAIWAN

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**

I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/713,220 | 02/26/2010 | Andrew WOLFE | 121-0019-US-REG | 4243 |

TITLE OF INVENTION: PROCESSOR CORE COMMUNICATION IN MULTI-CORE PROCESSOR

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | NO | $1770 | $300 | $0 | $2070 | 05/14/2013 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| BUTLER, DENNIS | 2115 | 713-322000 |

**1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).**

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

**2. For printing on the patent front page, list**

(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

**3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT** (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) :   ☐ Individual   ☐ Corporation or other private group entity   ☐ Government

**4a. The following fee(s) are submitted:**

☐ Issue Fee
☐ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

**4b. Payment of Fee(s): (Please first reapply any previously paid issue fee shown above)**

☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

**5. Change in Entity Status** (from status indicated above)

☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.

☐ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature _____        Date _____

Typed or printed name _____        Registration No. _____

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL-85 (Rev. 02/11) Approved for use through 08/31/2013.        OMB 0651-0033        U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/713,220 | 02/26/2010 | Andrew WOLFE | 121-0019-US-REG | 4243 |

83446    7590    02/14/2013

REN-SHENG INTERNATIONAL IP MANAGEMENT LTD.
GENE I. SU
7F, NO. 57, SEC. 2, DUN HUA S. ROAD
TAIPEI, 106
TAIWAN

| EXAMINER |
|---|
| BUTLER, DENNIS |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2115 | |

DATE MAILED: 02/14/2013

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment to date is 491 day(s). If the issue fee is paid on the date that is three months after the mailing date of this notice and the patent issues on the Tuesday before the date that is 28 weeks (six and a half months) after the mailing date of this notice, the Patent Term Adjustment will be 491 day(s).

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

**099**

# Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| | Application No. | Applicant(s) | |
|---|---|---|---|
| ***Notice of Allowability*** | 12/713,220 | WOLFE ET AL. | |
| | Examiner | Art Unit | |
| | DENNIS M. BUTLER | 2115 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *the amendment and remarks received on November 29, 2012*.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☒ The allowed claim(s) is/are *1-23*. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov .

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐ All   b) ☐ Some*   c) ☐ None  of the:

        1. ☐ Certified copies of the priority documents have been received.

        2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

        3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____.

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

    ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____.

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

Attachment(s)

1. ☐ Notice of References Cited (PTO-892)
2. ☐ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .

5. ☐ Examiner's Amendment/Comment
6. ☐ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____.

/DENNIS M BUTLER/
Primary Examiner, Art Unit 2115

Doc code: RCEX
Doc description: Request for Continued Examination (RCE)

PTO/SB/30EFS (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

# REQUEST FOR CONTINUED EXAMINATION(RCE)TRANSMITTAL
## (Submitted Only via EFS-Web)

| Application Number | 12/713,220 | Filing Date | 2010-02-26 | Docket Number (if applicable) | 121-0019-US-REG | Art Unit | 2115 |
| First Named Inventor | Andrew WOLFE | | | Examiner Name | BUTLER, DENNIS | | |

This is a **Request for Continued Examination (RCE)** under 37 CFR 1.114 of the above-identified application.
Request for Continued Examination (RCE) practice under 37 CFR 1.114 does not apply to any utility or plant application filed prior to June 8, 1995, or to any design application. The Instruction Sheet for this form is located at WWW.USPTO.GOV

## SUBMISSION REQUIRED UNDER 37 CFR 1.114

Note: If the RCE is proper, any previously filed unentered amendments and amendments enclosed with the RCE will be entered in the order in which they were filed unless applicant instructs otherwise. If applicant does not wish to have any previously filed unentered amendment(s) entered, applicant must request non-entry of such amendment(s).

☐ Previously submitted. If a final Office action is outstanding, any amendments filed after the final Office action may be considered as a submission even if this box is not checked.

    ☐ Consider the arguments in the Appeal Brief or Reply Brief previously filed on _____

    ☐ Other _____

☒ Enclosed

    ☐ Amendment/Reply

    ☒ Information Disclosure Statement (IDS)

    ☐ Affidavit(s)/ Declaration(s)

    ☐ Other

## MISCELLANEOUS

☐ Suspension of action on the above-identified application is requested under 37 CFR 1.103(c) for a period of months _____
(Period of suspension shall not exceed 3 months; Fee under 37 CFR 1.17(i) required)

☐ Other _____

## FEES

**The RCE fee under 37 CFR 1.17(e) is required by 37 CFR 1.114 when the RCE is filed.**
☐ The Director is hereby authorized to charge any underpayment of fees, or credit any overpayments, to Deposit Account No _____

## SIGNATURE OF APPLICANT, ATTORNEY, OR AGENT REQUIRED

☒ Patent Practitioner Signature

☐ Applicant Signature

Doc code: RCEX
Doc description: Request for Continued Examination (RCE)

Case 7:25-cv-00184-ADA    Document 25-2    Filed 10/27/25    Page 120 of 254

PTO/SB/30EFS (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Signature of Registered U.S. Patent Practitioner | | | |
|---|---|---|---|
| Signature | /Gene Su/ | Date (YYYY-MM-DD) | 2013-04-25 |
| Name | Gene Su | Registration Number | 45140 |

This collection of information is required by 37 CFR 1.114. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (01-10)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|

| Application Number | 12713220 |
|---|---|
| Filing Date | 2010-02-26 |
| First Named Inventor | Andrew WOLFE |
| Art Unit | 2115 |
| Examiner Name | Dennis BUTLER |
| Attorney Docket Number | 121-0019-US-REG |

| U.S.PATENTS | | | | | | Remove |
|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| | 1 | 7219245 | B1 | 2007-05-15 | Raghuvanshi | |
| | 2 | 6711447 | B1 | 2004-03-23 | Saeed | |

If you wish to add additional U.S. Patent citation information please click the Add button.   Add

| U.S.PATENT APPLICATION PUBLICATIONS | | | | | | Remove |
|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button.   Add

| FOREIGN PATENT DOCUMENTS | | | | | | | Remove |
|---|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
| | 1 | | | | | | | ☐ |

If you wish to add additional Foreign Patent Document citation information please click the Add button   Add

| NON-PATENT LITERATURE DOCUMENTS | | Remove |
|---|---|---|

EFS Web 2.1.17

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 12713220 |
| | Filing Date | 2010-02-26 |
| | First Named Inventor | Andrew WOLFE |
| | Art Unit | 2115 |
| | Examiner Name | Dennis BUTLER |
| | Attorney Docket Number | 121-0019-US-REG |

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|
| | 1 | JOONHO KONG et al., "Low-Cost Application-Aware DVFS for Multi-Core Architecture", Third 2008 International Conference on Convergence and Hybrid Information Technology, IEEE Computer Society, 2008, pages 106-111 | ☐ |
| | 2 | REINALDO BERGAMASCHI et al., "Exploring Power Management in Multi-Core Systems", IEEE, 2008, pages 708-713 (Downloaded on July 13, 2009 from IEEE Xplore) | ☐ |
| | 3 | WAYNE H. CHENG et al., "Dynamic Voltage and Frequency Scaling Circuits with Two Supply Voltages", IEEE, 2008, pages 1236-1239 (Downloaded on July 14, 2009 from IEEE Xplore) | ☐ |
| | 4 | WONYOUNG KIM et al., "System Level Analysis of Fast, Per-Core DVFS using On-Chip Switching Regulators", High Performance Computer Architecture, IEEE 14th International Symposium, Feb. 16-20, 2008, pages 123-134 | ☐ |
| | 5 | HOWLETT-PACKARD CORPORATION et al., "Advanced Configuration and Power Interface Specification", October 10, 2006, Pages 1-631 (represented by 4 different files), Revision 3.0b | ☐ |
| | 6 | MICAH SCHMIDT, "Nehalem: Xeon Gets Core i7 Upgrade", 2CPU.com, Mar 29, 2009 <http://www.2cpu.com/review.php?id=117> | ☐ |
| | 7 | "Third-Generation AMD Opteron Processor Key Architectural Features", WAYBACKMACHINE, October 20, 2007 <http://www.amd.com/us-en/Processors/ProductInformation/0,,30_118_8796_15224,00.html> | ☐ |

If you wish to add additional non-patent literature document citation information please click the Add button    Add

**EXAMINER SIGNATURE**

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

---

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

| | |
|---|---|
| Application Number | 12713220 |
| Filing Date | 2010-02-26 |
| First Named Inventor | Andrew WOLFE |
| Art Unit | 2115 |
| Examiner Name | Dennis BUTLER |
| Attorney Docket Number | 121-0019-US-REG |

**INFORMATION DISCLOSURE STATEMENT BY APPLICANT**
( **Not for submission under 37 CFR 1.99**)

---

### CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

☐   That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐   That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

☐   See attached certification statement.

☐   The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒   A certification statement is not submitted herewith.

### SIGNATURE
A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Gene Su/ | Date (YYYY-MM-DD) | 2013-04-25 |
|---|---|---|---|
| Name/Print | Gene Su | Registration Number | 45140 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

## Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent.  Accordingly, pursuant to the requirements of the Act, please be advised that:  (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent.  If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.    The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a).  Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.    A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.    A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.    A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract.  Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.    A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.    A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.    A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906.  Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive.  Such disclosure shall not be used to make determinations about individuals.

8.    A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151.  Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.    A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| | | |
|---|---|---|
| 83446 | 7590 | 06/11/2013 |

REN-SHENG INTERNATIONAL IP MANAGEMENT LTD.
GENE I. SU
7F, NO. 57, SEC. 2, DUN HUA S. ROAD
TAIPEI, 106
TAIWAN

| EXAMINER |
|---|
| BUTLER, DENNIS |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2115 | |

DATE MAILED: 06/11/2013

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/713,220 | 02/26/2010 | Andrew WOLFE | 121-0019-US-REG | 4243 |

TITLE OF INVENTION: PROCESSOR CORE COMMUNICATION IN MULTI-CORE PROCESSOR

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1780 | $300 | $0 | $2080 | 09/11/2013 |

THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. **PROSECUTION ON THE MERITS IS CLOSED.** THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.

THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN <u>THREE MONTHS</u> FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. **THIS STATUTORY PERIOD CANNOT BE EXTENDED.** SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

PTOL-85 (Rev. 02/11)

**PART B - FEE(S) TRANSMITTAL**

**Complete and send this form, together with applicable fee(s), to:** **Mail**    **Mail Stop ISSUE FEE**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, Virginia 22313-1450**
or **Fax**    **(571)-273-2885**

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

83446          7590          06/11/2013
REN-SHENG INTERNATIONAL IP MANAGEMENT LTD.
GENE I. SU
7F, NO. 57, SEC. 2, DUN HUA S. ROAD
TAIPEI, 106
TAIWAN

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

|  |
|---|
| (Depositor's name) |
| (Signature) |
| (Date) |

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/713,220 | 02/26/2010 | Andrew WOLFE | 121-0019-US-REG | 4243 |

TITLE OF INVENTION: PROCESSOR CORE COMMUNICATION IN MULTI-CORE PROCESSOR

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1780 | $300 | $0 | $2080 | 09/11/2013 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| BUTLER, DENNIS | 2115 | 713-322000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list

(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____
2 _____
3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE          (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) :    ☐ Individual    ☐ Corporation or other private group entity    ☐ Government

4a. The following fee(s) are submitted:
☐ Issue Fee
☐ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

4b. Payment of Fee(s): **(Please first reapply any previously paid issue fee shown above)**
☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

Page 2 of 4

PTOL-85 (Rev. 02/11)

5. **Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

<u>NOTE:</u> Absent a valid certification of Micro Entity Status (see form PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.

<u>NOTE:</u> If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.

<u>NOTE:</u> Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature _____     Date _____

Typed or printed name _____     Registration No. _____

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL-85 (Rev. 02/11) Approved for use through 08/31/2013.     OMB 0651-0033     U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/713,220 | 02/26/2010 | Andrew WOLFE | 121-0019-US-REG | 4243 |

83446    7590    06/11/2013

REN-SHENG INTERNATIONAL IP MANAGEMENT LTD.
GENE I. SU
7F, NO. 57, SEC. 2, DUN HUA S. ROAD
TAIPEI, 106
TAIWAN

| EXAMINER |
|---|
| BUTLER, DENNIS |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2115 | |

DATE MAILED: 06/11/2013

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment to date is 491 day(s). If the issue fee is paid on the date that is three months after the mailing date of this notice and the patent issues on the Tuesday before the date that is 28 weeks (six and a half months) after the mailing date of this notice, the Patent Term Adjustment will be 491 day(s).

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

# Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| | Application No. | Applicant(s) |
|---|---|---|
| ***Notice of Allowability*** | 12/713,220 | WOLFE ET AL. |
| | Examiner | Art Unit | AIA (First Inventor to File) Status |
| | DENNIS M. BUTLER | 2115 | No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *the IDS filed on April 25, 2013*.

    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☒ The allowed claim(s) is/are *1-23*. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov .

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    **Certified copies:**

      a) ☐ All   b) ☐ Some   *c) ☐ None of the:

        1. ☐ Certified copies of the priority documents have been received.

        2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

        3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____.

    **Interim copies:**

      a) ☐ All   b) ☐ Some   c) ☐ None of the: Interim copies of the priority documents have been received.

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

    ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____.

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)

2. ☒ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date 4/25/2013

3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

4. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .

5. ☐ Examiner's Amendment/Comment

6. ☐ Examiner's Statement of Reasons for Allowance

7. ☐ Other _____.

/DENNIS M BUTLER/
Primary Examiner, Art Unit 2115

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (01-10)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

**INFORMATION DISCLOSURE STATEMENT BY APPLICANT**
( Not for submission under 37 CFR 1.99)

| | |
|---|---|
| Application Number | 12713220 |
| Filing Date | 2010-02-26 |
| First Named Inventor | Andrew WOLFE |
| Art Unit | 2115 |
| Examiner Name | Dennis BUTLER |
| Attorney Docket  Number | 121-0019-US-REG |

### U.S.PATENTS                                                                Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| /D.B./ | 1 | 7219245 | B1 | 2007-05-15 | Raghuvanshi | |
| /D.B./ | 2 | 6711447 | B1 | 2004-03-23 | Saeed | |

If you wish to add additional U.S. Patent citation information please click the Add button. **Add**

### U.S.PATENT APPLICATION PUBLICATIONS                                          Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button. **Add**

### FOREIGN PATENT DOCUMENTS                                                    Remove

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | ☐ |

If you wish to add additional Foreign Patent Document citation information please click the Add button **Add**

### NON-PATENT LITERATURE DOCUMENTS                                             Remove

| | |
|---|---|
| Application Number | 12713220 |
| Filing Date | 2010-02-26 |
| First Named Inventor | Andrew WOLFE |
| Art Unit | 2115 |
| Examiner Name | Dennis BUTLER |
| Attorney Docket Number | 121-0019-US-REG |

# INFORMATION DISCLOSURE STATEMENT BY APPLICANT
( Not for submission under 37 CFR 1.99)

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|
| /D.B./ | 1 | JOONHO KONG et al., "Low-Cost Application-Aware DVFS for Multi-Core Architecture", Third 2008 International Conference on Convergence and Hybrid Information Technology, IEEE Computer Society, 2008, pages 106-111 | ☐ |
| /D.B./ | 2 | REINALDO BERGAMASCHI et al., "Exploring Power Management in Multi-Core Systems", IEEE, 2008, pages 708-713 (Downloaded on July 13, 2009 from IEEE Xplore) | ☐ |
| /D.B./ | 3 | WAYNE H. CHENG et al., "Dynamic Voltage and Frequency Scaling Circuits with Two Supply Voltages", IEEE, 2008, pages 1236-1239 (Downloaded on July 14, 2009 from IEEE Xplore) | ☐ |
| /D.B./ | 4 | WONYOUNG KIM et al., "System Level Analysis of Fast, Per-Core DVFS using On-Chip Switching Regulators", High Performance Computer Architecture, IEEE 14th International Symposium, Feb. 16-20, 2008, pages 123-134 | ☐ |
| /D.B./ | 5 | HOWLETT-PACKARD CORPORATION et al., "Advanced Configuration and Power Interface Specification", October 10, 2006, Pages 1-631 (represented by 4 different files), Revision 3.0b | ☐ |
| /D.B./ | 6 | MICAH SCHMIDT, "Nehalem: Xeon Gets Core i7 Upgrade", 2CPU.com, Mar 29, 2009 <http://www.2cpu.com/review.php?id=117> | ☐ |
| /D.B./ | 7 | "Third-Generation AMD Opteron Processor Key Architectural Features", WAYBACKMACHINE, October 20, 2007 <http://www.amd.com/us-en/Processors/ProductInformation/0,,30_118_8796_15224,00.html> | ☐ |

If you wish to add additional non-patent literature document citation information please click the Add button    Add

**EXAMINER SIGNATURE**

| Examiner Signature | /Dennis Butler/ | Date Considered | 06/01/2013 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

EFS Web 2.1.17

116

| | |
|---|---|
| Application Number | 12713220 |
| Filing Date | 2010-02-26 |
| First Named Inventor | Andrew WOLFE |
| Art Unit | 2115 |
| Examiner Name | Dennis BUTLER |
| Attorney Docket Number | 121-0019-US-REG |

**INFORMATION DISCLOSURE STATEMENT BY APPLICANT**
( **Not for submission under 37 CFR 1.99**)

---

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

☐ That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

☐ See attached certification statement.

☐ The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

### SIGNATURE
 A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Gene Su/ | Date (YYYY-MM-DD) | 2013-04-25 |
|---|---|---|---|
| Name/Print | Gene Su | Registration Number | 45140 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

## PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to:** <u>Mail</u>    Mail Stop ISSUE FEE
                                                                                  Commissioner for Patents
                                                                                  P.O. Box 1450
                                                                                  Alexandria, Virginia 22313-1450
                                                                        **or** <u>Fax</u>   (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

83446        7590        06/11/2013
REN-SHENG INTERNATIONAL IP MANAGEMENT LTD.
GENE I. SU
7F, NO. 57, SEC. 2, DUN HUA S. ROAD
TAIPEI, 106
TAIWAN

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**

I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

|  |
|---|
| (Depositor's name) |
| (Signature) |
| (Date) |

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/713,220 | 02/26/2010 | Andrew WOLFE | 121-0019-US-REG | 4243 |

TITLE OF INVENTION: PROCESSOR CORE COMMUNICATION IN MULTI-CORE PROCESSOR

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1780 | $300 | $0 | $2080 | 09/11/2013 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| BUTLER, DENNIS | 2115 | 713-322000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).
☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.
☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list
(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1  REN-SHENG INTERNATIONAL
2  _____
3  _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE

EMPIRE TECHNOLOGY DEVELOPMENT LLC

(B) RESIDENCE: (CITY and STATE or COUNTRY)

WILMINGTON, DELAWARE

Please check the appropriate assignee category or categories (will not be printed on the patent) :   ☐ Individual  ☒ Corporation or other private group entity  ☐ Government

4a. The following fee(s) are submitted:
☒ Issue Fee
☐ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

4b. Payment of Fee(s): **(Please first reapply any previously paid issue fee shown above)**
☐ A check is enclosed.
☒ Payment by credit card. ~~Form PTO-2038 is attached.~~
☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

PTOL-85 (Rev. 02/11)

**5. Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see form PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.

NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.

NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

| | | | |
|---|---|---|---|
| Authorized Signature | /Gene Su/ | Date | August 13, 2013 |
| Typed or printed name | Gene Su | Registration No. | 45,140 |

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL-85 (Rev. 02/11) Approved for use through 08/31/2013.     OMB 0651-0033     U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

PATENT
Atty. Dkt. No. 121-0019-US-REG

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re Application of: | § | |
|     Andrew WOLFE | § | |
| | § | Group Art Unit: 2115 |
| Serial No.:    12/713,220 | § | |
| | § | |
| Confirmation No.:     4243 | § | Examiner: |
| | § |     BUTLER, DENNIS |
| Filed:        February 26, 2010 | § | |
| | § | |
| For:        PROCESSOR CORE COMMUNICATION IN | § | |
|        MULTI-CORE PROCESSOR | § | |

**MAIL STOP ISSUE FEE**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

### AMENDMENT AFTER ALLOWANCE UNDER 37 C.F.R. §1.312 AND
### ISSUE FEE TRANSMITTAL

The Examiner is thanked for issuing the Notice of Allowance and Fee Due mailed on June 11, 2013.  Please enter the following amendment prior to issuing the present application as a patent under 37 C.F.R. §1.312.

Enclosed herewith please also find Issue Fee Transmittal Form PTOL-85(B).

The Issue Fee and the Publication Fee are being paid by credit card via EFS-Web.

It is respectfully noted that there may be additional reasons for allowance that have not been specifically cited, and which may apply to various of the allowed claims, in addition to or instead of the Examiner's Reasons for Allowance.  It is respectfully suggested that notwithstanding the Examiner's Reasons for Allowance, each of the allowed claims is believed to be patentable in its own right and/or at least for other reasons raised during the prosecution and/or explained in the specification of this application.

To the extent that any statements regarding patentability of any claims allowed by the Examiner made in any document filed in this application are inconsistent with or not included in the Examiner's Reasons for Allowance, they are incorporated by reference herein.

**PATENT**
Atty. Dkt. No. 121-0019-US-REG

Although it is believed that no additional fees are due in connection with this submission, the Commissioner is hereby authorized to charge Counsel's Deposit Account No. 50-4588/121-0019-US-REG for any fees required to make this submission timely and acceptable to the Office.

**Amendments to the Claims** are reflected in the listing of claims which begins on page 3 of this paper.

**PATENT**
Atty. Dkt. No. 121-0019-US-REG

**IN THE CLAIMS:**

The listing of claims will replace all prior versions, and listings, of claims in the application.

1.      (Previously Presented) A multi-core processor, comprising:
a first set of processor cores of the multi-core processor, wherein each processor core from the first set of processor cores is configured to dynamically receive a first supply voltage and a first output clock signal of a first phase lock loop (PLL) having a first clock signal as input;
a second set of processor cores of the multi-core processor, wherein each processor core from the second set of processor cores is configured to dynamically receive a second supply voltage and a second output clock signal of a second PLL having a second clock signal as input, wherein the first supply voltage is independent from the second supply voltage, and the first clock signal is independent from the second clock signal; and
an interface block coupled to the first set of processor cores and also coupled to the second set of processor cores, wherein the interface block is configured to facilitate communication between the first set of processor cores and the second set of processor cores.

2.      (Currently Amended) The multi-core processor of claim 1, <u>wherein </u>the interface block further ~~comprising~~<u>comprises </u>a first level shifter that is referenced to the second supply voltage and adapted to translate first logic levels associated with the first set of processor cores to second logic levels associated with the second set of processor cores for a first signal traveling from the first set of processor cores to the second set of processor cores.

3.      (Currently Amended) The multi-core processor of claim 1, <u>wherein </u>the interface block further ~~comprising~~<u>comprises</u> a second level shifter that is referenced to the first supply voltage and adapted to translate second logic levels associated with the second set of processor cores to first logic levels associated with the first set of processor cores for a second signal traveling from the second set of processor cores to the first set of processor cores.

4.      (Original) The multi-core processor of claim 1, wherein the interface block further comprises a synchronizer configured to synchronize the first clock signal and the second clock

PATENT
Atty. Dkt. No. 121-0019-US-REG

signal for communication between one or more processor cores of the first set of processor cores and one or more processor cores of the second set of processor cores.

5.      (Original) The multi-core processor of claim 1, wherein the first set of processor cores and the second set of processor cores are configured to receive one or more control signals from one or more control blocks located in a periphery of the multi-core processor.

6.      (Original) The multi-core processor of claim 1, wherein the first set of processor cores are located in a first region of the multi-core processor, and the second set of processor cores are located in a second region of the multi-core processor.

7.      (Original) The multi-core processor of claim 6, wherein the first region and the second region are overlapping regions of the multi-core processor.

8.      (Original) The multi-core processor of claim 6, wherein the first region and the second region are non-overlapping regions of the multi-core processor.

9.      (Original) The multi-core processor of claim 6, wherein the first region corresponds to a first row of the multi-core processor, and wherein the second region corresponds to a second row of the multi-core processor.

10.     (Previously Presented) The multi-core processor of claim 1, wherein the interface block is configured to idle communications between the first set of processor cores and the second set of processor cores when one or more of the first output clock signal and/or the second output clock signal is determined to have changed.

11.     (Previously Presented) The multi-core processor of claim 10, wherein the interface block is configured to resume communication between the first set of processor cores and the second set of processor cores after one or more of the first output clock signal and/or the second output clock signal is determined to have stabilized.

12.     (Original) The multi-core processor of claim 5, wherein the first set of processor cores is adjacent to the second set of processor cores, and the one or more control blocks are

PATENT
Atty. Dkt. No. 121-0019-US-REG

configured to select the first supply voltage and the second supply voltage to maintain a differential relationship between the first supply voltage and the second supply voltage.

13.    (Original) The multi-core processor of claim 12, wherein the differential relationship is based on having an output voltage level associated with the first set of processor cores to be within an acceptable input voltage level associated with the second set of processor cores.

14.    (Original) The multi-core processor of claim 1, wherein the first set of processor cores and the second set of processor cores are configured to receive one or more control signals from one or more control blocks located in a common region that is substantially central to the first set of processor cores and the second set of processor cores.

15.    (Currently Amended) A method ~~for managing~~to manage communications in a multi-core processor that includes a plurality of processor cores having a first set of processor cores and a second set of processor cores, the method comprising:

    idling communications between the first set of processor cores and the second set of processor cores in response to a clock frequency change request for the first set of processor cores; and

    resuming communications between the first set of processor cores and the second set of processor cores after having determined that a first phase lock loop operation associated with a first clock signal for the first set of processor cores has acquired a first lock signal and a second phase lock loop operation associated with a second clock signal for the second set of processor cores has also acquired a second lock signal, wherein the first clock signal is independent from the second clock signal.

16.    (Currently Amended) The method of claim 15, wherein resuming communications further ~~comprising~~comprises having determined that a third phase lock loop operation associated with a third set of processor cores in the multi-core processor has acquired a third lock signal, wherein the third set of processor cores is adjacent to the first set of processor cores.

17.    (Original) The method of claim 16, wherein the second set of processor cores is adjacent to the first set of processor cores.

PATENT
Atty. Dkt. No. 121-0019-US-REG

18.    (Currently Amended) A ~~non-transistory~~non-transitory computer-readable medium containing a sequence of instructions ~~for managing~~to manage communications in a multi-core processor that includes a plurality of processor cores having a first set of processor cores and a second set of processor cores, which when executed by a computing device, causes the computing device to:

>   issue a first command to idle communications between the first set of processor cores and the second set of processor cores in response to a clock frequency change request for the first set of processor cores;

>   issue a second command to resume communications between the first set of processor cores and the second set of processor cores after having determined that a first phase lock loop operation associated with a first clock signal for the first set of processor cores has acquired a first lock signal and a second phase lock loop operation associated with a second clock signal for the second set of processor cores has also acquired a second lock signal, wherein the first clock signal is independent from the second clock signal.

19.    (Currently Amended) The ~~non-transistory~~non-transitory computer-readable medium of claim 18, further including a sequence of instructions, which when executed by the computing device, causes the computing device to determine whether a third phase lock loop operation associated with a third set of processor cores in the multi-core processor has acquired a third lock signal before issuing the second command, wherein the third set of processor cores is adjacent to the first set of processor cores.

20.    (Currently Amended) The ~~non-transistory~~non-transitory computer-readable medium of claim 19, wherein the second set of processor cores is adjacent to the first set of processor cores.

21.    (Previously Presented) A multi-core processor, comprising:

>   a first set of processor cores of the multi-core processor, wherein each processor core from the first set of processor cores is configured to dynamically receive a first supply voltage from a power control block and a first output clock signal from a first phase lock loop (PLL) having a first clock signal as input in a clock control block;

PATENT
Atty. Dkt. No. 121-0019-US-REG

a second set of processor cores of the multi-core processor, wherein each processor core from the second set of processor cores is configured to dynamically receive a second supply voltage from the power control block and a second output clock signal from a second PLL having a second clock signal as input in the clock control block, wherein the first supply voltage is independent from the second supply voltage, and the first clock signal is independent from the second clock signal; and

an interface block coupled to the first set of processor cores and also coupled to the second set of processor cores, wherein the interface block is configured to facilitate communication between the first set of processor cores and the second set of processor cores.

22.    (Previously Presented) The multi-core processor of claim 21, wherein the interface block is configured to idle communications between the first set of processor cores and the second set of processor cores when one or more of the first output clock signal and/or the second output clock signal is determined to have changed.

23.    (Previously Presented) The multi-core processor of claim 22, wherein the interface block is configured to resume communication between the first set of processor cores and the second set of processor cores after one or more of the first output clock signal and/or the second output clock signal is determined to have stabilized.

PATENT
Atty. Dkt. No. 121-0019-US-REG

## REMARKS

Please enter the above amendment prior to issuing the present application as a patent. Specifically, claims 2 – 3, 15 – 16, and 18 – 20 have been amended to merely address formal matters in the claims without changing the scope thereof.

The amendments do not introduce any new matter or raise any new issues.  If there are any questions about any of the foregoing, please contact the undersigned representative.


Respectfully submitted,


/Gene Su/
Gene Su
Registration No. 45,140

Telephone:  (886) 2.2700.7882
Facsimile 1: (886) 2.2700.7856
Facsimile 2: (650) 644.3217
Email: filing@suipconsulting.com



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/713,220 | 02/26/2010 | Andrew WOLFE | 121-0019-US-REG | 4243 |

83446          7590          09/05/2013
REN-SHENG INTERNATIONAL IP MANAGEMENT LTD.
GENE I. SU
7F, NO. 57, SEC. 2, DUN HUA S. ROAD
TAIPEI, 106
TAIWAN

| EXAMINER |
|---|
| BUTLER, DENNIS |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2115 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 09/05/2013 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

gsu@suipconsulting.com
filing@suipconsulting.com
gene.i.su@gmail.com

PTOL-90A (Rev. 04/07)

| **Response to Rule 312 Communication** | **Application No.** | **Applicant(s)** |
| --- | --- | --- |
| | 12/713,220 | WOLFE ET AL. |
| | **Examiner** | **Art Unit** |
| | DENNIS M. BUTLER | 2115 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

1. ☒ The amendment filed on _13 August 2013_ under 37 CFR 1.312 has been considered, and has been:

   a) ☐   entered.

   b) ☒   entered as directed to matters of form not affecting the scope of the invention.

   c) ☐   disapproved because the amendment was filed after the payment of the issue fee.

        Any amendment filed after the date the issue fee is paid must be accompanied by a petition under 37 CFR 1.313(c)(1)

        and the required fee to withdraw the application from issue.

   d) ☐   disapproved.  See explanation below.

   e) ☒   entered  in part. See explanation below.

The amendments to claims 2,3,16,18,19 and 20 have been entered because they are directed to matters of form not affecting the scope of the invention. The amendment to claim 15 has not been entered because it would add indefinite language into the method claim and there is no reason why it is necessary to add the indefinite language.

| | /DENNIS M BUTLER/<br>Primary Examiner, Art Unit 2115 |
| --- | --- |

ENTER IN PART: /D.B./
/D.B./ 08/26/2013

PATENT
Atty. Dkt. No. 121-0019-US-REG

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re Application of: | § | |
|     Andrew WOLFE | § | |
| | § | Group Art Unit: 2115 |
| Serial No.:   12/713,220 | § | |
| | § | |
| Confirmation No.:   4243 | § | Examiner: |
| | § |    BUTLER, DENNIS |
| Filed:   February 26, 2010 | § | |
| | § | |
| For:   PROCESSOR CORE COMMUNICATION IN | § | |
|    MULTI-CORE PROCESSOR | § | |

**MAIL STOP ISSUE FEE**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

### AMENDMENT AFTER ALLOWANCE UNDER 37 C.F.R. §1.312 AND
### ISSUE FEE TRANSMITTAL

The Examiner is thanked for issuing the Notice of Allowance and Fee Due mailed on June 11, 2013. Please enter the following amendment prior to issuing the present application as a patent under 37 C.F.R. §1.312.

Enclosed herewith please also find Issue Fee Transmittal Form PTOL-85(B).

The Issue Fee and the Publication Fee are being paid by credit card via EFS-Web.

It is respectfully noted that there may be additional reasons for allowance that have not been specifically cited, and which may apply to various of the allowed claims, in addition to or instead of the Examiner's Reasons for Allowance. It is respectfully suggested that notwithstanding the Examiner's Reasons for Allowance, each of the allowed claims is believed to be patentable in its own right and/or at least for other reasons raised during the prosecution and/or explained in the specification of this application.

To the extent that any statements regarding patentability of any claims allowed by the Examiner made in any document filed in this application are inconsistent with or not included in the Examiner's Reasons for Allowance, they are incorporated by reference herein.

PATENT
Atty. Dkt. No. 121-0019-US-REG

Although it is believed that no additional fees are due in connection with this submission, the Commissioner is hereby authorized to charge Counsel's Deposit Account No. 50-4588/121-0019-US-REG for any fees required to make this submission timely and acceptable to the Office.

**Amendments to the Claims** are reflected in the listing of claims which begins on page 3 of this paper.



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | ISSUE DATE | PATENT NO. | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/713,220 | 10/01/2013 | 8549339 | 121-0019-US-REG | 4243 |

83446          7590          09/11/2013

REN-SHENG INTERNATIONAL IP MANAGEMENT LTD.
GENE I. SU
7F, NO. 57, SEC. 2, DUN HUA S. ROAD
TAIPEI, 106
TAIWAN

# ISSUE NOTIFICATION

The projected patent number and issue date are specified above.

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment is 524 day(s). Any patent to issue from the above-identified application will include an indication of the adjustment on the front page.

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Application Assistance Unit (AAU) of the Office of Data Management (ODM) at (571)-272-4200.

APPLICANT(s) (Please see PAIR WEB site http://pair.uspto.gov for additional applicants):

Andrew WOLFE, Los Gatos, CA;
Marc Elliot LEVITT, San Jose, CA;

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The USA offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to encourage and facilitate business investment. To learn more about why the USA is the best country in the world to develop technology, manufacture products, and grow your business, visit SelectUSA.gov.

PTO/SB/44 (09-07)
Approved for use through 08/31/2013. OMB 0651-0033
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.
(Also Form PTO-1050)

# UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

Page  1 of 1

PATENT NO.        : 8,549,339 B2

APPLICATION NO. : 12/713,220

ISSUE DATE        : October 1, 2013

INVENTOR(S)       : Wolfe, et al.


It is certified that an error appears or errors appear in the above-identified patent and that said Letters Patent is hereby corrected as shown below:


On the Face Page, in Field (56), under "OTHER PUBLICATIONS", in Column 2, Line 1, delete "al" and insert - - al., - -, therefor.

On the Face Page, in Field (56), under "OTHER PUBLICATIONS", in Column 2, Line 8, delete "al" and insert - - al., - -, therefor.

On the Face Page, in Field (56), under "OTHER PUBLICATIONS", in Column 2, Line 11, delete "al" and insert - - al., - -, therefor.

On the Face Page, in Field (56), under "OTHER PUBLICATIONS", in Column 2, Line 15, delete "Howlett-Packard" and insert - - Hewlett-Packard - -, therefor.

In Column 5, Line 61, delete "and or" and insert - - and/or - -, therefor.

In Column 9, Line 7, in Claim 15, delete "for managing" and insert - - to manage - -, therefor.


MAILING ADDRESS OF SENDER (Please do not use customer number below):

Maschoff Brennan
1389 Center Drive, Suite 300
Park City, Utah 84098, United States

This collection of information is required by 37 CFR 1.322, 1.323, and 1.324. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1.0 hour to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Attention Certificate of Corrections Branch, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

## Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.*, GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

PATENT NO.: 8,549,339

USPTO CONFIRMATION CODE: 4243

APPLICATION NO.: 12/713,220

FILED: February 26, 2010

EXAMINER: Dennis M. Butler

GROUP ART UNIT: 2115

FOR: PROCESSOR CORE COMMUNICATION IN MULTI-CORE PROCESSOR

37 CFR 1.322 & 37 CFR 1.323 REQUEST FOR CERTIFICATE OF CORRECTION
FOR USPTO AND/OR APPLICANT MISTAKE

Commissioner for Patents
Office of Patent Publication
ATTN: Certificate of Correction Branch
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

    A certificate of correction under 35 USC 254 is respectfully requested in the above-identified patent.

    It is believed that all errors identified herein were the fault of both the applicant and USPTO and, accordingly, please charge **$100.00** to the credit card utilized for this certificate of correction filing. In the event that a further fee is required, please charge the amount to the same credit card.

    The exact locations where the errors appear in the patent and patent application are as follows:

1

On the Face Page, in Field (56), under "OTHER PUBLICATIONS", in Column 2, Line 1, delete "al" and insert - - al., - -, therefor.
(LIST OF REFERENCES CITED BY APPLICANT AND CONSIDERED BY EXAMINER DATED JUNE 11, 2013, SHEET 2 (PAGE 28 OF FW), UNDER "NON-PATENT LITERATURE DOCUMENTS", ENTRY 1, LINE 1)

On the Face Page, in Field (56), under "OTHER PUBLICATIONS", in Column 2, Line 8, delete "al" and insert - - al., - -, therefor.
(LIST OF REFERENCES CITED BY APPLICANT AND CONSIDERED BY EXAMINER DATED JUNE 11, 2013, SHEET 2 (PAGE 28 OF FW), UNDER "NON-PATENT LITERATURE DOCUMENTS", ENTRY 3, LINE 1)

On the Face Page, in Field (56), under "OTHER PUBLICATIONS", in Column 2, Line 11, delete "al" and insert - - al., - -, therefor.
(LIST OF REFERENCES CITED BY APPLICANT AND CONSIDERED BY EXAMINER DATED JUNE 11, 2013, SHEET 2 (PAGE 28 OF FW), UNDER "NON-PATENT LITERATURE DOCUMENTS", ENTRY 4, LINE 1)

On the Face Page, in Field (56), under "OTHER PUBLICATIONS", in Column 2, Line 15, delete "Howlett-Packard" and insert - - Hewlett-Packard - -, therefor.
(LIST OF REFERENCES CITED BY APPLICANT AND CONSIDERED BY EXAMINER DATED JUNE 11, 2013, SHEET 2 (PAGE 28 OF FW), UNDER "NON-PATENT LITERATURE DOCUMENTS", ENTRY 5, LINE 1)

In Column 5, Line 61, delete "and or" and insert - - and/or - -, therefor.
(ORIGINALLY FILED SPECIFICATION DATED FEBRUARY 26, 2010, PAGE 10, LINE 1)

In Column 9, Line 7, in Claim 15, delete "for managing" and insert - - to manage - -, therefor.
(AMENDMENTS TO THE CLAIMS DATED AUGUST 13, 2013, PAGE 5, CLAIM 15, LINE 1)

The requested corrections are attached on Form PTO/SB/44.

Dated this 4th day of February, 2014.

Respectfully Submitted,

**/R. Burns Israelsen/ Reg. # 42,685**
R. BURNS ISRAELSEN
Acting in Representative Capacity
    (37 CFR 1.34)
Registration No. 42,685
Telephone No. (435) 252-1360

3

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.           : 8,549,339 B2                                      Page 1 of 1
APPLICATION NO.   : 12/713220
DATED                   : October 1, 2013
INVENTOR(S)         : Wolfe et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page

In Item (56), under "OTHER PUBLICATIONS", in Column 2, Line 1, delete "al" and insert -- al., --, therefor.

In Item (56), under "OTHER PUBLICATIONS", in Column 2, Line 8, delete "al" and insert -- al., --, therefor.

In Item (56), under "OTHER PUBLICATIONS", in Column 2, Line 11, delete "al" and insert -- al., --, therefor.

In Item (56), under "OTHER PUBLICATIONS", in Column 2, Line 15, delete "Howlett-Packard" and insert -- Hewlett-Packard --, therefor.

In the Specifications

In Column 5, Line 61, delete "and or" and insert -- and/or --, therefor.

In the Claims

In Column 9, Line 7, in Claim 15, delete "for managing" and insert -- to manage --, therefor.

Signed and Sealed this
Sixth Day of May, 2014

Michelle K. Lee

Michelle K. Lee
*Deputy Director of the United States Patent and Trademark Office*

Trials@uspto.gov
571-272-7822

Paper 7
Entered: April 22, 2025

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

MEDIATEK, INC. and MEDIATEK USA, INC.,
Petitioner,

v.

REDSTONE LOGICS LLC,
Patent Owner.

———————

IPR2025-00085
Patent 8,549,339 B2

———————

Before JEFFREY W. ABRAHAM, STEPHEN E. BELISLE, and
ANDREW L. NALVEN, *Administrative Patent Judges.*

NALVEN, *Administrative Patent Judge.*

DECISION
Denying Institution of *Inter Partes* Review
*35 U.S.C. § 314*

IPR2025-00085
Patent 8,549,339 B2

# I.    INTRODUCTION

MediaTek Inc. and MediaTek USA, Inc. (collectively, "Petitioner") filed a Petition (Paper 1, "Pet.") requesting *inter partes* review of claims 1–6, 8–11, 14 and 21 of U.S. Patent No. 8,549,339 B2 (Ex. 1001, "the '339 patent").  Redstone Logics LLC ("Patent Owner") filed a Preliminary Response (Paper 6, "Prelim. Resp.").

We have authority under 35 U.S.C. § 314 and 37 C.F.R. § 42.4(a). Pursuant to 35 U.S.C. § 314(a), an *inter partes* review may not be instituted "unless . . . there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition."  For the reasons that follow, we determine that Petitioner has not demonstrated a reasonable likelihood of prevailing in demonstrating the unpatentability of any of the challenged claims.  Accordingly, we do not institute an *inter partes* review.

# II.    BACKGROUND

## A.  Real Parties in Interest

Petitioner identifies MediaTek Inc. and MediaTek USA, Inc. as real parties-in-interest.  Pet. 1.  Patent Owner identifies Redstone Logics LLC as real party-in-interest.  Paper 4, 1 (Patent Owner's Mandatory Notice).

## B.  Related Proceedings

The parties identify the following related cases: *Samsung Electronics Co., Ltd. v. Redstone Logics LLC,* IPR2024-00974 (P.T.A.B. May 29, 2024); *Redstone Logics LLC v. Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.*, Case No. 2:23-cv-00485 (E.D. Tex.); *Redstone Logics LLC v. NXP Semiconductors N.V., NXP B.V., and NXP USA, Inc.*, Case No. 7:24-cv-00028 (W.D. Tex.); *Redstone Logics LLC v. MediaTek,*

IPR2025-00085
Patent 8,549,339 B2

*Inc. and MediaTek USA, Inc.*, Case No. 7:24-cv-00029 (W.D. Tex.); and

*Redstone Logics LLC v. Qualcomm Inc. and Qualcomm Technologies, Inc.*,

Case No. 7:24-cv-00231 (W.D. Tex.).  *See* Pet. 1; Paper 4, 1.

### C. The '339 Patent

The '339 patent describes a multi-core processor including two or
more independent processor cores arranged in an array.  Ex. 1001, 1:6–7.
The '339 patent describes providing a dynamic supply voltage and clock
speed control to allow the processor to operate at high power and high clock
speed when needed and low power and low clock speed when the
computational requirements are reduced.  *Id.* at 1:10–14.

Figure 1, reproduced below, illustrates a configuration of the multi-
core processor.  Ex. 1001, 1:26–27.

3

IPR2025-00085
Patent 8,549,339 B2



**FIG. 1**

Figure 1 depicts multi-core processor 100 including multiple processor cores
102 arranged in a 2-dimensional array. *Id.* at 2:4–9. Interface circuit 120
couple adjacent processor cores 102. *Id.* at 2:9–10. Figure 1 further depicts
multi-core processor 100 divided into regions arranged as stripes 112, 114,
116, and 118. *Id.* at 2:20–26. According to the '339 patent, each stripe is
powered by supply voltage from power control block 108 and associated
with an independent clock domain provided by clock control block 110.
*Id.* at 2:26–31.

IPR2025-00085
Patent 8,549,339 B2

Figure 3, reproduced below, illustrates a set of processor cores interfacing using a synchronizer. Ex. 1001, 1:31–33.



**FIG. 3**

Figure 3 depicts processor cores 152, 154, and 156 driven by clock signal 1, clock signal 2, and clock signal 3 respectively. *Id.* at 4:1–10. Phase lock loop ("PLL") 1, 2, and 3 provide stable clock signals to respective processor cores 152, 154, and 156 and synchronizers 302 and 306. *Id.* at 4:10–13, 4:64–5:6. Synchronizers 302 and 306 synchronize clock signals between

5

IPR2025-00085
Patent 8,549,339 B2

adjacent cores to allow for communication between the processor cores. *Id.*

5:1–8.

### *D. Illustrative Claim*

Petitioner challenges claims 1–6, 8–11, 14 and 21 of the '339 patent, where claims 1 and 21 are independent claims. Claim 1 is illustrative of the claimed invention and is reproduced below with Petitioner's labeling of elements.

1. 1[pre] A multi-core processor, comprising:

1[a1] a first set of processor cores of the multi-core processor,

1[a2] wherein each processor core from the first set of processor cores is configured to dynamically receive a first supply voltage and a first output clock signal of a first phase lock loop (PLL) having a first clock signal as input;

1[b1] a second set of processor cores of the multi-core processor,

1[b2] wherein each processor core from the second set of processor cores is configured to dynamically receive a second supply voltage and a second output clock signal of a second PLL having a second clock signal as input,

1[b3] wherein the first supply voltage is independent from the second supply voltage, and

1[b4] the first clock signal is independent from the second clock signal; and

1[c1] an interface block coupled to the first set of processor cores and also coupled to the second set of processor cores,

1[c2] wherein the interface block is configured to facilitate communication between the first set of processor cores and the second set of processor cores.

Ex. 1001, 7:53–8:5; Ex. 1017, 1.

IPR2025-00085
Patent 8,549,339 B2

### E.  Asserted Challenges to Patentability

Petitioner challenges claims 1–6, 8–11, 14 and 21 of the '339 patent as follows.  Pet. 15–95.

| Claims Challenged | 35 U.S.C. §[1] | References/Basis |
|---|---|---|
| 1, 5, 8–10, 14, 21 | 103(a) | Knoth,[2] Allarey[3] |
| 2–4 | 103(a) | Knoth, Allarey, Flautner[4] |
| 6 | 103(a) | Knoth, Allarey, Wolfe,[5] Kumar[6] |
| 11 | 103(a) | Knoth, Allarey, Wolfe |
| 1–3, 5, 8–10, 14, 21 | 103(a) | Naffziger,[7] Allarey |
| 4 | 103(a) | Naffziger, Allarey, Flautner |
| 6 | 103(a) | Naffziger, Allarey, Wolfe, Kumar |
| 11 | 103(a) | Naffziger, Allarey, Wolfe |

In support of its challenge, Petitioner relies on the Declaration of Dr. R. Jacob Baker (Ex. 1003).

---

[1] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284 (2011), amended 35 U.S.C. § 103 effective March 16, 2013. Because the application from which the '339 patent issued claims priority before this date, the pre-AIA version of § 103 applies.

[2] Knoth, U.S. Publ'n No. 2009/0158078 A1, published June 18, 2009 ("Knoth," Ex. 1005).

[3] Allarey et al., U.S. Patent 8,122,270 B2, issued February 21, 2012 ("Allarey," Ex. 1006).

[4] Flautner, U.S. Publ'n No. 2005/0034002 A1, published February 10, 2005 ("Flautner," Ex. 1007).

[5] Wolfe et al., U.S. Publ'n No. 2011/0153984 A1, published June 23, 2011 ("Wolfe," Ex. 1008).

[6] Kumar et al., U.S. Publ'n No. 2007/0080696 A1, published April 12, 2007 ("Kumar," Ex. 1009).

[7] Naffziger et al., U.S. Publ'n No. 2010/0122101 A1, published May 13, 2010 ("Naffziger," Ex. 1010).

IPR2025-00085
Patent 8,549,339 B2

## III.  DISCUSSION

### A.  Principles of Law

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")).  This burden of persuasion never shifts to the patent owner.  *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

A claim is unpatentable under § 103(a) "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103(a); *see KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when in evidence, objective indicia of non-obviousness (i.e., secondary considerations).  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).[8]

We consider Petitioner's asserted challenges with the above-noted principles in mind.

---

[8] Neither party presents evidence of secondary considerations at this stage.

IPR2025-00085
Patent 8,549,339 B2

*B. Claim Construction*

Only those claim terms that are in controversy need to be construed, and only to the extent necessary to resolve the controversy. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017). For purposes of this decision, we determine that no term requires express construction.

*C. Level of Ordinary Skill in the Art*

Petitioner contends that a person of ordinary skill in the art ("POSITA") would have had "at least a bachelor's degree in electrical engineering, computer engineering, computer science, or a similar field, and at least two years of industry or academic experience designing or analyzing electronic circuits, semiconductors, processors, or power management, and related firmware and software, or the equivalent." Pet. 6–7 (citing Ex. 1003 ¶ 29). Patent Owner does not challenge Petitioner's proffered definition as to the level of ordinary skill in the art. Prelim. Resp. 4.

For purposes of this Decision, we adopt Petitioner's assessment, which is consistent with the level of skill reflected in the specification and asserted prior art.

*D. Ground 1: Alleged Obviousness over Knoth and Allarey*

Petitioner asserts that claims 1, 5, 8–10, 14 and 21 of the '339 patent would have been obvious over Knoth and Allarey. Pet. 15–52. For the reasons explained below, we determine that Petitioner fails to demonstrate a reasonable likelihood of prevailing in showing that claims 1, 5, 8–10, 14 and 21 of the '339 patent are obvious over Knoth and Allarey.

Before addressing the parties' arguments, we provide an overview of the Knoth and Allarey references.

9

IPR2025-00085
Patent 8,549,339 B2

*1. Overview of Knoth*

Knoth describes a multiprocessor digital system including at least two processor cores 110. Ex. 1005 ¶ 23. Knoth describes a first digital circuit, e.g., a first processor core, operates at a first rate determined by a first clock signal and a second digital circuit, e.g., a second processor core, operates at a second rate determined by a second clock signal. *Id.* ¶ 4. A clock ratio controller provides dynamic voltage and frequency control including adjusting the frequency of the first and second clock signals in response to a power management signal. *Id.* at Abstract.

Figure 1A, reproduced below, depicts a multiprocessor system with two processor cores. Ex. 1005 ¶ 23.



**FIG. 1A**

Figure 1A depicts, in pertinent part, digital system 100 including power management unit 102, prescaler 104, a plurality of clock ratio controllers

IPR2025-00085
Patent 8,549,339 B2

106a–n, plurality of voltage controllers 107a–n, coherency manager 108, and a plurality of processor cores 110a–n.  *Id.* ¶¶ 22–23.

According to the '339 patent, power management unit 102 determines when to adjust the voltage and/or a frequency of one or more of processor cores 110 to affect power consumption and/or heat generation.  Ex. 1005 ¶ 24.  Clock ratio controllers 106a–n generate the clock signal used to control processor cores 110a–n and data communications on busses 122a–n. *Id.* ¶ 27.

Figure 2A, reproduced below, illustrates the elements of clock ratio controller 106.  Ex. 1005 ¶ 11.



**FIG. 2A**

Figure 2A depicts clock ratio controller 106 including, in pertinent part, frequency controller 204, fast clock signal divider 206a, and slow clock signal divider 206b.  *Id.* ¶ 44.  Clock ratio controller 106, indicated by the dotted box, is coupled to PLL 202 and prescaler 104 of digital system 100.

11

IPR2025-00085
Patent 8,549,339 B2

*Id.* ¶ 41. PLL 202 outputs clock signal 218 based on timing pulses generated by oscillator 219. *Id.* ¶ 42.

### 2. Overview of Allarey

Allarey is directed to "stabilizing voltage supplied to a multi-core processor during a clock signal frequency locking process." Ex. 1006, 1:6–9. Figure 1, reproduced below, depicts an embodiment of the apparatus to stabilize a supplied voltage during a clock signal frequency locking process. *Id.* at 1:31–33.

IPR2025-00085
Patent 8,549,339 B2



FIG. 1

Figure 1 depicts quad-core processor with two dual core dies 100.
*Id.* at 2:41–42. Processor 100 includes site 0 and site 1 coupled to voltage
plane 106. *Id.* at 2:42–44. Site 0 includes processing core 108, processing
core 110, and PLL 116. Site 1 similarly includes processing core 112,
processing core 114, and PLL 118. *Id.* at 2:43–46. PLL 116 and PLL 118
generate a clock signal for their respective sites to use as a reference clock

13

IPR2025-00085
Patent 8,549,339 B2

and may change the frequency of the clock signal through a relocking process. *Id.* at 2:52–55.

### 3. Analysis of Independent Claims 1 and 21

#### a. Petitioner's Contentions

Independent claim 1 recites, *inter alia*,

> 1[a2] . . . the first set of processor cores is configured to dynamically receive . . . a first output clock signal of a first phase lock loop (PLL) *having a first clock signal as input*;

> 1[b2] . . . the second set of processor cores is configured to dynamically receive . . . a second output clock signal of a second PLL *having a second clock signal as input*,

> 1[b4] *the first clock signal is independent from the second clock signal*.

Ex. 1001, 7:53–8:5 (emphasis added). Independent claim 21 recites substantially similar limitations. *Id.* at 10:15–37.

We first address Petitioner's contentions in pertinent part as follows. Petitioner contends that Knoth discloses a multiprocessor digital system that includes at least two processor cores. Pet. 18–19 (citing Ex. 1005 ¶ 23, Fig. 1A). Petitioner asserts that Knoth's "processor cores 110a-n operate independently through dedicated power and frequency management." *Id.* at 19 (citing Ex. 1005 ¶¶ 25–27, 31).

Petitioner contends that each processor core receives a clock signal from its respective clock ratio controller 106a-n. Pet. 22 (citing Ex. 1005 ¶¶ 27, 31). According to Petitioner, "each of clock ratio controllers 106a-n includes a phase locked loop (PLL) (for ease of discussion, referred to as PLL 202a-n corresponding to clock ratio controller 106a-n) (highlighted in

IPR2025-00085
Patent 8,549,339 B2

purple)."[9]  *Id.*  Petitioner depicts this arrangement in annotated Figure 1A of
Knoth.



Petitioner's annotated Figure 1A depicts Knoth's multiprocessor digital
system with clock ratio controllers 106a-n providing a clock signal to the
respective processor cores 110a-n.  *Id.*  Petitioner annotates Figure 1A by
adding a corresponding PLL 202a-n to each respective clock ratio controller
106a-n.  *Id.*

      Petitioner provides two alternatives as to how Knoth discloses a first
PLL having a first clock signal as input and a second PLL having a second
clock signal as input.  Pet. 23.  First, Petitioner contends that oscillator 219
provides timing pulses to a respective PLL.  *Id.* (citing Ex. 1005 ¶¶ 41–42).
Specifically, Petitioner asserts that an oscillator 219a-n would provide a

---

[9] We note that Knoth does not designate any individual PLL 202 as PLL
202a-n and instead describes only a single PLL 202.  *See* Ex. 1005 ¶¶ 41–42,
49, 58, 61, 73, Fig. 2A.

IPR2025-00085
Patent 8,549,339 B2

timing pulse to its corresponding clock ratio controller 106a-n.[10]  *Id.*
Alternatively, Petitioner contends that "each PLL within clock ratio
controller 106 receives as input a 'PLL control signal 226' (for ease of
discussion, referred to as PLL control signal 226a-n corresponding to clock
ratio controller 106a-n."[11]  *Id.* (citing Ex. 1005, Fig. 2A).

    In sum, Petitioner asserts that Knoth discloses processor core 110a
receiving a first output clock signal (core clock 128a) from PLL 202a.
*Id.* at 24.  Petitioner further asserts that PLL 202a receives a first clock
signal as input from oscillator 219a or PLL control signal 226a.  *Id.* at 24
(citing Ex. 1003 ¶ 116).  Petitioner contends that processor core 110n
similarly receives a core clock signal 128n from PLL 202n which receives a
second clock signal as input from oscillator 219n or PLL control signal
226n.  *Id.* at 24–25.

    Petitioner further relies on Allarey as disclosing two PLLs with input
clocks.  Pet. 25 (citing Ex. 1003 ¶¶ 117–121).  Specifically, Petitioner
asserts that Allarey discloses that processor cores in site 0, cores 108 and
110, receive a clock signal generated by PLL 116.  *Id.* (citing Ex. 1006,
2:38–3:3).  Petitioner further asserts that processor cores in site 1, cores 112
and 114, receive a clock signal generated by PLL 118.  *Id.*  Petitioner
contends that Allarey discloses that "[e]ach site includes a phase locked loop

---

[10] We note that Knoth does not designate an individual oscillator as 219a-n
and instead describes only a single oscillator 219.  *See* Ex. 1005 ¶ 42, Fig.
2A.

[11] We note that Knoth does not designate an individual PLL control signal
226 as 226a-n and instead describes only a single PLL control signal 226.
*See* Ex. 1005 ¶¶ 42, 55, 61, Fig. 2A.

IPR2025-00085
Patent 8,549,339 B2

(PLL) clock signal generation circuit" and "[e]ach PLL is capable of generating a clock signal." *Id.* at 26–27 (quoting Ex. 1006, 2:41–58).

Turning to element 1[b4], Petitioner contends that each of Knoth's clock ratio controller 106a-n operates independently because each receives "'individual frequency management (FM) signals 111a-n' that are 'used to individually control/scale the frequency of each processor core 110a-n.'" Pet. 28 (citing Ex. 1005 ¶ 25). Petitioner asserts that because the clock ratio controllers operate independently, "the first clock signal of the first PLL within clock ratio controller 106a is independent from the second clock signal of the second PLL within clock ratio controller 106n." *Id.* (citing Ex. 1003 ¶ 130). Relying on the declaration testimony of Dr. Baker, Petitioner contends that a POSITA "would read Knoth to include independent first and second PLLs within clock ratio controllers 106a and 106n, respectively, receiving the first and second clock signals (the timing pulses generated by oscillators 219a and 219n) that are independent from each other." *Id.* at 28–29 (citing Ex. 1003 ¶¶ 131–132).

Similarly, Petitioner contends that PLL control signals 226a and 226n are independent input clock signals. Pet. 29 (citing Ex. 1003 ¶ 133). According to Petitioner, each PLL control signal 226 is generated based on an independent voltage ready signal 136a-n and FM signal 111a-n. *Id.* (citing Ex. 1005 ¶¶ 25, 31, 55).

Finally, Petitioner contends that Allarey also discloses the first clock signal is independent from the second clock signal. Pet. 29 (citing Ex. 1003 ¶¶ 135–136). Specifically, Petitioner contends that Allarey discloses a separate PLL for each site. *Id.* (citing Ex. 1006, 2:41–58). As a result,

17

IPR2025-00085
Patent 8,549,339 B2

Petitioner, relying on the declaration testimony of Dr. Baker, asserts that the PLLs are independent of each other. *Id.* (citing Ex. 1003 ¶ 136).

### b. *Patent Owner's Arguments*

Patent Owner argues that the Petition fails to demonstrates how Knoth and Allarey disclose "a first and second PLL with respective first and second clock signals as inputs where the first clock signal is independent from the second clock signal." Prelim. Resp. 5.

First, Patent Owner argues that the Petition fails to sufficiently show that Knoth discloses a first PLL receiving a first input clock signal and a second PLL receiving a second input clock signal. Specifically, Patent Owner argues that the Petition's identification of PLL 202a and PLL 202n of Knoth as the claimed first and second PLL fails because Knoth discloses only a single PLL 202. Prelim. Resp. 6. Patent Owner argues that PLL 202a and PLL 202n are not disclosed in Knoth, but are instead creations of Petitioner's expert Dr. Baker. *Id.* at 6, 8 (citing Ex. 1005 ¶ 41). Rather than multiple PLLs, Patent Owner argues that Knoth discloses a single PLL 202 coupled to a plurality of clock ratio controllers 106a-n. *Id.* at 8 (citing Ex. 1005 ¶¶ 22, 41). Patent Owner further argues that although Allarey discloses two PLLs, Petitioner does not sufficiently explain how or why Allarey's PLLs could be implemented in Knoth. Prelim. Resp. 9.

Second, Patent Owner argues that the Petition fails to sufficiently show that either Knoth or Allarey teaches or suggests the first input clock signal being independent from the second input clock signal. Prelim. Resp. 11–13. In particular, Patent Owner argues that Knoth teaches only a single PLL 202 with a single oscillator 219 providing a single input clock signal. *Id.* at 11 (citing Ex. 1005 ¶ 42). Further, Patent Owner argues that "[n]either

IPR2025-00085
Patent 8,549,339 B2

the Petition nor Dr. Baker's declaration explain why it would be obvious or inherent or would be a [PHOSITA]'s reading that multiple PLLs, oscillators, or sets of timing pulses could or would be used." *Id.* at 14. With regard to Allarey, Patent Owner further argues that although Allarey discloses two PLLs, Petitioner has not shown that Allarey discloses any clock signals as inputs to its PLLs and thus further fails to show independent clock inputs for each PLL. *Id.* at 13 (citing Ex. 1006, 2:52–54; Ex. 1003 ¶ 121).

*c. Analysis*

For the following reasons, we agree with Patent Owner that Petitioner fails to sufficiently show that Knoth and Allarey teaches or suggests a first and second PLL with respective first and second clock signals as inputs where the first clock signal is independent from the second clock signal, as claim 1 and 21 requires. Prelim. Resp. 5.

Having considered the evidence and arguments presented, we determine that Petitioner has not sufficiently shown that Knoth or Allarey disclose two independent clock signals. First, we are not persuaded that Petitioner has shown sufficiently that Knoth includes a PLL in each clock ratio controller. Instead, we agree with Patent Owner that Knoth discloses clock ratio controllers 106a-n coupled to a single PLL 202 where PLL 202 receives a single clock input from oscillator 119. Prelim. Resp. 6–8 (citing Ex. 1005 ¶¶ 22, 41, Fig. 2A). Figure 2A, reproduced above, clearly delineates clock ratio controller 106 within a dotted line separate from PLL 202 and oscillator 119. Further, as noted by Patent Owner, Knoth explicitly describes a plurality of clock ratio controllers and processor cores designated as a-n, but only describes a single PLL 202 and oscillator 119. *Id.* at 8, 11 (citing Ex. 1005 ¶¶ 22, 41–42). Because Petitioner has not shown that

19

IPR2025-00085
Patent 8,549,339 B2

Knoth discloses two PLLs, Petitioner fails to show a first and second PLL with respective first and second clock signals as inputs where the first clock signal is independent from the second clock signal.

Petitioner's reliance on Knoth's PLL control signals 226a and 226n fails for the same reasons. However, we further note that this reliance is further misplaced because control signal 226 is not a clock signals. Prelim. Resp. 12. Moreover, as with Petitioner's contentions regarding PLL 202, although Petitioner asserts Knoth discloses control signals 226a-n, Petitioner has not directed us to any disclosure in Knoth that describes a control signal other than a single PLL control signal 226. Pet. 29 (citing Ex. 1005 ¶ 55; Ex. 1003 ¶ 133).

Petitioner's position further relies on the declaration testimony of Dr. Baker who states a POSITA "would read Knoth to include independent first and second PLLs within clock ratio controllers 106a and 106n, respectively, receiving the first and second clock signals (the timing pulses generated by oscillators 219a and 219n) that are independent from each other." Pet. 28–29 (quoting Ex. 1003 ¶ 132, citing *id.* ¶¶ 111, 131). We do not credit Dr. Baker's testimony on this point because it lacks sufficient explanation and is inconsistent with the disclosure of Knoth as detailed above. 37 C.F.R. § 42.65(a) ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight"); *Xerox Corp. v. Bytemark, Inc.*, IPR2022-00624, Paper 9 at 15 (PTAB Aug. 24, 2022) (precedential). Dr. Baker's testimony appears premised on the assertion that each clock ratio controller 106a-n operate independently from each other. Ex. 1003 ¶ 130. However, Dr. Baker does not explain why

20

IPR2025-00085
Patent 8,549,339 B2

independently operating clock ratio controllers teach or suggest that each clock ratio controller would receive an independent input clock signal.

We are further not persuaded by Petitioner's reliance on Allarey as disclosing a first clock input signal independent from a second clock input signal. Pet. 29 (citing Ex. 1006, 2:41–58; Ex. 1003 ¶¶ 135–136). Petitioner asserts that Allarey discloses sites 0 and 1 where each site includes an independent PLL and "[t]herefore, the first PLL clock signal generation circuit is independent from the second PLL clock signal generation circuit." *Id.* We are not persuaded by Petitioner's contention because Petitioner has not directed to us any disclosure in Allarey describing two independent input clock signals. *See* Pet. 26–27, 29. At best, Petitioner references Allarey's generation of a clock signal rather than an input clock signal thereto by stating that "[e]ach PLL is capable of generating a clock signal." Pet. 27 (citing Ex. 1006, 2:41–58).

Petitioner further relies on Dr. Baker who testifies that

> The PLL clock signal generation circuits are independent of each other since "each PLL can change the frequency of the clock signal through a relocking process." [Ex. 1006, 2:41–58]. When the PLL frequency is changed, the PLL clock signal generation circuit is also modified. Therefore, the first PLL clock signal generation circuit is independent from the second PLL clock signal generation circuit.

Ex. 1003 ¶ 136. Here again, we do not credit Dr. Baker's testimony because it does not provide sufficient explanation. In particular, Dr. Baker does not sufficiently explain why "the first PLL clock signal generation circuit [being] independent from the second PLL clock signal generation circuit" would teach or suggest that any input clock signals to the PLLs would be independent as claimed. Prelim. Resp. 14–15.

IPR2025-00085
Patent 8,549,339 B2

For these reasons we agree with Patent Owner that the Petition fails to sufficiently demonstrate that Knoth and Allarey teach "a first and second PLL with respective first and second clock signals as inputs where the first clock signal is independent from the second clock signal," as required by claims 1 and 21. Accordingly, we determine that the Petition fails to show that there is a reasonable likelihood that it would prevail in establishing unpatentability of claims 1 and 21 in view of Knoth and Allarey.

*4.  Summary*

For the foregoing reasons, Petitioner has not shown a reasonable likelihood of prevailing with respect to independent claims 1 or 21 for the asserted ground based on Knoth and Allarey.  Petitioner's additional contentions regarding dependent claims 5, 8–10, and 14 do not cure these deficiencies regarding claim 1 and fail for the same reasons.

*E.  Ground 2: Alleged Obviousness over Knoth, Allarey, and Flautner*

Petitioner asserts that claims 2–4 of the '339 patent would have been obvious over Knoth, Allarey, and Flautner.  Pet. 52–58.  Having reviewed the Petition, we find that Petitioner's reliance on Flautner does not cure the above-noted deficiencies with respect to independent claim 1.  Accordingly, Petitioner does not show that there is a reasonable likelihood that it would prevail in establishing unpatentability of claims 2–4 as obvious in view of Knoth, Allarey, and Flautner.

*F.  Ground 3: Alleged Obviousness over Knoth, Allarey, Wolfe, and Kumar*

Petitioner asserts that claim 6 of the '339 patent would have been obvious over Knoth, Allarey, Wolfe, and Kumar.  Pet. 58–64.  Having reviewed the Petition, we find that Petitioner's reliance on Wolfe and Kumar does not cure the above-noted deficiencies with respect to independent claim

22

161

IPR2025-00085
Patent 8,549,339 B2

1. Accordingly, Petitioner does not show that there is a reasonable likelihood that it would prevail in establishing unpatentability of claim 6 as obvious in view of Knoth, Allarey, Wolfe, and Kumar.

### G. Ground 4: Alleged Obviousness over Knoth, Allarey, and Wolfe

Petitioner asserts that claim 11 of the '339 patent would have been obvious over Knoth, Allarey, and Wolfe. Pet. 64–65. Having reviewed the Petition, we find that Petitioner's reliance on Wolfe does not cure the above-noted deficiencies with respect to independent claim 1. Accordingly, Petitioner does not show that there is a reasonable likelihood that it would prevail in establishing unpatentability of claim 11 as obvious in view of Knoth, Allarey, and Wolfe.

### H. Ground 5: Alleged Obviousness over Naffziger and Allarey

Petitioner asserts that claims 1–3, 5, 8–10, 14 and 21 of the '339 patent would have been obvious over Naffziger and Allarey. Pet. 65–91. For the reasons explained below, we determine that Petitioner has failed to demonstrate a reasonable likelihood of prevailing with respect to claims 1–3, 5, 8–10, 14 and 21.

Before addressing the parties' arguments, we provide an overview of the Naffziger reference.

### 1. Overview of Naffziger

Naffziger describes a method for controlling power consumption in a processor. Ex. 1010 ¶ 7. Naffziger discloses a processor including one or more processor cores and a power control unit. *Id.* ¶ 8. Figure 5, reproduced below, illustrates a processor having a power control unit and a plurality of processor cores. *Id.* ¶ 18.

23

IPR2025-00085
Patent 8,549,339 B2



Fig. 5

Figure 5 depicts a processor 500 having first processor core 105A and second processor core 105B. *Id.* ¶ 53. Power control unit 150 monitors the power of processor cores 105A and 105B and may assign operation of either core to a high or lower performance state by changing the frequency of clock signals clk_core_1 and clk_core_2 provided to respective processor cores 105A and 105B. *Id.*

Figure 2, reproduced below, illustrates power control unit 150. Ex. 1010 ¶ 15.

24

IPR2025-00085
Patent 8,549,339 B2



Fig. 2

Figure 2 depicts power control unit 150 including voltage control unit 205,
clock control unit 210, control logic 220, accumulator register 224, error
calculator 226, residency timer 228, and power monitoring unit 230.
*Id.* ¶ 26.  Clock control unit 210 may be implemented using a PLL.  *Id.* ¶ 33.

### 2. *Analysis of Claims 1 and 21*

#### a. *Petitioner's Contentions*

As with Ground 1, we first address Petitioner's contentions with
respect to limitations 1[a2], 1[b2], and 1[b4].  Petitioner's contentions are
substantially similar for corresponding limitations in claim 21.  Pet. 87–90.
Petitioner relies on Allarey in the same manner as above in Ground 1.  *See*

25

**164**

IPR2025-00085
Patent 8,549,339 B2

*id.* at 71, 73, 75. Petitioner further contends Naffziger discloses a first processor core 105A receiving a first voltage supply and a first output clock signal of a PLL of power control unit 150. Pet. 68–69 (citing Ex. 1010 ¶ 55, Figs. 2, 5; Ex. 1003 ¶¶ 248–253). Petitioner further asserts that Naffziger discloses a second processor core 105B receiving a second voltage supply and a second output clock signal of a PLL of a second power control unit 150. *Id.* at 72–73 (citing Ex. 1010 ¶ 32, Figs. 2, 5; Ex. 1003 ¶¶ 256–260). Petitioner contends that "Naffziger discloses a power control unit 150 with separate, independent supply voltage and clock signal control planes, or alternatively, multiple power control units each associated with a corresponding process core, that regulates their core supply voltage and core clock frequency." *Id.* at 67–68 (citing Ex. 1010 ¶¶ 22–23, 30, 54, 55); *see id.* at 69 (citing Ex. 1010 ¶ 55). Petitioner further addresses the second power control unit asserting that a

> PHOSITA reading Naffziger would have understood that the multi-core processor 500 includes more than one power control unit 150 each associated with a corresponding core—a first power control unit 150 corresponding to the first core 105A (for ease of discussion, referred to as the "first power control unit 150A") and a second power control unit 150 corresponding to the second core 105B (for ease of discussion, referred to as the "second power control unit 150B").

*Id.* at 69 (citing Ex. 1003 ¶ 250).

Petitioner further asserts that "[e]ach power control unit 150 including the first power control unit 150A further includes the clock control unit 210 that 'us[es] a phase locked loop (PLL) . . . for adjusting the frequency of a clock signal.'" Pet. 70–71 (citing Ex. 1010 ¶ 33, Figs. 2, 5). Petitioner contends that each power control unit 150 dynamically provides a core clock signal to a processor core. *Id.* Petitioner asserts that "[t]he PLL of clock

26

IPR2025-00085
Patent 8,549,339 B2

control unit 210 of the first power control unit 150A receives as an input 'an external clock signal, clk_ext.'" *Id.* at 71, 73 (citing Ex. 1010 ¶¶ 22, 33, Figs. 2, 5).

Petitioner further contends that Naffziger discloses first and second power control units receiving "first and second clock signals that are independent from each other." Pet. 74–75 (citing Ex. 1003 ¶ 264). Petitioner, relying on the declaration testimony of Dr. Baker, contends that "[a] PHOSITA would read Naffziger to include independent first and second power control units receiving the first and second clock signals that are independent from each other." *Id.*

### d. *Patent Owner's Arguments*

Patent Owner argues that the Petition fails to demonstrates how Naffziger and Allarey disclose "a first and second PLL with respective first and second clock signals as inputs where the first clock signal is independent from the second clock signal." Prelim. Resp. 15–16, 20–23. In particular, Patent Owner argues that Allarey fails for the reasons described above in Ground 1 and provides specific arguments as to Naffziger as follows. *Id.* at 23.

Patent Owner argues that Petitioner identifies only one clock input signal in Naffziger and thus fails to show two independent clock input signals as claimed. Prelim. Resp. 20–21 (citing Pet. 69, 72; Ex. 1010 ¶ 22). Specifically, Patent Owner contends that Naffziger discloses a "power control unit is coupled to receive an external clock signal, clk_ext, from a source external to processor 100." *Id.* at 21 (quoting Ex. 1010 ¶ 22, Fig. 5). Based on this disclosure and the arrangements depicted in Figures 2 and 5 reproduced above, Patent Owner argues that Naffziger discloses only a

27

IPR2025-00085
Patent 8,549,339 B2

single clock input signal. *Id.* Therefore, Patent Owner argues that Petitioner improperly relies on the same clock input signal clk_ext as both claimed the first and second clock input signals. *Id.* at 21 (citing Pet. 69, 72; Ex. 1010, Fig. 5). Patent Owner further argues that Petitioner's reliance on Dr. Baker's testimony is insufficient because it fails to explain why a second power control system would include a separate independent external clock signal. *Id.* at 23.

*e. Analysis*

For the following reasons, we agree with Patent Owner that Petitioner fails to sufficiently show that Naffziger and Allarey teaches or suggests a first and second PLL with respective first and second clock signals as inputs where the first clock signal is independent from the second clock signal, as claim 1 and 21 requires.

Petitioner asserts that Naffziger discloses a first processor core 105A and second processor core 105B receiving first and second output core clock signals from a PLL of power control unit 150. Pet. 68–69, 72–73 (citing Ex. 1010 ¶¶ 32, 55, Figs. 2, 5; Ex. 1003 ¶¶ 248–253, 256–260). Figure 5, depicts this arrangement with two processor cores coupled to a single power control unit 150. Ex. 1010, Fig. 5. In this embodiment, a single power control unit 150, depicted in Figure 2 above, includes a single clock control unit 210 in the form of a PLL receiving an input clock signal clk_ext. *Id.*

As noted by Petitioner, Naffziger contemplates an embodiment where the multi-core processor includes multiple power control units. Pet. 67–68 (citing Ex. 1010 ¶ 55). Naffgizer states:

> Another embodiment is contemplated wherein a multi-core processor includes multiple power control units, each of which is associated with a corresponding one of a plurality of

IPR2025-00085
Patent 8,549,339 B2

> processor cores. In such an embodiment, each power control unit
> may separately control the states of operation of its
> corresponding core. The power control unit for each core may
> also monitor power consumption of the processor as a whole,
> which may be used, along with one or more power error terms,
> as a basis for determining the operational state of its
> corresponding processor core.

Ex. 1010 ¶ 55. Hence, Naffziger contemplates using two power control units to separately control operation of a corresponding core. *Id.* However, notably absent from this discussion is any explanation regarding input clock signal clk_ext. *See id.*

As noted by Patent Owner, Petitioner does not identify a second input clock signal in either Naffziger or Allarey. Prelim. Resp. 21–23. Instead, Petitioner relies on the declaration testimony of Dr. Baker who testifies that "[a] PHOSITA would read Naffziger to include independent first and second power control units receiving the first and second clock signals that are independent from each other." Pet. 74–75 (citing Ex. 1003 ¶ 264). Dr. Baker's testimony appears premised on the assertion that Naffziger discloses separate, independent power control units associated with the cores and thus a POSITA would understand that the power control units would receive independent input clock signals. *Id.* Here again, we do not credit Dr. Baker's testimony because it does not provide sufficient explanation. Instead, we agree with Patent Owner that Dr. Baker's testimony lacks adequate explanation as to why separate, independent power control units, each including a PLL, would necessarily receive separate independent input clock signals clk_ext. Prelim. Resp. 23. Indeed, as noted by Patent Owner, Naffziger's single PLL embodiment receives a single input clock signal clk_ext and provides separate output core clock signals to separate cores.

29

IPR2025-00085
Patent 8,549,339 B2

Prelim. Resp. 9, 21 (citing Ex. 1010 ¶ 22, Fig. 5). In sum, although Petitioner demonstrates that Naffziger discloses using two PLLs, Petitioner has failed to adequately show that two PLLs receive separate, independent input clock signals.

For these reasons we agree with Patent Owner that the Petition fails to sufficiently demonstrate that Naffziger and Allarey teach "a first and second PLL with respective first and second clock signals as inputs where the first clock signal is independent from the second clock signal," as required by independent claims 1 and 21. Accordingly, we determine that the Petition fails to show that there is a reasonable likelihood that it would prevail in establishing unpatentability of claims 1 and 21 in view of Naffziger and Allarey.

### 3. Summary

For the foregoing reasons, Petitioner has not shown a reasonable likelihood of prevailing with respect to independent claims 1 or 21 for the asserted ground based on Naffziger and Allarey. Petitioner's additional contentions regarding dependent claims 2–3, 5, 8–10, and 14 do not cure these deficiencies regarding claims 1 and 21, and fail for the same reasons.

### I. Ground 6: Alleged Obviousness over Naffziger, Allarey, and Flautner

Petitioner asserts that claim 4 of the '339 patent would have been obvious over Naffziger, Allarey, and Flautner. Pet. 91–92. Having reviewed the Petition, we find that Petitioner's reliance on Flautner does not cure the above-noted deficiencies with respect to independent claims 1 and 21. Accordingly, Petitioner does not show that there is a reasonable likelihood that it would prevail in establishing unpatentability of claim 4 as obvious in view of Naffziger, Allarey, and Flautner.

30

IPR2025-00085
Patent 8,549,339 B2

### J. Ground 7: Alleged Obviousness over Naffziger, Allarey, Wolfe, and Kumar

Petitioner asserts that claim 6 of the '339 patent would have been obvious over Naffziger, Allarey, Wolfe, and Kumar. Pet. 92–95. Having reviewed the Petition, we find that Petitioner's reliance on Wolfe and Kumar does not cure the above-noted deficiencies with respect to independent claims 1 and 21. Accordingly, Petitioner does not show that there is a reasonable likelihood that it would prevail in establishing unpatentability of claim 6 as obvious in view of Naffziger, Allarey, Wolfe, and Kumar.

### K. Ground 8: Alleged Obviousness over Naffziger, Allarey, and Wolfe

Petitioner asserts that claim 11 of the '339 patent would have been obvious over Naffziger, Allarey, and Wolfe. Pet. 95. Having reviewed the Petition, we find that Petitioner's reliance on Wolfe does not cure the above-noted deficiencies with respect to independent claims 1 and 21. Accordingly, Petitioner does not show that there is a reasonable likelihood that it would prevail in establishing unpatentability of claim 11 as obvious in view of Naffziger, Allarey, and Wolfe.

### IV. CONCLUSION

For the foregoing reasons, we determine that Petitioner has not demonstrated on the record a reasonable likelihood that it will prevail in showing at least one of the challenged claims of the '339 patent is unpatentable.

### V. ORDER

For the reasons given, it is

ORDERED that the Petition is *denied* as to all challenged claims, and no trial is instituted.

IPR2025-00085
Patent 8,549,339 B2

For PETITIONER:

Robert C.F. Pérez
Michael Liu
PILLSBURY WINTHROP SHAW PITTMAN LLP
robert.perez@pillsburylaw.com
michael.liu@pillsburylaw.com


For PATENT OWNER:

Reza Mirzaie
Neil A. Rubin
Qi (Peter) Tong
RUSS, AUGUST & KABAT
rmirzaie@raklaw.com
nrubin@raklaw.com
ptong@raklaw.com

Exhibit 3



US 20090106576A1

<br />

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: **US 2009/0106576 A1**
　　Jacobowitz et al. (43) **Pub. Date:** **Apr. 23, 2009**

(54) **METHODS AND SYSTEMS FOR DIGITALLY CONTROLLED MULTI-FREQUENCY CLOCKING OF MULTI-CORE PROCESSORS**

(75) Inventors: **Lawrence Jacobowitz**, Wappingers Falls, NY (US); **Daniel J. Stigliani, JR.**, Hopewell Junction, NY (US)

Correspondence Address:
**CANTOR COLBURN LLP-IBM POUGH-KEEPSIE**
**20 Church Street, 22nd Floor**
**Hartford, CT 06103 (US)**

(73) Assignee: **INTERNATIONAL BUSINESS MACHINES CORPORATION**, Armonk, NY (US)

(21) Appl. No.: **11/873,458**

(22) Filed: **Oct. 17, 2007**

**Publication Classification**

(51) **Int. Cl.**
　　*G06F 1/08* (2006.01)
(52) **U.S. Cl.** ...................................................... **713/501**

(57) **ABSTRACT**

A method and system for digitally controlled multi-frequency clocking are provided. The method includes receiving a system reference oscillator clock frequency at a microprocessor including multiple cores. The system reference oscillator clock frequency provides a reference frequency to a local oscillator. The local oscillator supplies a core clock frequency to at least one of the cores. The method further includes adjusting the local oscillator to output the core clock frequency at a frequency greater than the system reference oscillator clock frequency as a function of digital frequency characteristic data associated with the core or cores. The method supports extendibility to larger systems and may support enhanced power management through frequency adjustments at the core level.





FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6



700

702

RECEIVE A SYSTEM REFERENCE OSCILLATOR CLOCK FREQUENCY AT A MICROPROCESSOR INCLUDING MULTIPLE CORES, WHERE THE SYSTEM REFERENCE OSCILLATOR CLOCK FREQUENCY PROVIDES A REFERENCE FREQUENCY TO A LOCAL OSCILLATOR, THE LOCAL OSCILLATOR SUPPLYING A CLOCK FREQUENCY TO AT LEAST ONE OF THE CORES

704

ADJUST THE LOCAL OSCILLATOR TO OUTPUT A FREQUENCY GREATER THAN THE SYSTEM REFERENCE OSCILLATOR CLOCK FREQUENCY AS A FUNCTION OF DIGITAL FREQUENCY CHARACTERISTIC DATA ASSOCIATED WITH THE AT LEAST ONE OF THE CORES

FIG. 7

## METHODS AND SYSTEMS FOR DIGITALLY CONTROLLED MULTI-FREQUENCY CLOCKING OF MULTI-CORE PROCESSORS

### CROSS-REFERENCE TO RELATED APPLICATIONS

[0001]   This application contains subject matter related to the subject matter of the following co-pending application, which is hereby incorporated herein by reference in its entirety: U.S. patent application Attorney Docket No. POU920070208US1, entitled METHODS AND SYSTEMS FOR A DIGITAL FREQUENCY LOCKED LOOP FOR MULTI-FREQUENCY CLOCKING OF A MULTI-CORE PROCESSOR, filed on Oct. 17, 2007.

### BACKGROUND OF THE INVENTION

[0002]   The present disclosure relates generally to computer system clocking, and, in particular, to digitally controlled multi-frequency clocking of multi-core processors.

[0003]   Computer systems, such as servers, have encountered technology limitations associated with scaling performance by continuing to increase processor clock frequency. An approach being exploited in the industry to alleviate this bottleneck is the use of multiple processors working in synchronism to achieve higher performance. It has been shown that the scaling of these configurations for commercial use is approximately linear (sub-linear) with the number of processors but continues to scale with large numbers of processors. To date, the technique has been demonstrated for small numbers of processors (e.g., less than 100) at modest frequencies (e.g., less than 5 GHz). This approach usually contains multiple processor chips which are interconnected together with a clocking and data fabric to insure a quasi-synchronous structure. Silicon technology density improvements from generation to generation have enabled the placement of multiple processor cores on a processor chip to further the scaling of this paradigm.

[0004]   This new paradigm, however, requires the distribution of a common clock to all the processor chips and cores. The increasing difficulty and hardware cost, as well as signal integrity concerns, associated with the transmission of high frequency clocking throughout a multi-chip and multi-core processor computer system make this an untenable long-term strategy for future systems. The state of the art for clock distribution is based on analog signals using transmission lines. This technique is limited in scalability due to skin effect, media and connector loss, crosstalk, termination mismatches, and the like. Today's large servers contain, for example, greater than 10 processor chips typically containing two cores. It is expected that demand for both the number of processor chips and cores per chip will increase in the future. Transmission of high frequency clocks (>5-10 GHz) for multiple chips, with multiple cores, in server systems is not feasible with known board technology and connectors. Operating this configuration in a tightly coupled mode, as a symmetric multi-processor (SMP), will require a new clocking paradigm.

[0005]   Additionally, as chips become larger with more cores, regional process and parameter variability across a chip due to fabrication may result in each core having an optimal power/performance metric at a different clock voltage and clock frequency setting. As the chips get larger, the variability between the cores will increase. Obtaining optimum

performance for each core within a multi-core system is not feasible today. Separate core fixed voltage domains are known, but they can only serve to optimize the power at the chip level and not obtain optimum chip performance.

[0006]   Therefore, it would be beneficial to develop an approach to provide general processor clocking for multiple multi-core processor chip computer systems. Such an approach would enable a multiple processor computer system, e.g., a server, to maintain clock signal integrity and optimal frequency performance of each core independently, as well as higher total performance at a given power level. Conversely, power optimization on a processor core basis would also be advantageous. Further extendibility, as more cores per chip and larger chips exacerbate high frequency clock tree structures and optimization problems, would provide additional benefits. Accordingly, there is a need in the art for digitally controlled multi-frequency clocking in multi-core processor systems.

### BRIEF SUMMARY OF THE INVENTION

[0007]   Embodiments of the invention include a method for digitally controlled multi-frequency clocking. The method includes receiving a system reference oscillator clock frequency at a microprocessor including multiple cores. The system reference oscillator clock frequency provides a reference frequency to a local oscillator. The local oscillator supplies a core clock frequency to at least one of the cores. The method further includes adjusting the local oscillator to output the core clock frequency at a frequency greater than the system reference oscillator clock frequency as a function of digital frequency characteristic data associated with the core or cores. The method supports extendibility to larger systems and may support enhanced power management through frequency adjustments at the core level.

[0008]   Additional embodiments include a system for digitally controlled multi-frequency clocking. The system includes a microprocessor including multiple cores and a local oscillator supplying a core clock frequency to at least one of the cores in response to a reference frequency received from a system reference oscillator clock frequency. The local oscillator is adjusted to output the core clock frequency at a frequency greater than the system reference oscillator clock frequency as a function of digital frequency characteristic data associated with the core or cores. The system supports extendibility to larger systems and may support enhanced power management through frequency adjustments at the core level.

[0009]   Other systems and/or methods according to embodiments will be or become apparent to one with skill in the art upon review of the following drawings and detailed description. It is intended that all such additional systems and/or methods be included within this description, be within the scope of the present invention, and be protected by the accompanying claims.

### BRIEF DESCRIPTION OF THE DRAWINGS

[0010]   The subject matter which is regarded as the invention is particularly pointed out and distinctly claimed in the claims at the conclusion of the specification. The foregoing and other objects, features, and advantages of the invention are apparent from the following detailed description taken in conjunction with the accompanying drawings in which:

2

[0011] FIG. 1 depicts multi-frequency clocking of a multi-core processor chip in accordance with exemplary embodiments;

[0012] FIG. 2 depicts multi-frequency clocking of a processor multi-chip module in accordance with exemplary embodiments;

[0013] FIG. 3 depicts multi-frequency clocking of a master processor node in accordance with exemplary embodiments;

[0014] FIG. 4 depicts multi-frequency clocking of a non-master processor node in accordance with exemplary embodiments;

[0015] FIG. 5 depicts multi-frequency clocking of an alternate configuration of a multi-core processor chip in accordance with exemplary embodiments;

[0016] FIG. 6 depicts multi-frequency clocking of a multi-core processor chip sharing a local oscillator for multiple cores in accordance with exemplary embodiments; and

[0017] FIG. 7 depicts an exemplary process for multi-frequency clocking.

[0018] The detailed description explains the preferred embodiments of the invention, together with advantages and features, by way of example with reference to the drawings.

DETAILED DESCRIPTION OF THE INVENTION

[0019] Exemplary embodiments provide methods and systems for digital multi-frequency clocking in multi-chip and/or multi-core processor systems. In exemplary embodiments, a computer system (e.g., a server) clocking subsystem with a single system reference oscillator provides both a reference clock for the computer system and a reference for individual processor cores but is not used directly to generate the individual core clocks. The system reference oscillator is used to provide a level of synchronization for the individual core clocks, which may be tightly synchronized or loosely synchronized based on the platform architecture. Exemplary embodiments allow for both tightly or loosely synchronized processors (e.g., based on local oscillator design) simultaneously within the same platform or a combination thereof, including degrees of asynchronous optimization.

[0020] Clock distribution to each processor chip and core may be achieved with a digital data signal via a distribution network and a digitally controlled high-speed local oscillator as part of the core. The local core oscillator frequency may be determined by digital control data that can be used to set the core frequency of operation using digital signal processing or other digital means. The process of establishing, maintaining, and adjusting the high-speed local core oscillator frequency may be performed according to the disclosure of U.S. patent application Attorney Docket No. POU920070208US1.

[0021] In exemplary embodiments, the digital control data resides in system serial electrically erasable programmable read-only memory (SEEPROM) and is part of vital chip data for each chip. Each core may have a specified data field associated with it that contains unique data for the core (e.g., power consumption as a function of core operating frequency). The frequency can be established based upon a policy set by the computer system manufacturer or customer. For example, the frequency can be set to the maximum capability of each core based upon a particular voltage setting at a given temperature.

[0022] In exemplary embodiments, core clock frequency control information is sent to each core as a moderate speed (e.g., 10-100 Mb/s) digital control data signal, thereby avoiding problems associated with high-speed analog signal trans-

mission. As digital data, the core clock frequency control information has high noise immunity and low signal distortion. The core clock frequency control information, also referred to as "vData" herein, may be sent as individual control data fields to each core. The vData may be latched into digitally controlled oscillator functions of the cores from system chip data held in the system SEEPROM of a master server or processing node. No further data transmission is required until the core clock frequency needs to be adjusted for conditions such as an environmental or policy change.

[0023] In exemplary embodiments, the single master reference oscillator is set at a moderate frequency (e.g., 10-100 MHz) which is also distributed to each core via analog transmission line techniques and re-drive circuits. This clock can be used to latch the data into registers within the core oscillator function, rather than to set the frequency directly. A change in the fundamental core operating frequency may not be required, such that a low speed reference is sufficient to provide a clock for digital signal processing functions associated with the digitally controlled oscillator.

[0024] Each core can run asynchronous or quasi-synchronously to each other and with respect to local cache. Once the different cores of a chip are asynchronous, some handshaking/buffering may be performed to transfer data between caches. Further details are provided herein.

[0025] Turning now to the drawings, it will be seen that in FIG. 1 there is a block diagram of a microprocessor (μP) chip 100 upon which digitally controlled multi-frequency clocking is implemented in exemplary embodiments. The μP chip 100 of FIG. 1 includes four cores 102. The cores 102 provide independent processing engines, enabling parallel processing within the μP chip 100. Each core 102 can access a local cache 104, paired with the core 102, and a common cache 106 (e.g., a level-2 cache) shared between the cores 102. Independent digitally controlled clock generators, i.e., local oscillators 108, are used to clock each core 102 and local cache 104 pair synchronously, such that each core 102 can operate asynchronously to other cores 102 in the μP chip 100. In exemplary embodiments, the local oscillators 108 are digitally controlled with a frequency as determined by core clock frequency data stored in a local store vData and distribution function (LS&D) 110 in the μP chip 100. Each core 102 may have different core clock frequency settings, which can be optimized to reduce power consumption and heat dissipation at each core 102. The core clock frequency settings may be organized as one or more tables, enabling selection of higher frequencies for increased performance as a function of power dissipation, and vice versa. Power dissipation may be determined as a function of voltage at given temperatures. A master reference oscillator 112 provides a system reference oscillator clock frequency ($v_R$) that is used to gate digital vData into the LS&D 110 and also into the individual local oscillators 108. The local oscillator 108 output frequency can be adjusted to operate at an optimum point for each core 102 (e.g., maximum performance, lowest power), which may be above or below the mean operating frequency of total processor machine population for a larger system in which the μP chip 100 is incorporated.

[0026] In exemplary embodiments, the reference oscillator clock frequency ($v_R$) is a relatively low frequency such that it can be easily routed throughout a multi-chip module (MCM) or a printed circuit (PC) board without significant signal degradation, yet fast enough for clock synchronization updates sufficient to insure that the local oscillators 108 are

stable and remain within the a deviation range of approximately 10-100 ppm (parts per million) across the computer system. For example, the reference oscillator clock frequency ($v_R$) may be approximately 10-100 MHz to control the local oscillators **108** running at frequencies ranging from approximately 5 to 10 GHz. The distribution of clock signals can be point-to-point for improved reference clock integrity but may be multi-drop for lower performance and lower cost configurations. Using a slower frequency clock to digitally command a local higher frequency clock may reduce issues associated with routing high frequency analog signals over long distances, such as skin effect, media and connector loss, crosstalk, termination mismatches, and the like.

[0027]    While only four cores **102** are depicted within the μP chip **100**, it will be understood that any number of cores **102** can be included within the scope of the invention. Since all of the cores **102** may be running asynchronously to the common cache **106**, as well as other memory, a level of buffering can be provided between the cores **102** and the common cache **106** to accommodate the asynchronous nature of the interface. The μP chip **100** need not include separate caches **104** for each core **102** or the common cache **106** as depicted in FIG. **1**. Each local oscillator **108** may also include a bypass mode to allow the master reference oscillator **112** or another core's local oscillator **108** to be used in the event that a given local oscillator **108** circuit fails, thereby providing a backup clock. The μP chip **100** may additionally include support interfaces for integrating the μP chip **100** into a larger computer system, such as an I/O and memory interface **114**, a fabric interface **116**, and a core/chip vData interface **118**. The fabric interface **116** can be used to interconnect multiple μP chips **100** together to construct a larger multi-processor system, forming one or more MCMs, and supporting a symmetric multiprocessing (SMP) configuration. In an SMP configuration, memory is coherent to the μP chips **100** within the SMP.

[0028]    FIG. **2** illustrates an exemplary MCM **200** that contains four μP chips **100**. Distribution of vData and the reference oscillator clock frequency ($v_R$) to the individual μP chips **100** is performed via a first-level distribution application specific integrated circuit (ASIC) **202** mounted on the MCM **200**. The distribution ASIC **202** may parse or otherwise route any MCM-level vData to specific μP chips **100** for storage and configuration in the respective LS&Ds **110**. The distribution ASIC **202** may represent any type of integrated circuit, a programmable logic device (PLD), or a combination of discrete components. In exemplary embodiments, clock wiring **204** between the distribution ASIC **202** and the μP chips **100** on the MCM **200** is point-to-point, with all of the μP chips **100** synchronized to the master reference oscillator **112** located on a master processor node **300** (e.g., a main server PC board), as illustrated in FIG. **3**, used to synchronize multiple MCMs **200**. Returning now to FIG. **2**, the μP chips **100** of the MCM **200** are interconnected via an internal cluster fabric **206** to insure that SMP properties can be maintained. In exemplary embodiments, the μP chips **100** are also connected to a MCM fabric controller **208** via MCM fabric **210**. The MCM fabric controller **208** may be used to interconnect several MCMs **200** together into a larger SMP node configuration. Additionally, each μP chip **100** may connect to I/O and memory subsystems **212**, e.g., main system memory, which can be external to the MCM **200**.

[0029]    In alternate exemplary embodiments, the μP chips **100** are interconnected on multiple single chip modules (SCMs) mounted on a common glass epoxy PC board. This alternate packaging configuration may be used for smaller systems. The distribution ASIC **202** can be mounted on an SCM on a system board, and interconnection to each μP chip **100** can be made via system PC board wiring.

[0030]    Turning now to FIG. **3**, a master processor node **300** is depicted including a system level assembly **302** with several MCMs **200** interconnected using multi-frequency clocking of each MCM **200**. The master processor node **300** contains the master reference oscillator **112** for the entire computer system as well as a master SEEPROM **304**, which contains all the vData for each processor core within the computer system. The master processor node **300** is referred to as such since it includes both the master reference oscillator **112** and the master SEEPROM **304** that can be distributed to other nodes in a multi-node system. It is also the first node that is configured in a multi-node system, such as a server. The master processor node **300** may additionally include node main memory **306** to support functioning as a single board computer (e.g., a blade form-factor) without I/O. A node fabric controller **308** can be used to form a communication fabric between the MCMs **200** and additional nodes (not depicted). In exemplary embodiments, node fabric connections **310** connect the MCM fabric controller **208** of each MCM **200** to the node fabric controller **308**. Intra-MCM communication may be performed via communication links **312**, enabling exchanges of data between the MCMs **200** on the system level assembly **302** without passing the data to other nodes. The node fabric controller **308** may interface to other nodes via a fabric interface **314**.

[0031]    In exemplary embodiments, the master reference oscillator **112** is a high precision, crystal controlled, temperature and voltage compensated oscillator that provides a very accurate (less than 10 ppm) system clock.

[0032]    The vData in the master SEEPROM **304** is a digital representation of optimum processor (core) frequencies along with identification (Id) of the appropriate chips and cores, such as the μP chips **100** and cores **102** of FIGS. **1** and **2**. The Id information can be used to insure that the correct data is transmitted and stored in the LS&D **110** on each μP chip **100** for the cores **102**. The vData may be derived from frequency characterization data, voltage characterization data, power characterization, and the like gathered by a service element (SE) **316**. For example, optimum core operation frequencies may be determined by varying the local core clock frequency and power supply voltage (Vdd) to derive one or more curves for microprocessor component families. The SE **316** analyzes and reformats data into vData and loads the vData into the master SEEPROM **304** via a digital interface **318** (e.g. an inter-integrated circuit (I2C) bus). The SE **316** may be embodied as any form of computer device capable of writing to the master SEEPROM **304**, such as a personal computer, workstation, or hand-held device. In alternate exemplary embodiments, the SE **316** is a subsystem within the same computer system as the master processor node **300** (e.g., a server subsystem). The totality of data gathered and analyzed by the SE **316** may be used to set the optimum frequency, voltage, and the like, for each core **102** to achieve the highest performance possible or other policy established by a customer. For example, "green" policies may be implemented to minimize aggregate power dissipation in the computer system, lowering operating cost as well as environmental impact through conserving power. Each node within the computer system, such as the master processor node **300**, may perform workload monitoring at the system

4

level, node level, MCM level, chip level, and/or core level. Event monitoring may be performed using closed loop autonomic servocontrol and/or additional sensor nets can be used to turn down the clock frequency and/or the power-grid point at the various levels. For example, power dissipation may be reduced by lowering local oscillator frequencies or power supply voltage (Vdd) to an idle or zero value, while targeting various levels of the system (e.g., node, MCM, HLP chip, and/or core). The SE 316 may also enable in-field calibration of optimal operating conditions, such as degradation with time or environmental conditions.

[0033]  The vData for each core/chip can be obtained during the chip test/verification stage in the manufacturing process or as part of a training program during initial power-on of the computer system. The latter approach may be part of the initialization and set-up process of the computer system. The SE 316 may implement the data collection process for each μP chip 100 and/or core 102, and subsequently load the vData into the master SEEPROM 304.

[0034]  Using Id information in the vData, the master SEEPROM 304 can distribute and route the vData to corresponding μP chips 100 and cores 102 of FIGS. 1 and 2. The vData may be stored in the digitally controlled local oscillator 108 of each core 102 and then used to generate a core processor clock frequency until it is updated via a change to the master SEEPROM 304. In exemplary embodiments, the vData is not sent continuously from the master SEEPROM 304, but only upon an update. Thus, the core processor clock frequency of each core 102 can be updated upon an event driven basis to establish and maintain local high-speed digital clocking rather than requiring continuous high-speed analog clocking from the master reference oscillator 112.

[0035]  Although the master reference oscillator 112 and the master SEEPROM 304 are shown as part of the master processor node 300, they may reside elsewhere within the computer system. In such as configuration, all nodes may be the same, with no node designated as the master processor node. Interconnections between various nodes within the computer system can be made via cables, including wire and/or optical connections.

[0036]  FIG. 4 illustrates clocking of a non-master processor node 400. Similar to the master processor node 300 of FIG. 3, the non-master processor node 400 includes a system level assembly 402 that further includes a node fabric controller 308 in communication with MCMs 200 and fabric interface 314 as described in reference to FIG. 3. Instead of a master reference oscillator 112 or master SEEPROM 304 as depicted on the master processor node 300, the non-master processor node 400 includes a reference oscillator distributor 404 and a vData distributor 406. If the master reference oscillator 112 or master SEEPROM 304 are located external to a node (such as with the non-master processor node 400), then all nodes can be the same, and the master processor node 300 is not required. In exemplary embodiments, all nodes contain a node fabric controller 308 to allow the attachment of multiple nodes, thereby building a very large clustered computer system. The non-master processor node 400 may also include node main memory 408 to support processing functions of the μP chips 100 and cores 102 of FIGS. 1 and 2 on the MCMs 200. It will be understood that additional elements known in the art to support a computer system are included (but not depicted) within the scope of exemplary embodiments, e.g., a user interface, power supply, I/O, and additional interfaces.

[0037]  FIGS. 5 and 6 depict further possible configurations for clock and data distribution to multiple cores within microprocessor chips 500 and 600. The exemplary μP chip 500 includes a second level distribution function 502 to distribute the system reference oscillator clock frequency ($v_R$) received from the first level distribution ASIC 202 to the local oscillators 108. The μP chip 500 includes multiple L2 (common) caches 106 shared between multiple cores 102, as well as local caches 104 and local oscillators 108 paired with each core 102. The μP chip 500 also includes a larger LS&D 504 to distribute vData to the eight local oscillators 108 as compared to LS&D 110 of FIG. 1. It will be understood that the exemplary μP chip 500 represents merely one example of scaling possibilities within a given microprocessor employing the inventive principles disclosed herein.

[0038]  Similarly, the μP chip 600 represents an additional possible exemplary configuration that connects a local oscillator 108 to multiple cores 102. In this example, each core 102 has a corresponding local cache 104 and access to an L2 (common) cache 106. The second level distribution function 502 may be utilized to distribute the system reference oscillator clock frequency ($v_R$) to each local oscillator 108. The one-to-many local oscillator 108 to cores 102 configuration of FIG. 6 may be employed in designs where multiple cores 102 are grouped in different regions of the μP chip 600, e.g., north and south areas of the chip, with regional differences significant enough to justify separate local oscillators 108 for each region but not different enough at each core 102 to justify a local oscillator 108 for each core 102. The configuration depicted in FIG. 6 may also be advantageous to lower cost and complexity over the configuration of FIG. 5, while reducing flexibility at the core level. LS&D 602 may also be reduced in size and complexity as compared to the LS&D 504 of FIG. 5 and the LS&D 110 of FIG. 1, since fewer local oscillators 108 are adjusted.

[0039]  Turning now to FIG. 7, a process 700 for digitally controlled multi-frequency clocking will now be described in accordance with exemplary embodiments, and in reference to the FIGS. 1-6. At block 702, the μP chip 100 of FIG. 1 receives system reference oscillator clock frequency ($v_R$). The system reference oscillator clock frequency ($v_R$) provides a reference frequency to the local oscillators 108, which in turn supply a core clock frequency to the cores 102. The relationship of local oscillators 108 to cores 102 can be one-to-one (as depicted in FIGS. 1 and 5) or one-to-many (as depicted in FIG. 6). For example, a single local oscillator 108 can supply a core clock frequency to one core 102 or multiple cores 102 within the μP chip 100.

[0040]  At block 704, the local oscillators 108 are adjusted to output frequencies that are greater than the system reference oscillator clock frequency ($v_R$) as a function of digital frequency characteristic data (vData) associated with the cores 102 which are connected to each local oscillator 108. For example, $v_R$ may be a relatively low frequency, such as 50 MHz, generated by the master reference oscillator 112. For a given operating scenario, one core 102 may have an optimum operating frequency of 5.0 GHz, while a second core 102 has an optimum operating frequency of 5.1 GHz, and yet a third core 102 can have an optimum operating frequency of 4.9 GHz, all in the same μP chip 100. Using the vData associated with each core 102 in the LS&D 110, each corresponding local oscillator 108 can be adjusted to the specific optimum operating frequency based upon the specific core 102 or cores 102 to which it is connected.

US 2009/0106576 A1

5

[0041] As previously described, the vData received at the LS&D **110** may be gated in using the system reference oscillator clock frequency ($v_R$). In exemplary embodiments, the vData is received at the LS&D **110** from a nonvolatile memory device, such as the master SEEPROM **304**, which is external to the μP chip **100**. The vData may include includes frequency settings to optimize core clock frequency as a function of the core clock frequency versus voltage at a given temperature or range of temperatures.

[0042] To form larger processing systems such as MCM **200** of FIG. **2**, multiple μP chips **100** may be interconnected via a communication fabric, with $v_R$ and vData distributed to the multiple μP chips **100**. Further scaling can be achieved through interconnecting multiple MCMs **200** into one or more nodes, such as master processor node **300** of FIG. **3** or non-master processor node **400** of FIG. **4**. As system scaling increases, the advantages of digitally controlled multi-frequency clocking may become more apparent as a larger number of cores **102** are included into a single system with long signal paths.

[0043] Technical effects of exemplary embodiments include use of individual core clocks for workload management and to save power during server idle times by dynamically changing core clock frequency. Lowering the core clock frequency dynamically may reduce power consumption and heat dissipation. Further power management can be realized by controlling the power supply voltage (Vdd) to each core and/or chip. Thus, power management may be controlled through a combination of local core clock control and/or power grid control of the power supply voltage (Vdd) to reduce power consumption. The use of event frequency monitors to measure processing workloads in real-time enables workload management at the system level, servocontrolling power consumption to idle and/or turn off cores that are inactive. Additional technical effects include using a system reference oscillator clock frequency ($v_R$) to clock data in and out, such as clock information in a digital format, rather than generating local processor core clock frequencies as an analog multiple of $v_R$, enabling the use of a lower frequency system-wide clock and higher frequency local digitally controlled clocks. Further technical effects include programmable high-speed local digitally controlled clocks at the core level, with programmability at the system level for multiple cores in multiple microprocessor chips.

[0044] Advantages include a net performance gain of operating each core at its maximum frequency of approximately 10-20% potential improvement as compared to limiting a common core frequency to match the slowest core in a multi-core system. Employing a local store and distribution function for vData for individual chips versus on an MCM may simplify localized core clock frequency control and scalability. Further advantages may include supporting extendibility to a cluster fabric between server frames when the nodes are in separate server frames. The inventive techniques disclosed herein can be applied to any processing platform that uses multi-core microprocessor chips, for example, servers, client microprocessor platforms, storage controllers, data communication switches, wireless communications devices, high-definition television equipment, and the like, which employ advanced solid-state clocking devices.

[0045] While the invention has been described with reference to exemplary embodiments, it will be understood by those skilled in the art that various changes may be made and equivalents may be substituted for elements thereof without

departing from the scope of the invention. In addition, many modifications may be made to adapt a particular situation or material to the teachings of the invention without departing from the essential scope thereof. Therefore, it is intended that the invention not be limited to the particular embodiment disclosed as the best mode contemplated for carrying out this invention, but that the invention will include all embodiments falling within the scope of the appended claims. Moreover, the use of the terms first, second, etc. do not denote any order or importance, but rather the terms first, second, etc. are used to distinguish one element from another. Furthermore, the use of the terms a, an, etc. do not denote a limitation of quantity, but rather denote the presence of at least one of the referenced item.

What is claimed is:

1. A method for digitally controlled multi-frequency clocking, comprising:

receiving a system reference oscillator clock frequency at a microprocessor including multiple cores, wherein the system reference oscillator clock frequency provides a reference frequency to a local oscillator, the local oscillator supplying a core clock frequency to at least one of the cores; and

adjusting the local oscillator to output the core clock frequency at a frequency greater than the system reference oscillator clock frequency as a function of digital frequency characteristic data associated with the at least one of the cores.

2. The method of claim **1** further comprising:

receiving the digital frequency characteristic data at a local data store and distribution function in the microprocessor, wherein the local data store and distribution function gates in the digital frequency characteristic data using the system reference oscillator clock frequency.

3. The method of claim **2** wherein the digital frequency characteristic data is received at the local data store and distribution function from a nonvolatile memory device external to the microprocessor.

4. The method of claim **1** wherein the microprocessor further comprises dedicated independently digitally controlled local oscillators for each core, and the digital frequency characteristic data is provided on a per core basis via a local data store and distribution function.

5. The method of claim **1** wherein the digital frequency characteristic data includes frequency settings to optimize core frequency as a function of the core clock frequency versus voltage at a given temperature.

6. The method of claim **1** further comprising:

interconnecting multiple microprocessors via a communication fabric; and

distributing the system reference oscillator clock frequency and the digital frequency characteristic data to the microprocessors.

7. The method of claim **6** wherein the communication fabric is controlled by a fabric controller and the distributing of the system reference oscillator clock frequency and the digital frequency characteristic data is performed via a distribution application specific integrated circuit (ASIC).

8. The method of claim **6** wherein the multiple microprocessors are grouped to form a multi-chip module (MCM).

9. The method of claim **8** wherein multiple MCMs are interconnected in a node supporting intra-MCM communication.

6

**10**. The method of claim **9** wherein the node is one of a master processor node and a non-master processor node, the master processor node including:

a master reference oscillator to generate the system reference oscillator clock frequency; and

a master nonvolatile memory device to hold the digital frequency characteristic data for the MCMs; and

the non-master processor node including:

a reference oscillator distributor to distribute the system reference oscillator clock frequency; and

a data distributor to distribute the digital frequency characteristic data to the MCMs.

**11**. The method of claim **1** further comprising:

performing power management control via adjusting the local oscillator to output the core clock frequency as a function of processing workload.

**12**. A system for digitally controlled multi-frequency clocking, comprising:

a microprocessor including multiple cores; and

a local oscillator supplying a core clock frequency to at least one of the cores in response to a reference frequency received from a system reference oscillator clock frequency, wherein the local oscillator is adjusted to output the core clock frequency at a frequency greater than the system reference oscillator clock frequency as a function of digital frequency characteristic data associated with the at least one of the cores.

**13**. The system of claim **12** further comprising:

a local data store and distribution function in the microprocessor, wherein the local data store and distribution function gates in the digital frequency characteristic data using the system reference oscillator clock frequency.

**14**. The system of claim **13** wherein the digital frequency characteristic data is received at the local data store and distribution function from a nonvolatile memory device external to the microprocessor.

**15**. The system of claim **12** wherein the microprocessor further comprises dedicated independently digitally controlled local oscillators for each core, and the digital frequency characteristic data is provided on a per core basis via a local data store and distribution function.

**16**. The system of claim **12** wherein the digital frequency characteristic data includes frequency settings to optimize core frequency as a function of the core clock frequency versus voltage at a given temperature.

**17**. The system of claim **12** further comprising:

multiple microprocessors interconnected via a communication fabric; and

a distribution application specific integrated circuit (ASIC) to distribute the system reference oscillator clock frequency and the digital frequency characteristic data to the microprocessors.

**18**. The system of claim **16** wherein the multiple microprocessors are grouped to form a multi-chip module (CM).

**19**. The system of claim **18** wherein multiple MCMs are interconnected in a node supporting intra-MCM communication, and the node is one of a master processor node and a non-master processor node, the master processor node including:

a master reference oscillator to generate the system reference oscillator clock frequency; and

a master nonvolatile memory device to hold the digital frequency characteristic data for the MCMs; and

the non-master processor node including:

a reference oscillator distributor to distribute the system reference oscillator clock frequency; and

a data distributor to distribute the digital frequency characteristic data to the MCMs.

**20**. The system of claim **12** wherein the local oscillator is adjusted to perform power management via outputting the core clock frequency as a function of processing workload.

* * * * *

Exhibit 4



US 20090138737A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: **US 2009/0138737 A1**

Kim et al. (43) **Pub. Date:** **May 28, 2009**

(54) **APPARATUS, METHOD AND PROGRAM PRODUCT FOR ADAPTIVE REAL-TIME POWER AND PERFOMANCE OPTIMIZATION OF MULTI-CORE PROCESSORS**

(75) Inventors: **Daeik Kim**, White Plains, NY (US); **Jonghae Kim**, Fishkill, NY (US); **Moon J. Kim**, Wappingers Falls, NY (US); **James R. Moulic**, Poughkeepsie, NY (US)

Correspondence Address:
**SILVY ANNA MURPHY**
**100 TURNBERRY LANE**
**CARY, NC 27518 (US)**

(73) Assignee: **INTERNATIONAL BUSINESS MACHINES CORPORATION**, Armonk, NY (US)

(21) Appl. No.: **11/946,522**

(22) Filed: **Nov. 28, 2007**

**Publication Classification**

(51) **Int. Cl.**
*G06F 1/32* (2006.01)

(52) **U.S. Cl.** ......................................................... **713/322**

(57) **ABSTRACT**

An apparatus, method and program product for optimizing core performance and power in of a multi-core processor. The apparatus includes a multi-core processor coupled to a clock source providing a clock frequency to one or more cores, an independent power supply coupled to each core for providing a supply voltage to each core and a Phase-Locked Loop (PLL) circuit coupled to each core for dynamically adjusting the clock frequency provided to each core. The apparatus further includes a controller coupled to each core and being configured to collect performance data and power consumption data measured for each core and to adjust, using the PLL circuit, a supply voltage provided to a core, such that, the operational core frequency of the core is greater than a specification core frequency preset for the core and, such that, core performance and power consumption is optimized.





FIG. 1



FIG. 2



FIG. 3A



FIG. 3B



FIG. 4A



FIG. 4B



FIG. 5A



FIG. 5B



FIG. 5C



FIG. 5D



FIG. 6



FIG. 7



FIG. 8



**FIG. 9**

# APPARATUS, METHOD AND PROGRAM PRODUCT FOR ADAPTIVE REAL-TIME POWER AND PERFOMANCE OPTIMIZATION OF MULTI-CORE PROCESSORS

## FIELD OF THE INVENTION

[0001]   The present invention relates to the field of electronic components, and more particularly to an apparatus, method and program product for adaptive real-time power and performance optimization of multi-core processors.

## BACKGROUND OF THE INVENTION

[0002]   Current microprocessor chips with multiple cores typically use a single power supply voltage and a fixed clock frequency for the multiple cores on a chip. Given wafer-level and die-level process variations in microprocessor chip manufacturing one core on a microprocessor chip can have different performance characteristics than another core on the chip, which can result in low processor chip yield due to the fact that some cores do not perform faster than a given frequency specification required for all cores on a chip. As the number of cores on a chip increase, the chip yield becomes a critical bottleneck for microprocessor chip manufacturing. As such, there is a need for a cost effective and efficient way to improve microprocessor chip yield during manufacturing.

## SUMMARY OF THE INVENTION

[0003]   In a first aspect of the invention, there is provided an apparatus for optimizing performance and power consumption of a multi-core processor. The apparatus comprises a multi-core processor having a plurality of cores, the multi-core processor being coupled to a clock source configured to provide a reference input clock frequency to the plurality of cores in the multi-core processor, each of the cores of the plurality of cores having a specification core frequency preset for the multi-core processor. The apparatus further comprises at least one power supply voltage connected to the multi-core processor for providing a supply voltage to the plurality of cores, a respective core of the plurality of cores having a respective operational core frequency that is proportional to the supply voltage provided by at least one power supply voltage, at least one PLL (Phase Locked Loop) having one or more dividers, the one PLL being coupled to the multi-core processor and being configured to dynamically adjust the reference input clock frequency provided to a respective core of the plurality of cores to ensure that a respective operational core frequency of the respective core is at least equal to the reference input clock frequency. The apparatus further comprises a main controller coupled to the plurality of cores, the main controller being configured to collect core performance data and core power consumption data measured for the plurality of cores, the main controller being configured to adjust either the supply voltage provided by at least one power supply voltage connected to the respective core or being configured to adjust the reference input clock frequency provided to the respective core, wherein adjustment of either the supply voltage provided or the respective input clock frequency provided to the respective core optimizes a respective core performance and a respective core power consumption by the respective core, and wherein the main controller dynamically adjusts the supply voltage provided by at least

one power supply voltage to the plurality of cores in real-time mode. The apparatus further comprises a voltage level-translating communication transceiver configured to enable communications between the main controller and the plurality of cores and configured to enable communications between each of the plurality of cores. In an embodiment, the apparatus further comprises at least two PLLs (Phase Locked Loops) coupled to the multi-core processor, each of the at least two PLLs having one or more voltage-controlled oscillators (VCOs) and one or more dividers, a PLL of the at least two PLLs being configured to dynamically adjust the reference input clock frequency supplied to one or more cores of the plurality of cores in order to ensure that a respective operational core frequency of the respective core is greater than the specification core frequency preset for the respective core. In an embodiment, the apparatus further comprises a plurality of power supply voltages connected to the multi-core processor, a respective individual power supply voltage of the plurality of power supply voltages being configured to provide a respective supply voltage to an individual core of the plurality of cores, wherein the main controller dynamically adjusts the respective supply voltage provided by the respective individual power supply voltage to the individual core to increase the respective operational core frequency of the respective core, and wherein the main controller dynamically adjusts the respective supply voltage provided by the respective individual power supply voltage to the individual core in real-time mode. In an embodiment, the main controller is configured to distribute instruction blocks to the plurality of cores in a manner that achieves a balancing criterion with respect to the plurality of cores, wherein the balancing criterion comprises at least one of: equal performance balancing, maximum performance balancing, power consumption balancing and instruction count balancing. In an embodiment, the core performance data measured for the multi-core processor comprises computing a sum of a respective core performance data measured for each core of the plurality of cores, and wherein the core power consumption data measured for the multi-core processor comprises computing a sum of a respective core power consumption data measured for each core of the plurality of cores.

[0004]   In another aspect of the invention, there is provided an apparatus for compensating semiconductor manufacturing process-induced variation in core performance of a multi-core processor. The apparatus comprises a multi-core processor including a plurality of cores, the multi-core processor being coupled to a clock source configured to provide a reference input clock frequency to the plurality of cores in the multi-core processor, a respective power supply voltage coupled to a respective core of the plurality of cores for providing a respective supply voltage to the respective core, wherein a respective operational core frequency of the respective core is proportional to the respective supply voltage provided by the respective power supply voltage, a phase locked loop (PLL) circuit coupled to each core of the plurality of cores, the PLL circuit having one or more voltage-controlled oscillators (VCOs) and one or more dividers, the PLL circuit being configured to dynamically adjust the reference input clock frequency provided to the respective core of the plurality of cores, and a main controller coupled to each core of the plurality of cores, the main controller being configured to collect core performance data and core power consumption data measured for each core of the plurality of cores, the main controller being configured to adjust, using the PLL circuit

2

coupled to the respective core, the respective supply voltage provided to the respective core in order to ensure that the respective operational core frequency of the respective core is greater than a specification core frequency preset for the respective core and to optimize the power consumption by the respective core, wherein core performance of the respective core is optimized. The apparatus further comprises a voltage level-translating communication transceiver configured to enable communications between the main controller and the plurality of cores and configured to enable communications between each of the plurality of cores. In an embodiment, the PLL circuit further comprises one or more voltage-controlled oscillators (VCOs) and one or more dividers, the PLL circuit being configured to dynamically adjust the reference input clock frequency provided to the respective core to ensure that the respective operational core frequency of the respective core is at least equal to the reference input clock frequency. In an embodiment, the main controller dynamically adjusts the respective supply voltage provided by the respective power supply voltage to the respective core in real-time mode. In an embodiment, the main controller is configured to distribute instruction blocks to the plurality of cores in a manner that achieves a balancing criterion with respect to the plurality of cores, and wherein the balancing criterion comprises at least one of: equal performance balancing, maximum performance balancing, power consumption balancing and instruction count balancing. In an embodiment, the core performance data measured for the multi-core processor comprises computing a sum of the respective core performance data measured for each core of the plurality of cores and, in an embodiment, the core power consumption data measured for the multi-core processor comprises computing a sum of a respective core power consumption data measured for each core of the plurality of cores.

[0005]    In another aspect of the invention, there is provided a method for optimizing performance and power consumption of a multi-core processor. The method comprises providing a multi-core processor having a plurality of cores, the multi-core processor being coupled to a clock source configured to provide a reference input clock frequency to the plurality of cores in the multi-core processor, connecting a separate voltage power source configured to provide a respective supply voltage to each core of the plurality of cores in the multi-core processor, wherein a respective core operational clock frequency is proportional to the respective supply voltage provided to a respective core, and wherein a respective core power consumption by the respective core is proportional to the reference input clock frequency and to the respective supply voltage squared, collecting, using a main controller coupled to each core of the plurality of cores, core performance data and core power consumption data measured for each core of the plurality of cores and adjusting, using the main controller, either the respective supply voltage provided to the respective core of the plurality of cores or the reference input clock frequency provided to the respective core of the plurality of cores, based on a respective core performance data and a respective core power consumption data collected for the respective core of the plurality of cores, wherein adjustment of either the respective power provided to the respective core ensures that the respective operational core frequency of the respective core is greater than a respective specification core frequency preset for the respective core, and wherein adjustment of the reference input clock frequency ensures that the respective operational core fre-

quency of the respective core is at least equal to the reference input clock frequency, and whereby the respective core performance and the respective core power consumption by the respective core is optimized. The method further comprises enabling, utilizing a voltage level-translating communication transceiver, communications between the main controller and the plurality of cores and enabling communications between each of the plurality of cores. In an embodiment, the adjusting step further comprises supplying each core of the plurality of cores with at least one PLL (Phase Locked Loop) having one or more voltage-controlled oscillators (VCOs) and one or more dividers, at least one PLL with the one or more VCOs and the one or more dividers being configured to dynamically adjust the input clock frequency provided to the respective core, wherein the respective operational core frequency is at least equal to the reference input clock frequency, and wherein the respective power consumption by the respective core is adjusted. In an embodiment, the adjusting step further comprises dynamically adjusting either the output power supply voltage or the input clock frequency provided to the respective core in real-time mode. In an embodiment, the adjusting step further comprises distributing, using the main controller, instruction blocks to each core of the plurality of cores in a manner that achieves a balancing criterion with respect to the plurality of cores, wherein the balancing criterion comprises at least one of: equal performance balancing, maximum performance balancing, power consumption balancing and instruction count balancing. In an embodiment, a core performance data measured for the multi-core processor comprises computing a sum of the respective core performance data measured for each core of the plurality of cores in the multi-core processor, and wherein the core power consumption data measured for the multi-core processor comprises computing a sum of a respective core power consumption data measured for each core of the plurality of cores.

[0006]    In another aspect of the invention, there is provided a computer program product for optimizing performance and power consumption of a multi-core processor. The computer program product comprises a computer readable medium, first program instructions to supply a reference input clock frequency to a plurality of cores of a multi-core processor, the plurality of cores in the multi-core processor being coupled to a main controller, the first program instructions including instructions to supply a respective supply voltage to a respective core of the plurality of cores in the multi-core processor, wherein a respective core operational clock frequency is proportional to the respective supply voltage supplied to the respective core, and wherein a respective core power consumption by the respective core is proportional to the reference input clock frequency and to the respective supply voltage squared, second program instructions to collect, using the main controller, core performance data and core power consumption data measured for the plurality of cores, third program instructions to adjust, using the main controller, either the respective supply voltage supplied to the respective core or the reference input clock frequency supplied to the respective core, based on a respective core performance data and a respective core power consumption data collected for the respective core of the plurality of cores, wherein adjustment of either the supply voltage provided to the respective core or the reference input clock frequency supplied optimizes the respective core performance and the respective core power consumption by the respective core. The computer program product further comprises fourth program instructions to

enable communications between the main controller and the plurality of cores and to enable communications between each of the plurality of cores, utilizing a voltage level-translating communication transceiver. In an embodiment, the first program instructions include instructions to couple each core of the plurality of cores with at least one phase locked loop (PLL) circuit having one or more voltage-controlled oscillators (VCOs) and one or more dividers, at least one PLL circuit with the one or more VCOs and the one or more dividers being configured to dynamically adjust the reference input clock frequency of the respective core, wherein a respective operational core frequency of the respective core is at least equal to the reference input clock frequency, and wherein the respective power consumption by the core is adjusted. In an embodiment, the second program instructions include instructions to distribute, using the main controller, instruction blocks to each core of the plurality of cores in a manner that achieves a balancing criterion with respect to the plurality of cores, the balancing criterion comprises at least one of: equal performance balancing, maximum performance balancing, power consumption balancing and instruction count balancing. In an embodiment, the third program instructions include instructions to dynamically adjust the supply voltage provided to the respective core to ensure that the respective operational core frequency of the respective core is greater than a respective specification core frequency preset for the respective core, wherein the respective core performance and the respective power consumption of the respective core is optimized. In an embodiment, the third program instructions include instructions to dynamically adjust either the supply voltage provided or the reference input clock frequency supplied to the respective core in real-time mode. In an embodiment, a core performance data measured for the multi-core processor comprises computing a sum of the respective core performance data measured for each core of the plurality of cores in the multi-core processor, and wherein a core power consumption data measured for the multi-core processor comprises computing a sum of a respective core power consumption data measured for each core of the plurality of cores. In an embodiment, each of the first, second, third and fourth program instructions are recorded on the computer readable medium.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0007] The accompanying drawings, which are incorporated in and form a part of this specification, illustrate embodiments of the invention and, together with the description, serve to explain the principles of the invention:

[0008] FIG. 1 is a schematic block diagram of an apparatus for optimizing performance and power consumption of a multi-core processor, in accordance with an embodiment of the invention.

[0009] FIG. 2 is a schematic block diagram of an apparatus for optimizing performance and power consumption of a multi-core processor, in accordance with an embodiment of the invention.

[0010] FIGS. 3A-3B are graphs illustrating an example of adjusting the supply voltage supplied to one or more cores to balance the operational core frequency of the cores in a multi-core processor, in accordance with an embodiment of the invention.

[0011] FIGS. 4A-4B are graphs illustrating an example of adjusting the supply voltage supplied to one or more cores to balance the power consumption in the one or more cores in the multi-core processor, in accordance with an embodiment of the invention.

[0012] FIGS. 5A-5C are graphs illustrating an example of adjusting the supply voltage to provide minimum operational power or performance in a multi-core processor, in accordance with an embodiment of the invention.

[0013] FIGS. 5B-5D are graphs illustrating an example of adjusting the supply voltage to provide maximum operational power or performance in a multi-core processor, in accordance with an embodiment of the invention.

[0014] FIG. 6 is a flowchart illustrating a clock adjustment scheme for testing the cores in a multi-core processor, in accordance with an embodiment of the invention.

[0015] FIG. 7 is a flowchart illustrating a clock frequency adjustment scheme for optimizing the operational core frequency of a core in a multi-core processor, in accordance with an embodiment of the invention.

[0016] FIG. 8 is a flowchart illustrating a voltage adjustment scheme for maximizing an operational core frequency of a core in a multi-core processor in order to ensure that the core passes the required specification core frequency, in accordance with an embodiment of the invention.

[0017] FIG. 9 is a schematic block system diagram illustrating an embodiment of a system having deployed thereon a core power and performance optimization tool or code for optimizing power and performance of multi-core processor, in accordance with an embodiment of the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

[0018] Many of the functional units described in this specification have been labeled as modules, in order to more particularly emphasize their implementation independence. For example, a module may be implemented as a hardware circuit comprising custom VLSI circuits or gate arrays, off-the-shelf semiconductors such as logic chips, transistors, or other discrete components. A module may also be implemented in programmable hardware devices such as field programmable gate arrays, programmable array logic, programmable logic devices or the like. Modules may also be implemented in software for execution by various types of processors. An identified module or component of executable code may, for instance, comprise one or more physical or logical blocks of computer instructions which may, for instance, be organized as an object, procedure, or function. Nevertheless, the executables of an identified module need not be physically located together, but may comprise disparate instructions stored in different locations which, when joined logically together, comprise the module and achieve the stated purpose for the module.

[0019] Further, a module of executable code could be a single instruction, or many instructions, and may even be distributed over several different code segments, among different programs, and across several memory devices. Similarly, operational data may be identified and illustrated herein within modules, and may be embodied in any suitable form and organized within any suitable type of data structure. The operational data may be collected as a single data set, or may be distributed over different locations including over different storage devices, over disparate memory devices, and may exist, at least partially, merely as electronic signals on a system or network. Furthermore, modules may also be implemented as a combination of software and one or more hardware devices. For instance, a module may be embodied in the

4

combination of a software executable code stored on a memory device. In a further example, a module may be the combination of a processor that operates on a set of operational data. Still further, a module may be implemented in the combination of an electronic signal communicated via transmission circuitry.

[0020]  Reference throughout this specification to "one embodiment," "an embodiment," or similar language means that a particular feature, structure, or characteristic described in connection with the embodiment is included in at least one embodiment of the present invention. Thus, appearances of the phrases "in one embodiment," "in an embodiment," and similar language throughout this specification may, but do not necessarily, all refer to the same embodiment.

[0021]  It will be apparent to those skilled in the art that various modifications and variations can be made to the present invention without departing from the spirit and scope of the invention. Thus, it is intended that the present invention cover the modifications and variations of this invention provided they come within the scope of the appended claims and their equivalents. Reference will now be made in detail to the preferred embodiments of the invention.

[0022]  In one embodiment, the present invention provides an apparatus for optimizing performance and power consumption of a multi-core processor. The apparatus comprises a multi-core processor having a plurality of cores, the multi-core processor being coupled to a clock source configured to provide a reference input clock frequency to the plurality of cores in the multi-core processor, each of the cores of the plurality of cores having a specification core frequency preset for the multi-core processor. The apparatus further comprises at least one power supply voltage connected to the multi-core processor for providing a supply voltage to the plurality of cores, a respective core of the plurality of cores having a respective operational core frequency that is proportional to the supply voltage provided by at least one power supply voltage, at least one PLL (Phase Locked Loop) having one or more voltage-controlled oscillators (VCOs) and one or more dividers, the one PLL being coupled to the multi-core processor and being configured to dynamically adjust the reference input clock frequency provided to a respective core of the plurality of cores to ensure that a respective operational core frequency of the respective core is at least equal to the reference input clock frequency. The apparatus further comprises a main controller coupled to the plurality of cores, the main controller being configured to collect core performance data and core power consumption data measured for the plurality of cores, the main controller being configured to adjust either the supply voltage provided by at least one power supply voltage connected to the respective core or being configured to adjust the reference input clock frequency provided to the respective core, wherein adjustment of either the supply voltage provided or the reference input clock frequency provided to the respective core optimizes a respective core performance and a respective core power consumption by the respective core, and wherein the main controller dynamically adjusts the supply voltage provided by at least one power supply voltage to the plurality of cores in real-time mode. The apparatus further comprises a voltage level-translating communication transceiver configured to enable communications between the main controller and the plurality of cores and configured to enable communications between each of the plurality of cores. In an embodiment, the apparatus further comprises at least two PLLs (Phase Locked Loops)

coupled to the multi-core processor, each of the at least two PLLs having one or more voltage-controlled oscillators (VCOs) and one or more dividers, a PLL of the at least two PLLs being configured to dynamically adjust the reference input clock frequency supplied to one or more cores of the plurality of cores in order to ensure that a respective operational core frequency of the respective core is greater than the specification core frequency preset for the respective core. In an embodiment, the apparatus further comprises a plurality of power supply voltages connected to the multi-core processor, a respective individual power supply voltage of the plurality of power supply voltages being configured to provide a respective supply voltage to an individual core of the plurality of cores, wherein the main controller dynamically adjusts the respective supply voltage provided by the respective individual power supply voltage to the individual core to increase the respective operational core frequency of the respective core, and wherein the main controller dynamically adjusts the respective supply voltage provided by the respective individual power supply voltage to the individual core in real-time mode. In an embodiment, the main controller is configured to distribute instruction blocks to the plurality of cores in a manner that achieves a balancing criterion with respect to the plurality of cores, wherein the balancing criterion comprises at least one of: equal performance balancing, maximum performance balancing, power consumption balancing and instruction count balancing. In an embodiment, the core performance data measured for the multi-core processor comprises computing a sum of a respective core performance data measured for each core of the plurality of cores, and wherein the core power consumption data measured for the multi-core processor comprises computing a sum of a respective core power consumption data measured for each core of the plurality of cores.

[0023]  In another aspect of the invention, there is provided an apparatus for compensating semiconductor manufacturing process-induced variation in core performance of a multi-core processor. The apparatus comprises a multi-core processor including a plurality of cores, the multi-core processor being coupled to a clock source configured to provide a reference input clock frequency to the plurality of cores in the multi-core processor, a respective power supply voltage coupled to a respective core of the plurality of cores for providing a respective supply voltage to the respective core, wherein a respective operational core frequency of the respective core is proportional to the respective supply voltage provided by the respective power supply voltage, a phase locked loop (PLL) circuit coupled to each core of the plurality of cores, the PLL circuit having one or more voltage-controlled oscillators (VCOs) and one or more dividers, the PLL circuit being configured to dynamically adjust the reference input clock frequency provided to the respective core of the plurality of cores, and a main controller coupled to each core of the plurality of cores, the main controller being configured to collect core performance data and core power consumption data measured for each core of the plurality of cores, the main controller being configured to adjust, using the PLL circuit coupled to the respective core, the respective supply voltage provided to the respective core in order to ensure that the respective operational core frequency of the respective core is greater than a specification core frequency preset for the respective core and to optimize the power consumption by the respective core, wherein core performance of the respective core is optimized. The apparatus further comprises a voltage

5

level-translating communication transceiver configured to enable communications between the main controller and the plurality of cores and configured to enable communications between each of the plurality of cores. In an embodiment, the PLL circuit further comprises one or more voltage-controlled oscillators (VCOs) and one or more dividers, the PLL circuit being configured to dynamically adjust the reference input clock frequency provided to the respective core to ensure that the respective operational core frequency of the respective core is at least equal to the reference input clock frequency. In an embodiment, the main controller dynamically adjusts the respective supply voltage provided by the respective power supply voltage to the respective core in real-time mode. In an embodiment, the main controller is configured to distribute instruction blocks to the plurality of cores in a manner that achieves a balancing criterion with respect to the plurality of cores, and wherein the balancing criterion comprises at least one of: equal performance balancing, maximum performance balancing, power consumption balancing and instruction count balancing. In an embodiment, the core performance data measured for the multi-core processor comprises computing a sum of the respective core performance data measured for each core of the plurality of cores and, in an embodiment, the core power consumption data measured for the multi-core processor comprises computing a sum of a respective core power consumption data measured for each core of the plurality of cores.

[0024]    Reference is now made to FIGS. **1** and **2**, which depict various embodiments of an apparatus for optimizing performance and power consumption in a multi-core processor. Turning to FIG. **1**, reference numeral **100** depicts an embodiment of an apparatus comprising of a multi-core processor having a plurality of cores **110**, **120**, **130** and **140**, where each of the cores **110**, **120**, **130** and **140** is coupled to a main controller or main control circuit **150**, discussed further herein below with respect to FIG. **2**, and each core K is connected to its own separate power supply voltage ($V_{DDK}$). In particular, as shown in FIG. **1**, core **110** is connected via wiring **112** to its own separate power supply voltage ($V_{DD1}$), reference numeral **114**, whereas, core **120** is connected via wiring **122** to its own separate power supply voltage ($V_{DD2}$), reference numeral **124**. In a similar manner, core **130** is connected via wiring **132** to its own separate power supply voltage ($V_{DD3}$), reference numeral **134** and core **140** is connected via wiring **142** to its own separate power supply voltage ($V_{DD4}$), reference numeral **144**. In an embodiment, each of the respective wiring **112**, **122**, **132** and **142** is comprised of inductors, capacitors and resistors. In an embodiment, each of the power supply voltages **114**, **124**, **134** and **144** is also coupled to the controller **150**. Further, each of the cores **110**, **120**, **130** and **140** and each of the power supply voltages **114**, **124**, **134** and **144** are connected to a voltage level-translating communication transceiver **180**, that is configured to enable communication between the main controller **150** and each of the cores **110**, **120**, **130** and **140** as well as is configured to enable communications between and among each of the cores **110**, **120**, **130** and **140** in the multi-core processor. Further, in an embodiment, the multi-core processor is coupled to a main PLL (Phase-Locked Loop), reference numeral **160** that is configured to receive (indicated by arrow **172**) an input clock frequency or clock rate or speed ($F_{CLK}$) from a clock source (reference numeral **170**), such as, a crystal oscillator. In an embodiment, the main PLL **160** comprises a voltage-controlled oscillator (VCO), one or more frequency dividers

(preferably, at least one divider for each core in the multi-core processor), a phase detector or phase-frequency detector and a low-pass filter configured in a feedback loop for multiplying the input clock frequency received from the clock source in order to provide a reference input clock frequency that is delivered to each of the cores in the multi-core processor. The main PLL **160** comprises at least four dividers, one divider coupled to each of the respective cores **110**, **120**, **130** and **140**, such that, a respective reference input clock frequency (indicated by arrows **162**, **164**, **166** and **168**) is provided to each of the cores in the multi-core processor. For instance, if the input reference clock frequency ($F_{CLK}$) received from the clock source **170**, such as a crystal oscillator is 100 MHz (megahertz), the main PLL **160** may be configured to adjust the input reference clock frequency ($F_{CLK}$) to deliver a core frequency ($F_K$) of 3.2 GHz (gigahertz) to each of the plurality of cores, for instance, by using a frequency divider ratio of 32. In an embodiment, a specification core frequency ($F_{SPEC}$) is preset or pre-specified for each of the cores **110**, **120**, **130** and **140** in the multi-core processor, such that, an operational core frequency ($F_K$) at which a core K of the cores **110**, **120**, **130** and **140** performs or operates has to exceed the preset specification core frequency in order for the multi-core processor to pass testing. Further, in an embodiment, the operational or operating core frequency ($F_K$) of a core among the plurality of cores in the multi-core processor is proportional to the respective supply voltage provided or supplied by the respective power supply voltage. Furthermore, a maximum operational or operating core frequency of a core ($F_{MAX}$) is defined as the core frequency or rate at which the core functions correctly with a given power supply voltage ($V_{DDK}$) supplied to the core. In an embodiment, the supply voltage supplied or provided to a core by a power supply voltage is adjustable by the controller **150**. For instance, the supply voltage ($V_{DD1}$) supplied by the power supply voltage **114** to the core **110** is adjustable by the controller **150**. Similarly, the supply voltage ($V_{DD2}$) supplied by the power supply voltage **124** to the core **120**, the supply voltage ($V_{DD3}$) supplied by the power supply voltage **134** to core **130** and the supply voltage ($V_{DD4}$) supplied by the power supply voltage **144** to core **140** are each adjustable by the controller **150**, as discussed herein further with respect to FIG. **2**. Moreover, increasing a supply voltage supplied to a core increases the operating or operational core frequency, $F_K$, since $F_K$ for a core K is given by: $F_K = \beta V_{DDK}$, such that performance is optimized in the core, which is discussed further herein below. In an embodiment, the apparatus further comprises a voltage level-translating communication transceiver **180** that is configured to enable communications between the main controller **150** and the plurality of cores **110**, **120**, **130** and **140**. In an embodiment, the voltage level-translating communication transceiver **180** communicates the voltage $V_{DD1}$, $V_{DD2}$, $V_{DD3}$ and $V_{DD4}$ supplied to each of the respective cores **110**, **120**, **130** and **140**, such that, the controller **150** may adjust the individual voltage supplied to a particular core, if necessary. Further, the voltage level-translating communication transceiver **180** is configured to enable communications between each of the plurality of cores **110**, **120**, **130** and **140**.

[0025]    Referring to FIG. **2**, reference numeral **200** shows another embodiment of an apparatus for optimizing performance and power consumption in a multi-core processor. As shown in FIG. **2**, each of the cores **210**, **220**, **230** and **240** in a multi-core processor is coupled to a main controller **250**. Further, as shown in FIG. **2**, core **210** is connected via wiring

6

212 to its own separate power supply voltage ($V_{DD1}$), reference numeral 214, whereas, core 220 is connected via wiring 222 to its own separate power supply voltage ($V_{DD2}$), reference numeral 224. In a similar manner, core 230 is connected via wiring 232 to its own separate power supply voltage ($V_{DD3}$), reference numeral 234 and core 240 is connected via wiring 242 to its own separate power supply voltage ($V_{DD4}$), reference numeral 244. In an embodiment, each of the respective wiring 212, 222, 232 and 242 is comprised of inductors, capacitors and resistors. Further, in an embodiment, the multi-core processor is coupled to a main PLL (Phase-Locked Loop), reference numeral 260, which is configured to receive an input clock frequency from a clock source 270, such as, a crystal oscillator (as shown in FIG. 1). In an embodiment, the main PLL 260 comprises a voltage-controlled oscillator (VCO), one or more frequency dividers, a phase detector or phase-frequency detector and a low-pass filter configured in a feedback loop for multiplying the input clock frequency to provide an output clock frequency that is provided to the multi-core processor. Further, in an embodiment, the multi-core processor comprises additional PLLs, which receive an input from the main PLL 260. In an embodiment, at least one PLL is coupled to each core in the multi-core processor, with the PLL being configured to further multiply the output clock frequency received from the main PLL 260 in order to deliver a reference input clock frequency that is higher than the input clock frequency received from the main PLL 260. As shown in FIG. 2, each of PLL1 (reference numeral 216), PLL2 (reference numeral 226), PLL3 (reference numeral 236) and PLL4 (reference numeral 246) receives an input clock frequency from the main PLL 260 (indicated by respective arrows 262, 264, 266 and 268), which provides a first multiple of the clock frequency provided by the clock source 270. Further, each of the PLLs, PLL1 (reference numeral 216), PLL2 (reference numeral 226), PLL3 (reference numeral 236) and PLL4 (reference numeral 246), delivers a reference input clock frequency (indicated by arrows 218, 228, 238 and 248) that is a further multiple of the clock frequency provided (arrow 272) by the clock source 270. Accordingly, in an embodiment, a respective PLL is configured to provide a reference input clock frequency ($F_{CLK}$) to a respective core K to ensure that a respective operational or operating core frequency ($F_K$) of the respective core is at least equal to the adjusted reference input clock frequency. Further, as mentioned herein above with respect to FIG. 1, a specification core frequency ($F_{SPEC}$) is preset or pre-specified for each of the cores 210, 220, 230 and 240 in the multi-core processor, such that, an operational core frequency ($F_K$) at which a core K of the cores 210, 220, 230 and 240 performs or operates has to exceed the preset specification core frequency in order for the multi-core processor to pass testing. In an embodiment, the controller 250 is configured to collect core performance data and core power consumption data measured for the plurality of cores. Further, the main controller is configured to adjust either a respective supply voltage ($V_{DDK}$) provided by the respective power supply voltage connected to a respective core K or is configured to adjust the reference input clock frequency provided to the respective core, such that, adjustment of either the supply voltage provided or the respective input clock frequency provided to the respective core optimizes a respective core performance and a respective core power consumption by the respective core, and wherein the main controller dynamically adjusts the supply voltage provided by the power supply

voltage to each of the plurality of cores in real-time mode. The apparatus 200 further comprises a voltage level-translating communication transceiver (shown in FIG. 1) that is configured to enable communications between the main controller 250 and the plurality of cores 210, 220, 230 and 240. In an embodiment, the voltage level-translating communication transceiver communicates the voltage $V_{DD1}$, $V_{DD2}$, $V_{DD3}$ and $V_{DD4}$ supplied to each of the respective cores 210, 220, 230 and 240, such that, the controller 250 may adjust the individual voltage supplied to a particular core, if necessary. Further, the voltage level-translating communication transceiver is configured to enable communications between each of the plurality of cores 210, 220, 230 and 240.

[0026]    Moreover, given that the operational or operating core frequency ($F_K$) of a core K in the multi-core processor is proportional to the respective supply voltage provided or supplied by the respective power supply voltage ($V_{DDK}$), increasing the power supply voltage increases the operational or operating core frequency of the core. For instance, the supply voltage supplied by the power supply voltage 214 ($V_{DD1}$) to the core 210 is adjustable by the controller 250. Similarly, the supply voltage supplied by the power supply voltage 224 ($V_{DD2}$) to the core 220, the supply voltage supplied by the power supply voltage 234 ($V_{DD3}$) to core 230 and the power supply supplied by the power supply voltage 244 ($V_{DD4}$) to core 240 are each adjustable by the controller 250, as discussed herein further with respect to FIGS. 3A-3B, 4A-4B and 5A-5D. Moreover, increasing a supply voltage supplied to a core K increases performance by increasing the operating or operational core frequency, since $F_K$ for a core K is given by: $F_K = \beta V_{DD}$, where $V_{DD}$ is the supply voltage supplied to a core K and $F_K$ is the operational core frequency achievable by adjusting the supply voltage, which is further discussed herein below. Moreover, increasing the supply voltage ($V_{DDK}$) supplied to a core K increases power consumption ($P_K$) of the core K, which is given by the formula: $P_K = \alpha V_{DD}^2 F_{CLK}$, where $V_{DD}$ is the supply voltage supplied to a core K and $F_{CLK}$ is the clock frequency supplied to the core K. As such, the controller is configured to balance power consumption within the core while balancing the operational core frequency of a core based on goals or targets to be achieved for the multi-core processor.

[0027]    Reference is now made to FIGS. 3A-3B, 4A-4B and 5A-5D, which provide examples of the apparatus described herein above that can be utilized for adjusting either supply voltage or the clock frequency and/or power consumption of a respective core to optimize the operational core frequency of a core and/or optimize the power consumption of a core. Turning to FIGS. 3A and 3B, reference numeral 300A and 300B, illustrate an example of adjusting the supply voltage ($V_{DD}$) supplied to one or more cores in a multi-core processor, such that, the operational core frequency ($F_K$) of a core is within an Equi-Frequency Tuning Range 380 (EFTR), and the overall power consumption is minimized within the multi-core processor, as shown by reference numeral 300B of FIG. 3B. It is understood that although the examples in FIGS. 3A and 3B discuss the invention in terms of a multi-core processor having six cores, the multi-core processor may have more or less cores. As shown in the graph of FIG. 3A, the horizontal axis depicts the supply voltage 360 (VDD or $V_{DD}$) in volts (V), whereas, the vertical axis depicts an operational core frequency 350 ($F_K$) in gigahertz (GHZ) achievable in a core in a multi-core processor by adjusting the supply voltage (VDD). In particular, if a uniform VDD, for instance, a supply

7

voltage of 1.0 V (reference numeral **330**) is supplied to each core **302**, **304**, **306**, **308**, **310** and **312** (depicted by round circles initially and then as squares when their voltage levels have been adjusted), it may turn out that cores **302**, **304**, **306** and **308** are operating at an operational core frequency that is faster than the required specification frequency ($F_{SPEC}$), whereas, cores **310** and **312** are operating at an operational core frequency that is slower than the required specification frequency ($F_{SPEC}$), represented by reference line **340**, due to within die or chip variation. Instead of the entire multi-core processor or chip failing testing because of the two slower cores **310** and **312**, which do not meet the required specification frequency ($F_{SPEC}$), the inventive apparatus (shown in FIGS. **1** and **2**) provides individual supply voltages for each of the cores, such that, a respective voltage supplied to a core can be adjusted by a main controller or main control core, as discussed in FIGS. **1** and **2** herein above. As such, in FIG. **3**A, the voltage supplied to cores **302**, **304**, **306** and **308** can be decreased, such that, each of the cores operational core frequency (as represented by line **370**) is still above the required specification frequency ($F_{SPEC}$) **340**. In particular, the supply voltage of core **302** is decreased from 1.0 V to around 0.81 V (the core now shown as square **314**), whereas, the supply voltage of core **304** is decreased from 1.0 V to around 0.91 V (the core now shown as square **316**). Similarly, the supply voltage of core **306** is decreased from 1.0 V to around 0.92 V (the core now shown as square **318**) and the supply voltage of core **308** is decreased from 1.0 V to around 0.95V (the core now shown as square **322**). On the other hand, the supply voltage for the two slower cores **310** and **312** is increased, such that the supply voltage of core **310** is increased from 1.0 V to around 1.04 V (the core now shown as square **324**) and the supply voltage of core **312** is increased from 1.0 V to around 1.08 V (the core now shown as square **326**). As such, the operational core frequency of the cores is optimized. Moreover, the adjusted voltage level of each core is still within a technical voltage limit of 0.8 V to 1.1 V, such that, operational functionality of the multi-core processor is not impacted by going beyond this voltage limit. Accordingly, the voltage supplied to the cores can be adjusted so that each core has a certain core frequency or speed that is within the Equi-Frequency Tuning Range (EFTR), reference numeral **380** in FIG. **3**A, for obtaining a maximum operating core frequency ($F_K$), reference line **370**, that is above the minimum specification core frequency requirement ($F_{SPEC}$) **340** for the cores in the multi-core processor, while minimizing overall power consumption ($P_K$) in the multi-core processor, as discussed below.

[0028]    Turning to FIG. **3**B, reference numeral **300**B, illustrates changes in power consumption when the supply voltage ($V_{DD}$ or VDD) of each of the cores is adjusted, as discussed herein above with respect to FIG. **3**A. As mentioned herein above, the operating or operational core frequency, $F_K$ for a core K is given by: $F_K = \beta V_{DD}$, where $V_{DD}$ is the supply voltage supplied to a core K, thus, the maximum operational core frequency $F_K$ achievable being proportional to the supply voltage $V_{DD}$ and where adjusting the supply voltage supplied to a core adjusts the maximum operational core frequency of the core. Moreover, given that the power consumption ($P_K$) of the core K is given by the formula: $P_K = \alpha V_{DD}^2 F_{CLK}$, where $V_{DD}$ is the supply voltage supplied to a core K and $F_{CLK}$ is the clock frequency supplied to the core K, such that, increasing the supply voltage increases the power consumption given that power consumption of a core is proportional to the supply

voltage squared. As shown in the graph of FIG. **3**B, the horizontal axis depicts the supply voltage **365** ($V_{DD}$) in volts (V), whereas, the vertical axis depicts a core's power consumption **355** ($P_K$) in watts (W). In particular, if a uniform VDD, for instance, a supply voltage of 1.0 V (now reference numeral **335**) is supplied to each core **303**, **305**, **307**, **309**, **311** and **313** (depicted by round circles initially and then as squares when their voltage levels are changed, which leads to power adjustment), it may turn out that some of the cores (cores **307** and **313** in FIG. **3**B) are operating at an operational core frequency that is slower than the required specification frequency ($F_{SPEC}$), whereas, the rest of the cores **303**, **305**, **309**, **311** are operating at an operational core frequency that is faster than the required specification frequency ($F_{SPEC}$), discussed in FIG. **3**A. As such, when the supply voltage to the faster cores **303**, **305**, **309**, **311** is decreased (shown by squares **315**, **317**, **323** and **325**, respectively), the power consumption is also decreased in these four cores. On the other hand, when the supply voltage to the slower cores **307** and **313** is increased (shown by squares **321** and **329**, respectively), the power consumption is also increased in these two cores. However, since the power consumption of four of the six cores has been decreased, overall performance of the multi-core processor is achieved. Accordingly, the controller can measure a core's operational core frequency and can determine whether or not the supply voltage to a respective core needs to be adjusted in order to improve the core frequency or speed of one or more cores in the multi-core processor and, hence, improve the overall power consumption and performance of the multi-core processor.

[0029]    Turning to FIGS. **4**A and **4**B, reference numeral **400**A and **400**B, illustrate an example of adjusting the supply voltage ($V_{DD}$) supplied to one or more cores in a multi-core processor (shown by reference numeral **400**A of FIG. **4**A), such that, the power consumption is maintained within an Equi-Power Tuning Range **480** (EPTR), shown by reference numeral **400**B of FIG. **4**B, for minimizing overall power consumption. In an embodiment, the EPTR **480** (in FIG. **4**B) represents a power consumption range that is greater than the minimum power consumption specification requirement, indicated by reference line **470** and less than a maximum power consumption limit, indicated by reference line **460**, that could lead to an increase in temperature and, which could lead to eventual malfunctioning of a core in the multi-core processor. It is understood that although the examples in FIGS. **4**A and **4**B discuss the invention in terms of a multi-core processor having eight cores, the multi-core processor may have more or less cores. As shown in the graph of FIG. **4**A, the horizontal axis depicts the supply voltage, reference numeral **460** ($V_{DD}$) in volts (V), whereas, the vertical axis depicts an operational core frequency, reference numeral **450** ($F_K$) in gigahertz (GHZ) achievable in a core in a multi-core processor by adjusting the supply voltage ($V_{DD}$). In particular, if a uniform VDD, for instance, a supply voltage of 1.0 V (reference numeral **430**A) is supplied to each core **402**, **404**, **406**, **408**, **410**, **412**, **414** and **416** (depicted by round circles initially and then as squares when their voltage levels have been adjusted), it may turn out that cores **402**, **404**, **408**, **410**, **412** and **416** are operating at an operational core frequency that is faster than the required specification frequency ($F_{SPEC}$), reference line **440**, whereas, cores **406** and **416** are operating at an operational core frequency that is slower than the required specification frequency ($F_{SPEC}$), represented by reference line **440**. Again, instead of discarding the

entire chip or multi-core processor because of the two slower cores **406** and **416**, the inventive apparatus (shown in FIGS. **1** and **2**) provides individual supply voltages for each of the cores, such that, a respective voltage supplied to a core can be adjusted by a main controller or main control core, as discussed in FIGS. **1** and **2** herein above. As such, in FIG. **4**A, the voltage supplied to cores **402**, **404**, **406**, **408**, **410**, **412**, **414** and **416** can be increased or decreased, such that, the operational core frequency of the cores is still above the required specification frequency ($F_{SPEC}$) **440** shown in FIG. **4**A, while the power consumption of each of the cores falls within the Equi-Power Tuning Range (EPTR), reference numeral **480**, shown in FIG. **4**B. As mentioned herein above, the operating or operational core frequency, $F_K$ for a core K is given by: $F_K = \beta V_{DD}$, where $V_{DD}$ is the supply voltage supplied to a core K, thus, the operational core frequency $F_K$ achievable is proportional to the supply voltage $V_{DD}$ and by adjusting the supply voltage supplied to a core the operational core frequency of the core is adjusted. In particular, as shown in FIG. **4**A, the supply voltage of cores **402**, **404**, **408**, **410**, **412** and **416** is decreased (now shown as squares **418**, **420**, **422**, **424**, **426** and **432**, respectively), whereas, the supply voltage of core **406** and **414** is increased (now shown as squares **418** and **428**, respectively). Turning to FIG. **4**B, reference numeral **400**B, illustrates how the power consumption can be adjusted when the supply voltage ($V_{DD}$) is adjusted, given the formula $P_K = \alpha V_{DD}{}^2 F_{CLK}$, where $V_{DD}$ is the supply voltage supplied to a core K and $F_{CLK}$ is the clock frequency supplied to the core K, such that, increasing the supply voltage increases the power consumption since power consumption of a core is proportional to the supply voltage squared and is proportional to the clock frequency supplied to the cores, as discussed herein above with respect to FIGS. **1** and **2**. As shown in FIG. **4**B, the horizontal axis depicts the supply voltage ($V_{DD}$) in volts (V), reference numeral **465**, whereas, the vertical axis depicts a core's power consumption ($P_K$) in watts (W), reference numeral **455**. In particular, if a supply voltage of 1.0 V, for instance, a supply voltage of 1.0 V (now reference numeral **430**B) is supplied to each core **403**, **405**, **407**, **409**, **411**, **413**, **415** and **417** (depicted by round circles initially and then as squares when their voltage levels and, thus, power have been adjusted), it may turn out that some of the cores (cores **403**, **405**, **407**, **409**, **411** and **413** in FIG. **4**B) are operating at a power consumption that is higher than within the Equi-Power Tuning Range (EPTR) **480** that is desired. As such, the supply voltage supplied to each of the cores **403**, **405**, **407**, **409**, **411** and **413** is decreased (now represented by squares **419**, **421**, **423**, **427** and **429**, respectively), whereas, the supply voltage supplied to each of the cores **415** and **417** is increased (now represented by squares **431** and **433**, respectively), so that the power consumption of each of the cores in the multi-core processor is brought within the Equi-Power Tuning Range **480**. Accordingly, the controller can balance the power consumption of cores in a multi-core processor in order to improve power consumption of the core.

[0030]  Reference is now made to FIGS. **5**A-**5**D, where FIGS. **5**A and **5**B illustrate adjusting the supply voltage to achieve minimum operational power in a multi-core processor, and where FIGS. **5**C and **5**D illustrate adjusting the supply voltage to achieve maximum performance of a multi-core processor. It is understood that although the examples in FIGS. **5**A through **5**D discuss the invention in terms of a multi-core processor having eight cores, the multi-core processor may have more or less cores. Turning to FIG. **5**A,

reference numeral **500**A illustrates an example of how adjusting, namely, decreasing the supply voltage ($V_{DD}$), reference numeral **560**A supplied to each of eight cores in a multi-core processor, reference numerals **502**A, **504**A, **506**A, **508**A, **510**A, **512**A, **514**A, **516**A to a minimum supply voltage, reference numerals **518**A, **520**A, **522**A, **524**A, **526**A, **528**A, **530**A and **532**A, respectively, decreases the operational core frequency **550**A of some of the eight cores below a maximum operational core frequency **540**A, but still above a minimum or specification core frequency and hence minimizes the optimum performance of the multi-core processor. In particular, a controller in a multi-core processor can be configured to decrease a uniform $V_{DD}$ supplied to each of the eight cores, for instance, from a supply voltage of 1.0 V to a supply voltage of 0.8V. Moreover, as shown in FIG. **5**B, reference numeral **500**B, decreasing the supply voltage ($V_{DD}$), reference numeral **560**B supplied to each of the eight cores in a multi-core processor, reference numerals **502**B, **504**B, **506**B, **508**B, **510**B, **512**B, **514**B, **516**B, respectively, decreases the power consumption ($P_K$), reference numeral **555**B of these eight cores in the multi-core processor. In particular, decreasing the supply voltage ($V_{DD}$) supplied to each of the eight cores, reference numerals **502**B, **504**B, **506**B, **508**B, **510**B, **512**B, **514**B, **516**B to a minimum supply voltage, reference numerals **518**B, **520**B, **522**B, **524**B, **526**B, **528**B, **530**B and **532**B, respectively, decreases the power consumption in each of these eight cores as well. Accordingly, a controller in a multi-core processor can be configured to decrease a uniform $V_{DD}$ supplied to each of the eight cores, for instance, from a supply voltage of 1.0 V to a supply voltage of 0.8V in order to achieve minimal operational power or minimum performance, as shown in FIGS. **5**A and **5**B.

[0031]  Turning to FIG. **5**C, reference numeral **500**C illustrates an example of how adjusting, namely, increasing the supply voltage ($V_{DD}$), reference numeral **560**C supplied to each of eight cores in a multi-core processor, reference numerals **502**C, **504**C, **506**C, **508**C, **510**C, **512**C, **514**C, **516**C to a maximum supply voltage, reference numerals **518**C, **520**C, **522**C, **524**C, **526**C, **528**C, **530**C and **532**C, respectively, increases the operational core frequency **550**C of these eight cores above a maximum operational core frequency **540**C, and hence increases the performance of the multi-core processor. In particular, a controller in a multi-core processor can be configured to increase a uniform $V_{DD}$ supplied to each of the eight cores, for instance, from a supply voltage of 0.8V to a supply voltage of 1.0V. Accordingly, increasing the supply voltage ($V_{DD}$), increases the operating core frequency ($F_K$), which in turns improves or maximizes the overall performance of the microprocessor. Moreover, as shown in FIG. **5**D, reference numeral **500**D, increasing the supply voltage ($V_{DD}$), reference numeral **560**D supplied to each of eight cores in a multi-core processor, reference numerals **502**D, **504**D, **506**D, **508**D, **510**D, **512**D, **514**D, **516**D, respectively, also increases the power consumption ($P_K$), reference numeral **555**D of these eight cores in the multi-core processor. In particular, increasing the supply voltage ($V_{DD}$) supplied to each of the eight cores, reference numerals **502**D, **504**D, **506**D, **508**D, **510**D, **512**D, **514**D, **516**D to **518**D, **520**D, **522**D, **524**D, **526**D, **528**D, **530**D and **532**D, respectively, increases the power consumption in each of these eight cores as well. Accordingly, a controller in a multi-core processor can be configured to increase a uniform $V_{DD}$ supplied to each of the eight cores, for instance, from a supply voltage

of 0.8V to a supply voltage of 1.0 V in order to achieve maximum performance or operational power, as shown in FIGS. **5**C and **5**D.

[0032]    In another embodiment, the invention provides a method for optimizing performance and power consumption of a multi-core processor. The method comprises providing a multi-core processor having a plurality of cores, the multi-core processor being coupled to a clock source configured to provide a reference input clock frequency to the plurality of cores in the multi-core processor, connecting a separate voltage power source configured to provide a respective supply voltage to each core of the plurality of cores in the multi-core processor, wherein a respective core operational clock frequency is proportional to the respective supply voltage provided to a respective core, and wherein a respective core power consumption by the respective core is proportional to the reference input clock frequency and to the respective supply voltage squared, collecting, using a main controller coupled to each core of the plurality of cores, core performance data and core power consumption data measured for each core of the plurality of cores and adjusting, using the main controller, either the respective supply voltage provided to the respective core of the plurality of cores or the reference input clock frequency provided to the respective core of the plurality of cores, based on a respective core performance data and a respective core power consumption data collected for the respective core of the plurality of cores, wherein adjustment of either the respective power provided to the respective core ensures that the respective operational core frequency of the respective core is greater than a respective specification core frequency preset for the respective core, and wherein adjustment of the reference input clock frequency ensures that the respective operational core frequency of the respective core is at least equal to the reference input clock frequency, whereby the respective core performance and the respective core power consumption by the respective core is optimized. The method further comprises enabling, utilizing a voltage level-translating communication transceiver, communications between the main controller and the plurality of cores and enabling communications between each of the plurality of cores. In an embodiment, the adjusting step further comprises supplying each core of the plurality of cores with at least one PLL (Phase Locked Loop) having one or more voltage-controlled oscillators (VCOs) and one or more dividers, at least one PLL with the one or more VCOs and the one or more dividers being configured to dynamically adjust the input clock frequency provided to the respective core, wherein the respective operational core frequency is at least equal to the reference input clock frequency, and wherein the respective power consumption by the respective core is adjusted. In an embodiment, the adjusting step further comprises dynamically adjusting either the output power supply voltage or the input clock frequency provided to the respective core in real-time mode. In an embodiment, the adjusting step further comprises distributing, using the main controller, instruction blocks to each core of the plurality of cores in a manner that achieves a balancing criterion with respect to the plurality of cores, wherein the balancing criterion comprises at least one of: equal performance balancing, maximum performance balancing, power consumption balancing and instruction count balancing. In an embodiment, a core performance data measured for the multi-core processor comprises computing a sum of the respective core performance data measured for each core of the plurality of cores in

the multi-core processor, and wherein the core power consumption data measured for the multi-core processor comprises computing a sum of a respective core power consumption data measured for each core of the plurality of cores.

[0033]    Turning to FIG. **6**, reference numeral **600** depicts a flowchart outlining a method for determining a maximum operational core frequency ($F_K$) for a core in a multi-core processor by adjusting the clock frequency provided to the multi-core processor, such that, a maximum operational core frequency is achieved at a given supply voltage $V_{DD}$. In an embodiment, the controller is configured to determine a maximum operational core frequency for a core, as described herein below. The method begins with step **602**, where the chip or microprocessor is powered up. In step **604**, the clock frequency ($F_{CLK}$) is initialized, where $F_{CLK}$ is set to $F_0$, an initial clock frequency. A test is executed in step **606** to determine in step **608** whether or not the chip or multi-core processor passes the test when set to the initial $F_{CLK}$. If the multi-core processor fails the test in step **608**, then the clock frequency is decreased in step **618** and the test is re-executed in step **620**. Again, a determination is made in step **622** as to whether or not the multi-core processor passes the test. If the multi-core processor fails the test in step **622**, then the process returns to step **618**, where the clock frequency is decreased and the test is re-executed in step **620**. Steps **618** through **622** are repeated until the multi-core processor passes the test in step **622**. If the multi-core processor passes the test in step **622**, $F_K$ is set to $F_{CLK}$ in step **624**, ending the process at step **626**. On the other hand, in step **608**, if the multi-core processor passes the test in step **608**, then the clock frequency is increased in step **610** and the test is re-executed in step **612**. Again, a determination is made in step **614** as to whether or not the multi-core processor passes the test. If the multi-core processor passes the test in step **614**, then the process returns to step **610**, where the clock frequency is increased and the test is re-executed in step **612**. Steps **610** through **614** are repeated until the multi-core processor fails the test in step **614**. If the multi-core processor fails the test in step **614**, $F_K$ is set in step **616** to the last $F_{CLK}$ that passed the test in step **614**, ending the process at step **626**. In another embodiment, a program or code running on an operating system may be run on an external system for adjusting either the clock frequency or the supply voltage supplied to the multi-core processor, as described further herein below with respect to FIG. **9**.

[0034]    Turning to FIG. **7**, reference numeral **700** depicts a flowchart outlining a method for determining whether an operational core frequency ($F_K$) for a core is greater than a specification core frequency ($F_{SPEC}$) preset for a core in a multi-core processor, such that, the supply voltage $V_K$ to a core can be adjusted to ensure that the core passes the minimum specification core frequency required. The method begins with step **702**, where the chip or microprocessor is powered up. In step **704**, the supply voltage to a core ($V_K$) is initialized to the initial supply voltage, $V_{DD0}$. Further, in step **706**, the $F_K$ of a core is measured and a determination is made in step **708** as to whether or not the operational core frequency $F_K$ ($F_{MAX}$) is greater than $F_{SPEC}$. If the operational core frequency $F_K$ is greater than the preset specification core frequency $F_{SPEC}$, then the supply voltage $V_K$ to the core is decreased in step **710**. A determination is made in step **712**, as to whether or not the supply voltage $V_K$ is greater than a predetermined lower bound voltage $V_{LIMIT, LO}$. If the supply voltage $V_K$ is greater than a predetermined lower bound voltage $V_{LIMIT, LO}$, then the operational core frequency is mea-

10

sured in step **714** to determine in step **716** whether or not the operational core frequency is greater than the specification core frequency. If the operational core frequency is greater than the specification core frequency in step **716** (that is, fails) then the last successful supply voltage $V_K$ is used in step **718**, ending the process at step **732**. However, if the operational core frequency is greater than the specification core frequency in step **716**, then the process returns back to step **710** and steps **710** through **716** are repeated, as necessary. Going back to step **708**, if the operational core frequency $F_{MAX}$ is not greater than the preset specification core frequency $F_{SPEC}$ (fails), then the supply voltage $V_K$ to the core is increased in step **720**. A determination is made in step **722**, as to whether or not the supply voltage $V_K$ is less than a predetermined upper bound voltage $V_{LIMIT, HP}$. If the supply voltage $V_K$ is less than the predetermined upper bound voltage $V_{LIMIT, HP}$ then the core fails the minimum $F_{SPEC}$ requirement in step **730**, ending the process at step **732**. However, if the supply voltage $V_K$ is not less than a predetermined voltage limit $V_{TH}$, then the operational core frequency is measured in step **724** to determine in step **726** whether or not the operational core frequency is greater than the specification core frequency. If the operational core frequency is not greater than the specification core frequency in step **726** (that is, fails) then the supply voltage $V_K$ is increased in step **720** and the steps **720** through **726** are repeated, as necessary until $F_{MAX}$ is greater than $F_{SPEC}$. However, if the operational core frequency $F_{MAX}$ is greater than the specification core frequency $F_{SPEC}$ in step **726** (that is, passes), then the process ends at step **732**.

[0035]   Turning to FIG. **8**, reference numeral **800** depicts a flowchart outlining a method for adjusting the supply voltage in order to ensure that a core meets the minimum specification core frequency ($F_{SPEC}$). The method begins with step **802**, where the chip or microprocessor is powered up. In step **804**, n=1 (current or first core), and in step **806**, the supply voltage $V_n$ for the first core is adjusted in step **806** for the preset specification core frequency. A determination is made in step **808** as to whether or not the core passes the preset specification core frequency at the adjusted supply voltage for that core ($V_n$). If the core does not pass in step **808**, the set up is deemed a failure in step **810**, ending the process at step **818**. However, if the core passes in step **808**, then n is set to n=n+1 in step **812** and the next core in the multi-core processor is examined. Further, a determination is made in step **814** as to whether or not n<=N, where n is the current core and N is the total number of cores in the multi-core processor. If it is determined in step **814** that n>N (that is, n is not less than or equal to N), then the set up is complete in step **816** and the process ends in step **818**. However, if in step **814**, it is determined that n<=N, then the process continues with step **806** where the supply voltage for the current core is adjusted and the steps **806** through **814** in the process are repeated until each core is examined and there are no more cores whose supply voltage needs to be adjusted, thus, completing the set up in step **816** and ending the process in step **818**.

[0036]   In yet another embodiment, the invention provides a computer program product for optimizing performance and power consumption of a multi-core processor. The computer program product comprises a computer readable or computer-usable medium, first program instructions to supply a reference input clock frequency to a plurality of cores of a multi-core processor, the plurality of cores in the multi-core processor being coupled to a main controller, the first program instructions including instructions to supply a respec-

tive supply voltage to a respective core of the plurality of cores in the multi-core processor, wherein a respective core operational clock frequency is proportional to the respective supply voltage supplied to the respective core, and wherein a respective core power consumption by the respective core is proportional to the reference input clock frequency and to the respective supply voltage squared, second program instructions to collect, using the main controller, core performance data and core power consumption data measured for the plurality of cores, third program instructions to adjust, using the main controller, either the respective supply voltage supplied to the respective core or the reference input clock frequency supplied to the respective core, based on a respective core performance data and a respective core power consumption data collected for the respective core of the plurality of cores, wherein adjustment of either the supply voltage provided to the respective core or the reference input clock frequency supplied optimizes the respective core performance and the respective core power consumption by the respective core, and wherein the first, second and third program instructions are recorded on the computer readable medium. The computer program product further comprises fourth program instructions to enable communications between the main controller and the plurality of cores and to enable communications between each of the plurality of cores, utilizing a voltage level-translating communication transceiver. In an embodiment, the first program instructions include instructions to couple each core of the plurality of cores with at least one phase locked loop (PLL) circuit having one or more voltage-controlled oscillators (VCOs) and one or more dividers, at least one PLL circuit with the one or more VCOs and the one or more dividers being configured to dynamically adjust the reference input clock frequency of the respective core, wherein a respective operational core frequency of the respective core is at least equal to the reference input clock frequency, and wherein the respective power consumption by the core is adjusted. In an embodiment, the second program instructions include instructions to distribute, using the main controller, instruction blocks to each core of the plurality of cores in a manner that achieves a balancing criterion with respect to the plurality of cores, the balancing criterion comprises at least one of: equal performance balancing, maximum performance balancing, power consumption balancing and instruction count balancing. In an embodiment, the third program instructions include instructions to dynamically adjust the supply voltage provided to the respective core to ensure that the respective operational core frequency of the respective core is greater than a respective specification core frequency preset for the respective core, wherein the respective core performance and the respective power consumption of the respective core is optimized. In an embodiment, the third program instructions include instructions to dynamically adjust either the supply voltage provided or the reference input clock frequency supplied to the respective core in real-time mode. In an embodiment, a core performance data measured for the multi-core processor comprises computing a sum of the respective core performance data measured for each core of the plurality of cores in the multi-core processor, and wherein a core power consumption data measured for the multi-core processor comprises computing a sum of a respective core power consumption data measured for each core of the plurality of cores. In an embodiment, each of the first, second, third and fourth program instructions are recorded on the computer readable medium.

[0037]    Turning to FIG. 9, reference numeral 900 depicts a schematic block system diagram illustrating one embodiment of a computer system 900, such as, a standalone or personal computer or a server that has deployed thereon or is coupled to a system that has deployed thereon a core power and performance optimization tool 920 that is configured to manage the controller, as described herein above. The core power and performance optimization tool or code or program 920 can be loaded into the system 900 from a computer readable media, such as, a magnetic tape or disk, optical media, DVD, memory stick, semiconductor memory, etc. or downloaded from the Internet via a network adapter or card, such as, a TCP/IP adapter card. Although the invention is discussed herein below in terms of a server, it is understood that the invention can be practiced on a personal computer running a core power and performance optimization tool 920.

[0038]    As shown in FIG. 9, the server or system 900 comprises a central processing unit (CPU) 904, a local storage device 902, a network interface 906 and a memory 910. The CPU 904 is configured generally to execute operations within the system/server 900, such as, the core power and performance optimization tool or code 920. The network interface 906 is configured, in one embodiment, to facilitate network communications of the system 900 over a communications channel of a network. In one embodiment, as shown in FIG. 9, the core power and performance optimization tool 920 which, in an embodiment, runs on a multi-core processor testing server or system 900, comprises a logic unit that contains a plurality of modules configured to functionally execute the necessary steps of adjusting either the supply voltage provided to a respective core or the respective input clock frequency provided to the respective core, such that, the adjustment optimizes a respective core performance and a respective core power consumption by the respective core. In particular, the core power and performance optimization tool or code 920 comprises a clocking module 922, a data collection module 924, a load or instruction distribution module 926, a testing module 928, a supply voltage adjustment module 930, a clock frequency adjustment module 932, and a communication module 934.

[0039]    Referring to FIG. 9, the clocking module 922 of the core power and performance optimization tool 920 is configured to measure a reference input clock frequency supplied to one or more cores in a multi-core processor. The data collection module 924 is configured to collect core performance data and core power consumption data for the one or more cores in the multi-core processor. In an embodiment, the core performance data 912 collected is stored in storage 902, whereas, the core power consumption data 914 is stored in storage 902. Further, the load or instruction distribution module 926 is configured to distribute instruction blocks to the one or more cores in the multi-core processor based on analysis of the data collected by the data collection module 924. In an embodiment, the load or instruction distribution module 926 is configured to distribute instruction blocks to the plurality of cores in a manner that achieves a balancing criterion with respect to the plurality of cores, such as, achieving either equal performance balancing, maximum performance balancing, power consumption balancing or instruction count balancing. The testing module 928 is configured to run one or more tests 908 stored in memory 910 of the system 900 for testing the one or more cores in the multi-core processor, as discussed herein above with respect to FIGS. 6-8. The supply voltage adjustment module 930 is configured to adjust the

supply voltage supplied to a core based on analysis of the data collected by the data collection module 924. Further the clock frequency adjustment module 932 is configured to adjust the clock frequency supplied to a core based on analysis of the data collected by the data collection module 924. The communications module 934 is configured to permit communication between the various modules of the power and optimization tool or code 920 and other systems, such as, the storage 902.

[0040]    Accordingly, by providing an independent power supply for each core or at least to a group of cores, the controller can control each power supply to achieve specific core performances or power consumptions to provide a higher yield of multi-core processor chips that pass a specified or preset core frequency or specification speed test. Moreover, given that the core frequency is proportional to the power supply voltage, by increasing the supply voltage, the speed of the core and, hence, the multi-core processor performance is increased. Additionally, since the core power consumption is proportional to the clock frequency and to the supply voltage squared, by adjusting the supply voltage to one or more cores that are performing at a slower frequency, the power consumption of these cores can be adjusted (as long as the cores meet the specified frequency requirement); thus, providing an increase in processor chip yield. Accordingly, the controller can equalize power consumption in each core, which reduces mechanical stresses due to thermal changes in a multi-core processor, as the multi-core processor is heated and cooled over time. Additionally, since the controller can adjust the power supply in real time, the performance of each core and the power consumption of each core can be adjusted in real time.

[0041]    The foregoing descriptions of specific embodiments of the present invention have been presented for the purpose of illustration and description. They are not intended to be exhaustive or to limit the invention to the precise forms disclosed, and obviously many modifications and variations are possible in light of the above teaching. The embodiments were chosen and described in order to best explain the principles of the invention and its practical application, to thereby enable others skilled in the art to best utilize the invention and various embodiments with various modifications as are suited to the particular use contemplated. It is intended that the scope of the invention be defined by the claims appended hereto and their equivalents.

What is claimed is:

1. An apparatus for optimizing performance and power consumption of a multi-core processor, comprising:

a multi-core processor including a plurality of cores, said multi-core processor being coupled to a clock source configured to provide a reference input clock frequency to said plurality of cores in said multi-core processor, each of said cores of said plurality of cores having a specification core frequency preset for said multi-core processor;

at least one power supply voltage connected to said multi-core processor for providing a supply voltage to said plurality of cores, a respective core of said plurality of cores having a respective operational core frequency that is proportional to said supply voltage provided by said at least one power supply voltage;

at least one PLL (Phase Locked Loop) having one or more voltage-controlled oscillators (VCOs) and one or more dividers, said at least one PLL being coupled to said

multi-core processor and being configured to dynamically adjust said reference input clock frequency provided to a respective core of said plurality of cores to ensure that a respective operational core frequency of said respective core is at least equal to said reference input clock frequency; and

a main controller coupled to said plurality of cores, said main controller being configured to collect core performance data and core power consumption data measured for said plurality of cores, said main controller being configured to adjust either said supply voltage provided by said at least one power supply voltage connected to said respective core or being configured to adjust said reference input clock frequency provided to said respective core, wherein adjustment of either said supply voltage provided or said respective input clock frequency provided to said respective core optimizes a respective core performance and a respective core power consumption by said respective core, and wherein said main controller dynamically adjusts said supply voltage provided by said at least one power supply voltage to said plurality of cores in real-time mode.

2. The apparatus according to claim 1, further comprising:

a voltage level-translating communication transceiver configured to enable communications between said main controller and said plurality of cores and configured to enable communications between each of said plurality of cores.

3. The apparatus according to claim 2, further comprising:

at least two PLLs (Phase Locked Loops) coupled to said multi-core processor, each of said at least two PLLs having one or more voltage-controlled oscillators (VCOs) and one or more dividers, a PLL of said at least two PLLs being configured to dynamically adjust said reference input clock frequency supplied to one or more cores of said plurality of cores in order to ensure that a respective operational core frequency of said respective core is greater than said specification core frequency preset for said respective core.

4. The apparatus according to claim 3, further comprising:

a plurality of power supply voltages connected to said multi-core processor, a respective individual power supply voltage of said plurality of power supply voltages being configured to provide a respective supply voltage to an individual core of said plurality of cores, wherein said main controller dynamically adjusts said respective supply voltage provided by said respective individual power supply voltage to said individual core to increase said respective operational core frequency of said respective core, and wherein said main controller dynamically adjusts said respective supply voltage provided by said respective individual power supply voltage to said individual core in real-time mode.

5. The apparatus according to claim 4, wherein said main controller is configured to distribute instruction blocks to said plurality of cores in a manner that achieves a balancing criterion with respect to said plurality of cores, wherein said balancing criterion comprises at least one of: equal performance balancing, maximum performance balancing, power consumption balancing and instruction count balancing.

6. The apparatus according to claim 5, wherein said core performance data measured for said multi-core processor comprises computing a sum of a respective core performance data measured for each core of said plurality of cores, and

wherein said core power consumption data measured for said multi-core processor comprises computing a sum of a respective core power consumption data measured for each core of said plurality of cores.

7. An apparatus for compensating semiconductor manufacturing process-induced variation in core performance of a multi-core processor, comprising:

a multi-core processor including a plurality of cores, said multi-core processor being coupled to a clock source configured to provide a reference input clock frequency to said plurality of cores in said multi-core processor;

a respective power supply voltage coupled to a respective core of said plurality of cores for providing a respective supply voltage to said respective core; wherein a respective operational core frequency of said respective core is proportional to said respective supply voltage provided by said respective power supply voltage;

a phase locked loop (PLL) circuit coupled to said each core of said plurality of cores, said PLL circuit having one or more voltage-controlled oscillators (VCOs) and one or more dividers, said PLL circuit being configured to dynamically adjust said reference input clock frequency provided to said respective core of said plurality of cores; and

a main controller coupled to said each core of said plurality of cores, said main controller being configured to collect core performance data and core power consumption data measured for said each core of said plurality of cores, said main controller being configured to adjust, using said PLL circuit coupled to said respective core, said respective supply voltage provided to said respective core in order to ensure that said respective operational core frequency of said respective core is greater than a specification core frequency preset for said respective core and to optimize said power consumption by said respective core, wherein core performance of said respective core is optimized.

8. The apparatus according to claim 7, further comprising:

a voltage level-translating communication transceiver configured to enable communications between said main controller and said plurality of cores and configured to enable communications between each of said plurality of cores.

9. The apparatus according to claim 8, wherein said PLL circuit further comprises one or more voltage-controlled oscillators (VCOs) and one or more dividers, wherein said PLL circuit having said one or more VCOs and said one or more dividers is configured to dynamically adjust said reference input clock frequency provided to said respective core to ensure that said respective operational core frequency of said respective core is at least equal to said reference input clock frequency.

10. The apparatus according to claim 9, wherein said main controller dynamically adjusts said respective supply voltage provided by said respective power supply voltage to said respective core in real-time mode.

11. The apparatus according to claim 10, wherein said main controller is configured to distribute instruction blocks to said plurality of cores in a manner that achieves a balancing criterion with respect to said plurality of cores, and wherein said balancing criterion comprises at least one of: equal performance balancing, maximum performance balancing, power consumption balancing and instruction count balancing.

13

**12**. The apparatus according to claim **11**, wherein said core performance data measured for said multi-core processor comprises computing a sum of said respective core performance data measured for said each core of said plurality of cores, and wherein said core power consumption data measured for said multi-core processor comprises computing a sum of a respective core power consumption data measured for each core of said plurality of cores.

**13**. A method for optimizing performance and power consumption of a multi-core processor, said method comprising the steps of:

provide a multi-core processor having a plurality of cores, said multi-core processor being coupled to a clock source configured to provide a reference input clock frequency to said plurality of cores in said multi-core processor;

connecting a separate voltage power source configured to provide a respective supply voltage to said each core of said plurality of cores in said multi-core processor, wherein a respective core operational clock frequency is proportional to said respective supply voltage provided to a respective core, and wherein a respective core power consumption by said respective core is proportional to said reference input clock frequency and to said respective supply voltage squared;

collecting, using a main controller coupled to said each core of said plurality of cores, core performance data and core power consumption data measured for said each core of said plurality of cores; and

adjusting, using said main controller, either said respective supply voltage provided to said respective core of said plurality of cores or said reference input clock frequency provided to said respective core of said plurality of cores, based on a respective core performance data and a respective core power consumption data collected for said respective core of said plurality of cores, wherein adjustment of either said respective power provided to said respective core ensures that said respective operational core frequency of said respective core is greater than a respective specification core frequency preset for said respective core, and wherein adjustment of said reference input clock frequency ensures that said respective operational core frequency of said respective core is at least equal to said reference input clock frequency, whereby said respective core performance and said respective core power consumption by said respective core is optimized.

**14**. The method according to claim **13**, further comprising the step of:

enabling, utilizing a voltage level-translating communication transceiver, communications between said main controller and said plurality of cores and enabling communications between each of said plurality of cores.

**15**. The method according to claim **14**, wherein said adjusting step further comprises the step of:

supplying each core of said plurality of cores with at least one PLL (Phase Locked Loop) having one or more voltage-controlled oscillators (VCOs) and one or more dividers, said at least one PLL with said one or more VCOs and said one or more dividers being configured to dynamically adjust said input clock frequency provided to said respective core, wherein said respective operational core frequency is at least equal to said reference

input clock frequency, and wherein said respective power consumption by said respective core is adjusted.

**16**. The method according to claim **15**, wherein said adjusting step further comprises the step of:

dynamically adjusting either said output power supply voltage or said input clock frequency provided to said respective core in real-time mode.

**17**. The method according to claim **16**, wherein said adjusting step further comprises the step of:

distributing, using said main controller, instruction blocks to said each core of said plurality of cores in a manner that achieves a balancing criterion with respect to said plurality of cores, wherein said balancing criterion comprises at least one of: equal performance balancing, maximum performance balancing, power consumption balancing and instruction count balancing.

**18**. The method according to claim **17**, wherein a core performance data measured for said multi-core processor comprises computing a sum of said respective core performance data measured for said each core of said plurality of cores in said multi-core processor, and wherein said core power consumption data measured for said multi-core processor comprises computing a sum of a respective core power consumption data measured for each core of said plurality of cores.

**19**. A computer program product for optimizing performance and power consumption of a multi-core processor, said computer program product comprising:

a computer readable medium;

first program instructions to supply a reference input clock frequency to a plurality of cores of a multi-core processor, said plurality of cores in said multi-core processor being coupled to a main controller, said first program instructions including instructions to supply a respective supply voltage to a respective core of said plurality of cores in said multi-core processor, wherein a respective core operational clock frequency is proportional to said respective supply voltage supplied to said respective core, and wherein a respective core power consumption by said respective core is proportional to said reference input clock frequency and to said respective supply voltage squared;

second program instructions to collect, using said main controller, core performance data and core power consumption data measured for said plurality of cores;

third program instructions to adjust, using said main controller, either said respective supply voltage supplied to said respective core or said reference input clock frequency supplied to said respective core, based on a respective core performance data and a respective core power consumption data collected for said respective core of said plurality of cores, wherein adjustment of either said supply voltage provided to said respective core or said reference input clock frequency supplied optimizes said respective core performance and said respective core power consumption by said respective core, and wherein said first, second and third program instructions are recorded on said computer readable medium.

**20**. The computer program product according to claim **19**, further comprising:

fourth program instructions to enable communications between said main controller and said plurality of cores and to enable communications between each of said

US 2009/0138737 A1                                                            May 28, 2009

14

plurality of cores, utilizing a voltage level-translating communication transceiver, wherein said fourth program instructions are recorded on said computer readable medium.

**21**. The computer program product according to claim **20**, wherein said first program instructions include instructions to couple each core of said plurality of cores with at least one phase locked loop (PLL) circuit having one or more voltage-controlled oscillators (VCOs) and one or more dividers, said at least one PLL circuit with said one or more VCOs and said one or more dividers being configured to dynamically adjust said reference input clock frequency of said respective core, wherein a respective operational core frequency of said respective core is at least equal to said reference input clock frequency, and wherein said respective power consumption by said core is adjusted.

**22**. The computer program product according to claim **21**, wherein said second program instructions include instructions to distribute, using said main controller, instruction blocks to said each core of said plurality of cores in a manner that achieves a balancing criterion with respect to said plurality of cores, said balancing criterion comprises at least one of: equal performance balancing, maximum performance balancing, power consumption balancing and instruction count balancing.

**23**. The computer program product according to claim **22**, wherein said third program instructions include instructions to dynamically adjust said supply voltage provided to said respective core to ensure that said respective operational core frequency of said respective core is greater than a respective specification core frequency preset for said respective core, wherein said respective core performance and said respective power consumption of said respective core is optimized.

**24**. The computer program product according to claim **23**, wherein said third program instructions include instructions to dynamically adjust either said supply voltage provided or said reference input clock frequency supplied to said respective core in real-time mode.

**25**. The method according to claim **24**, wherein a core performance data measured for said multi-core processor comprises computing a sum of said respective core performance data measured for said each core of said plurality of cores in said multi-core processor, and wherein a core power consumption data measured for said multi-core processor comprises computing a sum of a respective core power consumption data measured for each core of said plurality of cores.

*    *    *    *    *

Exhibit 5

# THE OXFORD ENGLISH DICTIONARY

## SECOND EDITION

*Prepared by*

J. A. SIMPSON *and* E. S. C. WEINER

### VOLUME VII

Hat–Intervacuum

CLARENDON PRESS · OXFORD

1989

*Oxford University Press, Walton Street, Oxford* OX2 6DP
*Oxford  New York  Toronto*
*Delhi  Bombay  Calcutta  Madras  Karachi*
*Petaling Jaya  Singapore  Hong Kong  Tokyo*
*Nairobi  Dar es Salaam  Cape Town*
*Melbourne  Auckland*
*and associated companies in*
*Berlin  Ibadan*

*Oxford is a trade mark of Oxford University Press*

© *Oxford University Press* 1989

*All rights reserved. No part of this publication may be reproduced,
stored in a retrieval system, or transmitted, in any form or by any means,
electronic, mechanical, photocopying, recording, or otherwise, without
the prior permission of Oxford University Press*

*British Library Cataloguing in Publication Data*
*Oxford English dictionary.—2nd ed.*
*1. English language–Dictionaries*
*I. Simpson, J. A. (John Andrew), 1953-*
*II. Weiner, Edmund S. C., 1950-*
*423*
*ISBN 0-19-861219-2 (vol. VII)*
*ISBN 0-19-861186-2 (set)*

*Library of Congress Cataloging-in-Publication Data*
*The Oxford English dictionary.—2nd ed.*
*prepared by J. A. Simpson and E. S. C. Weiner*
*Bibliography: p.*
*ISBN 0-19-861219-2 (vol. VII)*
*ISBN 0-19-861186-2 (set)*
*1. English language—Dictionaries.  I. Simpson, J. A.*
*II. Weiner, E. S. C.  III. Oxford University Press.*
*PE1625.087 1989*
*423—dc19     88-5330*

*Data capture by ICC, Fort Washington, Pa.*
*Text-processing by Oxford University Press*
*Typesetting by Filmtype Services Ltd., Scarborough, N. Yorks.*
*Manufactured in the United States of America by*
*Rand McNally & Company, Taunton, Mass.*

against the Scottish Commissioners. **1646** Sir T. Browne *Pseud. Ep.* i. iii. 12 The independency of their causes, and contingency in their events. **1647** May *Hist. Parl.* i. v. 55 The independency of that kingdome. *a* **1670** Rust *Disc. Truth* (1682) 185 Then will God be determined in his actions from something without himself, which is to take away his independency and self-sufficiency. **1737** Pope *Hor. Ep.* i. vii. 70 'Give me', I cry'd, (enough for me) 'My Bread, and Independency!' **1748** Chesterf. *Lett.* (1792) II. cxlv. 20 The Seven United Provinces; whose independency was first allowed by Spain at the treaty of Munster. **1775** J. Adams in *Fam. Lett.* (1876) 66 Suspicions entertained of designs of independency; an American republic. **1790** Bewick *Hist. Quadrup.* (1807) 1 The wild and extensive plains... where he [the horse] ranges without controul, in a state of entire independency. **1829** I. Taylor *Enthus.* iii. (1867) 55 Reason as well as faith... demands that we deny independency to whatever is created. **1884** *Pall Mall G.* 16 Feb. 8/2 Urged to maintain the independency of Zulu territory.

**b.** Const. *on*, *upon*, of, rarely *from*.

**1624** F. White *Repl. Fisher* 450 In an extasie there is alienation and independence of the spirit vpon the sences. **1630** Prynne *Anti-Armin.* 94 The freenesse of Gods Election, and its in-dependancy on any fore-seene faith. **1642** G. Eglisham *Forerunner Revenge* in *Select. Harl. Misc.* (1793) 371 In regard...of my independency from the accused. **1668** Pepys *Diary* (1877) V. 433 In opposition to, or at least independency of, the Duke of York. **1796** Morse *Amer. Geog.* I. 256 A desirable degree of independency on British and other foreign manufactures. **1841-4** Emerson *Essays* Ser. I. ix. (1876) 217 Its independency of those limitations which circumscribe us on every hand.

**2.** That system of ecclesiastical polity in which each local congregation of believers is held to be a church independent of any external authority: = Congregationalism 1.

The prevailing name in England, in the 17th century, for this form of church government, but not favoured in New England (see quot. 1648, and congregational 3), and in modern use (other than historical) largely displaced by *Congregationalism*.

**1642** Sir E. Dering *Sp. on Relig.* xvi. 82 That new-borne Bastard, Independency. **1648** Bp. Guthrie *Cotton Way Congreg. Ch.* (New Eng.) 11 Nor is Independency a fit name of the way of our Churches. For in some respects it is too strait, and in others too large. **1648** C. Walker (title) The History of Independency. **1694** *Provid. God* 95 Those they then called Puritans...were divided about Church-Government, some for Presbytery and others for Independency. **1733** Neal *Hist. Purit.* II. 107 His [Robinson's] peculiar sentiments of Church discipline, since known by the name of Independency. **1872** G. H. Curteis *Bampton Lect.* ii. 41 The cradle in which Independency was nurtured was the Non-Conforming Puritanism of the sixteenth century.

**3.** *concr.* **a.** *pl.* Independent things; things unrelated to each other.

**1659** Bp. Walton *Consid. Considered* 9 The whole being 'rudis indigestaque moles', a confused heap of Independencies. [A pun on sense 2.]

**b.** An independent or autonomous state. (Cf. DEPENDENCY *q.c.*)

**1818** Jas. Mill *Brit. India* II. v. ii. 355 Of these independencies, the most important...was that...which...included the whole of the vast province, or region of Berar. **1847** Grote *Greece* II. xxv. IV. 16 Many petty independencies, small towns, and villages.

**c.** A person of independent means.

**1866** Carlyle *Edw. Irving* 145 Expecting to be flattered like an independency, as well as paid like an innkeeper.

**d.** A competency; a fortune which renders it unnecessary for the possessor to earn his living: = prec. 2.

**1748** Richardson *Clarissa* (1811) I. xiii. 87, I, who never designed to take advantage of the independency bequeathed me. **1804** W. Tennant *Ind. Recreat.* (ed. 2) I. 286 Men...who leave their native country with the sole view of acquiring an independency. **1886** *L'pool Daily Post* 5 Mar. 4/5 The deceased had something in the nature of an independency, however modest.

**independent** (ındı'pɛndənt), *a.* and *sb.* Also 7-8 -ant. [f. in-³ + dependent: cf. F. *indépendant* (*c* 1600 in Hatz.-Darm.), It. *independente* (Florio, 1598).] Not dependent.

**A.** *adj.*

**1. a.** Not depending upon the authority of another, nor in a position of subordination or subjection; not subject to external control or rule; self-governing, autonomous, free.

**1611** H. Jacob *Declar. & Plainer Open.* 13 [Each congregation is] an entire and independent body-politic, endued with power immediately under and from Christ. **1651** Hobbes *Leviath.* ii. xxix. 172 It is not one independent Common-wealth, but three independent Factions. **1774** J. Bryant *Mythol.* II. 40 Attica...was divided into...independant hamlets. **1776** Adam Smith *W.N.* i. viii. (1869) I. 73 An independent workman, such as a weaver or shoemaker. **1882** Mrs. Pitman *Mission L. Greece & Pal.* 37 In 1829, Greece was acknowledged as an independent state, having its own king and government. **1885** J. Martineau *Types Eth.* Th. II. 10 The Theory of an autonomous or independent conscience.

**b.** Const. *of* (formerly *on*, *upon*, *from*).

**1651** Hobbes *Govt. & Soc.* xv. §18. 258 An opinion, that there is any man endued with a Soveraignty independent from God. **1680** Morris *Geog. Rect., Brit. Isles* (1685) 15 These Islands...were first possessed by divers People, independent on upon the other. **1705** Addison *Italy* 489 The Town of St. Gaul is a little Protestant Republick, wholly independent of the Abbot. **1776** (13 June) *Amherst Rec.* (1884) 70/1 Voted—That should the Honourable Congress, for the safety of the united Colonies in America, Declare them Independant of the Kingdom of Great-Britain; We...solemnly engage with our lives and fortunes to support them in the measure. **1785** T. Balguy *Disc.* 115 It has been said...that the church is independent on the state.

**2.** (with capital *I.*) Belonging to or adhering to that form of ecclesiastical polity called INDEPENDENCY (*q.v.*, sense 2): = CONGREGATIONAL 3.

Also applied to that political party in the 17th century of which the Independent churches formed the chief element.

**[1611:** see 1.] **1644** T. Lechford *Pl. Dealing or News fr. New Eng.* 79 The Congregationall independent government, whereof I have had some experience. **1653** W. Dell *Tryal Spir.* 82 Sydrach Simpson, one of the first Pastors of an Independant Congregation in England. **1654** Selden *Table-t.* (Arb.) 57 Both the Independant man, and the Presbyterian man do equally exclude the Civil Power, though after a different manner. **1660** R. Coke *Power & Subj.* 262 The Army, commanded by Oliver Cromwell, turned out the Rump of the Long Parliament which headed the Independent party. *a* **1674** Clarendon *Hist. Rebell.* viii. §259 The Independent party (for so they were now [1645] contented to be call'd, in opposition to the other which was styled Presbyterian). **1676** W. Hubbard *Happiness of People* 35 Why else doe wee in New England (who are now call'd Independents in Select. Land IV. 8 There is an Independent meeting-house. **1831** (title) Declaration of the Faith, Order and Discipline of the Congregational or Independent Dissenters. **1872** G. H. Curteis *Bampton Lect.* ii. 40 The Independent system does not concern itself with either Ritual or Doctrine.

**3.** Not depending on something else for its existence, validity, efficiency, operation, or some other attribute; not contingent on or conditioned by anything else. a. Const. as in sense 1.

**1614** Jackson *Creed* III. xxxix. §6 His faith [is] no otherwise independent of any externall proposall then ours is. **1646** H. Lawrence *Comm. Angells* 73 The will is independent vpon all created power, both in its operation and in its being. **1659** Pearson *Creed* (1682) I. 31 A Being of itself and independent from any other. **1692** Bentley *Boyle Lect.* 69 An incorporeal substance independent from matter. **1790** Steele *Tatler* No. 54 ¶1 Beauty and Merit are Things real, and independent on Taste and Opinion. **1772** Priestley *Inst. Relig.* (1782) I. 276 They cannot be considered as independent of one another. **1790** Paley *Hora Paul.* i. ¶13 The Instances are independent of one another. **1816** Playfair *Nat. Phil.* II. 323 This is quite independent of the figure of the Earth, and would be the same though the Earth were truly spherical. **1885** S. Cox *Exposit.* Ser. I. ix. 107 An argument...wholly independent of the teaching of the Scripture.

**b.** *simply.* Not depending upon the existence or action of others, or of each other; existing, acting, conducted, or obtained in a way apart from and unaffected by others, as *independent action, inquiry, investigation, conclusion, results, account, record, information, evidence; independent suspension*; also of the agent, as *independent investigator, observer, witness*, etc.

**1790** Paley *Hora Paul.* i. ¶6 No danger of confounding the production with original history, or of mistaking it for an independent authority. *Ibid.* iv. No. iv, It is the junction of two conclusions, deduced from independent sources. *Ibid.* v. No. ii, Two records...manifestly independent, that is manifestly written without any participation of intelligence. **1865** Earle *Two Saxon Chron.* Introd. 37 Some of the independent entries of C countenance its Abingdon origin. *Ibid.* 45 Other independent annals about the same date, e.g. 1031, 1032, 1043, argue the presence of such a source. **1867** Freeman *Norm. Conq.* I. vi. 510 Something is proved when two independent narratives agree. **1872** Watts *Dict. Chem.* II. 770 Scheeler's investigation...comprised another independent discovery of oxygen gas. **1879** J. A. H. Murray *Synopsis Hora Paul.* 10 Here four independent witnesses, those who agree in all the facts, confirm and supplement each other. *Ibid.* 14 Have we any independent information connecting Erastus with Corinth? **1885** Tait *Prop. Matter* iii. §33 Air is made up of separate and independent particles. *a* **1900** *Med.* An independent inquiry has been instituted by the Local Board of Health. The work is the result of independent research. **1930** *Engineering* 7 Feb. 163/1 A special chapter on independent suspension systems. **1963** H. F. Webb *Motorist's Dict.* 135 *Independent suspension*, a form of suspension where each wheel is completely independent of the others and no connecting axle beams are used. **1973** *Country Life* 15 Dec. 1581/2 For absolute comfort and stability at very high speeds there is all round independent suspension.

**c.** Often used adverbially in phr. *independent of* (+*on*, +*from*) = Independently of, apart from, without regard to, irrespective of.

**1690** Locke *Hum. Und.* III. v. §5 Put together in the Mind, independent on the other original Patterns in Nature. **1748** *Anson's Voy.* III. ii. 311 Independent of that attachment which all mankind have ever shown to the places of their birth...there were few countries more worthy to be regretted. **1871** Grote *Eth. Fragm.* i. (1876) 20 We pursue the one and avoid the other quite independent of regard to the feelings of others.

**d.** Of one of a set of equations, axioms, or quantities in respect of the others: incapable of being expressed in terms of, or of being derived or deduced from, the others; hence applied to a set of axioms, etc., all of which have this property; *linearly independent*, (of each of a set of equations or quantities) incapable of being expressed as a linear combination of the others, i.e. satisfying no relation of the form $a_1x_1 + a_2x_2 + \ldots + a_nx_n = 0$ (where $x_i$ are the quantities and $a_i$ arbitrary constants) unless $a_1 = a_2 = \ldots = a_n = 0$.

**1740** N. Sanderson *Elem. Algebra* I. ii. 105 If a problem be justly proposed, it ought to have as many independent conditions...as there are unknown quantities to be discovered by them. **1798** J. Wood *Elem. Algebra* (ed. 2) 73 These equations must also be independent, that is, not deducible one from another. **1879** *Encycl. Brit.* I. 541/1 A problem is limited when the conditions furnish just as many independent equations as there are unknown quantities to be determined: if there be fewer, the problem is indeterminate; but if there be more, the problem in general admits of no solution. **1885** [see LICENCE]. **1902** *Trans. Amer. Math. Soc.* III. 142 Hilbert states...that his body of axioms consists of independent axioms, that is, that no one of the axioms is logically deducible from the remaining axioms. **1931** L. J. Rouse *College Algebra* iv. 69 The equations $2x + y = 5$ and $3x + 2y = 4$ cannot be reduced to the same form and are therefore independent. **1940** O. Helmer tr. *Tarski's Introd. Logic* §30. 131 We strive to arrive at an axiom system which does not contain a single superfluous statement...which can be derived from the remaining axioms... An axiom system of this kind is called independent (or a system of mutually independent axioms). **1944** A. Church *Introd. Math. Logic* I. 1. 25 An axiom of a logistic system is said to be independent if, in the system whose axioms and rules consist of all axioms and rules of the original system except that one, the suppressed axiom is not a theorem. **1959** G. & R. C. James *Math. Dict.* (ed. 2) 209 The numbers 3 and *e* are linearly independent with respect to rational numbers, since $a_1 \cdot 3 + a_2 \cdot e$ can not be zero if $a_1$ and $a_2$ are rational numbers, not both zero. Since $-1 \cdot 3 + (3/e)e = 0$, 3 and *e* are linearly dependent with respect to real numbers. **1961** Powell & Crasemann *Quantum Mech.* i. 117 Two solutions of Eq. (5-47) (or, more generally, any two functions of *x*) are linearly independent if the equation $c_1\psi_1 + c_2\psi_2 = 0$ cannot be satisfied identically for all *x* in any choice of the constants $c_1$ and $c_2$ except $c_1 = c_2 = 0$. *Ibid.* 118 To linearly independent solutions, $\psi_1$ and $\psi_2$, a particular set in the sense that every solution of Eq. (5-47) can be expressed as a linear combination of $\psi_1$ and $\psi_2$. **1965** Hughes and Londey *Elem. Formal Logic* xiii. 132 Since $A_4$ is non-independent, the axiom set for PM could be reduced by one. But no further reduction of this sort is possible; neither $A_1$ nor $A_2$ nor $A_3$ nor $A_5$ is a consequence of the other three under Substitution and Detachment, and these four are therefore said to be independent axioms.

**4.** Not dependent or having to rely on another for support or supplies. **a.** Const. as in sense 1.

**1670** R. Coke *Disc. Trade Pref.*, While other Creatures live free and Independent from one another, only Man stands in need and help of another. *a* **1788** N. Cotton *Fables, Bee, Ant & Spar.*, Who...Are independent of the great, Nor know the wants of pride and state. **1837** Lytton *E. Maltrav.* I. xii. He was made independent of his father. **1880** Shorthouse *J. Inglesant* ii. (1883) 18 His father had left him so considerable a fortune that he was independent of any profession.

**b.** *simply.* (*a*) Not dependent on any one else for one's living; (*b*) not needing to earn one's livelihood; possessing a competency.

**1732** Law *Serious C.* x. (ed. 2) 142 He hath chosen to be idle and independant in the world. **1786** Burns *Ep. Yng. Friend* vii, Gather gear by ev'ry wile That's justify'd by Honor...for the glorious privilege Of being independent. **1802** Mar. Edgeworth *Moral T.* (1816) I. i. 7 He was really independent, because he had learnt how to support himself either by the labours of his head or of his hands. **1847** C. Brontë *J. Eyre* xvii, She [a servant] has saved enough to keep her independent if she liked to leave. **1893** *Westm. Gaz.* 10 Apr. 5/2 A room occupied by an independent elderly gentleman.

*transf.* **1784** Cowper *Task* iv. 409 A dry but independent crust, hard earned And eaten with a sigh.

**c.** *transf.* Sufficient to make one independent; constituting a competency.

**c 1790** Imison *Sch. Art* I. 215 The prices...being...out of the reach of any, but such as are possessed of independent fortunes. **1837** Dickens *Pickw.* xxxiv, A gentleman of considerable independent property. **1885** *Daily News* 3 Oct. 4/6 A person of independent means.

**5. a.** Not depending on others for the formation of opinions or guidance of conduct; not influenced or biased by the opinions of others; thinking or acting, or disposed to think or act, for oneself. (Of persons, their dispositions, etc.)

**1735-8** Bolingbroke *On Parties* 9 On this Foundation all the reasonable, independent Whigs and Tories unite. **1771** Smollett *Humph. Cl.* 26 June, I believed there was not a more independent and incorruptible member in the house. **1795** Burns *For a' that* (1800) Song v, The man of independent mind, He looks and laughs at a' that. **1849** Cobden *Speeches* 52 An independent and energetic man who will be as harmless as possible in peace. **1852** Hawthorne *Blithedale Rom.* xix, A person capable of taking an independent stand. **1861** Geo. Eliot *Silas M.* i. 12 This would have been an effort of independent thought such as he had never known. **1889** *Daily News* 28 June 5/2 Perhaps the best *bon-mot* attributed to the late Lord Derby is his definition of an independent politician as 'a politician who cannot be depended on'.

**b.** Used in the names of various political or other parties, as *Independent Republicans* (U.S.: see B. 2 b); *Independent Labour Party* (abbrev. I.L.P.: see I. III): the title of the political organization founded at Bradford in January 1893 by James Keir Hardie as an offshoot of the Social Democratic Federation, for the support of parliamentary candidates of approved socialistic views; orig. as opp. the Conservative and Liberal parties, later distinct from the Labour Party; also in the names of newspapers, as the *Cambridge Independent Press*.

**c 1888** *Scottish Labour Party Manifesto* in N. Beer *Hist. Brit. Socialism* (1920) II. xv. 300 The formation of a distinct, separate, and Independent Labour Party. **1902**

*Encycl. Brit.* XXXI. 668/2 Attempts had been made to influence politics directly by means of an Independent Labour Party...which bound itself to support only candidates of sound socialist views. **1922** *Ibid.* XXXII. 507/1 The Labour party...included the Independent Labour party and the Fabian Society and one or two smaller Socialist bodies. **1933** D. E. BUTLER *Electoral Syst. in Brit.* II. v. 154 The total of 5 [members of parliament from outside the three major parties] for 1935 is made up of 4 Independent Labour Party members from Glasgow...where a substantial part of the Labour party had split away—and 1 Communist. **1955** *Times* 24 May 14/3 An election manifesto issued last night by the Independent Labour Party reaffirms the party's belief that workers' control 'is an essential part of Socialism'. **1971** BUTLER & PINTO-DUSCHINSKY *Brit. Gen. Election 1970* v. 112 The failure of those other traditional spokesmen of the left, the Independent Labour party and the Socialist Party of Great Britain, was still more complete.

c. Also (with some colouring of 4), Refusing to be under obligation to others; having a self-respect which declines unearned assistance.

*Mod.* The widow has a hard struggle, but is very independent, and refuses all pecuniary aid. He is too independent to accept as a favour what he cannot earn by his own exertions.

d. Of schools: receiving no grant from the government and not subject to the control of a local authority.

**1944** *Act 7 & 8 Geo. VI* c. 31 §70 The Minister shall appoint one of his officers to be Registrar of Independent (i.e. private) Schools. **1957** *Encycl. Brit.* VII. 989/1 The Independent Schools association...; its official publication is the *Independent School*. **1966** *Rep. Comm. Inquiry Univ. Oxf.* II. 45 Independent schools are subdivided into independent boarding and independent day schools according to whether the majority of pupils were boarders or day pupils.

e. *Independent Television (Authority)* (abbrev. I.T.A., I.T.V.: see I. III): a corporation, independent of direct government control, engaged in commercial television broadcasting in Great Britain; also, the channel carrying their programmes; renamed in 1972 the *Independent Broadcasting Authority* (abbrev. I.B.A.: see I. III), and widened to include commercial radio broadcasting.

**1954** *Act 2 & 3 Eliz. II* c. 55 §1 There shall be an authority, to be called the Independent Television Authority...whose function shall be to provide, in accordance with the provisions of this Act, and for the period of ten years from the passing of this Act, television broadcasting services, additional to those of the British Broadcasting Corporation. **1958** *Times Lit. Suppl.* 15 Aug. p. xl/1 This brings sharply into the picture the B.B.C.'s rival, Independent Television. **1959** *Chambers's Encycl.* XI. 349/2 (*heading*) Independent Television. *Ibid.*...This corporation is controlled by directors appointed by the government and leases facilities to privately financed companies, which draw their revenues from advertisements. **1960** *B.B.C. Handbk.* 165 The Postmaster General issued a broadcasting licence, for television only, at a later stage to the Independent Television Authority, which was set up under the Television Act of 1954. **1971** [see *I.B.A.* s.v. I. III]. **1973** *Times* 13 Dec. 4/5 The Independent Broadcasting Authority will hold meetings today...about advertising which will be lost as a result of the shorter hours of transmission announced yesterday. *Ibid.* 15 Dec. 2 BBC and independent television agreed last night to spread their closing hours.

**6. a.** *Math.* Not depending upon another for its value. *independent variable*: a quantity whose variation does not depend on that of another.

**1852** TODHUNTER *Diff. Calc.* i. §1 Frequently when we are considering two or more variables it is in our power to fix upon whichever we please as the independent one. **1873** B. WILLIAMSON *Diff. Calc.* (ed. 2) i. §2 [If *u*, *v*, *w*, be functions of *x*], *x* is said to be the *independent* variable, to which any value may be assigned at pleasure; and *u*, *v*, *w*, are called *dependent* variables, as their values depend on that of *x*. **1852** J. EDWARDS *Diff. Calc.* i. §5 An Independent variable is one which may take up any arbitrary value that may be assigned to it.

**b.** *independent float*: in Critical Path Analysis, the amount of 'float' or leeway in any one activity which can occur without affecting the timing of the whole operation.

**1963** R. E. MCGARRAH *Production & Logistics Managem.* viii. 211 'Independent float' pertains to those non-critical activities whose leeway is not affected by the starting or completion time of its preceding or succeeding activities. **1964** K. G. LOCKYER *Introd. Critical Path Analysis* v. 48 *Independent float*, the time by which an activity can expand without affecting any other activity either previous or subsequent. **1967** A. BATTERSBY *Network Analysis* (ed. 2) App. 4. 335 *Independent float* is so called because it is what remains if all proceeding jobs finish as late as possible and all succeeding jobs begin as early as possible. **1967** S. WODDGATE in Wills & Yearsley *Handbk. Managem. Technol.* 80 Independent float is the minimum spare time available under any condition, i.e. either early or late. **1968** *Gloss. Terms Project Network Analysis* (B.S.I.) 8 *Independent float*, earliest date of succeeding event minus latest date of preceding event minus activity duration. (If negative, the independent float is taken as zero.)

**7. *Comb. independent seconds (watch)*: see quots.

**1837** DICKENS *Pickw.* xxviii. A kind, excellent independent-spirited...man. **1877** KNIGHT *Dict. Mech.* II. 1179/1 *Independent seconds-watch*, a watch in which the action of the center seconds-hand is independent of the regular going works of the watch... For great nicety in timing, quarter and fifth second watches are now made. **1890** BOLDREWOOD *Col. Reformer* (1891) 143 A certain

independent-minded young lady friend. **1962** E. BRUTON *Dict. Clocks & Watches* 93 *Independent seconds*, clock or watch with seconds hand...which jumps from one second to the next, i.e. it is dead beat.

**B.** *sb.*

**1.** An adherent of Independency; a member or adherent of an Independent church; a Congregationalist.

**1644** (*title*) Apologeticall Narration of the Independents. **1646** (29 Aug.) in *Hamilton Pap.* (Camden) 113 Cheesely says the Independents intend not to demand the King. **1692** WASHINGTON tr. *Milton's Def. Pop.* Pref., They that we call independents...hold, that no classes or synods have a superiority over any particular church. **1710** STEELE & ADDISON *Tatler* No. 257 ⁋12 Camaronians, Muggletonians, Brownists, Independents, Masorites, Camisars, and the like. **1870** ROGERS *Hist. Gleanings* II. 74 In modern times the credit of being the first to advocate the doctrine of toleration must be shared between the Independents and Quakers. **1884** STOUGHTON *Relig. Eng.* I. 236 The old historic name of Independent began [at the beginning of the 19th century] to be merged in that of Congregationalist.

**2. a.** A person or thing that is independent (in various senses), *nonce-uses*.

**1675** OGILBY *Brit.* Pref. 2 Roads we have divided into Independants, such as commence actually at London [etc.]. **1742** YOUNG *Nt. Th.* ii. 132 That awful Independent on Tomorrow!... Whose Yesterdays look backward with a Smile. **1886** *Daily News* 4 June 5/2 There is a school of independents in domestic service, as there is in literature.

**b.** A person who acts (in politics, art, etc.) independently of any organized party; also, a member of any organized party called *Independent* (see A. 5 b).

**1808** PIKE *Sources Missis.* III. App. (1810) 90 Twenty thousand auxiliaries from the United States...joined to the independents of the country [Texas]. **1888** BRYCE *Amer. Commw.* II. III. liv. 379 The Independent Republicans... Independents, or Mugwumps. **1896** A. HILLIER in *Daily News* 16 Jan. 6/3 If later painters arrived at more harmonious results...the Independents have still the glory of being the bold hussars of the vanguard, the Jacobins of the revolution in art which has since been accomplished throughout all Europe.

**c.** A frequent name of a newspaper, as the *New York Independent* (cf. A. 5 b).

**1837** DICKENS *Pickw.* xiii. That disgraceful and dastardly journal, the [Eatanswill] Independent. **1865** 'HACKNEY *Newcomes* liv. He endeavoured to be civil to the 'Newcome Independent'... as well as to the 'Newcome Sentinel'.

Hence †**inde'pendented** *ppl. a. Obs.* (*nonce-wd.*), made independent, formed according to Independency. †**inde'pendentish** *a.*, having a flavour of Independency.

**1653** R. BAILLIE *Dissuas. Vind.* (1655) 44 Presbyterian water, exceedingly well-fenced with Independentish ingredients. **1659** GAUDEN *Tears Ch.* 43 The new titles...of independented, dissolved and congregated, associated and new-fangled Churches.

**inde'pendentism.** [f. INDEPENDENT + -ISM.]

†**1.** = INDEPENDENCY 2. *Obs.*

**1653** R. BAILLIE *Dissuas. Vind.* (1655) 44, I love not Episcopal principles, neither Independentisme. **1659** GAUDEN *Tears Ch.* 564 Anabaptisme, or Presbyterianisme, or Independentisme...rudely jumbled Episcopacy out of the Church of England. **1663** J. LIVINGSTONE *Mem. Charact. in Sel. Biog.* (1845) I. 335 He marvellously refuted Independentisme. **1827** AIKMAN *Hist. Scot.* IV. vii. 84 They opposed every approach to independentism.

**2.** The principles of any party called *Independent*.

**independently** (-ndə'pentli), *adv.* [f. INDEPENDENT *a.* + -LY².] In an independent manner; without dependence on another person or thing, or on each other; apart from or without regard to the action of others.

**1651** J. GOODWIN *Redemption Red.* i. §10 Second causes...do not perform, what...they do perform, independently, and of themselves. **1849** T. P. BIRKS *Hora Apostol.* Pref., My own conclusions were formed independently. *Ibid.*, The dates to which I have been independently led agree very nearly with those adopted in the Literary History. **1860** TYNDALL *Glac.* i. xxv. 180 Mr. Wills...made the same observation independently. **1876** GEO. ELIOT *Dan. Der.* xxiii, She can hardly earn her own poor bread independently. **1886** FARRAR *Hist. Interpret.* 403 He examined the Canon as independently as Luther had done. *Mod.* The two parts of the mechanism work independently.

**b.** With *of* (formerly *on*, *upon*, *from*): In a way independent of; without regard to; apart from.

**1659** PEARSON *Creed* (1845) 485 *note*, Independently from this place, we have proved, that the Holy Spirit is a person. **1678** CUDWORTH *Intell. Syst.* i. iv. §7. 199 They Maintained Matter to exist Independently upon God. **1700** DRYDEN (J.), Dispose lights and shadows, without finishing every thing independently the one of the other. **1797** S. CLARKE *3rd & 4th Def.* (1712) 7, Parts, existing distinctly and independently from each other. **1824** L. MURRAY *Eng. Gram.* (ed. 5) I. 274 The infinitive mood is often made absolute, or used independently on the rest of the sentence. **1867** TROLLOPE *Chron. Barset* II. li. 76 So that he might work at his canvas independently of his model. **1884** J. RAE *Contemp. Socialism* 165 Utility can confer value independently of labour.

†**inde'pending**, *a. Obs.* [f. IN-³ + DEPENDING *ppl. a.*: cf. INDEPEND *v.*] = INDEPENDENT *a.*

**1604** T. WRIGHT *Passions* vi. 301 The soule...being immortall, and independing of the body. **1657** HAKEWILL *Apol.* II. v. (1630) 82 A Soveraigne and independing power. **1650** B. SPENCER (*title*) Chrysomeson, a Golden Mean...

wherein all Seekers...may find the True Religion, independing on Man's Invention. **1652** BP. HALL *Invis. World* II. §1 An independing and selfsubsisting agent. **1675** OGILBY *Brit., Post-Roads Eng.*, The...Roads...are Reduc'd to three to Independing Itineraries.

†**inde'plorable**, *a. Obs. rare*⁻⁰. [IN-³.] = 1653 COCKERAM 11, Not to be Lamented, *Indeplorable*

**inde'posable**, *a. rare.* [IN-³.] That cannot be deposed.

**1673** STILLINGFL. *Serm.* 5 *Not.* (L.), That doctrine which makes princes indeposable by the pope.

†**in'deprávate**, *a. Obs.* [ad. L. *indēprāvātus*, f. *in-* (IN-³) + *dēprāvātus* depraved, corrupted. DEPRAVATE.] Not depraved; uncorrupted, pure.

**1609** J. DAVIES *Holy Roode* (1876) 28 (D.) Or these Wounds, these Woundes unimpaired, by holy Sanctuaries for my whole Man.

†**in'deprecable**, *a. Obs. rare*⁻⁰. [ad. L. *indēprecābilis* that cannot be averted by prayer. f. *in-* (IN-³) + *dēprecābilis* DEPRECABLE.] **1623** COCKERAM, *Indeprecable*, that will not be intreated **1656** in BLOUNT *Glossogr.* **1658** in PHILLIPS, etc.

†**inde'prehensible**, *a. Obs.* [ad. L. *indēprehensibilis* not to be seized or caught (Quintil.), f. *in-* (IN-³) + *dēprehendēre* to seize, catch, DEPREHEND: see -IBLE.] Incapable of being mentally apprehended or detected: undiscoverable.

**1633** T. MORTON *Discharge* 174 (T.) A case perplexed and indeprehensible. **1653** GAULE *Magastrom.* 142 To presume his errour indeprehensible.

**indeprivable** (indi'praivǎb(ǎ)l), *a.* Now *rare.* [f. IN-³ + DEPRIVABLE.]

**1.** Of which one cannot be deprived; incapable of being taken away; inalienable.

**1744** HARRIS *Three Treat.* III. i. (1765) 121 The Sovereign Good...should...be durable, self-derived, and (if I may use the Expression) indeprivable. *Ibid.* II. 192 Rectitude of Conduct is a Good Indeprivable. **1789** MRS. PIOZZI *Journ. France* I. 126 The advantages of blood...may surely be deemed indeprivable. **1835** GRESWELL *Parables* II. 59 So pure, so valuable, and so indeprivable.

**2.** That cannot be deprived of something *rare*⁻⁰.

**1828** WEBSTER, *Indeprivable*, that cannot be deprived [Hence in later Dicts.]

Hence **indeprivability**, the quality of being indeprivable or inalienable.

**1789** MRS. PIOZZI *Journ. France* I. 125 James Harris tells us, that virtue answers to the character of indeprivability.

**in-depth** *attrib.*: see DEPTH I. 3 c.

**inder-, -ly, -more, -ward**: see INNER, -LY, etc.

**inderborite** (indi'bɔːrait). *Min.* [f. *Inder*, the name of a lake in Kazakhstan + BOR(ON - -ITE².] A colourless to white hydrated borate of calcium and magnesium, $CaMgB_6O_{11}.11H_2O$.

**1941** G. S. GORBIKOV in *Compt. Rend.* (*Doklady*) *de l'Acad. des Sci. de l'URSS* XXXIII. 255 The new mineral is an analogon of hydroboracite and has been named inderborite after the place of finding. **1967** E. L. MUETTERTIES *Chem. Boron & its Compounds* iii. 188 The binary salt minerals, in the system $CaO.MgO.B_2O_3.H_2O$ (hydroboracite and inderborite) are probable derivatives of the colemanite-meyerhofferite trimer.

**inderite** ('ndǝrait). *Min.* [as prec. + -ITE¹.] A colourless hydrated magnesium borate, $Mg_2B_6O_{11}.15H_2O$.

**1937** BOLDYREVA & YEGOROVA in *Mat. Central Sci. Investig. Geol. Prospecting Inst.* (U.S.S.R.) Gen. Ser. No. 2 52 Inderite, a new hydrated magnesium borate $Mg_2B_6O_{11}.15H_2O$ has been found in the Kzyl-Tuga deposit (Western Kasakhstan, Inder Mountains) in the form of fine white, sometimes slightly pink kidney-shaped nodules. **1946** *Amer. Mineralogist* XXXI. 71 A second occurrence of inderite $(Mg_2B_6O_{11}.15H_2O)$...has been discovered. **1967** E. L. MUETTERTIES *Chem. Boron & its Compounds* iii. 161 NMR analyses have been performed on the minerals inderite, $Mg_2B_6O_{11}.15H_2O$...borax...and inderborite.

†**inderkins.** *Obs. rare*⁻¹. Some kind of fabric: see quot.

**1696** J. F. *Merchant's Ware-ho.* 25 Inderkins, which is a sort of Cloth of no great use in this Town, only proper for Towels, it is a coarse narrow Cloth which comes from Hamborough...it is made of the worst of Hemp.

**indescriba'bility.** [f. next: see -ITY.] Incapacity of being described; also (with *an* and *pl.*) something that cannot be described.

**1824** *Examiner* 456/2 In ably conveying the assumed hoyden, and falling somewhat short of a critical conception of the indescribabilities. **1843** CARLYLE *Past & Pr.* I. ii. A fearful indescribability. **1864** SALA in *Daily Tel.* 21 Sept., I have now done my best to describe what..I may term the indescribability of Transatlantic warfare.

**indescribable** (indi'skraibǎb(ǎ)l), *a.* (*sb.*) [IN-³.]

**1.** That cannot be described; that does not admit of exact description; indefinite, vague.

**1794** W. CURTIS *Bot. Mag.* No. 234 That indescribable something, called by Linnæus the Nectary. **1833** HT. MARTINEAU *Cinnamon & Pearls* i. 16 Various sacred indescribable articles were scattered around. **1862** MRS. OLIPHANT *Last Mortimers* I. xii, His voice...had..an

Exhibit 6

# New Oxford
# American Dictionary

## THIRD EDITION

*Edited by*

Angus Stevenson

Christine A. Lindberg

**FIRST EDITION**

Elizabeth J. Jewell

Frank Abate



OXFORD

UNIVERSITY PRESS

# OXFORD
UNIVERSITY PRESS

Oxford University Press, Inc., publishes works that further
Oxford University's objective of excellence
in research, scholarship, and education.

Oxford New York

Auckland Cape Town Dar es Salaam Hong Kong Karachi
Kuala Lumpur Madrid Melbourne Mexico City Nairobi
New Delhi Shanghai Taipei Toronto

With offices in

Argentina Austria Brazil Chile Czech Republic France Greece
Guatemala Hungary Italy Japan Poland Portugal Singapore
South Korea Switzerland Thailand Turkey Ukraine Vietnam

Copyright © 2010 by Oxford University Press

First edition 2001
Second edition 2005
Third edition 2010

Published by Oxford University Press, Inc.
198 Madison Avenue, New York, NY 10016
www.oup.com

Oxford is a registered trademark of Oxford University Press

All rights reserved. No part of this publication may be reproduced,
stored in a retrieval system, or transmitted, in any form or by any means,
electronic, mechanical, photocopying, recording, or otherwise,
without the prior permission of Oxford University Press.

The Library of Congress Cataloging-in-Publication Data
Data available
ISBN 978-0-19-539288-3

1 3 5 7 9 8 6 4 2

Printed in the United States of America
on acid-free paper

1536233313150735

**2** a deep recess or notch on the edge or surface of something: *the indentation between the upper lip and the nose.*

**in·den·ta·tion test** ▶ n. a test for determining the hardness of a solid by making an indentation in a sample under standard conditions and measuring the size of the indentation or the distance moved by the indenter.

**in·dent·ed** /inˈdentid/ ▶ adj. Heraldry divided or edged with a zigzag line.

**in·dent·er** /inˈdentər/ ▶ n. a small hard object used for producing an indentation in a solid in an indentation test.

**in·den·tion** /inˈdenCHən/ ▶ n. archaic term for INDENTATION.

**in·den·ture** /inˈdenCHər/ ▶ n. a formal legal agreement, contract, or document, in particular: ■ historical a deed of contract of which copies were made for the contracting parties with the edges indented for identification. ■ a formal list, certificate, or inventory. ■ an agreement binding an apprentice to a master: *the 30 apprentices have received their indentures on completion of their training.* ■ historical a contract by which a person agreed to work for a set period for a landowner in a British colony in exchange for passage to the colony. ■ the fact of being bound to service by such an agreement: *men in their first year after indenture to the Company of Watermen and Lightermen.* ▶ v. [with obj.] (usu. **be indentured to**) chiefly historical bind (someone) by an indenture as an apprentice or laborer: (as adj. **indentured**) *landowners tried to get their estates cultivated by indentured laborers.* – DERIVATIVES **in·den·ture·ship** /-ˌSHip/ n. – ORIGIN late Middle English *endenture*, via Anglo-Norman French from medieval Latin *indentura*, from *indentatus*, past participle of *indentare* (see INDENT[1]).

**in·de·pend·ence** /ˌindəˈpendəns/ ▶ a historic city in northwestern Missouri, east of Kansas City; pop. 110,440 (est. 2008).

**in·de·pend·ence** /ˌindəˈpendəns/ ▶ n. the fact or state of being independent: *Argentina gained independence from Spain in 1816 | I've always valued my independence.* – ORIGIN mid 17th cent.: from INDEPENDENT, partly on the pattern of French *indépendance.*

**In·de·pend·ence Day** ▶ n. another term for FOURTH OF JULY. ■ a day celebrating the anniversary of national independence.

**In·de·pend·ence Hall** ▶ a building in Philadelphia where the US Declaration of Independence was proclaimed and outside which the Liberty Bell is kept.

**in·de·pend·en·cy** /ˌindəˈpendənsē/ ▶ n. (pl. **independencies**) 1 rare an independent or self-governing state. 2 archaic term for INDEPENDENCE.

**in·de·pend·ent** /ˌindəˈpendənt/ ▶ adj. 1 free from outside control; not depending on another's authority: *the study is totally independent of central government | Canada's largest independent investment firm.* ■ (of a country) self-governing: *India became independent in 1947.* ■ not belonging to or supported by a political party: *the independent candidate.* ■ (of broadcasting, a school, etc.) not supported by public funds. ■ not influenced or affected by others; impartial: *a thorough and independent investigation of the case.* ■ (**Independent**) historical Congregational. 2 not depending on another for livelihood or subsistence: *I wanted to remain independent in old age.* ■ capable of thinking or acting for oneself: *advice for independent travelers.* ■ (of income or resources) making it unnecessary to earn one's living: *a woman of independent means.* 3 <mark>not connected with another or with each other;</mark> separate: *we need two independent witnesses to testify | the legislature and the judicature are independent of each other.* ■ not depending on something else for strength or effectiveness; freestanding: *an independent electric shower.* ■ Mathematics (of one of a set of axioms, equations, or quantities) incapable of being expressed in terms of, or derived or deduced from, the others. ▶ n. an independent person or body. ■ an independent political candidate, voter, etc. ■ (**Independent**) historical a Congregationalist. – ORIGIN early 17th cent. (as an adjective): partly on the pattern of French *indépendant.*

**in·de·pend·ent·ly** /ˌindəˈpendəntlē/ ▶ adv. 1 in a way that is free from outside control or influence: *the government must prove its ability to govern independently.* 2 without outside help; unaided: *disabled people living independently in their own homes.* 3 in a way that is not connected with another; individually: *decisions are made independently of consumers.*

**in·de·pend·ent sus·pen·sion** ▶ n. a form of vehicle suspension in which each wheel is supported independently of the others.

**in·de·pend·ent var·i·a·ble** ▶ n. Mathematics a variable (often denoted by *x*) whose variation does not depend on that of another.

**in-depth** ▶ adj. comprehensive and thorough: *in-depth interviews.*

**in·de·scrib·a·ble** /ˌindiˈskrībəbəl/ ▶ adj. too unusual, extreme, or indefinite to be adequately described: *most prisoners suffered indescribable hardship.* – DERIVATIVES **in·de·scrib·a·bil·i·ty** /-ˌskrībəˈbilitē/ n., **in·de·scrib·a·bly** /-blē/ adv.

**in·de·struct·i·ble** /ˌindiˈstrəktəbəl/ ▶ adj. not able to be destroyed: *indestructible plastic containers.* – DERIVATIVES **in·de·struct·i·bil·i·ty** /-ˌstrəktəˈbilitē/ n., **in·de·struct·i·bly** /-blē/ adv.

**in·de·ter·mi·na·ble** /ˌindiˈtərmənəbəl/ ▶ adj. not able to be definitely ascertained, calculated, or identified: *a woman of indeterminable age.* ■ (of a dispute or difficulty) not able to be resolved. – ORIGIN late 15th cent. (in the sense 'unable to be limited'): from late Latin *indeterminabilis*, from in-'not' + *determinabilis* (see DETERMINABLE).

**in·de·ter·mi·na·cy prin·ci·ple** /ˌindiˈtərmənəsē/ ▶ n. another term for UNCERTAINTY PRINCIPLE.

**in·de·ter·mi·nate** /ˌindiˈtərmənit/ ▶ adj. not exactly known, established, or defined: *the date of manufacture is indeterminate.* ■ (of a judicial sentence) such that the convicted person's conduct determines the date of release. ■ Mathematics (of a quantity) having no definite or definable value. ■ Medicine (of a condition) from which a diagnosis of the underlying cause cannot be made: *indeterminate colitis.* ■ Botany (of a plant shoot) not having all the axes terminating in a flower bud and so producing a shoot of indefinite length. – DERIVATIVES **in·de·ter·mi·na·cy** /-nəsē/ n., **in·de·ter·mi·nate·ly** adv., **in·de·ter·mi·nate·ness** n. – ORIGIN early 17th cent.: from late Latin *indeterminatus*, from in-'not' + Latin *determinatus* 'limited, determined' (see DETERMINATE).

**in·de·ter·mi·nate vow·el** ▶ n. Phonetics the vowel heard in "a moment *ago*"; a schwa.

**in·de·ter·mi·na·tion** /ˌindiˌtərməˈnāSHən/ ▶ n. the state of being uncertain or undecided.

**in·de·ter·min·ism** /ˌindiˈtərmənizəm/ ▶ n. 1 Philosophy the doctrine that not all events are wholly determined by antecedent causes. 2 the state of being uncertain or undecided. – DERIVATIVES **in·de·ter·min·ist** n., **in·de·ter·min·is·tic** /-ˌtərmōˈnistik/ adj.

**in·dex** /ˈindeks/ ▶ n. (pl. **indexes** or esp. in technical use **indices** /-dəˌsēz/) 1 an alphabetical list of names, subjects, etc., with references to the places where they occur, typically found at the end of a book. ■ an alphabetical list by title, subject, author, or other category of a collection of books or documents; e.g., in a library. ■ Computing a set of items each of which specifies one of the records of a file and contains information about its address. 2 an indicator, sign, or measure of something: *exam results may serve as an index of the teacher's effectiveness.* ■ a figure in a system or scale representing the average value of specified prices, shares, or other items as compared with some reference figure: *the hundred-shares index closed down 9.3.* ■ a pointer on an instrument, showing a quantity, a position on a scale, etc. ■ Math a number giving the magnitude of a physical property or another measured phenomenon in terms of a standard: *the oral hygiene index was calculated as the sum of the debris and calculus indices.* 3 Mathematics an exponent or other superscript or subscript number appended to a quantity. 4 Printing a symbol shaped like a pointing hand, typically used to draw attention to a note. 5 (**the Index**) short for INDEX LIBRORUM PROHIBITORUM. ▶ v. [with obj.] 1 record (names, subjects, etc.) in an index: *the list indexes theses under regional headings.* ■ provide an index to. 2 link the value of (prices, wages, or other payments) automatically to the value of a price index: *legislation indexing wages to prices.* 3 [no obj.] (often as noun **indexing**) (of a machine or part of one) rotate or otherwise move from one predetermined position to another in order to carry out a sequence of operations. – DERIVATIVES **in·dex·a·ble** adj., **in·dex·a·tion** /ˌindekˈsāSHən/ n., **in·dex·er** n., **in·dex·i·ble** adj. – ORIGIN late Middle English: from Latin *index, indic-* 'forefinger, informer, sign,' from *in-* 'toward' + a second element related to *dicere* 'say' or *dicare* 'make known'; compare with INDICATE. The original sense 'index finger' (with which one points) came to mean 'pointer' (late 16th cent.), and

figuratively something that serves to point to a fact or conclusion; hence a list of topics in a book ("pointing" to their location).

**in·dex card** ▶ n. a small card on which information is recorded, typically stored alphabetically with others in a card index.

**in·dex case** ▶ n. Medicine the first identified case in a group of related cases of a particular communicable or heritable disease.

**in·dex fin·ger** ▶ n. the finger next to the thumb; the forefinger.

**in·dex fos·sil** ▶ n. Geology a fossil that is useful for dating and correlating the strata in which it is found.

**in·dex·i·cal** /inˈdeksikəl/ Linguistics ▶ adj. another term for DEICTIC. ▶ n. an indexical word or expression. – ORIGIN early 20th cent.: coined in this sense by the American philosopher C. S. Peirce.

**In·dex Li·bro·rum Pro·hib·i·to·rum** /ˈindeks liˈbrōrəm ˌprōhiˈbitôrəm/ an official list of books that Roman Catholics were forbidden to read or that were to be read only in expurgated editions, as contrary to Catholic faith or morals. The first Index was issued in 1557; it was revised at intervals until abolished in 1966. – ORIGIN Latin, 'index of forbidden books.'

**In·di·a** /ˈindēə/ a country in southern Asia that occupies the greater part of the Indian subcontinent; pop. 1,156,897,800 (est. 2009); capital, New Delhi; official languages, Hindi and English (14 other languages are recognized as official in certain regions; of these, Bengali, Gujarati, Marathi, Tamil, Telugu, and Urdu have the most first-language speakers). Hindi name BHARAT. ■ a code word representing the letter I, used in radio communication.

<mark>Much of India was united under a Muslim sultanate based around Delhi from the 12th century until incorporated in the Mogul empire in the 16th century. Colonial intervention began in the late 17th century, particularly by the British; in 1765, the East India Company acquired the right to administer Bengal. In 1858, after the Indian Mutiny, Britain took over the company's authority, and in 1876 Queen Victoria was proclaimed Empress of India. Independence was won in 1947, at which time India was partitioned, and Pakistan was created from mainly Muslim territories in the northeast (now Bangladesh) and the northwest. A member of the Commonwealth of Nations, India is the second most populous country in the world.</mark>

– ORIGIN via Latin from Greek *India*, from *Indus*, the name of the Indus River, from Persian *Hind*, from Sanskrit *sindhu* 'river,' specifically 'the Indus,' also 'the region around the Indus' (compare with SINDHI). Both the Greeks and the Persians extended the name to include all the country east of the Indus. Compare with HINDI and HINDU.

**In·di·a ink** ▶ n. deep black ink containing dispersed carbon particles, used esp. in drawing and technical graphics. – ORIGIN mid 17th cent.: originally applied to Chinese and Japanese pigments prepared in solid blocks and imported to Europe via India.

**In·di·a·man** /ˈindēəmən/ ▶ n. (pl. **Indiamen**) historical a ship engaged in trade with India or the East or West Indies, esp. an East Indiaman. – ORIGIN early 18th cent.: from INDIA + -man from MAN-OF-WAR.

**In·di·an** /ˈindēən/ ▶ adj. 1 of or relating to the indigenous peoples of America. 2 of or relating to India or to the subcontinent comprising India, Pakistan, and Bangladesh. ▶ n. 1 an American Indian. 2 a native or inhabitant of India, or a person of Indian descent. – DERIVATIVES **In·di·an·i·za·tion** /indēənˌizāSHən/ n., **In·di·an·ize** /-ˌnīz/ v., **In·di·an·ness** n.

USAGE **Indian**, meaning 'native of America before the arrival of Europeans,' is objected to by many who now favor **Native American**. There are others (including many members of these ethnic groups), however, who see nothing wrong with **Indian** or **American Indian**, which are long-established terms, although the preference where possible is to refer to specific peoples, as **Apache, Delaware,** and so on. The terms **Amerind** and **Amerindian,** once proposed as alternatives to **Indian,** are used in linguistics and anthropology, but have never gained widespread use. Newer

PRONUNCIATION KEY ə *ago, up*; ər *over, fur*; ä *hat*; ä *are*; ä *car*; e *let*; ē *see*; i *fit*; ī *by*; ng *sing*; ō *go*; ō *law, for*; oi *toy*; ŏŏ *good*; ōō *goo*; ou *out*; TH *thin*; TH *then*; ZH *vision*

Exhibit 7

# AND8248/D

# System Clock Generators: A Comparison of a PLL Synthesizer vs. a Crystal Oscillator Clock



**ON Semiconductor®**

http://onsemi.com

**Prepared by: Casey Stys and Paul Shockman**
ON Semiconductor
Application Engineers

**APPLICATION NOTE**

### Abstract

*An electronic system requires a reliable, precision timing reference: the system clock. We examine and compare two forms of system clocks, the Crystal Oscillator and the Phase Locked Loop Synthesizer.*

### The System Clock

Generation and distribution of the system master clock will require at minimum an oscillator source driving a gain amplifier, translation to standard logic levels, and a clock distribution network. Two of the most common oscillator sources are the Crystal Oscillator Clock Module and the Phase Locked Loop (PLL) Synthesizer Clock. A complex system clock may include: a mux function between oscillator sources, additional translation to other logic family levels, fanout buffering, zero delay buffering, skew tuning, higher multiple frequency generation, and frequency division in diverse topologies. See Figure 1: Generic System Clock Tree Design illustrating various possible topologies and applications of On Semiconductor devices in a system clock tree.



**Figure 1. Generic System Clock Tree Design**

© Semiconductor Components Industries, LLC, 2006
December, 2006 – Rev. 1

Publication Order Number:
**AND8248/D**

Today's very complex system designs may need to distribute numerous clock copy signals at several logic standards and at several frequencies. Some boards may also demand tight skew and synchronization characteristics between several devices requiring zero delay buffers and skew tuning buffers. Multiple copies of a clock may require a fanout buffer for distribution. Frequency multiples of a clock may require a PLL synthesizer. All these requirements may be combined in challenging clock tree designs.

### Crystal Oscillator Clock (XO)

The traditional System Clock Tree oscillator source in general use is a quartz crystal. For oscillator operation, the quartz crystal must also be in a loop with a gain amplifier to compensate for crystal losses and to match impedances. This gain amplifier must also be level translated to standard logic levels for use by the system clock distribution network. For a generalized schematic of the Crystal Oscillator Clock, see Figure 2: Typical Crystal Oscillator Clock.



**Figure 2. Typical Crystal Oscillator Clock**

A Crystal Oscillator Clock (or XO) is usually found as a single supply hermetically sealed, or "canned", module with an internal crystal and integrated circuitry, although a discrete hybrid remains an alternative design. These canned oscillators are complex to manufacture and may be relatively expensive with long lead times and unique custom customer requirements often driving cost higher. The Crystal Oscillator Clock is generally limited to a single frequency and only one logic output, or a single differential pair. Operation may be in a fundamental or overtone mode.

Key characteristic features of the Crystal Oscillator Clock may include:

    Frequency Accuracy
    Frequency Precision
    Stability across temperature and voltage
    Oscillation startup time
    Aging
    Jitter (Phase Noise, Cycle−to−Cycle, Period)
    Output load capability
    Duty Cycle
    Rise and fall times
    Power Dissipation or current demand
Some advantages may include:
    Crystal ease of use
    Frequency Accuracy and Precision
    Family logic level compatible output
Some disadvantageous limitations may include:
    Crystal fixed operating frequency
    Single Output
    Custom order application specific frequencies
    Large physical size
    Long delivery lead time

### PLL−Synthesizers

A more advanced System Clock Tree oscillator source is a Phase Locked Look Synthesizer clock generator offering greater design flexibility and potential cost reduction. By utilizing fully integrated Phase Locked Loop (PLL) circuitry, higher functions become available such as multiples of the crystal frequency, and output phase alignment. A single Synthesizer clock device could offer substantial cost reduction over a design with multiple crystals of different frequencies. ON Semiconductor PLL−synthesizer clock generators offer comparable or better parametric performance, greater design flexibility, a lower overall cost potential, and reduced lead times compared to the most widely used crystal oscillators. For a generalized schematic of a simple PLL Synthesizer Clock Generator, see Figure 3: Typical PLL Synthesizer Clock.



**Figure 3. Typical PLL Synthesizer Clock**

A generic PLL Synthesizer Clock device requires an external crystal and contains an integrated phase−lock−loop (PLL) circuit capable of multiplying up or dividing down the crystal's unique frequency. An external crystal permits the added flexibility of fine−tuning or pulling frequency, but requires additional external stabilizing capacitors, one on each side of the crystal.

For operation, the quartz crystal must also be in a loop with a gain amplifier to compensate for crystal losses and to match impedances. This gain amplifier output becomes a Reference signal to the Phase Frequency Detector (PFD) which drives a charge pump and a Low Pass Filter (LPF). The LPF output approaches a DC level which drives the Voltage Controlled Oscillator (VCO) at frequency. Output from the VCO may be ported out of the device, but will also be sent through a Divide counter (÷N) and back to the PFD as a Feedback signal. As a loop dynamic, the PFD compares the Feedback signal to the Reference and outputs a pulse width modulated signal to pump the VCO frequency/phase either up or down, accordingly to the crystal Reference. The Charge Pump assures the pulse width modulated signal will not vary in the HIGH and LOW levels. The "÷N" counter will multiply up the VCO output frequency. For "Phase Lock Loop General Operations", see AND8040.

Common to all PLL outputs, the VCO output phase approaches zero with respect to the input Reference signal (zero delay buffering). When the PLL feedback loop "÷N" is externally accessible, controlled delay may be added. More complex PLL Synthesizer devices may incorporate multiple PLLs, additional input or output dividers, logic family translators, or banks of fanout. The VCO output must also be level translated to standard logic levels for use by the system clock distribution network.

Key characteristic features of a generic PLL Synthesizer Clock include all those of the Crystal Oscillator Clock:

        Frequency Accuracy
        Frequency Precision
        Stability across temperature and voltage
        Oscillation startup time
        Aging
        Jitter (Phase Noise, Cycle−to−Cycle, Period)
        Output load capability
        Duty Cycle
        Rise and fall times
        Power Dissipation or current demand
And additionally,
        Multiple Outputs
        Aligned Outputs
        Multiple Selectable Frequencies
        Pullable Frequency
        Jitter Rejection

Some advantages of the PLL Synthesizer Clock include all those found in the Crystal Oscillator Clock:
        Ease of use
        Frequency accuracy and precision

        Family logic level compatible output
And potential benefits:
        Lower frequency (less costly) crystal
        Multiple logic family outputs
        Differential outputs
        Multiple selectable frequencies
        Spread spectrum option
        Layout board area optimization (reduced overall footprint)
        Pullable Frequency
        Jitter Rejection
        Shorter delivery lead time
        Simplifies customer BOM
Some challenges may include:
        Crystal capacitor considerations

**Frequency Accuracy and Stability**

Frequency is exactly defined as the number of oscillations per second, but is often approximated as instantaneous frequency (reciprocal of the wavelength period) measurement with significant error. Frequency precision refers to the number of significant digits in a frequency measurement.

Output Frequency (Fout) accuracy is a marginal error (deviation boundary) from a nominal or mean spec value (Fin) and usually expressed in Parts Per Million (PPM). Crystal operation accuracy is typically measured at 25°C, where effects due to changes in operating temperature, input voltage, aging shock and vibration are most stable.

Frequency stability is typically expressed in Parts Per Million (PPM). It is as spec deviation boundary from a reference frequency over such parameters such as temperature, voltage, and time (drift and aging). Common crystal spec stability values overvoltage and temperature are 25, 50 and 100 PPM.

A crystal driven PLL frequency synthesizer would be phase and frequency locked on the crystal signal, thus retaining the crystal spec stability and accuracy in PPM. In a PLL the mean output frequency, fout, is a multiplier factor, N, of the input reference mean frequency:

$$Fout = (N)(Fin) \qquad \text{(eq. 1)}$$

Where:
    Fout is the mean output frequency (in MHz)
    N is the multiplier factor
    Fin is the input reference mean frequency (in MHz)

A PLL output signal frequency accuracy, Fouta, expressed as ±PPM (parts per million) deviation relative to the output target mean frequency is equal to the input accuracy expressed as ±PPM deviation relative to the input target reference mean frequency. This due to the PLL locking both phase and frequency to the input signal.

$$\text{Fouta (output frequency } \pm \text{ PPM)} = \text{Fina (input frequency } \pm \text{ PPM)} \qquad \text{(eq. 2)}$$

Where:

Fouta is the output deviation ($\pm$ PPM relative to the output target mean frequency)

Fina is the input deviation ($\pm$ PPM relative to the input target reference mean frequency)

If the input signal deviates $\pm 20$ PPM from the input mean frequency, the output reference will deviate $\pm 20$ PPM from the output mean frequency, regardless of the PLL's N loop multiplier factor. When frequency accuracy boundaries are expressed in Hertz (or MHz), they get multiplied by N, the PLL loop multiplier factor.

For example:

An NB4N507 PLL with a multiplier factor of 8 has an input reference crystal frequency of 16 MHz with $\pm 20$ PPM accuracy. What is the output accuracy and frequency?

The output mean frequency, Fout, will be Fin times 8, the multiplier factor according to Equation 1.

$$Fout = (N)(Fin)$$
$$= 8 \ (16 \times 10^{\wedge} 6)$$
$$= 128 \ MHz$$

Since the mean input frequency (Fin) of 16 MHz signal has the accuracy, Fa, of $\pm 20$ PPM, the input signal deviation Fina is $\pm 320$ Hertz:

$$Fina = (Fin)(Fa) \qquad (eq. 3)$$
$$= (16 \times 10^{\wedge} 6)(\pm 20 \times 10^{\wedge} -6)$$
$$= \pm 320 \ Hertz$$

The crystal frequency will range from 16.00032 MHz (or 16,000,320 Hz) to 15.99968 MHz (or 15,999,680 Hz).

Output frequency signal (Fout) of 128 MHz also has accuracy, Fa, of $\pm 20$ PPM, and will deviate $\pm 2560$ Hertz:

$$Fouta = (Fout)(Fa) \qquad (eq. 4)$$
$$= (128 \times 10^{\wedge} 6)(\pm 20 \times 10^{\wedge} -6)$$
$$= \pm 2560 \ Hertz$$

The output frequency will range from 128.00256 MHz (or 128,002,560 Hz) to 127.99744 MHz (or 127,997,440 Hz). Precision was not considered in this example.

## Jitter

A stable PLL–based frequency synthesizer will display output frequency stability primarily determined by the crystal specifications, while presenting a characteristic additive Rj (random jitter) magnitude greater than the crystal spec. Output Jitter magnitude may be specified as Rj(RMS), Cycle–to–Cycle (RMS), Period (RMS), or total jitter (Peak–to–Peak) is measured time units, typically as ps.

Random Jitter (Rj) is a stochastic deviation in the edge placement from an ideal reference. This measurement is often made in the time domain on an accumulation of instantaneous waveforms (typ. 10,000). When measuring frequency, true Gaussian Rj (random jitter) is always present and must always sum to zero, whereas the magnitude measurement of Rj (random jitter) is an independent parameter to frequency. Period jitter is an accumulation (typ. 10,000) of instantaneous deviations in the waveform period from ideal reference locations

Alternatively, the jitter measurement may be derived from frequency domain Phase Noise summation, usually across a specified offset measurement frequency band from the ideal reference, or carrier. Sampling time close to the carrier becomes impractically long, limiting the measurement band lower cutoff. The upper measurement band cutoff becomes limited by approaching the residual noise floor.

Any crystal shock or vibration can produce large phase deviations. Supply noise, crosstalk, and EMI can affect jitter.

## Summary

A System Clock Tree may consist of one or several Crystal Oscillator Clocks (XOs) which may be replaced by a PLL Synthesizer Clock and divider. Each PLL Synthesizer Clock output frequency may be further divided down to provide a replacement for two or more different Crystal Oscillator Clocks (XOs).

EXAMPLE 1)

DESIGN A has four separate Crystal Oscillator Clocks (XOs) and four Xtals:

    (2)   16 MHz XO

    (1)   32 MHz XO

    (1)   128 MHz XO

Compared to DESIGN B with one Crystal Oscillator Clock (XOs) and one Xtal:

    (1)   16 MHz Xtal on NB4N507 PLL with X8 selected for 128 MHz

    (1)   NB6L230 $\div 4$ (32 MHz) and $\div 8$ (16 MHz)

    (1)   MC100EP11 (1:2 Fanout of 16 MHz)

EXAMPLE 2)

DESIGN C has three separate Crystal Oscillator Clocks (XOs) and three Xtals:

    (1)   200 MHz XO

    (1)   100 MHz XO

    (1)   50 MHz XO

Compared to DESIGN D with one Crystal Oscillator Clock (XOs) and one Xtal:

    (1)   25 MHz Xtal on NB4N507 PLL with X8 selected for 200 MHz

    (1)   Use the 200 MHz into a MC100LVEP34 with $\div 2$ (100 MHz) and $\div 4$ (50 MHz)

**ON Semiconductor** and  Ⓜ  are registered trademarks of Semiconductor Components Industries, LLC (SCILLC).  SCILLC reserves the right to make changes without further notice to any products herein.  SCILLC makes no warranty, representation or guarantee regarding the suitability of its products for any particular purpose, nor does SCILLC assume any liability arising out of the application or use of any product or circuit, and specifically disclaims any and all liability, including without limitation special, consequential or incidental damages. "Typical" parameters which may be provided in SCILLC data sheets and/or specifications can and do vary in different applications and actual performance may vary over time.  All operating parameters, including "Typicals" must be validated for each customer application by customer's technical experts.  SCILLC does not convey any license under its patent rights nor the rights of others.  SCILLC products are not designed, intended, or authorized for use as components in systems intended for surgical implant into the body, or other applications intended to support or sustain life, or for any other application in which the failure of the SCILLC product could create a situation where personal injury or death may occur.  Should Buyer purchase or use SCILLC products for any such unintended or unauthorized application, Buyer shall indemnify and hold SCILLC and its officers, employees, subsidiaries, affiliates, and distributors harmless against all claims, costs, damages, and expenses, and reasonable attorney fees arising out of, directly or indirectly, any claim of personal injury or death associated with such unintended or unauthorized use, even if such claim alleges that SCILLC was negligent regarding the design or manufacture of the part.  SCILLC is an Equal Opportunity/Affirmative Action Employer.  This literature is subject to all applicable copyright laws and is not for resale in any manner.

## PUBLICATION ORDERING INFORMATION

**LITERATURE FULFILLMENT**:
  Literature Distribution Center for ON Semiconductor
  P.O. Box 5163, Denver, Colorado 80217 USA
  **Phone**: 303−675−2175 or 800−344−3860 Toll Free USA/Canada
  **Fax**: 303−675−2176 or 800−344−3867 Toll Free USA/Canada
  **Email**: orderlit@onsemi.com

**N. American Technical Support**: 800−282−9855 Toll Free
  USA/Canada
**Europe, Middle East and Africa Technical Support:**
  Phone: 421 33 790 2910
**Japan Customer Focus Center**
  Phone: 81−3−5773−3850

**ON Semiconductor Website: www.onsemi.com**

**Order Literature**: http://www.onsemi.com/orderlit

For additional information, please contact your local
Sales Representative

Exhibit 8

US007538625B2

(12) **United States Patent**
Cesky et al.

(10) Patent No.: **US 7,538,625 B2**
(45) Date of Patent: **May 26, 2009**

(54) **METHOD AND ENHANCED PHASE LOCKED LOOP CIRCUITS FOR IMPLEMENTING EFFECTIVE TESTING**

(75) Inventors: **Michael David Cesky**, Rochester, MN (US); **James David Strom**, Rochester, MN (US)

(73) Assignee: **International Business Machines Corporation**, Armonk, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 135 days.

(21) Appl. No.: **11/679,323**

(22) Filed: **Feb. 27, 2007**

(65) **Prior Publication Data**

US 2008/0204154 A1     Aug. 28, 2008

(51) **Int. Cl.**
*H03L 7/00* (2006.01)
*H03L 7/06* (2006.01)
(52) **U.S. Cl.** ............................ **331/51**; 331/18; 331/25; 331/16; 327/156; 327/157
(58) **Field of Classification Search** ................. 331/18, 331/25, 16, 34, 51, 10
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,757,240 A * 5/1998 Boerstler et al. .............. 331/34
2008/0007348 A1 1/2008 Huang et al.

* cited by examiner

*Primary Examiner*—Rexford Barnie
*Assistant Examiner*—Thienvu V Tran
(74) *Attorney, Agent, or Firm*—Joan Pennington

(57) **ABSTRACT**

A method and enhanced phase-locked loop (PLL) circuit enable effective testing of the PLL. A phase frequency detector generates a differential signal, receiving a reference signal and a feedback signal of an output signal of the PLL circuit. A charge pump is coupled to the phase frequency detector receiving the differential signal. The charge pump applies either negative or positive charge pulses to a low-pass filter, which generates a tuning voltage input applied to a voltage controlled oscillator. A first divider is coupled to the voltage controlled oscillator receives and divides down the VCO output signal, providing the output signal of the PLL circuit. A second divider receives the output signal of the PLL circuit and provides the feedback signal to the phase frequency detector. The output signal of PLL circuit is applied to a clock distribution.

12 Claims, 4 Drawing Sheets

300



PRIOR ART



## FIG. 1

PRIOR ART



# FIG. 2



<u>FIG. 3</u>

| FOUT (MHZ) | FRACTIONAL-N DIVIDER (F=1...5, K=1, N=10) | FVCO(MHZ) |
|---|---|---|
| 750 | (10+1/1) | 7575 |
| 750 | (10+1/2) | 7875 |
| 750 | (10+1/3) | 7750 |
| 750 | (10+1/4) | 7687.5 |
| 750 | (10+1/5) | 7650 |

# FIG. 4

US 7,538,625 B2

**1**

## METHOD AND ENHANCED PHASE LOCKED LOOP CIRCUITS FOR IMPLEMENTING EFFECTIVE TESTING

### FIELD OF THE INVENTION

The present invention relates generally to the data processing field, and more particularly, relates to a method and apparatus for implementing enhanced phase-locked loop (PLL) circuits enabling effective testing.

### DESCRIPTION OF THE RELATED ART

Phase-Locked Loop circuits are used in frequency synthesizers to provide an output signal that has a selectable, precise, and stable frequency with low frequency spurs and good phase noise. The phase-locked loop output signal may connect to the clock distribution of a games or server processor chip or provide the clock for a high speed IO interface and many other applications.

When a PLL is locked, a simple phase-frequency detector can send out a small glitching pulse every reference clock cycle. The charge pump reacts to this glitch the same way it reacts to any other input, it changes the control voltage and current, which causes a glitch in the control voltage and charge pump current. This causes the VCO frequency to change.

Phase-Locked Loops are designed, optimized, and characterized within the scope and specifications of the chips they are integrated in; the robustness of the design is rarely tested. During a time when chip designs are being used in many applications, only slightly altered, knowing the full strength and capabilities of components within the chip, especially phase-locked loops, becomes more beneficial to circuit designers. A need exists to characterize the robustness of phase-locked loops and to create a design that enables effective phase-locked loop characterization.

During phase-locked loop characterization, it is essential to run exercisers on the rest of the chip while taking characterization measurements for the phase-locked loop circuit. Exercisers including various host programs and interactive utilities are used in a comprehensive test strategy and system verification testing for hardware (HW), software and firmware (FW) elements in integrated circuit chips and systems. Existing exercisers such as Trash, IDE, TNK, HTX or AVP can be used for chip testing during phase-locked loop characterization.

Exercisers run commands simultaneously and continuously on chips creating noise, the created noise generates jitter within phase-locked loops. For example, the noise from running a microprocessor with the exercisers or during functional operation is difficult to recreate in a test site or pad cage environment.

Exercisers will stop running or crash when one tries to input a frequency greater than the chip can handle; this is a dilemma in fully testing the robustness of phase-locked loops because traditionally, phase-locked loops are capable of running significantly faster than the rest of the chip. For single-use chips, the phase-locked loop would not be fully tested outside the chips frequency range.

However, with today's multiple applications for chips, to identify the limitations and capabilities of phase-locked loop designs would be very beneficial. Therefore, a design that provides the ability to test the phase-locked loops at frequencies above the chips frequency range while still running exercisers is necessary.

**2**

### SUMMARY OF THE INVENTION

A principal aspect of the present invention is to provide a method and enhanced phase-locked loop (PLL) circuit for implementing effective testing. Other important aspects of the present invention are to provide such method and enhanced phase-locked loop (PLL) circuit substantially without negative effect and that overcome many of the disadvantages of prior art arrangements.

In brief, a method and enhanced phase-locked loop (PLL) circuit are provided for implementing effective testing. A phase frequency detector generates a differential signal, receiving a reference signal and a feedback signal of an output signal of the PLL circuit. A charge pump is coupled to the phase frequency detector receiving the differential signal. The charge pump applies either negative or positive charge pulses to a low-pass filter depending on whether the reference signal phase leads or lags the phase of the output feedback signal and generates a tuning voltage input applied to a voltage controlled oscillator. A first divider is coupled to the voltage controlled oscillator receives and divides down the VCO output signal, providing the output signal of the PLL circuit. A second divider receives the output signal of the PLL circuit and provides the feedback signal to the phase frequency detector. The output signal of PLL circuit is applied to a clock distribution.

In accordance with features of the invention, the first divider is a fractional-N divider. The first divider allows the phase-locked loop VCO output signal to vary in a frequency range much greater than a maximum frequency at the clock tree. The output signal of the PLL circuit is N-divided and compared to the reference signal at the phase frequency detector.

In accordance with features of the invention, the phase-locked loop is enabled to vary in frequency range significantly higher than the frequency capabilities of the clock tree, while maintaining the use of exercises and the generation of real noise during testing the phase-locked loop. The robustness of the phase-locked loop circuit can be tested and its usefulness in multiple applications can be identified.

### BRIEF DESCRIPTION OF THE DRAWINGS

The present invention together with the above and other objects and advantages may best be understood from the following detailed description of the preferred embodiments of the invention illustrated in the drawings, wherein:

FIG. 1 is a prior art phase-locked loop circuit including a feedback N divider;

FIG. 2 is a prior art phase-locked loop circuit including a feedback fractional-N divider;

FIG. 3 illustrates an exemplary phase-locked loop circuit including a first and second divider in accordance with the preferred embodiment; and

FIG. 4 illustrates exemplary operation of the first divider of the phase-locked loop circuit of FIG. 3 in accordance with the preferred embodiment.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. 1 illustrates a basic phase-locked loop circuit. The basic phase-locked loop circuit receives a reference signal from a reference oscillator 102, and includes a phase/frequency detector 104 coupled to a charge pump 106, a low-pass filter (LPF) 108, a voltage-controlled oscillator 110, and a feedback divider or N divider 112. The phase/frequency

US 7,538,625 B2

3

detector **104** takes a reference signal and generates an output voltage that is proportional to the phase difference between the input reference signal and the output signal fed back from the VCO **110**. The charge pump **106** then delivers either positive or negative charge pulses to the low-pass filter **108** depending on whether the reference signal phase leads or lags the phase of the feedback of the VCO output signal. These charge pulses are integrated by the low-pass filter **108** to generate a tuning voltage input into the VCO **110**. The output frequency of the VCO **110** moves up or down based upon the tuning voltage in order to synchronize with the reference signal. Typically, the tuning voltage from the loop filter **108** moves higher or more positive to advance the VCO output phase and make its frequency higher and vice versa for the down voltages. The VCO output signal, FOUT, is related to the reference signal, FREF by the relationship FOUT=N*FREF, where N represents the feedback divider **112**. Table 1 shows frequencies attainable with integer-N dividers.

TABLE 1

| FREF (MHz) | Integer-N (N = 2 . . . 6) | FOUT (MHz) |
|---|---|---|
| 10 | 2 | 20 |
| 10 | 3 | 30 |
| 10 | 4 | 40 |
| 10 | 5 | 50 |
| 10 | 6 | 60 |

In a basic design, the phase-locked loop varies in frequency, the clock distribution of a game or server processor chip, high speed IO interface, or other application is fixed in frequency, and the feedback divider to the phase-locked loop is a fixed integer, N, value. This setup does not allow the phase-locked loop to run at frequencies greater than the clock tree paths can handle. With the N divider, N is an integer and therefore, the smallest increment in the VCO output frequency value is equal to the magnitude of the reference frequency. In order to have small step sizes between adjacent output frequencies, a very low reference frequency would be required. This, however, would introduce a limited frequency range and a long settling time for the phase-locked loop. A low reference frequency does not allow characterizing the inter-chip interfaces at high frequencies.

FIG. **2** illustrates a conventional fractional-N divider that is needed to provide a rational multiple of the reference signal frequency and allow for smaller step sizes. The basic fractional-N divider phase-locked loop circuit receives a reference signal from a reference oscillator **202**, and includes a phase/frequency detector **204** coupled to a charge pump **206**, a low-pass filter (LPF) **208**, a voltage-controlled oscillator **210**, and a feedback divider or fractional-N divider **212**. In a basic fractional-N phased-lock loop, the VCO output signal, FOUT is related to the reference signal, FREF, by the relationship FOUT=FREF*(N+K/F), where N is the integer divider, F is the fractional modulus of the circuit, such as an 8 would indicate a $\frac{1}{8}^{th}$ fractional resolution, and K is the fractional channel of operation. Table 2 shows frequencies attainable with fractional-N dividers.

TABLE 2

| $F_{REF}$ (MHz) | Fractional-N (F = 1 . . . 5, K = 1, N = 10) | $F_{VCO}$ (MHz) |
|---|---|---|
| 10 | (10 + ⅟₁) | 110 |
| 10 | (10 + ½) | 105 |

4

TABLE 2-continued

| $F_{REF}$ (MHz) | Fractional-N (F = 1 . . . 5, K = 1, N = 10) | $F_{VCO}$ (MHz) |
|---|---|---|
| 10 | (10 + ⅓) | 103.33 |
| 10 | (10 + ¼) | 102.5 |
| 10 | (10 + ⅕) | 102 |

In accordance with features of the invention, a method and phase-locked loop (PLL) circuit are provided for testing the robustness of the PLL design. The phase-locked loop (PLL) circuit of the invention enables the complete and effective characterization of components within the chip, specifically including the phase-locked loop. This invention allows the robustness of the phase-locked loop to be fully tested. By altering the loop in the phase-locked loop to include a fractional-N divider prior to the clock distribution tree and an integer-N divider prior to the phase/frequency detector, it is possible with the phase-locked loop (PLL) circuit of the invention to fully characterize the phase-locked loop while still running exercisers.

Having reference now to the drawings, in FIG. **3**, there is shown an exemplary phase-locked loop (PLL) circuit generally designated by the reference character **300** in accordance with the preferred embodiment. The phase-locked loop (PLL) circuit **300** is arranged for implementing enabling effective testing in accordance with the preferred embodiment. The PLL circuit **300** includes a reference oscillator **302** coupled to a phase frequency detector The phase frequency detector **304** generates a differential signal, receiving a reference signal and a feedback signal of an output signal of the PLL circuit **300**. A charge pump **306** is coupled to the phase frequency detector **304** receiving the differential signal. The charge pump **306** applies either negative or positive charge pulses to a low-pass filter **308** depending on whether the reference signal phase leads or lags the phase of the output feedback signal and generates a tuning voltage input applied to a voltage controlled oscillator (VCO) **310**.

A first divider **312** coupled to the voltage controlled oscillator (VCO) **310**, receives and divides down the VCO output signal, providing the output signal FOUT of the PLL circuit **300**. The PLL circuit **300** includes a second divider **314** receives the output signal of the PLL circuit and provides the feedback signal to the phase frequency detector **304**. The output signal FOUT of the PLL circuit **300** is applied to a clock distribution or clock tree **316**.

In accordance with features of the invention, the phase-locked loop (PLL) circuit **300** includes the reference signal entering the phase-locked loop as normal, and exiting to a fractional-N divider. This added fractional-N divider **312** allows the operation frequency of the phase-locked loop to vary significantly while still maintaining a fixed frequency FOUT at the clock tree **316**. The location of FOUT that the clock tree normally sees is now after the fractional-N divider **312**. The FOUT signal is also N-divided and compared to the reference signal at the phase frequency detector **304** like a typical phase-locked loop. The new loop configuration of the phase-locked loop (PLL) circuit **300** allows the phase-locked loop to vary in frequency range well outside the capabilities of the clock tree **316**, thus, enabling the use of exercises and the generation of real noise to the phase-locked loop. The robustness of the phase-locked loop circuit **300** can now be tested and its usefulness in multiple applications can be realized. Also, the need for separate hardware to characterize the phase-locked loop circuit **300** and understand its usefulness is not as urgent and necessary. This new design makes transi-

US 7,538,625 B2

5

tions to a new application and reuse of the current design for separate chips easier for phase-locked loop designers.

In the PLL circuit **300**, the first divider **312** of the preferred embodiment is a fractional-N divider. The second divider **314** is an integer-N divider and is the feedback divider of the PLL circuit **300**.

The VCO output signal, FVCO, is related to the output signal, FOUT, by the relationship FVCO=FOUT*(N+K/F), where N is an integer, F is the fractional modulus of the fractional-N divider **312**, and K/F represents fractional resolution such as with, K of 1 and F equal to 8 indicates a ⅛$^{th}$ fractional resolution.

FIG. **4** shows exemplary frequencies attainable with fractional-N divider As can be appreciated from FIG. **4**, the VCO output signal, FVCO, is divided down by the fractional-N divider **312** to provide the output signal, FOUT that is applied to the clock tree **316**.

The new loop configuration of PLL circuit **300** allows the phase-locked loop VCO output signal to vary in frequency range much greater than the capabilities of the clock tree **316**, thus, maintaining the use of exercises and the generation of real noise to the phase-locked loop being tested and fully characterized. The previous PLL designs, such as shown in FIGS. **1** and **2**, would cause exercisers to crash and halt the generation of real noise from the rest of the chip.

While the present invention has been described with reference to the details of the embodiments of the invention shown in the drawing, these details are not intended to limit the scope of the invention as claimed in the appended claims.

What is claimed is:

**1.** A phase-locked loop (PLL) circuit comprising:

a phase frequency detector receiving a reference signal and a feedback signal of an output signal of the PLL circuit, said phase frequency detector generating a differential signal,

a charge pump coupled to said phase frequency detector receiving said differential signal, said charge pump generating either negative or positive charge pulses responsive to said reference signal and said output feedback signal,

a low-pass filter coupled to said charge pump, said low-pass filter generating a tuning voltage,

a voltage controlled oscillator coupled to said low-pass filter receiving said tuning voltage, said voltage controlled oscillator generating a VCO output signal,

a first divider coupled to the voltage controlled oscillator receiving and dividing down said VCO output signal, said first divider providing the output signal of the PLL circuit;

a second divider receiving the output signal of the PLL circuit and providing said feedback signal to said phase frequency detector; and the output signal of the PLL circuit being applied to a clock tree, and

wherein said first divider is configured to allow the phase-locked loop VCO output signal to vary in a frequency range much greater than a maximum frequency at the clock tree.

**2.** The phase-locked loop (PLL) circuit as recited in claim **1** wherein said first divider is a fractional-N divider.

**3.** The phase-locked loop (PLL) circuit as recited in claim **1** wherein said output signal of PLL circuit is N-divided by said second divider and compared to the reference signal by said phase frequency detector.

**4.** The phase-locked loop (PLL) circuit as recited in claim **1** wherein said second divider is an integer-N divider.

6

**5.** A phase-locked loop (PLL) circuit comprising:

a phase frequency detector receiving a reference signal and a feedback signal of an output signal of the PLL circuit, said phase frequency detector generating a differential signal,

a charge pump coupled to said phase frequency detector receiving said differential signal, said charge pump generating either negative or positive charge pulses responsive to said reference signal and said output feedback signal,

a low-pass filter coupled to said charge pump, said low-pass filter generating a tuning voltage,

a voltage controlled oscillator coupled to said low-pass filter receiving said tuning voltage, said voltage controlled oscillator generating a VCO output signal,

a first divider coupled to the voltage controlled oscillator receiving and dividing down said VCO output signal, said first divider providing the output signal of the PLL circuit;

a second divider receiving the output signal of the PLL circuit and providing said feedback signal to said phase frequency detector; and the output signal of the PLL circuit being applied to a clock tree, and

said phase-locked loop VCO output signal having an operating frequency range greater than a maximum frequency at the clock tree, enabling the use of exercisers and noise generation during phase-locked loop testing within said operating frequency range.

**6.** The phase-locked loop (PLL) circuit as recited in claim **5** wherein said first divider is a fractional-N divider, said fractional-N divider represented by (N+K/F), where N represents an integer, F represents a fractional modulus, and K/F represents a fractional resolution of said first divider.

**7.** A method for implementing testing of a phase- locked loop (PLL) circuit including a phase frequency detector receiving a reference signal and a feedback signal of an output sinal of the PLL circuit, said phase frequency detector generating a differential signal, a charge pump coupled to said phase frequency detector receiving said differential signal, said charge pump generating either negative or positive charge pulses responsive to said reference signal and said output feedback signal, a low-pass filter coupled to said charge pump, said low-pass filter generating a tuning voltage, a voltage controlled oscillator coupled to said low-pass filter receiving said tuning voltage, said voltage controlled oscillator generating a VCO output signal, said method comprising the steps of:

providing a first divider coupled to the voltage controlled oscillator receiving and dividing down said VCO output signal, said first divider providing the output signal of the PLL circuit, and

providing a second divider coupled to said first divider receiving the output signal of the PLL circuit and providing the feedback signal to said frequency detector;

applying the first divider output signal of PLL circuit to a clock tree; and said phase-locked loop VCO output signal having an operating frequency range greater than a maximum frequency at the clock tree, further enabling the use of exercisers and noise generation during phase-locked loop testing within said operating frequency range.

**8.** The method for testing a phase-locked loop (PLL) circuit as recited in claim **7** wherein providing said first divider includes providing a fractional-N divider.

US 7,538,625 B2

7

**9**. The method for testing a phase-locked loop (PLL) circuit as recited in claim **8** wherein said fractional-N divider represented by (N+K/F), where N represents an integer, F represents a fractional modulus, and K/F represents a fractional resolution of said first divider.

**10**. The method for testing a phase-locked loop (PLL) circuit as recited in claim **7** wherein providing said second divider includes providing an integer-N divider.

**11**. The method for testing a phase-locked loop (PLL) circuit as recited in claim **10** wherein said output signal of

8

PLL circuit is N-divided by said second divider and the N-divided output signal is compared to the reference signal by the phase frequency detector.

**12**. The method for testing a phase-locked loop (PLL) circuit as recited in claim **7** wherein said first divider allows the phase-locked loop VCO output signal to vary in a frequency range much greater than a maximum frequency at the clock tree.

\*  \*  \*  \*  \*